**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE OF NAACP;<br>DISABILITY RIGHTS SOUTH CAROLINA;<br>JUSTICE 360;<br>*Plaintiffs*,<br>v.<br>SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE;<br>EDEN HENDRICK, individually and in her official capacity as Executive Director of the South Carolina Department of Juvenile Justice;<br>*Defendants*. | Case No.: 0:22-cv-01338-MGL-PJG |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs South Carolina State Conference of NAACP, Disability Rights South Carolina, and Justice 360 ("Plaintiffs"), by counsel, and for their Complaint against Defendants South Carolina Department of Juvenile Justice ("DJJ") and Eden Hendrick, allege as follows:

## INTRODUCTION

1. Children detained by South Carolina are in danger. DJJ is charged with providing these children with custodial care and rehabilitation. Instead, it subjects them to prolonged isolation and endemic violence at facilities that are overcrowded, unsanitary, and bereft of educational and rehabilitative services.

2. Children in DJJ's custody are detained in nightmarish conditions. There is sewage water in the cells, feces on the floor, and cockroaches in the food. Youth-on-youth violence is routine, and staff often use violence against the children they are supposed to supervise and protect. DJJ's policies, procedures, and practices enable the limited staff on hand to look the other way when violence occurs, rather than keep children safe. Instead of curtailing

violence, many staff resort to "protecting" youth by placing them in solitary confinement for 23 hours a day. Prolonged isolation likewise has become a default management tool to address even the most minor infractions.

3. Under these conditions, educational opportunities for detained youth are illusory. On the rare days DJJ is fully staffed, detained youth have a limited class schedule. But far more often, the class schedule is disregarded due to inadequate staffing and the uncontrolled violence described in this Complaint. The inadequate education provided by DJJ has been particularly damaging for the many children who suffer from learning impairments and/or physical disabilities.

4. DJJ officials have violated federal law and the Fourteenth Amendment of the U.S. Constitution. This is not the first time. In the 1960s, a Pulitzer Prize winning journalist exposed the "horrible beyond belief" living conditions in South Carolina's juvenile justice facilities and described how boys were regularly "beaten with fists, rubber hoses, ropes . . . and other weapons." In 1990, DJJ was sued for violating the constitutional and statutory rights of the children in its care. In 1995, it lost that lawsuit and was required to submit a remedial plan and implement policy changes to meet minimally acceptable standards at its facilities. Yet problems persisted. In 2002, South Carolina paid $1.1 million to settle claims that children as young as ten years old had been sexually assaulted at DJJ facilities. In 2017, a legislative audit revealed that DJJ facilities continued to be violent and dangerous and that youth experienced beatings, abuse, extended periods of isolation, and unsafe living conditions. A subsequent legislative audit showed that these conditions continued from 2017-2019. In 2020, the United States Department of Justice ("DOJ") released a report and notice detailing "numerous, specific, and repeated violations of the Fourteenth Amendment" at the Broad River Road Complex ("BRRC")—including 134 fights and 71 assaults over a less than one-year period.

5. On April 14, 2022, DOJ and DJJ filed a settlement agreement resolving DOJ's investigation into unconstitutional conditions at the BRRC. The agreement seeks to remedy

some of the violence and overuse of isolation at that facility. But by the agreement's terms, DJJ can avoid making necessary changes until 2024. Furthermore, the agreement is limited to the BRRC and does not address unconstitutional conditions at DJJ's four other secure facilities.

6. Despite decades' worth of findings and multiple interventions, DJJ has failed to maintain adequate conditions in any of its secure facilities. South Carolina's children deserve better—right now. Plaintiffs and the detained youth they represent seek immediate injunctive relief requiring DJJ to provide constitutionally adequate conditions of confinement: clean water, dry beds, healthy food, safety from violence, freedom from solitary confinement, meaningful access to education and mental health resources, and accommodations for children with disabilities. If DJJ cannot comply with these constitutional minima, then Plaintiffs seek an order compelling the release of children from custody to whatever degree is necessary to ensure that DJJ can provide a safe, secure, and rehabilitative environment to those who remain in its care.

## PARTIES

### Plaintiffs

7. Plaintiffs are some of South Carolina's most prominent civil rights organizations. They serve, represent, and work daily with detained youth in South Carolina.

8. The South Carolina State Conference of the NAACP ("South Carolina NAACP") is a nonprofit, nonpartisan membership organization in South Carolina. The South Carolina NAACP is a state conference branch of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. The South Carolina NAACP was chartered in 1939 and is the oldest civil rights group in South Carolina. The South Carolina NAACP has more than 12,000 members; at least one of those members is the parent of a child currently detained in a DJJ facility.

9. Consistent with the national NAACP's mission, the South Carolina NAACP, on behalf of its members and the other constituents it serves, advocates for a society in which all individuals have equal rights, all children have access to a free, high quality public education,

and all persons are free from disproportionate incarceration and racially motivated practices. The South Carolina NAACP has seen its mission substantially impaired by DJJ's policies and practices challenged in this lawsuit. The majority of the children detained—and traumatized—by DJJ are Black. DJJ's failure to keep these children safe or to provide them with basic rehabilitative services harms the South Carolina NAACP's efforts to promote greater equality across the state.

10. Disability Rights South Carolina, Inc. ("DRSC") is a South Carolina nonprofit corporation with principal offices in Columbia. DRSC is South Carolina's Protection and Advocacy system ("P&A"), as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 *et seq.*; the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*; and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e *et seq*. The DD Act authorizes P&A systems to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. *See* 42 U.S.C. § 15043(a)(2)(A)(i). The PAIMI Act authorizes P&A systems to pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State. *See* 42 U.S.C. § 10805(a)(1)(C).

11. DRSC operates to protect and advance the legal, civil, and human rights of people with disabilities in South Carolina. It has been harmed by DJJ's persistent constitutional and statutory violations. DRSC represents all disabled children within DJJ custody. DJJ has directly harmed these children by failing to protect them, by exposing them to unreasonable dangers, by forcing them to endure prolonged periods of isolation, and by failing to provide them with adequate services. This has meaningfully impaired DRSC's ability to carry out its organizational mission of advocating for detained youth who are disabled and in the custody of DJJ. The interest DRSC seeks to protect through its participation in this action—to ensure that DJJ meets

its constitutional and statutory obligations to disabled minors in DJJ custody—is germane to DRSC's purpose.

12. Justice 360 is a South Carolina nonprofit organization headquartered in Columbia. Its mission is to promote fairness, reliability, and transparency in the criminal justice system for children facing lengthy sentences and individuals facing the death penalty in South Carolina.

13. Justice 360 provides direct representation to children in the custody of DJJ and the South Carolina Department of Corrections. Justice 360 also provides legal resources and engages in public education and advocacy around youth detention and capital punishment. The interest Justice 360 seeks to protect in this action—that DJJ complies with its constitutional and statutory obligations to minors in DJJ custody—is germane to its purpose. Justice 360's ability to carry out its mission, including direct representation of children in DJJ custody, has been substantially impaired by DJJ's constitutional and statutory violations.

14. The South Carolina NAACP, DRSC, and Justice 360 all provide legal and other services to youth who are or may in the future be in the custody of DJJ.

**Defendants**

15. The South Carolina Department of Juvenile Justice ("DJJ") is the state agency responsible for providing custodial care and rehabilitation to children who are incarcerated, on probation or parole, or in community placement for a criminal status offense. *See* S.C. Code Ann. §§ 63-19-310, 63-19-350. DJJ is a "state education agency" pursuant to 34 C.F.R. § 300.2(b)(1)(ii). It is responsible for the education of all detained youth in its custody. In addition to its statutorily mandated rehabilitative function, DJJ operates its own school district that serves youth in DJJ custody.

16. L. Eden Hendrick is the Interim Executive Director of the South Carolina Department of Juvenile Justice. Hendrick was appointed by Governor Henry McMaster on February 22, 2022. Prior to her tenure as Interim Executive Director, Hendrick served as Acting Director of DJJ.

## JURISDICTION AND VENUE

17. This action arises under the Fourteenth Amendment to the United States Constitution; the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (the "IDEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. (the "ADA"); and the Rehabilitation Act, 29 U.S.C. § 705 *et seq*.

18. Plaintiffs' Fourteenth Amendment claims for relief are predicated on 42 U.S.C. § 1983, which authorizes actions to redress the deprivation under color of state law of rights, privileges, and immunities secured by the Constitution and laws of the United States.

19. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as well as 42 U.S.C. § 1983.

20. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs have occurred in the District of South Carolina and Defendants are located in the District.

21. Venue is proper in the Columbia division under Local Rule 3.01 because a substantial portion of the events or omissions giving rise to the claims occurred in this division.

## FACTUAL ALLEGATIONS

### South Carolina's Juvenile Justice System

22. South Carolina's juvenile justice system is operationally and philosophically distinct from the adult criminal justice system. Under South Carolina law, DJJ is responsible for "providing or arranging for necessary services *leading to the rehabilitation*" of the youth in its custody. S.C. Code Ann. § 63-19-350(7) (emphasis added). Accordingly, the juvenile system's principal purpose is to manage youth under a strategy of redirection and rehabilitation, rather than punishment. As this Court has explained, "[t]he Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment." *Alexander S. By and Through*

*Bowers v. Boyd*, 876 F. Supp. 773, 796 n.42 (D.S.C. 1995) (citing *Kent v. United States*, 383 U.S. 541, 554-55 (1966)).

23. DJJ was established to provide "custodial care and rehabilitation" to children in South Carolina. On its website, DJJ claims to "operate[] its own accredited school district, help[] youth pursue career and workforce development opportunities, show[] youth how to make a positive impact on their local communities, and provide[] rehabilitative and recreational services tailored to the individual needs of each young person under agency supervision."

24. DJJ takes custody of children 17 years or younger when they are detained by law enforcement or referred to DJJ by a school or solicitor (a state prosecutor). Typically, DJJ interviews a child and then makes a recommendation to the solicitor about their case. The solicitor then chooses whether and how to prosecute the case. Among other options, the solicitor can divert the child to a community program or require them to make restitution.

25. If the solicitor chooses to prosecute the child, the child is sent to family court for what is known as a "disposition," in which a judge adjudicates whether the child is guilty, or "delinquent." If a child is adjudicated delinquent, the judge can send the child to DJJ custody for either a fixed or indeterminate sentence. Often, prior to a child's commitment to a DJJ facility, the judge will request an evaluation of the child. This entails psychological, social, and educational assessments and occurs either in the community or at one of DJJ's evaluation centers.

26. If a child is adjudicated delinquent but has a severe mental illness, the child cannot legally be detained under South Carolina law. S.C. Code Ann. § 63-19-1450.

**<u>DJJ's Past Constitutional and Statutory Violations</u>**

27. DJJ has a well-documented history of violent and unsafe conditions for children in its custody. In the late 1960s, Pulitzer Prize winning reporter Howard James exposed how, in South Carolina's juvenile facilities, boys were "beaten with fists, rubber hoses, ropes, broken hoe handles and broom handles, and other weapons." That violence, along with substandard living

conditions, caused James to observe that juvenile justice facilities in South Carolina were "horrible beyond belief."

28. By the 1990s, little had improved. In 1995, a group of law firms and civil rights organizations representing children incarcerated in various DJJ facilities successfully sued DJJ in this Court. They alleged that the conditions of confinement at DJJ deprived detained youth of their statutory rights and violated their constitutional rights to due process, equal protection, and freedom from cruel and unusual punishment. *See Alexander S.*, 876 F. Supp. at 776.

29. The Court agreed. It found that DJJ facilities were routinely overcrowded, lacked adequate staffing, and confined detainees in a manner that created fire hazards. *Id.* at 779-80, 791-92. It found that DJJ facilities failed to offer children with disabilities adequate education, failed to implement their Individualized Education Plans ("IEPs") as required by law, and failed to provide adequate medical care. *Id.* at 788-89. It noted the lack of hygienic conditions in the facilities—"several juveniles, and even the food services director, testified that frequently cockroaches and other foreign matter are present in the food served to juveniles." *Id.* at 787. And it "determined that in many cases the rehabilitative efforts of DJJ are not working and that juveniles are often returned to society more prone to commit crimes than they were before their incarceration." *Id.* at 780.

30. Based on these conditions of confinement at DJJ facilities, the Court held that DJJ had violated the constitutional and statutory rights of the children in its care. It issued an injunction requiring DJJ to submit a remedial plan and implement policy changes to meet minimally acceptable standards at its facilities. *Id.* at 804. DJJ entered into a consent decree with the plaintiffs in which a court-appointed monitor oversaw the state's treatment of children in its custody.

31. Despite this decree, violence in DJJ facilities continued. In the two years leading up to the termination of the consent decree in 2003, South Carolina paid $1.1 million to settle

nine claims alleging that children as young as ten years old had been sexually assaulted at DJJ facilities.

32. In 2003, DJJ represented to the Court that it would take a new approach, with the help of an outside consultant, in exchange for an end to the court's oversight and monitoring. Among other promised improvements to programming and treatment, DJJ stated that it would create an intramural sports program, partner with Clemson University to run "learning camps," hire more corrections officers, grade itself using a regular report card, and track youth recidivism rates.

33. Despite these promises, abuses at DJJ returned to the spotlight just a little over a decade later.

**DJJ's Present-Day Abuses**

34. At the request of members of South Carolina's General Assembly, an audit was conducted in 2017 analyzing the period from 2014 to 2016. The Legislative Audit Council ("LAC") reviewed comprehensive information from multiple sources, including a survey of all DJJ employees, interviews with DJJ employees and other state employees, and documentation including juvenile case files, DJJ budgets, audits, and financial records. The LAC released a report in 2017 summarizing its findings. *See* Ex. 1. The report demonstrated that the unsafe and unconstitutional conditions successfully challenged by the *Alexander S.* plaintiffs had only worsened since the consent decree's expiration. Specifically, the report criticized DJJ for failing to "maintain[] a safe and secure environment for staff and juveniles." *Id.* at 13. It observed that DJJ facilities continue to be tremendously violent and dangerous for youth, many of whom have experienced severe beatings, physical and verbal abuse, extended periods of solitary confinement, and unsafe living conditions.

35. The report also established that DJJ "violated state law by failing to report the deaths of two children to the South Carolina Department of Corrections and did not properly investigate claims that one of the deaths involved foul play." *Id.* at 19.

36. The report also detailed how a child in DJJ custody was sexually assaulted in circumstances that were caused directly by the failure of DJJ staff to supervise the children in its custody. *Id*. at 23. This incident led to the filing of at least two lawsuits alleging that DJJ was negligent in failing to prevent the sexual assault. *Id*.

37. The LAC's report concluded with 74 recommendations to improve conditions at all DJJ facilities. *See* Ex. 1.

38. Following the release of the LAC's 2017 audit report, then-DJJ Executive Director Sylvia Murray resigned.

39. In 2018, DJJ reported to members of the General Assembly that it had implemented 97% of the LAC's recommendations. However, this claim was belied by a second LAC audit report released in 2021. That report examined DJJ facilities from 2017-2019 and found that only 50 percent of the LAC's recommendations had been fully implemented. The remaining half had only been partially implemented or not implemented at all. Ex. 2 at 129. For example, DJJ had failed to resolve identified problems in its "policies and procedures [being] reflective of current practices, use of isolation, and security procedures and practices" at the BRRC, *id.* at 138, or to address its failure to "monitor juvenile cases and work with county solicitors to ensure that juveniles . . . receiv[e] rehabilitative support services," *id.* at 153. The LAC's second audit report further indicated that, from 2017-2019, safety conditions had deteriorated rather than improved. The average number of recorded incidents per month had more than doubled since 2017, *id*. at 22, and DJJ employees increasingly felt unsafe at work during this period, *id.* at 17.

40. On September 27, 2017, the United States Department of Justice ("DOJ") notified South Carolina of its intent to conduct an investigation into the conditions at the BRRC. Ex. 6 at 1. The DOJ visited DJJ offices around the state, conducted interviews of staff, detainees, and their family members, toured the BRRC three times, and reviewed thousands of documents and video recordings. *Id.*

41. On February 5, 2020, DOJ sent a report to Governor Henry McMaster summarizing its investigation of the BRRC. *See id*. In this report, DOJ determined that "there is reasonable cause to believe that the conditions at BRRC violate the Fourteenth Amendment to the Constitution and that these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Fourteenth Amendment." *See id.* at 1. DOJ stated that these "numerous, specific, and repeated" constitutional violations also "establish[ed] a pattern or practice of violations" under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997a *et seq*. *Id.* at 8.

42. DOJ's report highlighted the routine violence that occurs at the BRRC. For example, between July 2018 and May 2019, DJJ documented "134 fights and 71 assaults that resulted in 99 injuries to youth in a facility with an average daily population of just over 100." *Id.* at 9. The report also demonstrated DJJ's unconstitutional use of solitary confinement at the BRRC, through which children who commit minor infractions are placed "alone in their 8 foot long by 8 foot wide cell for 23 hours a day" with "no natural light." *Id.* at 16. Other evidence in the report documented cases of sexual assault, self-harm, and inadequate mental health care to address these harms. *Id.* at 8, 16-17.

43. DOJ concluded that DJJ, "through its failure to train its staff, implement effective behavior management tools, and establish key safety features in its physical plant, seriously harms youth or places them at substantial risk of serious harm from other youth." *Id.* at 18. In light of these findings, DOJ asked DJJ to undertake the following remedial measures: ensure "adequate surveillance and retain video . . . to investigate allegations of abuse," "make changes to staffing patterns," train staff to "reduce youth-on-youth violence and the use of isolation," "eliminate the use of isolation for minor misbehavior, protective custody, and mental health observation," "replace long-term isolation" with other options, take additional measures to protect youth who are vulnerable to victimization, create a specialized housing unit for such children, and promptly transfer suicidal youth to appropriate placements. *Id.* at 17-18.

44. On April 1, 2021, DJJ Executive Director Freddie Pough submitted a 10-page letter to the legislative committee defending DJJ's policies and practices. Pough asserted that DJJ has "implemented, or [is] in the process of implementing, many improvements that will positively impact the juvenile justice system in South Carolina for many years to come. DJJ is committed to continuing these improvements, including a number of those recommended by LAC, and will defer to the General Assembly for guidance with regard to recommendations that may require additional funding or legislative authorization."

45. On June 4, 2021, staff at the BRRC staged a walkout in protest of unsafe working conditions and a lack of security for themselves and detained youth. One Juvenile Correctional Officer ("JCO") interviewed during the walkout observed that "[t]here are people getting badly assaulted" and "the kids are not safe." The officer noted that, because of long hours due to understaffing, JCOs "don't have a high response time, communication is down. You're tired. So, how can we as officers, protect the kids if we're working these long hours like this."

46. Another JCO involved in the walkout, Lt. Ricky Dyckes Jr., told reporters that the BRRC had a malfunctioning sewage system that was creating "inhumane" conditions. He reported that there were "tissues, feces, urine, all on the floor. You can smell it when you come to lock up. Those kids are inhaling it and living in those conditions. This is just unacceptable."

47. A visit by State Senator Katrina Shealy in July 2021 confirmed these conditions. She noted that in the girl's dorm, there was odor and trash, and the bathroom "had mold at least 4 or 5 inches on the wall . . . [with] peeling paint." Ex. 5. ¶ 25. She also testified to seeing feces, urine, food, and open trash on the floor. *Id.* ¶¶ 10, 16.

48. On June 29, 2021, the South Carolina Senate voted 34-4 that they had no confidence in Pough, deciding that he was unable to fix problems at DJJ. On September 21, 2021, Pough resigned. Pough has been replaced by Hendrick, the current Interim Director of DJJ. Hendrick has been nominated by Governor McMaster to the position permanently and is currently awaiting a confirmation vote by the South Carolina Senate.

49. At a February 23, 2022 legislative hearing, Hendrick herself acknowledged that DJJ facilities are "constantly over capacity" and referred to the "immediate trauma" a child experiences when they are taken into custody at DJJ.

50. On April 14, 2022, DJJ and DOJ announced a settlement resolving DOJ's investigation into the "security, safety, and the use of isolation" at DJJ's long-term commitment facility, the BRRC. Ex. 7 ¶ 1. DOJ simultaneously released a report describing its "conclusions regarding use of force at BRRC," Ex. 8 at 3, which documented DJJ's "pattern or practice of failing to keep the young people in its custody reasonably safe from harm by staff," *id*. at 3. For example, DJJ's own internal reports demonstrated "that staff hog-tied a boy using handcuffs and left him on the floor for hours, forced a boy to the ground after staff engaged him in 'horseplay,' and punched a boy in the face without justification for that level of force." *Id*. at 4.

51. The agreement between DJJ and DOJ applies only to BRRC and covers only policies and practices related to safety and the use of isolation at that facility.

52. If implemented, the settlement agreement will reduce understaffing and alleviate the violence and overuse of isolation at the BRRC. But key provisions will not go into effect for years, at the earliest. For example, to address BRRC's understaffing, the agreement specifies that DJJ will retain "a consultant to conduct a staffing study within nine months of the effective date" of the agreement, Ex. 7 ¶ 29, and "[w]ithin 18 months of receiving the staffing study, DJJ will make reasonable efforts to implement changes to existing staffing," *id*. ¶ 32.

53. Over the past 25 years, DJJ has been subject to a court-ordered injunction, received multiple critical audit reports by state and federal agencies, and experienced turnovers in leadership prompted by legislative action. DJJ has been given every opportunity to design and implement reasonable reforms. Yet little has changed for the children detained at DJJ facilities. Children continue to be subjected to violence, sexual assaults, dehumanizing living conditions, and inadequate educational and mental health services.

**DJJ's Statewide Operations**

54. DJJ operates five secure facilities, 43 county offices, and 10 camps across South Carolina. The five secure facilities include three regional evaluation centers—the Coastal Evaluation Center ("CEC"), Midlands Evaluation Center ("MEC"), and Upstate Evaluation Center ("UEC"). These centers are meant to be temporary facilities where children are taken to be evaluated at the beginning of their custody with DJJ. State law provides that children may be detained in the evaluation centers for no more than 45 days. S.C. Code Ann. § 63-19-1440(C).

55. The CEC is an evaluation center in Ridgeville. In contravention of the law, children are often detained at the CEC for longer than the 45-day limit. In 2019, the length of stay for youth at the CEC ranged from 38 to 108 days. Adam T. Barnett, *Prison Rape Elimination Act Audit Report* (Sept. 23, 2019) at 3, https://djj.sc.gov/sites/default/files/Documents/PREA%20PDFs/CEC%20PREA%20Audit%202019.pdf.

56. The CEC has a designated capacity of 112 children, *id.*, but it does not have staffing to hold that many children. In January and early February, the facility was closed for roughly three weeks due to DJJ's inability to staff the facility with JCOs. Upon closure, the children detained at the CEC were transferred to the BRRC, DJJ's long-term commitment facility. Although the CEC has reopened, the staffing shortages have prevented the facility from housing more than approximately one quarter of its normal capacity.

57. The MEC is an evaluation center in Columbia. The MEC has a designated capacity of 113 youth. But it, too, does not have the staff to hold this many children. In light of its short staffing, the MEC is incapable of housing more children. Children are sometimes detained at the MEC for longer than the 45-day limit.

58. The UEC is an evaluation center in Union. The facility has a designated capacity of 112 youth. Like the DJJ's other evaluation centers, the UEC does not have the staff to hold this many children. Because it is so understaffed, the UEC is effectively full. Children are sometimes detained at the UEC for longer than the 45-day limit.

59. In addition to its three evaluation centers, DJJ operates one pre-trial detention facility in Columbia, the Juvenile Detention Center ("JDC"), which detains children ages 11 to 20 from across most of South Carolina's 46 counties. *Id*. The JDC's stated purpose is to provide custodial care and treatment to children detained by law enforcement and the family courts prior to disposition. The facility also detains youth awaiting trial on serious and violent charges.

60. The JDC is designed to hold 72 youth at maximum capacity. *Id.* According to a 2020 Report by a South Carolina Senate Select Committee, between July 2, 2019 and January 28, 2020, this maximum was exceeded three quarters of the time, and the number of children held at JDC climbed as high as 100. Ex. 3, at 8. On February 25, 2022, 120 children were housed in the facility, bringing the JDC to an unprecedented 166% capacity. Due to this overcrowding, the JDC does not have enough beds for the detained youth. Children are forced to sleep on makeshift beds known as "boat beds," which are plastic bins the size of sleeping bags.

61. The JDC is also understaffed, an issue that Hendrick has acknowledged. As a result, children are routinely left unattended—even in the F Wing, the JDC's most violent unit. These circumstances have led to serious injuries because the facility is unable to prevent or respond to the episodic violence that erupts when staff is absent.

62. DJJ's fifth secure center is its sole long-term commitment facility, the BRRC, which is also located in Columbia. The BRRC detains children ranging in age from 13 to 19 years old. In 2020, the average length of stay or time under supervision for youth at the BRRC was 36 months.

63. The BRRC's designated capacity is 228 youth. *Id*. The facility currently detains only 52 children. However, like DJJ's other secure centers, the BRRC is extremely understaffed, preventing DJJ from providing a safe environment for the children detained there.

64. Many children detained in the BRRC have serious mental illnesses. For example, six or seven children detained at the BRRC are currently awaiting placement outside of DJJ,

because they have such severe mental illnesses that, by law, they should not have been committed to DJJ.

65. The BRRC facility includes over 40 buildings, which include single resident cells, multiple occupancy cells, four open bay/dorm housing units, and 72 segregation or isolation cells. *Id*. Each dorm unit at the BRRC includes three "pods"—A, B, and C—each of which houses 8 detained children. The pods do not have private units and the children in each pod are forced to congregate in the center and unable to separate from one another. Due to a lack of JCOs, DJJ is often unable to staff one JCO in each pod in order to monitor the children. Often, only one JCO is available to supervise all three pods in a dorm, leaving many children unsupervised for long periods of time.

66. The BRRC formerly had two units where children were placed for isolation. The intensive treatment unit (ITU) was the less severe isolation unit, but it was shut down by the BRRC because of DJJ's persistent failure to provide adequate security staff. As a consequence, until recently, all children placed in isolation were forced to stay in the BRRC's more severe isolation unit, known as the crisis management unit (CMU). *See* Ex. 6 at 6. In some cases, children have been left in isolation in the CMU for almost a year.

**<u>Youth Detained by DJJ</u>**

67. At present, more than 250 children are being held in DJJ custody. The children in DJJ custody are disproportionately Black and also disproportionately come from families that live below the federal poverty line. Many suffer from one or more mental illnesses.

68. Upon information and belief, the experiences of the individuals described in this section are representative of those encountered by other youth detained throughout DJJ's statewide facilities.

69. Child 1 is sixteen years old and is detained at the BRRC. Earlier this year, three other children entered his room and began assaulting him, leaving his face swollen and bleeding

profusely. Rather than intervening in the attack, the officer on duty told Child 1 to stay away from the facility's cameras so that he could not be seen bleeding.

70. Child 2 is nineteen years old and is detained at the BRRC. Near the end of last year, he was attacked by four or five other youth, who stomped on him on the ground. The single guard on duty failed to intervene because he was afraid of the children. Child 2 was assaulted for ten minutes before back-up arrived and broke up the fight. Due to DJJ's failure to prevent the attack or intervene in a timely manner, Child 2 was seriously injured and required surgery on his ear. DJJ has responded to Child 2's ongoing lack of safety by placing him in "protective custody"—permanent solitary confinement where he receives no educational services. Instead, Child 2 is forced to spend 23 hours per day in isolation, without any opportunity for socialization, interaction with other human beings, or recreation time.

71. Child 3 is eighteen years old and is detained at the BRRC. Earlier this year, he was assaulted by a group of other detainees after the sole JCO on duty left to check on another area. He suffered a broken ring finger and fractured wrist on his left hand; a gash to the top of his head and his right eyebrow (both requiring stitches); and a gash on his right ear which had to be glued together. Though a correctional officer took him to the infirmary, neither the correctional officer, DJJ investigator, nor the Infirmary ER took pictures of his injuries. Child 3 reports that no X-rays were taken. He suffers nightmares about the assault. DJJ staff do not allow him to attend classes with the other children, because DJJ staff do not believe that they can keep him safe during that time.

72. Child 4 is fifteen years old and has been detained at the JDC for several months. Earlier this year, he was assaulted by several other boys, who kicked at his head as he lay on the floor. The only JCO nearby was physically unable to break up the fight and had to call for back-up. Child 4 was eventually taken to the infirmary and given only Tylenol to treat his severe injuries. Since the assault, the JCOs have allowed Child 4's assailants to approach, taunt, and menace him during recreation.

73. Child 5 is eighteen years old and requires mental health treatment, including medication and counseling. He was first detained at the UEC and has been detained at the BRRC for the last four months. While detained at the BRRC, Child 5 was frequently placed in solitary confinement as punishment for minor misbehaviors, some of which were completely out of his control. For example, in response to one detainee breaking a window, his entire unit at the BRRC was placed in solitary confinement as punishment. Child 5 was once kept in isolation for two weeks straight, during which he time was only permitted to leave his cell to take a shower. While in isolation, Child 5 was denied mental health and educational services.

74. Child 6 was detained at the JDC for over three years until his release on parole near the end of 2021. He spent half of his time detained at JDC in solitary confinement during which he was allowed to leave his cell for only one hour a day. While he was in isolation, Child 6 was denied educational materials and often any time outside at all. While in isolation, Child 6's mood was unstable, he had difficulty sleeping, and he reported feeling paranoid and anxious. Child 6 has continued to suffer from these symptoms even after leaving the JDC. Because of his time in isolation, he becomes anxious when he is not alone and struggles to sleep.

75. Child 7 has been detained off and on for over 2 years at the JDC. He has been placed in isolation for much of his time in custody, often between one to two weeks at a time. He remains detained at JDC and suffers anxiety and other symptoms from spending so much time isolated from others.

76. Child 8 is a sixteen-year-old who was assaulted by two other youth using makeshift weapons. The assault resulted in Child 8 suffering injuries including a cracked skull, broken cheek bone, two missing teeth, and possible internal bleeding in their brain.

77. Child 9 was repeatedly assaulted by other youth in the BRRC. Video footage captured several youth dragging him into a bedroom cubicle to assault him, twice chasing him to the exit door of the pod to further assault him, and then assaulting him yet again in another bedroom cubicle. Although a DJJ officer observed the event, he refused to protect Child 9—he

did not attempt to restrain the attackers, he did not remove Child 9 from the pod, and he did not call other officers to help assist in subduing the attackers. When Child 9's grandmother complained about the assault—noting that he could barely chew because he had been hit in the jaw—Child 9 was punished and placed in isolation for weeks. Ex. 6 at 10-11.

78. Child 10 is a seventeen-year-old detained at the BRRC. While in DJJ custody, he has been the victim of over sixty assaults. One of the most brutal assaults occurred when Child 10 was sleeping in his dorm: a group of his peers obtained access to his room, snuck up on him while he was asleep, and attacked him with makeshift weapons including a sock filled with rocks. Child 10 was beaten until he was unconscious, and he awoke prostrate on the floor and bleeding. Neither the JCOs nor any other DJJ staff stopped the attack. Nor did they follow up with any investigation into the attackers. Child 10 spent time in the infirmary to recover. Shortly thereafter, he was placed in "protective custody"—meaning, solitary confinement. Child 10 receives no schooling or rehabilitative services. Despite Child 10's placement in isolated "protective custody," he has not been able to escape the violence. Last year, the door locks malfunctioned, causing the doors to come open. A group of youth entered Child 10's room and stabbed him repeatedly, resulting in additional injuries and leaving scars. Once again, DJJ staff failed to intervene to keep Child 10 safe.

79. Child 11 was assaulted by multiple public security officers ("PSOs"), or members of DJJ's police force, who were called to the BRRC to respond to a disturbance. They tripped him, beat him while he was on the floor, then restrained him in handcuffs and continued to beat him.

80. Child 12 was beaten up and choked by 5 PSOs while he was in handcuffs and shackles; three South Carolina Law Enforcement Division ("SLED") officers watched but did not intervene as he was assaulted. The PSOs accused Child 12 of robbing staff as a justification for the beating. After the assault, DJJ staff "hogtied" him, looping his handcuffs through the shackles around his ankles, and refused to allow him to file a grievance.

81. Child 13 has been detained at the BRRC. He refused to be recruited by a gang with a major presence in DJJ facilities, known as "The Folk." In retaliation, the Folk put a "hit" out on Child 13. Despite his warnings to DJJ staff that he feared being attacked in Pod C, Child 13 was transferred there as punishment for a minor infraction. The day after his transfer, Child 13 was assaulted four different times. Child 13 was first assaulted in Room 1 in Pod C, which has no operational cameras. His attackers gained access to his dorm by threatening one of the JCOs on duty with violence. Rather than prevent the attack, the JCO gave the attackers the keys to Child 13's dorm. Once inside Child 13's dorm, the attackers hit Child 13 on his head, above his eyebrow, and all across his face. The attackers instructed a private contractor employed by DJJ who was manning the control room of the dorm not to call for help. Despite witnessing Child 13 being assaulted, the contract security guard did not seek help or otherwise intervene. As a result of this assault, Child 13 suffered a broken nose, a hematoma on his right ear, a black eye, a split lip, injuries on his back and ribs, and bruises all over his body. Despite suffering these injuries, Child 13 was not taken to the infirmary until the following day. Although he filed a complaint with DJJ staff, an investigator did not come to speak with him.

82. Child 14 was assaulted and brutally beaten by several youth who stomped on his head for approximately fifteen minutes. The assault took place inside of a BRRC room with no camera coverage. The sole JCO on duty observed the incident but refused to intervene. Child 14 suffered severe injuries and had to be transferred out of the facility to the emergency room.

83. Child 15 was diagnosed with multiple conditions including Borderline Intellectual Functioning, PTSD, ADHD, and Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure. While a DJJ neuropsychologist provided numerous specific recommendations for Child 15's treatment, DJJ failed to implement any of them. Instead, Child 15 was sent to solitary confinement at CMU for multiple prolonged periods, where his emotional and mental health suffered greatly and where he continued to be denied medical attention and treatment for his conditions.

## Ongoing Violations at DJJ

### DJJ's Failure to Protect Youth From Violence

84. The Fourteenth Amendment requires states to ensure reasonably safe conditions of confinement for detained children and guarantees them the right to reasonable protection from the aggression of other detainees and staff. But DJJ maintains facilities that are plagued by routine youth-on-youth violence. DJJ staff do little to nothing to prevent this violence, ignore pleas for help from children in the middle of assaults, and, still worse, often participate in instigating or committing violence against detained children.

85. Since 2017, there has been a 42 percent increase in youth-on-youth violence or staff-on-youth violence in DJJ secure facilities. The threat of violence at DJJ facilities is now so great that children are afraid to leave their cells or to sleep. For example, some children avoid taking medications that they need to sleep because they are afraid they will be "blitzed" or "attacked" by a group of their peers while sleeping.

86. DJJ's own data show that their facilities are extremely dangerous, and that youth suffer from physical and sexual violence at the hands of other youth and staff. During the first quarter of 2021, DJJ facilities self-reported the following incidents:

| | Youth-on-Youth Assault | Fights | Youth Injuries | Staff-on-Youth Assault | Inappropriate Sexual Conduct |
|---|---|---|---|---|---|
| CEC | 10 | 7 | 12 | | 9 |
| MEC | 44 | 28 | 36 | 1 | |
| UEC | 11 | 11 | 65 | | 1 |
| JDC | 15 | 13 | 15 | 3 | |
| BRRC | 34 | 28 | 50 | 1 | 15 |

87. These problems have continued into 2022. In January 2022 alone, DJJ reported 56 youth-on-youth assaults, 32 fights, and 30 injuries across its five secure facilities.

88. Among DJJ facilities, violence is typically the worst at the BRRC due to the combination of longer-term commitments and DJJ staff's neglect and refusal to take steps to

protect children and stop the violence. *See* Ex. 6 at 9. The DOJ has concluded based on DJJ's own data that youth are not reasonably safe from injury at the hands of other youth.

89. Multiple incidents of violence at the BRRC continue to occur each day, many of which result in serious injuries. The violence at the BRRC has spiraled so far out of control that children are unable to attend school for days or weeks at a time. Even when the BRRC is operating under its best conditions, children can only attend school for half days, because DJJ staff believe that they would not be able to contain the violence that would ensue as a result of full-day attendance.

90. Violence at DJJ facilities is often connected to gang activity. Youth in custody are targeted by other detained youth who are gang members. Staff members themselves are sometimes affiliated with gangs. These gang affiliations perpetuate staff-on-youth and youth-on-youth violence, creating an atmosphere of fear that perpetuates youth trauma and behavioral problems.

91. Violence is so rampant at DJJ facilities that detained children and DJJ staff have developed their own vocabulary to describe the most common acts of violence. For example, a "hit" refers to a common practice at DJJ, where someone from one dorm asks someone in a different dorm to assault someone else housed there. Hits are a frequent occurrence at DJJ facilities, including the JDC. Some JCOs are aware of the practice of rival gangs issuing hits on detained children but do little to nothing to thwart those hits. Even worse, some JCOs directly encourage children to make "hits" on other children. The JCOs who engage in this egregious behavior often go unpunished.

92. At some of the facilities, some of the youth-on-youth violence occurs through "fight nights" that are explicitly or implicitly sanctioned by DJJ staff. These fight nights consist of groups of children going to two particular rooms—which the children know lack working cameras—to engage in vicious, staff-sanctioned fights. DJJ staff are either intentionally absent during these fights, or they casually observe but choose not to intervene and stop them.

93. Sometimes children are "blitzed," or attacked by multiple other children at once. One child, for example, won a scheduled fight only to be blitzed after by four or five children.

94. At the BRRC, youth-on-youth violence also takes place through "friendlies"—fights that occur in Rooms 1 or 10 in the BRRC dorms because those rooms are known to lack working cameras. The JCOs are aware that these fights occur but they choose not to intervene. For example, in one incident, a JCO was aware that a fight was happening in Room 1 or 10, but instead of intervening, the JCO removed her hearing aid to avoid listening to the fight. Despite it being common knowledge that Rooms 1 and 10 lack working cameras, the settlement agreement between DOJ and DJJ gives DJJ three months to "identify areas within BRRC where there is currently no video surveillance" and another two months just to "propose a . . . timeline for adding surveillance tools." Ex. 7 ¶ 33. This leisurely timetable will needlessly put children at risk of further violence.

95. Sometimes DJJ staff assault detained children through what are described as "play fights." These "play fights" result in detained youth being written up for disciplinary infractions when the JCOs decide that the "fight" is over; when a JCO wins the fight, the result is often injuries to detained youth. "Play fights" create a permissive atmosphere in which violence is implicitly or explicitly endorsed by staff within DJJ facilities.

96. In addition to themselves partaking in violence, some DJJ staff encourage it among the detained children. For instance, DJJ staff sometimes pay youth with food or privileges to assault other youth. They also provoke youth into engaging in violence. For example, DJJ personnel have made offensive comments to detained youth, including telling them that their "mother should have aborted you," in an effort to incite the youth to violence. When making these comments, the staff step out of the view of security cameras and continue to provoke detained youth into trying to attack them.

97. Incidents of violence and sexual assaults are caused by a number of shortcomings at DJJ facilities, including but not limited to limited training, broken security systems, severe understaffing, and direct or tacit participation in violence by staff.

98. DJJ fails to effectively train JCOs and other frontline providers with regard to preventing violence or appropriately engaging with traumatized children. Because of DJJ's understaffing, DJJ has cut back on training provided to JCOs; new and untrained JCOs are rushed into duty to get on-the-job training. The vast majority of JCOs themselves report that the de-escalatory training they receive is inadequate. Ex. 2 at 12.

99. DJJ fails to properly maintain cameras—a critical safety mechanism—in its facilities. Cameras are broken throughout the facilities, and detained youth and DJJ staff take advantage of the security gaps that result. Although DJJ has at times added new cameras, it employs only a single person responsible for repairing cameras in DJJ facilities all over the state. As a result, many cameras are not working, creating opportunities for violence to go unchecked.

100. In 2021, a PREA audit of the JDC found that it failed to provide safe and secure rooms to the children it houses. Ex. 4 at 24-25. The audit uncovered that the locks to sixteen private cells were malfunctioning. Ex. 4 at 25. By failing to fix the broken locks to children's private cells—the only place in the JDC where children could hopefully count on being protected from assault—DJJ failed to do even the bare minimum to create a safe environment for children. *Id.* at 25.

101. In addition to security failures, a major driver of violence at DJJ facilities is woeful understaffing, which results in a failure by DJJ staff to provide minimal supervision to youth. Federal standards under the Prison Rape Elimination Act ("PREA") require that juvenile facilities have minimum juvenile-to-security staff ratios of 8:1 during resident waking hours. 28 C.F.R. § 115.313(c). Because of design flaws, including cell doors that obstruct lines of sight from central areas, DJJ facilities require higher staff ratios. Yet the 2021 PREA audit of the JDC

found that the facility's child-to-staff ratio failed to comply with even the PREA's minimum. Ex. 4 at 23-24. Instead, DJJ has operated the JDC with ratios of between 11:1 and 15:1. *Id.*

102. DJJ facilities also fail to meet South Carolina state requirements for the supervision of children in state custody. DJJ has failed to ensure that its facilities have "sufficient personnel to provide uninterrupted supervision and to provide administrative, program, and support requirements" to youth in custody. S.C. Code Ann. § 63-19-360. DJJ has also failed to ensure that "at least one [juvenile custodial officer] directly supervise[s] the juveniles at all times." *Id.*

103. DJJ even fails to comply with its own internal requirement that each 12-hour shift at the BRRC be staffed by "a minimum of 49 officers."

104. The harms of understaffing at DJJ result in the limited number of JCOs being overworked and left with low morale. As a result, many JCOs are complacent in the face of violence at DJJ and allow violence among children to proliferate. When JCOs do try to break up fights or disturbances, they often respond disproportionately, inflicting severe injuries on the children in their custody.

105. In response to understaffing, JCOs have enlisted PSOs or SLED officers for help. But those officers are rarely trained on how to interact with children safely. Children have been maced or badly beaten by JCOs, PSOs, and SLED officers claiming to stop a fight.

106. Violence has become so common at DJJ facilities that it is difficult for advocates or DJJ itself accurately to keep track of instances of youth-on-youth assaults.

**DJJ's Unconstitutional Use of Isolation**

107. The Fourteenth Amendment forbids isolating youth solely for punitive reasons. *See Bell v. Wolfish*, 441 U.S. 520 (1979). That established principle of law reflects the medical fact that solitary confinement permanently interferes with a child's physical, psychological, and social development. Isolation has been shown to cause trauma, anxiety, depression, insomnia, hallucinations, agitation, anger, fear, and feelings of hopelessness and abandonment. Children

begin to experience these effects almost immediately and they only worsen with time in solitary confinement. Children subjected to isolation are also at increased risk of self-harm. Research shows that more than half of all suicides in juvenile facilities occurred while children were held in isolation. Ex. 3, at 23-24 & n.64.

108. The American Medical Association, the American Academy of Child and Adolescent Psychiatry, the National Commission on Correctional Health Care, and DOJ have all recognized that solitary confinement is particularly harmful for children and should not be used for disciplinary purposes.

109. As described below, DJJ uses isolation in contravention of this scientific consensus and established law. Both the DOJ and South Carolina Legislative Committee have identified DJJ's use of isolation as "excessive and unconstitutional." Ex. 2 at 23, 27; Ex. 6 at 13-16.

DJJ's Isolation Units Are Unsanitary and Unsafe

110. DJJ isolates children in a variety of ways and for a number of purposes. For punishment or, ostensibly, to keep children in protective custody safe, DJJ forces children into formal, solitary confinement in cells that are set apart from regular housing and specifically designed for isolation. At other times—for example, when there is a disturbance in a facility, when a JCO wants to punish children without submitting any paperwork, or when there are simply too few staff—DJJ staff lock children in their cells, isolating children for almost the entirety of each day over the course of days or weeks.

111. Solitary confinement at DJJ facilities often occurs in substandard and unsanitary conditions, in violation of the Fourteenth Amendment.

112. At the JDC, isolation cells are complete lock-up units, comparable to housing at a secure adult prison. Each cell has a small window that looks into the unit's common area. The only furniture is a thin cement mattress, a small desk, and a combined toilet and sink.

113. At the BRRC, solitary confinement occurred until recently in an isolation unit known as the crisis management unit ("CMU"). *See* Ex. 6 at 2. The CMU consists of three

wings of concrete and steel cells. *Id*. Each cell is 8 feet by 8 feet and has no furniture except a cement bed, a thin mattress, and a toilet. *Id*. The cells have no light apart from what comes through a narrow slot in the solid metal door and a small window that is painted over. *Id*.

114. Youth detained in solitary confinement typically spend 23 hours of each day in their tiny cell, where they must sleep, eat, defecate, and urinate.

115. DJJ staff and children use the term "23-and-1" to describe the common practice of giving boys and girls in isolation only one hour per day to be outside of isolation. Youth in isolation must use this hour to shower, change clothes, and use the shared phone to speak with their families. Some youth detained in solitary confinement do not have working toilets in their cells and must wait until their allotted one hour outside of their cell to use the restroom or ask a JCO for permission to use the restroom. When children are permitted to go outside during this one hour, they are shackled in a small recreation area. Ex. 6 at 6.

116. Due to the severe understaffing at DJJ, children who are not in formal isolation—meaning that they have not been segregated in specially designated areas for disciplinary or security purposes—are still often locked in their cells for most or all of the day. Children are almost never allowed outside, and they rarely have access to sports or other recreational activities.

117. Children in isolation in DJJ custody are denied not only opportunities for normal everyday human interaction, but also denied critical services, including sanitary facilities, meaningful outdoor recreation, adequate mental health care, and mandatory educational services and instruction such as GED testing. These youth miss any chance at educational progress and their development stagnates. Over the course of just three months in 2018, for example, seven children were forced to miss their scheduled testing sessions because DJJ decided to hold them in isolation. Ex. 2 at 92.

DJJ Grossly Overuses Isolation

118. DJJ's practice of grossly overusing isolation has been documented by DOJ. A chart prepared by DOJ shows that, from 2015 to 2017, children were kept in isolation at BRRC for hundreds of days over the course of the time they were detained. Ex. 6 at 15. Many children at BRRC were placed in isolation dozens of times while in custody. For example, over the span of two years, one child was placed in isolation 24 times and spent a total of 301 days in isolation—over half his time in custody. Another child was placed in isolation 20 times for a total of 276 days over the same period. This pattern of overuse has not improved. Between July 1, 2018 and May 31, 2019, DJJ used isolation around 94 times each month at BRRC alone. Ex. 6 at 15. In some cases, children have been left in isolation for almost a year.

119. DJJ staff regularly resort to isolation to punish children. Rather than adhere to DJJ's progressive discipline policy, or use "cool-down" rooms, DJJ staff employ 23-and-1 to punish children for minor and vague infractions, such as "showing disrespect, not complying with officers' directions, or using profanity." Ex. 6 at 14. Youth have likewise been isolated for "masturbating, . . . having playing cards, . . . being unable to urinate to complete a drug test, . . . tattooing," or for not being in a designated housing or programming area. *Id.*

120. DJJ has used isolation across its facilities for a multitude of reasons beyond disciplinary and protection purposes. Since the onset of the pandemic, DJJ has placed youth in isolation not because they have done anything wrong, but because DJJ is short-staffed, or simply has nowhere else to put the children in its custody.

121. For example, at the start of March, the children in one wing at the JDC were allowed out of their cells only for two hours a day, because DJJ did not have enough staff to adequately supervise the wing. One child spent more than two weeks able to leave his cell only from 6 am to 8 am. Only during those hours could he shower, use the restroom, or sit in the small, bare common area between cells. For the rest of the day, he was locked in his cell with a malfunctioning toilet.

122. DJJ has also used isolation to manage the pandemic. Children who become ill, or who contract COVID-19, are often forced to stay in isolation. At the BRRC, children have been forced into isolation because the facility has only two beds in the infirmary where sick children can recover.

123. DJJ has also used solitary confinement to isolate detainees awaiting a disciplinary hearing, or awaiting transfer from BRRC to the adult prison at Turbeville—even though such transfers can sometimes take up to a year.

124. DJJ's arbitrary use of isolation as a management tool has caused needless harm to the children in its care. DJJ's policy and practice of subjecting many children to repeated weeks-long periods of isolation causes them serious physical, emotional, psychological, and developmental harm. These repeat stays also create a vicious cycle: Research shows that isolating children in solitary confinement can exacerbate the agitation and behavior that led to solitary confinement in the first place.

<u>DJJ Isolates Youth With Mental Health Conditions</u>

125. DJJ knows that solitary confinement puts children at serious risk of new and worsening symptoms of mental illness, including self-harming behaviors and suicide. But it does not have or implement policies to eliminate these risks. Individuals are not assessed by a mental health professional before being subjected to solitary confinement, regardless of whether that confinement is formal or informal. As a result, DJJ cannot and does not exclude from solitary confinement children who are at a heightened risk of suicide or self-harm, including those with mental disabilities. In practice, DJJ ignores mental diagnoses and places children in isolation despite, and very often because of, their mental disabilities.

126. In March 2022, for example, DJJ staff confined an autistic child in the JDC to his cell for 22 hours a day or longer, because the DJJ staff did not have the capacity to supervise him or the training to handle his interactions with other children.

127. Perhaps worse still, DJJ affirmatively uses solitary confinement to house children on suicide watch or mental health observation. For example, DJJ placed one child who was experiencing suicidal ideations as a result of being in isolation on suicide watch—an even more restrictive form of isolation—until he signed a contract agreeing not to harm himself.

128. Between March 2017 and November 2017, there were 46 reported instances of youth placed in isolation for similar reasons. Ex. 6 at 15-16. Isolating children who are suicidal or need mental health observation is counterproductive and dangerous. Children in solitary confinement at DJJ report being anxious, depressed, and attempting self-harm. While in isolation, children display worsened, not improved, mental health conditions attributable to the unreasonable length and conditions of solitary confinement.

129. DOJ has reported that at least three children have tried to hang themselves by tying sheets around their necks while in isolation at the BRRC. None of these children were provided adequate or appropriate psychiatric treatment. Ex. 6 at 16.

DJJ Ignores Minimal Procedural Safeguards Against the Use of Isolation

130. Not only does DJJ rely excessively on isolation in violation of the Fourteenth Amendment, DJJ also systematically and deliberately fails to follow its own procedures, such as those relating to documentation, that are required for confinement in isolation. According to DJJ's policies and procedures regarding isolation of youth, every child subjected to isolation should be reevaluated every four hours they are in solitary confinement. Instead, DJJ staff regularly fill out standardized forms extending isolation for four-hour increments and submit these *at the same time* as the initial form indicating a child will be isolated. This practice nullifies a critical check designed to prevent DJJ staff from subjecting children in its care to unconstitutional periods of isolation.

131. DJJ staff fail to follow other related procedures. For example, in 2018, CEC completed in full only 2% of the isolation document requirements. Ex. 2 at 34. DJJ records also

rarely, if ever, account for informal isolation—for instance, when children are not allowed out of their cells for extended periods of time because of understaffing or disturbances.

132. As a result, DJJ statistics with respect to isolation significantly undercount the number of children who are subjected to isolation and the lengths of such isolation.

**DJJ's Failure to Provide Education**

133. DJJ is obligated to provide educational programs and services to all children in its custody. *See* S.C. Code Ann. § 63-19-360 (5); *id.* § 63-19-380.

134. Education is critical both to the rehabilitation of detained youth and the success of the community as a whole. Participation in any kind of educational programming during incarceration decreases the likelihood of recidivism by as much as 43 percent. Lois M. Davis, Robert Bozick, Jennifer L. Steele, Jessica Saunders, and Jeremy N. V. Miles, *Evaluating the Effectiveness of Correctional Education* (2013), https://www.rand.org/pubs/research_reports/RR266.html.

135. Effective educational programming can also help remedy many disciplinary problems that are rife in DJJ facilities. Detained youth who are occupied and engaged are far less likely to act out and engage in destructive behavior. Educational programming can thereby dramatically increase the safety and security of DJJ facilities.

136. Along with standard educational services, federal law mandates that students with disabilities must receive special education and supplementary support based on their Individualized Education Plans ("IEPs"). Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et. seq*. IEPs provide a statement of a student's present level of success, measurable annual goals designed to meet the students' needs, and a list of the special education and supplementary services required to support the student in meetings those goals. *See* 34 C.F.R. § 300.320.

137. DJJ often does not provide meaningful education to detained youth while they are in custody. Even under the best of circumstances in DJJ facilities, children are almost never in a

classroom and never given formal instruction. Occasionally DJJ will provide worksheets for detained youth, but they are rarely collected, and children seldom receive guidance or feedback on their responses. Sometimes, the detained youth are not even given pencils to complete the worksheets.

138. DJJ operates its own school district that serves approximately 500 students in grades 4-12. The BRRC has a designated school, the Empowerment & Enrichment Academy of South Carolina (formerly the Birchwood School) where children attend middle and high school. No other DJJ facilities have designated schools; the other facilities only have rooms putatively used for education.

139. Students attending school through DJJ are theoretically in school year-round. But in reality, classes in DJJ facilities happen irregularly, if at all. The JDC's school schedule, for example, provides that children are supposed to receive two hours of class every other day—for a total of four hours of class a week. But even this inadequate minimum is rarely, if ever, reached. At the start of March 2022, children at the JDC had not been to class for weeks. One child noted that he and others had been told that class would be held one day, only for the class to be cancelled because of a lack of staff.

140. Despite having a designated school, children at the BRRC only irregularly attend classes, even under the best of circumstances. Sometimes, DJJ staff cancel classes at the BRRC because there are too few teachers. DJJ staff also cancel classes because of fights or other disturbances in the dorms. At other times, they cancel classes because there are too few JCOs to keep the classrooms safe or to transport the children on the short walk from their dormitories to the school. Weeks and even months have gone by in which DJJ has not had the staff to transport all of the children detained at the BRRC to learn in a classroom setting.

141. DJJ also does not provide special education and related services to detained youth with disabilities. Detained youth with disabilities are offered the same "instruction" as all others—generally, worksheets handed out only sporadically.

142. DJJ's policies to evaluate detained youth with intellectual disabilities and place them on an IEP are inadequate. DJJ frequently becomes aware that children in its custody have undiagnosed intellectual disabilities, yet does not attempt to evaluate or give additional supports to these individuals. For example, one Justice 360 client is a child who struggles with verbal communication. Despite that disability, DJJ has provided the child only *one day* of education over the past nine months.

143. DJJ fails to employ a sufficient number of teachers to educate the children it detains. As a consequence, there are only infrequent opportunities for detained youth to learn in a classroom setting. Even when DJJ is able to hire educators, DJJ often fails to hire adequately trained, certified special education teachers for the children who need such services.

144. DJJ also fails to have enough JCOs to keep children and teachers safe in classrooms. DJJ school officials have, for example, requested that specially-designated JCOs work in the school at the BRRC facility, but DJJ has failed to fulfill those requests. As a result, classrooms are often the sites of fights or "hits." Most teachers do not have access to phones in the classrooms, exacerbating teacher and staff concerns about their own safety and the safety of the children.

145. As a result of these failures, children at DJJ are prevented from making progress in school, sometimes forcing them to repeat a year of school or to drop out altogether. Upon their release, children often receive certificates from DJJ for additional credit hours of specialized education services—an attempt to compensate for the wholly inadequate education they received while in DJJ custody.

146. The number of students receiving their GED at the BRRC is on the decline. In 2019-2020, for example, only 38 students in DJJ's school district received their GED, down from 55 in 2018-19 and 61 in 2017-18. Ex. 2 at 91.

147. If a child is able to obtain their GED, DJJ makes no effort to help them advance further in their education.

**DJJ's Failure to Provide Rehabilitative Services**

148. Both the Fourteenth Amendment and South Carolina law require DJJ to provide the children in its custody with rehabilitative services. *See* S.C. Code Ann. § 63-19-350(7). DJJ regularly fails to do so.

149. For example, DJJ fails to provide children in the JDC with structured educational or recreational programming. As a result, even when they are not effectively in isolation, children at the JDC have nothing to do for hours on end. They can gather together in small groups, watch TV, and read, if they have had access to the library. At best, they are bored. At worst, the lack of programming leads to fights and contributes to the violent atmosphere that is counter to meaningful rehabilitation.

150. At other facilities, like the BRRC, DJJ occasionally allows the children in its custody to participate in programs such as woodcarving, which the children enjoy. But it offers such programs only infrequently and to a limited number of children.

151. Children rarely have positive interactions with adults while they are in DJJ custody. Sometimes, because of understaffing, children go days without seeing an adult on their unit. When they do interact with adults, those interactions are often violent. The few clinicians, including social workers, nurses, and psychologists, who provide care are often barred by JCOs or other security personnel from interacting with children.

152. DJJ also fails to provide care that is appropriate for the traumatized children in its custody. Children arrive at DJJ already having faced multiple traumatic events related to their lives at home and school. Indeed, a national study found that 75 percent to 93 percent of children entering the juvenile justice system report that they have experienced at least one traumatic event. Samantha Buckingham, *Trauma Informed Juvenile Justice*, 53 Am. Crim. L. Rev. 641, 654 (2016).

153. Once at DJJ, children are thrust into conditions where physical violence is rampant, staff are hostile or neglectful, and where "safety" can only be guaranteed by psychologically damaging isolation.

154. Trauma—particularly unaddressed trauma—impedes rehabilitation. Traumatic events and traumatic episodes have a significant, negative effect on children's development. Children who experience trauma are at a higher risk for depression, suicidal ideations, and attempted suicide. They are less able to form trusting social bonds, regulate their emotions, or understand rules. They are also more prone to interpreting the behavior of others as hostile, more prone to experiencing a lack of control, and more prone to becoming either hyper-aroused or dissociative during stressful events.

155. Trauma-informed care is proven effective at treating individuals who have experienced trauma. Trauma-informed approaches also benefit the staff who implement their principles, especially in custodial environments where there are high rates of moderate to severe traumatic stress among staff. *See* Christopher E. Branson et al., *Trauma-Informed Juvenile Justice Systems: A Systematic Review Of Definitions And Core Components*, 9 Psychol. Trauma 635 (2017).

156. Trauma-informed care has become the accepted standard of professional care in juvenile detention. The DOJ has advocated for implementation of trauma-informed care since at least 2012, arguing that it is necessary to meaningfully rehabilitate incarcerated children. *See* U.S. Dep't of Justice, *Report of the Attorney General's National Task Force on Children Exposed to Violence* (Dec. 12, 2012), available at https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf. DJJ fails to meet the professional standard of trauma-informed care. The violence, isolation, and lack of services at its facilities are traumatizing, and thus antithetical to the core tenets of trauma-informed care and DJJ's requirement to provide rehabilitative services.

**DJJ's Failure to Identify and Treat Mental Health Disabilities**

157. DJJ fails to provide basic mental health care to the children it detains. DJJ has so few clinical providers that, even under the best of circumstances, clinical services in DJJ facilities are inadequate or sporadic. When there are too few JCOs, or when children are in lock-down, clinical providers are often unable to access children to provide them with mental health services.

158. DJJ also fails to provide regular access to medication or counseling. Because of the constant disruptions, inadequate clinical staffing, and overall disarray in DJJ, children rarely get medications at the time when they are prescribed to be taken; sometimes, children are forced to skip their prescribed medication altogether.

159. In addition, DJJ insists that because the JDC is a short-term facility, DJJ cannot treat children housed there for anything other than mental health conditions that were previously diagnosed. As a result, children who have mental health conditions but were not diagnosed before entering custody are unable to access appropriate medication and care.

160. South Carolina state law prohibits the commitment of any child with a severe mental illness or developmental disability into DJJ custody. S.C. Code Ann. § 63-19-1450.

161. According to the South Carolina Senate, S.C. Code Ann. § 63-19-1450 "reflects an understanding that DJJ is not equipped to house such seriously disabled children and that placing them in DJJ custody is harmful to those children and creates risks for other children in DJJ custody as well as for DJJ staff." Ex. 3 at 28.

162. Despite South Carolina's prohibition on committing children with severe mental or developmental disabilities, DJJ detains those children anyway. For example, in 2017, 117 young people with serious mental illness entered the BRRC, and a majority of these children were never transferred to psychiatric residential treatment. Ex. 6 at 7.

163. DJJ's processes to identify or accommodate children with severe learning disabilities or mental illnesses, or children who are suicidal or experiencing emotional crises, are

grossly inadequate. Instead, those children are detained—sometimes for months or even years at a time—without adequate access to social workers, counselors, medication, or other treatment.

164. As noted, children with intellectual disabilities are sometimes placed in isolation as punishment for behavior related to those disabilities or as a behavior management technique.

**DJJ's Failure to Maintain Habitable and Sanitary Conditions**

165. In addition to violence, isolation, lack of educational opportunities, and lack of rehabilitative services, children detained within DJJ facilities face squalid conditions.

166. Rooms are overrun with odor, trash, and bugs. Rooms with standing water continue to be used to house children. In certain facilities, maggots and cockroaches come up through the drains.

167. Walls are covered in mold and graffiti. For example, these are recent photos taken at the JDC:





168. Toilets in DJJ facilities are frequently stopped up for weeks, leaving human excrement in the open where the children sleep. In one instance at the JDC, children used sheets to fill a stopped-up toilet in a futile attempt to cover the stench.



169. DJJ staff often turn a blind eye to these issues. In one instance, fire sprinklers were accidentally activated, causing water to come pouring down into cells that were occupied by kids. The floors flooded as the sprinklers expelled dirty, black water. Despite this flooding, DJJ staff forced children to stay in the cells while their clothes, items, and bodies were soaked. Staff members wrongly believed youth had set off the sprinklers and forced them to stay as a form of punishment.

170. DJJ staff force children to clean up but do not provide adequate supplies, if they provide any supplies at all. During her tour of the BRRC on July 20, 2021, for example, Senator Shealy testified to seeing kids mopping with dirty water. Ex. 5. ¶ 16.

171. Children are denied showers and access to basic hygiene. They are often unable to brush their teeth, wash their faces, or do anything else to keep themselves clean. Sheets and clothes go unwashed for long periods of time, so children live and sleep in filth.

172. Because of transportation issues and staffing shortages, youth routinely miss regular physician and dental checkups. Ex. 2 at 81.

173. Children are denied access to drinking water—sometimes because DJJ staff believe letting children out of their cells to have water would pose a security risk, or because there are no clean, working water fountains that are accessible to the children.

174. Children often go hungry due to a lack of adequate meals and the unsanitary way in which those meals are served. When children are isolated in their rooms, DJJ staff often serve food through small slots. That food sometimes has cockroaches in it, or it is rancid or contaminated. If children refuse to eat, they may be given pre-packaged food, which contains little to no nutritional value. Sometimes, because of understaffing or as a punishment, children are given no meals at all.

175. As noted above, DJJ facilities are routinely overcrowded. As a result, children are forced to sleep on thin mattresses on the floor. Children often complain they are cold, because they are forced to sleep with only a threadbare blanket. These detained children are left further

exposed to unsanitary conditions. When children go to bed, cockroaches and other bugs crawl over them and make it difficult to sleep.

176. Children are denied access to regular, adequate physical activity. Though DJJ staff are required by law to provide children physical activity each day, many children are prevented from even going outside on a daily basis. Often, detained youth will go a week or longer without spending any time outdoors. As noted, those in isolation fare even worse; if they are able to leave their cells other than to shower, they may find themselves shackled in a small recreation area. Ex. 6 at 6.

177. Because they do not have classes or recreational time outside, children in DJJ custody rarely have anything like a regular schedule. Instead, their time in DJJ custody is typically dictated by DJJ's variable staffing challenges: If there are too few JCOs, or whenever a JCO goes off duty, they are locked in their cell or dorm; when there are enough staff on duty, they shower and receive meals; they sleep when they can, but the dorms are often loud—and especially dangerous—at night.

178. No citizen—much less a child—should be required to live in the conditions described above.

## CLAIMS FOR RELIEF

### <u>Count 1: Violations of the Fourteenth Amendment</u>
### 42 U.S.C. § 1983
### Failure to Protect Children Entrusted to DJJ Care

179. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

180. The Fourteenth Amendment to the United States Constitution requires juvenile justice officials to ensure that detained youth are housed in reasonably safe conditions and protected from the aggression of other detained children and staff. *Alexander S.*, 876 F. Supp. at 797-98 (D.S.C. 1995) (citing *Brooks ex rel. Thomas S. v. Flaherty*, 699 F. Supp. 1178, 1200 (W.D.N.C. 1988), *aff'd*, 902 F.2d 250 (4th Cir. 1990)).

181. DJJ has a policy, pattern, or practice of failing to provide adequate supervision and protection to youth such that they are kept reasonably safe from violence while in DJJ's custody. DJJ's policies, patterns, or practices thus cause and exacerbate youth-on-youth violence in DJJ facilities in violation of the Fourteenth Amendment.

182. DJJ is aware of the ongoing violence at its facilities and the resulting harms to the children in its care. DJJ has been put on notice by the 1995 consent decree, the 2017 LAC audit, the 2020 DOJ Report, the 2021 LAC audit, its 2022 settlement agreement with the DOJ, frequent public reporting about the danger and violence in DJJ facilities, and outreach by organizations like DRSC. Yet it remains deliberately indifferent to the ongoing violence.

183. By subjecting South Carolina youth to dangerously violent conditions of confinement, DJJ violates the rights of South Carolina youth under the Fourteenth Amendment.

184. Plaintiffs have suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violation of these rights of South Carolina youth under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. These harms will continue unless DJJ's policies, practices, and procedures are enjoined by this Court.

**Count 2: Violations of the Fourteenth Amendment**

**42 U.S.C. § 1983**
**Prolonged and Punitive Use of Solitary Confinement for Children**

185. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

186. The Fourteenth Amendment to the United States Constitution protects the substantive due process rights of the children in the custody of DJJ.

187. DJJ has a policy, pattern, or practice of employing isolation as a punishment, in clear violation of the Fourteenth Amendment's requirement that isolation for detained youth be used only for non-punitive, legitimate governmental objectives, and even then not for prolonged

periods of time or in unsafe or unsanitary conditions. These violations interfere with children's rehabilitation and harm them emotionally, psychologically, physically, and educationally.

188. Through the policies and practices described herein, including through an excessive and inappropriate use of solitary confinement, DJJ subjects South Carolina youth to a substantial risk of serious harm and deprives them of their constitutionally guaranteed measure of dignity and autonomy. These policies and practices are inconsistent with modern constitutional standards and standards of common decency in a civilized society.

189. There is no legitimate rehabilitative or custodial purpose for DJJ's solitary confinement policies, practices, and procedures.

190. DJJ's use of isolation deprives children of their substantive due process right to rehabilitative treatment and a rehabilitative environment, in further violation of the Fourteenth Amendment.

191. DJJ and its agents, officials, and employees have been and are aware of all deprivations complained of herein and have condoned, or been deliberately indifferent to, such conduct. DJJ has also been and is aware of the substantial risk of harm caused by these deprivations and has done nothing to alleviate this risk of harm. It should be obvious to DJJ and its agents, officials, and employees that the conditions imposed on South Carolina youth in DJJ facilities cause tremendous mental anguish, physical harm, suffering, and pain to youth in DJJ custody, and cause material harms to the Plaintiffs who represent and advocate for South Carolina children.

192. Plaintiffs have suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violation of these rights of South Carolina youth under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. These harms will continue unless DJJ's policies, practices, and procedures are enjoined by this Court.

**Count 3: Violations of the Fourteenth Amendment**

**42 U.S.C. § 1983**
**Failure to Provide Rehabilitative Services**

193. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

194. The Fourteenth Amendment requires that noncriminal juvenile detention facilities like DJJ provide rehabilitative services and follow the accepted professional judgment, practice, or standards for the detention of children. *See Doe 4 by and through Lopez v. Shenandoah Valley Juv. Ctr. Comm.*, 985 F.3d 327, 341-44 (4th Cir. 2021) (applying the professional judgment standard from *Youngberg v. Romeo*, 457 U.S. 307 (1982) to a facility that detains unaccompanied immigrant children).

195. Rehabilitative services, including recreational and outdoor time, access to mental health services, and trauma-informed care, are the professional standard for juvenile detention and rehabilitation.

196. DJJ substantially departs from this standard of care by failing to operate safe facilities, failing to provide outdoor time or educational services, failing to train officers and staff on trauma-informed approaches, and failing to provide counseling or therapy designed to address underlying trauma.

197. Plaintiffs have suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violation of these rights of South Carolina youth under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. These harms will continue unless DJJ's policies, practices, and procedures are enjoined by this Court.

**Count 4: Violations of the Fourteenth Amendment**

**42 U.S.C. § 1983**
**Substandard Conditions of Confinement**

198. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

199. DJJ's policies and practices cause South Carolina youth detained at DJJ facilities to live in unlawful conditions with respect to sanitation, nutrition, hygiene, exercise, and education, in violation of the Fourteenth Amendment.

200. South Carolina children detained at DJJ facilities are subject to an inhumane physical and psychological environment at those facilities, which fail to provide minimum standards of safety and health.

201. Plaintiffs have suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violations of these rights of South Carolina youth under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. These harms will continue unless DJJ's policies, practices, and procedures are enjoined by this Court.

**Count 5: Violations of the Americans with Disabilities Act ("ADA")**

202. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

203. DRSC's incarcerated juvenile constituents are qualified individuals with disabilities as defined in the ADA. They have impairments that substantially limit one or more major life activities, they have records of such impairments, or they are regarded as having such impairments. All of DRSC's incarcerated juvenile constituents are qualified to participate in the services, programs, activities, and benefits provided to children within DJJ custody within the meaning of Title II of the ADA. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

204. Title II of the ADA prohibits public entities like DJJ from excluding people with disabilities from participation in, or denying them the benefits of, its services, programs, and

activities, or from otherwise subjecting people with disabilities to discrimination. 42 U.S.C. §§ 12102(2), 12132.

205. DJJ is a public entity as defined under 42 U.S.C. § 12131(1)(A) and thus has an affirmative duty to create policies and procedures to prevent discrimination based on disability.

206. DJJ violates the ADA by failing to ensure that children with disabilities have access to, are permitted to participate in, and are not denied the benefits of programs, services, and activities provided by DJJ. 42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

207. DJJ violates the ADA by failing to make "reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

208. As a result of DJJ's policies and practices regarding individuals with disabilities, DRSC constituents are unnecessarily placed and retained in solitary confinement because of their disabilities; are denied equal access to activities, programs, and services for which they are otherwise qualified; and are denied the opportunity to receive services in the most integrated setting appropriate to their needs. Thus, DJJ discriminates against "qualified individuals with a disability" within the meaning of the ADA. 28 C.F.R. § 35.152(b)(2).

209. DRSC has suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violation of these rights of South Carolina youth under the ADA. These harms will continue unless DJJ's policies, practices, and procedures are enjoined by this Court.

**Count 6: Violation of the Rehabilitation Act**

210. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

211. DRSC's incarcerated juvenile constituents are qualified individuals with disabilities as defined in Section 504 of the Rehabilitation Act. 29 U.S.C. §§ 705(20), 794.

212. DRSC's incarcerated juvenile constituents are qualified to participate in the services, programs, activities, and benefits provided to children in DJJ custody within the meaning of Section 504 of the Rehabilitation Act.

213. DJJ excludes DRSC's incarcerated juvenile constituents from participation in and denies them the benefits of programs or activities, by reason of their disabilities. 29 U.S.C. §794(a); 28 C.F.R. § 42.503(a).

214. DJJ discriminates against "qualified individual[s] with a disability" within the meaning of the Rehabilitation Act by administering programs and services for children with disabilities in a manner that denies them the opportunities to receive services in the most integrated setting appropriate to their needs. 29 U.S.C. § 794; 45 C.F.R. § 84.4(b)(2).

215. DJJ denies DRSC's incarcerated juvenile constituents the opportunity afforded others to participate in programs or activities. 28 C.F.R. § 42.503(b)(1).

216. DJJ uses criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap and defeat or substantially impair accomplishment of the objectives of DJJ's programs or activities with respect to handicapped persons. 28 U.S.C. § 42.503(b)(3).

217. DJJ violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate children with disabilities in its facilities, programs, activities, and services.

218. As a result of DJJ's discrimination and failure to provide reasonable accommodations, DRSC's incarcerated juvenile constituents do not have equal access to DJJ's activities, programs, and services for which they are otherwise qualified.

219. As a direct and proximate cause of these policies and practices, DRSC's incarcerated juvenile constituents continue to suffer harm and violation of their rights under Section 504 of the Rehabilitation Act. These harms will continue unless enjoined by this Court.

220. DRSC has suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violation of these rights of

South Carolina youth under the ADA. These harms will continue unless DJJ's policies, practices, and procedures are enjoined by this Court.

**Count 7: Violation of the IDEA**

221. Plaintiffs restate each of the allegations in the preceding paragraphs as if fully set forth herein.

222. DRSC's incarcerated population includes children who are or should be identified for special education and related services under the IDEA, 20 U.S.C. §§ 1400 *et. seq.* Therefore, they qualify as children with disabilities for purposes of the IDEA.

223. Under the IDEA, students with disabilities are entitled to receive a free appropriate public education ("FAPE"), including special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(A).

224. As operators of a state education agency, DJJ has a duty to provide FAPE to all children with disabilities under its supervision, in accordance with the requirements of the IDEA. *See* 34 C.F.R. § 300.2(b)(1)(ii).

225. Through their policies, procedures, and practices relating to their administration of schools within their facilities, DJJ fails to meet its obligations under the IDEA:

a. DJJ does not provide FAPE to DRSC's incarcerated juvenile constituents because it does not ensure that appropriate services and supports are available for students with disabilities in its facilities;

b. DJJ does not identify, locate, and evaluate all children with known or suspected disabilities who are in need of special education and related services as required by 20 U.S.C. § 1412(a)(1)(A), nor does it have in effect policies and procedures to ensure this happens as required by 34 C.F.R. § 300.111(a); and

c. DJJ does not implement appropriate IEPs for each child with a disability in accordance with 20 U.S.C. § 1414(d).

226. As a result, DJJ has violated and continues to violate rights secured by the IDEA and its implementing regulations.

227. DJJ's persistent violations of IDEA's inclusion mandates constitute systemic legal deficiencies. Plaintiffs seek systemwide relief, rather than individual remedies premised on the individual needs of particular students. The structural relief sought by Plaintiffs can neither be provided nor addressed through IDEA's administrative process; as such, IDEA's exhaustion requirements are inapplicable as exhaustion would be both futile and inadequate.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Adjudge and declare that the challenged acts, omissions, policies, and practices of Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, violate the rights of South Carolina children under the Fourteenth Amendment to the U.S. Constitution, the IDEA, the Rehabilitation Act, and the ADA;

B. Preliminarily and permanently enjoin Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

C. Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise to:

- Immediately take steps to protect children in its custody, including:
    - i. repairing all locks, cameras, and other security measures within all DJJ facilities;
    - ii. maintaining at least an 8:1 youth-to-staff ratio at all DJJ facilities at all times;

iii. investigating and promptly terminating any DJJ personnel found to have participated in or facilitated any assault on any child detained by DJJ; and

iv. training DJJ personnel to respond to youth-on-youth violence to ensure the protection of children in DJJ custody;

- Establish and file with the Court a written plan, designed to be implemented within 30 days, for providing sanitary conditions of confinement, with such plan specifically addressing (1) steps to assist youth in maintaining their hygiene, (2) steps to achieve a clean and safe living space in all dorms, units, pods, and common areas, and (3) ongoing maintenance and cleaning of the physical plant of each DJJ facility;
- Provide unrestricted access to clean drinking water and maintain healthy food and beverages appropriate for a youth's dietary needs, with such meals to be free of any contaminants and prepared in a hygienic and sanitary environment;
- Immediately cease the practice of "23-to-1";
- Immediately cease the use of solitary confinement or forced isolation of detained children as a punitive or disciplinary measure, or for any other reason other than an immediate and substantial risk of great bodily harm to self or others;
- Observe the following conditions, where isolation or separation of detained children is reasonably necessary to address an immediate and substantial risk of great bodily harm:

i. use of solitary confinement must be preceded in each instance by a face-to-face mental health evaluation by a licensed psychiatrist or psychologist with expertise in child and adolescent mental health, with such evaluation to address whether placement in isolation is a

contraindication to the youth's mental health and whether other, less restrictive options exist to adequately protect the youth, other youth, and staff, and with such evaluation to be memorialized in a detailed written record;

ii. children placed in solitary confinement should receive regular, in-person safety checks from DJJ staff;

iii. no child should be placed in isolation for an initial period of greater than two hours;

iv. a second face-to-face evaluation by a licensed psychiatrist or psychologist with expertise in child and adolescent mental health will occur at two hours, to determine whether an immediate and substantial risk of great bodily harm to self or others still exists, with the release/retention decision to be based on the actions and behavior of the youth since the initial review, and with such evaluation to be memorialized in a detailed written record;

v. if the evaluating psychiatrist or psychologist determines that retention in isolation beyond two hours is necessary, the child's parents shall be notified of such determination immediately, the DJJ facility administrator must visit the child in person, and the DJJ facility administrator must review and approve an individualized written plan, in consultation with the evaluating psychiatrist or psychologist, for the child's safe return to the general juvenile population later the same evening, with such written plan to include a description of the reasons for isolation and the less restrictive disciplinary measures attempted, and with a copy of such plan to be given to the child and the child's parents, along with any DJJ staff who are involved with the child;

vi. if the DJJ facility administrator determines, based on its review of the written plan, that safe return to the general juvenile population the same day or evening is not practicable and an overnight stay in isolation is necessary, the child's parents shall be notified of such determination immediately, periodic face-to-face evaluations of the child by a licensed psychiatrist or psychologist with expertise in child and adolescent mental health shall occur at least once every eight hours, and the DJJ facility administrator must review and approve an individualized written plan, in consultation with the evaluating psychiatrist or psychologist, for alternative interventions (e.g., hospitalization) in lieu of further isolation. In no event shall the child be forced to remain in isolation beyond 24 hours after his or her placement therein.

- Ensure that youth in isolation for more than two hours:
    i. have access to property items similar to or the same as those items allowed in general population, though specific items of property may be restricted on a case-by-case basis as needed for the safety of the youth and staff;
    ii. receive all regularly scheduled social worker visits, mental health services, and other health services;
    iii. receive any rehabilitative programming that was scheduled or in process before placement in isolation;
    iv. receive educational services with the general population, unless such attendance is determined by psychiatrist/psychologist reviews to present an immediate and substantial threat of physical harm to others, or an unreasonable risk of significant disruption of the classroom

environment, in which such case youth in restrictive isolation shall receive alternative educational services of a comparable type and quality on the same days and at the same time as the general population receives such services;

- Undertake a review of the placements of all youth currently held in solitary confinement or forced isolation, with any youth held in such settings to be immediately released to the general population if their continued placement in isolation otherwise violates the terms of the Court's Order;
- Prepare an individualized assessment and treatment plan for each child entering DJJ's custody, where such assessment and plan includes a detailed history of any underlying trauma or other pre-existing physical or mental health conditions, and specific goals and objectives for the child during their time in DJJ custody;
- Conduct weekly check-ins with all clinical providers and DJJ staff involved with the child to ensure progress along the treatment plan;
- Immediately comply with their obligations under the IDEA and ADA, including by ensuring that all juveniles in DJJ custody have access to at least three hours of teacher-led educational instruction each day as well as any IDEA-mandated special education and related services;
- Ensure each detained youth has access to regular counseling and therapy to address mental health needs and underlying trauma;
- Develop and implement a plan for implementing trauma-informed care at all DJJ facilities;
- Contract with a third party approved by Plaintiffs to train all DJJ staff on how to implement trauma-informed care;

- Immediately implement other measures deemed by the Court necessary to ensure adequate sanitation, nutrition, education, and basic health needs of children detained in DJJ facilities.

D. Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement a plan to eliminate the substantial risk of serious harm described herein;

E. Order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to implement certain remedies in the DOJ's settlement with DJJ across all facilities and on a more expedited timeframe;

F. Appoint an independent monitor of the Plaintiffs' choosing to oversee Defendants' compliance with the Court's order;

G. Retain jurisdiction over Defendants until such time as the Court is satisfied that the unlawful policies, practices, acts, and omissions complained of herein no longer exist and will not recur;

H. Award to Plaintiffs reasonable costs and attorneys' fees, including pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205;

I. Grant any additional relief that the Court deems just.

Dated: April 26, 2022

Respectfully submitted,

**ACLU OF SOUTH CAROLINA**

D. Allen Chaney Jr.
Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org

**WYCHE, P.A.**

Rita Bolt Barker
Wallace K. Lightsey (D.S.C. Bar No. 1037) Rita Bolt Barker (D.S.C. Bar No. 77600) Meliah Bowers Jefferson (D.S.C. Bar No. 10018) Jessica Monsell (D.S.C. Bar No. 13645)
200 E. Broad Street, Suite 400
Greenville, South Carolina 29601
Tel: (864) 242-8200
Fax: (864) 235-8900
rbarker@wyche.com
wlightsey@wyche.com
mjefferson@wyche.com
jmonsell@wyche.com

**NAACP**

Janette Louard*
Anna-Kathryn Barnes*
Joe Schottenfeld*
Martina Tiku*
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
abarnes@naacpnet.org
jschottenfeld@naacpnet.org
mtiku@naacpnet.org

**JENNER & BLOCK LLP**

Previn Warren*
William R. Weaver*
Mary E. Marshall*
Jessica J.W. Sawadogo*
1099 New York Ave. NW Suite 900
Washington DC 20001
Tel: (202) 637-6300
pwarren@jenner.com
wweaver@jenner.com
mmarshall@jenner.com
jsawadogo@jenner.com

Jeremy M. Creelan*
Jacob D. Alderdice*
Jeremy Ershow*
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
jcreelan@jenner.com
jalderdice@jenner.com
jershow@jenner.com

Amit B. Patel*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
apatel@jenner.com

**PRO HAC VICE APPLICATIONS TO BE FILED*