IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| South Carolina State Conference of NAACP; <br><br> Disability Rights of South Carolina; <br><br> Justice 360, <br><br>       *Plaintiffs*, <br><br> v. <br><br> South Carolina Department of Juvenile Justice; <br><br> Eden Hendrick, individually and in her official capacity as Executive Director of the South Carolina Department of Juvenile Justice, <br><br>       *Defendants.* | Case No.: 0:22-cv-01338-MGL-PJG <br><br><br><br> **MOTION TO DISMISS** |

Defendants South Carolina Department of Juvenile Justice (DJJ) and Eden Hendrick, individually and in her official capacity as Executive Director of the DJJ (Director Hendrick), by and through the undersigned counsel, move to dismiss Plaintiffs South Carolina State Conference of NAACP (SCNAACP), Disability Rights of South Carolina (DRSC), and Justice 360's Complaint, ECF No. 1, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

**INTRODUCTION**

Just last month, on April 13, 2022, DJJ entered into a settlement with the United States to "remedy the alleged constitutional violations identified by" the U.S. Department of Justice (DOJ) at Broad River Road Correctional facility (BRRC), DJJ's long-term residential facility for committed youth. ECF No. 1-7, at 2. This settlement was the product of a four-and-a-half-year

---

[1] Under Local Civil Rule 7.04 (D.S.C.), "a supporting memorandum is not required" as this motion contains "a full explanation" and a separate memorandum "would serve no useful purpose."

DOJ investigation with which "DJJ's leadership and staff fully cooperated" by "providing access to youth, staff, documents, and other necessary material" along with "full access" to its facilities. *Id.* Indeed, DJJ "began to implement improvements even while the investigation remained pending." *Id.* "As a result of DJJ's voluntary cooperation and willingness to implement meaningful change," the "Settlement Agreement, rather than contested litigation, represent[ed] the best opportunity to address DOJ's findings." *Id.*

To be clear, DJJ recognized it had improvements to make. That is why it "fully cooperated" with DOJ and worked hard to develop and implement meaningful solutions. Rehabilitating its juvenile population and providing the necessary services are of paramount importance. And DJJ takes it very seriously, as evidenced by the fact that DJJ has had an in-house settlement agreement coordinator, whose sole job is to ensure compliance with the DOJ agreement, in place since December 2021 (four months before the settlement agreement was even finalized and signed). Further, DJJ and DOJ have jointly selected a subject matter expert to provide DJJ technical assistance as it fulfills its obligations under the agreement. Although the agreement specifically references BRRC, DJJ—a state agency—is nevertheless implementing significant reforms on a systemwide basis. For example, all policy and training updates required by the agreement will apply and be implemented at all five DJJ secure facilities that house youth.

Notably, South Carolina's State Fiscal Accountability Authority—comprised of the Governor, Treasurer, Comptroller General, Chairman of the House Ways and Means Committee, and Chairman of the Senate Finance Committee—approved the DJJ–DOJ settlement agreement on April 5, 2022. In other words, it has received the blessing of not only the executive branch of the federal government, but also the blessing and support of leaders in the legislative and executive branches of state government. Additionally, on April 20, 2022, this Court granted DOJ and DJJ's

joint motion to dismiss the complaint, without prejudice, "subject to retention of jurisdiction and reinstatement upon the United States' motion for the purpose of resolving any claim that" DJJ "materially breached any provision of the Agreement." *United States v. S.C. Dep't of Juv. Justice*, No. 3:22-cv-01221-MGL, ECF No. 8, at 1–2 (D.S.C. Apr. 20, 2022).

Yet Plaintiffs, three special interest groups, filed this lawsuit six days later trying to Monday-morning quarterback a deal on which the ink is barely dry. In Plaintiffs' view, despite DOJ's and DJJ's efforts and years of good-faith negotiations, the deal does not go far or fast enough. So instead of giving the terms of the agreement a chance to unfold, Plaintiffs now demand a sweeping declaratory judgment, mandatory injunctive relief, and unlimited intervention from this Court. While Plaintiffs purport to raise a smattering of claims, the bottom line is that they want the Court to engraft their personal policy preferences into DJJ's operations as a matter of constitutional and federal law. Not satisfied with stopping there, Plaintiffs demand a monitor of their choosing—with no input from DJJ, DOJ, or this Court—to impose their will on South Carolina's juvenile justice system. And Plaintiffs' insistence upon this extraordinary relief is solely predicated on the flawed premise that they somehow know best.

From a legal perspective, this case is without merit. Despite demanding what, in essence, plainly amounts to classwide relief, Plaintiffs have made no effort to request class certification, much less to plead the elements entitling them to systemic relief. *See* Fed. R. Civ. P. 23. In fact, not a single juvenile detainee is a named plaintiff. *Cf. Alexander S. ex rel. Bowers v. Boyd*, 876 F. Supp. 773, 777 (D.S.C. 1995) (deciding "an action initiated by juveniles incarcerated at the four correctional institutions maintained and operated by" DJJ).

Plaintiffs have not done so because they cannot satisfy the mandatory exhaustion requirements of the Prison Litigation Reform Act (PLRA), 42 U.S.C. §§ 1997e *et seq.*; the

Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*; the Rehabilitation Act, 29 U.S.C. §§ 705 *et seq.*; or the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*  And their efforts at creative pleading do not save their claims.  Try as they might, Plaintiffs cannot whistle past the mandatory exhaustion requirements established by federal law on the undisclosed juvenile detainees they apparently seek to represent.  Further, Plaintiffs lack Article III standing and cannot bring derivative claims on behalf of juvenile detainees under 42 U.S.C. § 1983.  Moreover, had Plaintiffs reached out to DJJ instead of filing a lawsuit, they would know the vast majority of their claims are moot and have already been redressed.

But the ACLU of South Carolina—along with others—is now demanding that state officials, and this time the Attorney General of the United States, bend to its will by filing another most curious federal lawsuit to try to force a settlement or consent decree.[2]  *See* 18 U.S.C. § 3626(c)(1)–(2).  Plaintiffs' strategy is neither productive nor effective.  And the legal hurdles are insurmountable for them to move forward with their implausible claims.

Although Plaintiffs cite *Alexander S.* throughout their Complaint, they seem to ignore what the Court actually said there given their call for a two-hour initial isolation review period as opposed to the agreed upon four-hour one.  *Cf. Alexander S.*, 876 F. Supp. at 798 ("The test in this case is whether the state is providing minimally adequate or reasonable services and training necessary to ensure the protected interests of the Plaintiffs.  It is not appropriate that the state be held to a standard which imposes an affirmative duty to succeed in the purpose of correcting the juveniles' behavior.  Although such a standard may be desirable, it is not constitutionally mandated.").  This is only further reinforced by their insistence that DJJ implement all new policies

---

[2] *Cf.* Ex. A., *Voltz-Loomis v. McMaster*, No. 5:20-cv-01533-DCC, Hr'g Tr. at pp. 1–40 (D.S.C. July 1, 2020).  The Court can take judicial notice of its own dockets.  *See* Fed. R. Evid. 201(b)(1)–(2); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

within 30 days.  *Cf. id.* at 778–79 (declining to impose "a court-ordered remedial scheme" and allowing defendants "a *reasonable* period . . . to submit a remedial plan to the court for its review" (emphasis added)).  This is just a sampling of the minutiae in which Plaintiffs demand Court involvement solely because they did not get their way after bending the ear of folks at DOJ during its collaborative discussions with DJJ.  *See, e.g.*, *Drayden v. Needville Indep. Sch. Dist.*, 642 F.2d 129, 133 (5th Cir. 1981) (emphasizing that "[a] declaratory or injunctive relief granted by a district court regarding the cessation of discriminatory practices" following voluntary settlement between local and federal parties "would now be moot, not to mention redundant and superfluous"), *abrogated on other grounds by Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992).

Article III, however, does not sweep so broadly.  To be sure, "courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations."  *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).  So too with juvenile detention facilities.  *E.g.*, *Alexander S.*, 876 F. Supp. at 773.  "But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan."  *Bell*, 441 U.S. at 562.  The Court's role "is not to attempt to construct a paragon or 'model' training school program for DJJ."  *Alexander S.*, 876 F. Supp. at 779.  "Juvenile detention is a tricky business."  *Doe 4 ex rel. Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 348 (4th Cir. 2021) (Wilkinson, J., dissenting).  To the contrary, "[t]he wide range of 'judgment calls' that meet constitutional . . . requirements are confided to officials outside the Judicial Branch of Government."  *Bell*, 441 U.S. at 562.  After all, "[f]ederal courts resolve cases and controversies, not crusades."  *Timpson ex rel. Timpson v. McMaster*, 437 F. Supp. 3d 469, 472 (D.S.C. 2020).[3]

---

[3] *aff'd in part, vacated and remanded in part on other grounds sub nom. Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238 (4th Cir. 2022).

The United States and DJJ already reached an agreement on how best to address issues in South Carolina's juvenile justice system—in consultation with subject matter experts—to ensure compliance with federal law and constitutional standards (not Plaintiffs' arbitrary ones) and to fulfill the rehabilitative aims of the South Carolina Juvenile Justice Code. By needlessly trying to inject themselves into the process at the eleventh hour, Plaintiffs are only wasting precious resources, distracting DJJ from the ongoing implementation of significant reforms, and threatening to disrupt the settlement agreement with DOJ. With all due respect, lawyers for the ACLU of SC, SC NAACP, DRSC, and Justice 360 have no legal right to demand a seat at the table, particularly when they have not identified a single *client* juvenile detainee in the caption or otherwise. While their input is always welcomed, their misguided efforts to impose policy preferences through implausible lawsuits are not. The Court should dismiss the Complaint.

## BACKGROUND

Although DJJ can trace its roots to the late 1800s, it was created in its current form and established as a Cabinet-level agency in 1993. DJJ's executive director—who "is vested with the exclusive responsibility for policy of the department to carry out the responsibilities, duties, and privileges provided for in" the Juvenile Justice Code—is appointed by the Governor with advice and consent of the Senate. S.C. Code Ann. §§ 63-19-320 & -330.

A juvenile is only committed to the custody of DJJ by order of a family court judge and conveyance of the sheriff or deputy sheriff. *See* S.C. Code Ann. § 63-19-1440. And the Juvenile Justice Code provides that "[n]o juvenile may be committed to" a DJJ institution "who is seriously handicapped by mental illness or retardation." S.C. Code Ann. § 63-19-1450(A). "From the time of lawful reception of a child by" DJJ "and during the child's stay in custody in a correctional institution, facility, or program operated by the department, the child shall be under the exclusive

6

care, custody, and control of the department." S.C. Code Ann. § 63-194-1610. While committed, DJJ provides the child a panoply of institutional services. *See* S.C. Code Ann. § 63-19-360. Importantly, DJJ—as a designated "special school district"—also "provide[s] academic and vocational training" that must "meet all educational standards prescribed by law." S.C. Code Ann. § 63-19-380(A). DJJ recognizes and fully accepts its responsibilities to the youth it serves.

In 2017, after reviewing the agency from 2014 to 2016, the South Carolina Legislative Audit Council (LAC)—without the benefit of consulting with juvenile justice experts—issued a critical report regarding the state of DJJ, making a host of recommendations for improvement. Shortly thereafter, DOJ initiated an investigation into BRRC.[4] As part of its investigation, "DOJ visited DJJ offices around the state, conducted interviews of staff, detainees, and their family members, toured the BRRC three times, reviewed thousands of documents and video recordings." Pls.' Compl. ¶ 40. "On February 5, 2020, DOJ sent a report to Governor Henry McMaster summarizing its investigation of the BRRC." *Id.* ¶ 41.

DJJ immediately began cooperating with DOJ. On April 13, 2022, after years of discussion and collaboration, the parties signed a settlement agreement to, among other things, "ensure that the conditions in [BRRC] support the rights of the youth confined there, encourage rehabilitation, and improve the likelihood that youth will succeed upon release." ECF No. 1-7, at 2. The agreement focused on several areas of concern: (1) protecting youth from violence; (2) staffing; (3) video surveillance; (4) rehabilitative programming; (5) behavioral management; (6) use of force; (7) investigations into youth-on-youth physical harm, excessive or unnecessary use of force, or improper use of isolation; (8) isolation policies; (9) housing vulnerable youth and youth on suicide watch; (10) training staff; and (11) quality assurance. *Id.* at 4–14.

---

[4] DOJ visited other facilities, too, and brought consultants and subject matter experts to the visits.

Importantly, "[a]mong the steps that DJJ has already taken are to lower staff-to-youth ratios, reduce blind spots in housing units, implement cool down rooms to reduce use of isolation, develop an electronic portal for the entry and subsequent processing of Use of Physical Force forms, and hire additional investigative staff." *Id.* at 2. Although the agreement encompasses only BRRC, DJJ—as a state agency—has implemented and will continue to implement the new reforms on a systemwide basis as it does with all policies and procedures. *E.g.*, Ex. B, SCDJJ Policy No. G.3.4, Isolation of Youth, at 10 ("This policy applies to all of DJJ's hardware secure facilities.").

On April 26, 2022, Plaintiffs nevertheless filed this lawsuit against DJJ and Director Hendrick, asserting eight causes of action. ECF No. 1, at 1–54. Plaintiffs purport to raise four claims under Section 1983, alleging DJJ violated the Fourteenth Amendment by (1) failing to protect juveniles; (2) using isolation or solitary confinement as punishment; (3) failing to provide rehabilitative services; and (4) providing substandard conditions of confinement as it relates to sanitation, nutrition, hygiene, exercise, and education. *Id.* ¶¶ 179–201. In each claim, Plaintiffs—three special interest groups—include a conclusory, unadorned assertion that they have "suffered harm and will continue to suffer harm." *Id.* ¶¶ 184, 192, 197 & 201.

Plaintiffs, through DRSC only, further assert that DJJ violated federal law. According to DRSC, DJJ violated Title II of the ADA by failing to make reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. *Id.* ¶ 207. DRSC also argues DJJ violated the Rehabilitation Act by administering programs and services for juveniles with disabilities in a manner that denies them the opportunity to receive services in the most integrated setting appropriate to their needs. *Id.* ¶ 214. Last, DRSC contends DJJ violated the IDEA by failing to provide a free and appropriate public education (FAPE) by not ensuring appropriate services and supports are available for students with

disabilities; not identifying, locating, and evaluating all juveniles with known or suspected disabilities who are in need of special education and related services; and failing to implement appropriate IEPs for each juvenile with a disability. *Id.* ¶ 225.

This matter comes before the Court on Defendants motion to dismiss because Plaintiffs have no standing or legal basis to move forward with their claims in federal court.

STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) asks "the fundamental question of whether a court has jurisdiction to adjudicate the matter before it." *Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, 509 F. Supp. 3d 547, 553 (D.S.C. 2020) (citing Fed. R. Civ. P. 12(b)(1)). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). In determining whether jurisdiction exists, the Court "regard[s] the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss for "failure to state a claim upon which relief can be granted." When considering a Rule 12(b)(6) motion, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011). But "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Facts pled that are merely consistent with liability are not sufficient." *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).  While the Court is generally limited to the four corners of the complaint, it is "permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

**ARGUMENT**

I.     *At the outset, Plaintiffs' requested relief raises serious federalism, comity, and separation of powers concerns.*

As an initial matter, Plaintiffs' effort to drag the federal judiciary into the day-to-day intricacies of South Carolina's juvenile justice system should give the Court pause.  As the Supreme Court recognized, "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973); *see also Meacham v. Fano*, 427 U.S. 215, 229 (1976) ("Federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States.").  Indeed, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 84 (1987).

And the Supreme Court has likewise commented on how "ill equipped" federal courts are to handle the "complex and intractable" problems associated with prison management, observing that "judicial recognition of that fact reflects no more than a healthy sense of realism." *Rhodes v. Chapman*, 452 U.S. 337, 351 n.16 (1981).  For that reason, the Court has warned that federal courts "must proceed cautiously." *Id.* at 351.  While the Court certainly has a duty to scrutinize of constitutional claims, "[i]n discharging this oversight responsibility," the Court "cannot assume

10

that . . . officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the" juvenile justice system in South Carolina. *Id.* at 352.

Against this backdrop, the Court should be reluctant to wade into Plaintiffs' procedurally plagued lawsuit that seeks to undermine an agreement between the United States and DJJ that has been approved by this Court, leaders in the legislative and executive branches of state government, and the executive branch of the federal government.

II.    *The Court lacks subject matter jurisdiction because Plaintiffs do not have standing and most, if not all, their claims are moot.*

Before diving into the merits, Plaintiffs must show they are entitled to open the courthouse doors. Federal courts only decide "Cases" and "Controversies." U.S. CONST. art. III, § 2. And the case-or-controversy requirement of Article III encompasses standing and mootness. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). Plaintiffs' claims fail under both.

A.    *Plaintiffs lack Article III standing.*

"The plaintiff has the burden of establishing standing." *Somers v. S.C. State Elec. Comm'n*, 871 F. Supp. 2d 490, 496 (D.S.C. 2012). To show standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

"The injury in fact requirement precludes those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." *Meyer v. McMaster*, 394 F. Supp. 3d 550, 559 (D.S.C. 2019) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling*

11

*Corp.*, 204 F.3d 149, 156 (4th Cir. 2000)).  Indeed, "it is not enough that the party invoking the power of the court have a keen interest in the issue." *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013).  Plaintiffs have not identified an injury-in-fact personal to their organizations.

In their Section 1983 claims, Plaintiffs allege that—by engaging in certain policies and practices—"DJJ violates *the rights of South Carolina youth* under the Fourteenth Amendment," and "*Plaintiffs* have suffered harm and will continue to suffer harm for which there is no adequate remedy at law as a direct and proximate cause of DJJ's violation of these rights."  Pls.' Compl. ¶¶ 183–84 (emphasis added).  They further allege that "DJJ's use of isolation deprives children of their substantive due process right to rehabilitative treatment and a rehabilitative environment." *Id.* ¶ 190.  According to Plaintiffs, that "cause[s] material harms to the Plaintiffs who represent and advocate for South Carolina children." *Id.* ¶ 191.  Two observations.  One, any alleged injury would belong to the unidentified juvenile detainees, not Plaintiffs.  Two, Plaintiffs make no effort to explain their non sequiturs of those alleged injuries of others harming the special interest groups here.  In their third Section 1983 claim, Plaintiffs fail to allege that anyone was injured by DJJ's alleged departure from Plaintiffs' "professional judgment" standard of care borrowed from an unrelated case. *Id.* ¶¶ 194, 196; *but see Alexander S.*, 876 F. Supp. at 798.  Yet Plaintiffs still include the copy-and-paste provision about them being harmed.  Pls.' Compl. ¶ 197.  These abstract arguments certainly fail to qualify as an injury-in-fact.  Last, Plaintiffs allege that "South Carolina children detained at DJJ facilities are subject to an inhumane physical and psychological environment" and that somehow harms Plaintiffs. *Id.* ¶¶ 200, 201.  Again, that much does not follow.  A harm to an individual juvenile detainee does not constitute harm to Plaintiffs.

Plaintiffs' federal statutory claims suffer from the same problem.  Plaintiffs allege that "DJJ discriminates against 'qualified individuals with a disability' within the meaning of the ADA" and

"within the meaning of the Rehabilitation Act," *id.* ¶¶ 208 & 214, but they fail to identify who these individuals are or what disability they may have. Given that these federal remedial schemes focus on *individuals*, it is curious that Plaintiffs would not tether their allegations to a single one. In any event, these generic, conclusory allegations on behalf of unknown people do not establish a personal injury-in-fact for purposes of Plaintiffs' ADA and Rehabilitation Act claims. Turning to the IDEA, Plaintiffs are still off the mark. Although it is called the *Individuals* with Disabilities Education Act, "Plaintiffs seek systemwide relief, rather than individual remedies premised on the individual needs of individual students." *Id.* ¶ 227. Putting aside the question of whether that remedy is even available under the IDEA (as explained below, it is no substitute to the exhaustion requirement), this allegation openly absconds with any effort to plead a personal injury in fact.

Accordingly, Plaintiffs do not and cannot show they have Article III standing to bring any of their generalized, abstract, and bizarre claims against Defendants. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (holding "in a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending'"). Put simply, Plaintiffs have not alleged an injury-in-fact personal to them, and they cannot borrow others' alleged injuries to establish causation. Given the serious jurisdictional and legal hurdles addressed below, Plaintiffs also cannot show that their purloined injuries could in any way be redressed by the Court.

Nor can they establish associational standing. *See id.* at 181 ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the

lawsuit."). Taking them in reverse order, every claim "requires the participation of individual members in the lawsuit." *Id.* Further, given the failure to exhaust, no individual plaintiff could sue in his "own right" at this juncture anyway. *Id.* Last, aside from DRSC, no other plaintiff even tried to plausibly allege that "the interests at stake are germane to the organization's purpose." *Id.*

Plaintiffs fare no better under third-party standing. As a general rule, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This rule "represents a 'healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed,'" a court "might be 'called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.'" *Kowalski v. Tesmer*, 543 U.S. 125, 130 (1991) (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 n.5 (1984); *Warth*, 422 U.S. at 500). Although the Supreme Court has recognized a "limited" exception to this rule, the party seeking to invoke third-party standing must show (1) "a 'close' relationship with the person who possesses the right" and (2) "a 'hindrance' to the possessor's ability to protect his own interests." *Id.*

Here, Plaintiffs cannot meet either prong to invoke the limited exception. *First*, they do not have a close relationship with the juvenile detainees for whom they seek to carry the mantle. Nothing in the Complaint suggests any specific juvenile detainee is a client of these special interest groups. If he or she were, Plaintiffs would have added him or her as a named plaintiff. They did not. The SCNAACP, for example, simply alleges that one juvenile detainee's parent is a member without identifying who that person is. Justice 360 claims "it provides direct representation to children in the custody of DJJ," Pls.' Compl. ¶ 13, but it fails to identify a single one as a named

14

plaintiff or class member.  Again, no class relief was pleaded or sought.  For the reasons explained below, DRSC likewise does not push Plaintiffs over the goal line to raise specific, individualized claims subject to exhaustion requirements by citing general, inapposite federal statutes.

*Second*, Plaintiffs do not and cannot argue that juvenile detainees' ability to protect their own interests is in any way hindered.  To the contrary, several children—some of whom Plaintiffs apparently seek to launder, *see* Pls.' Compl. ¶¶ 69–83, without an attorney–client relationship for purposes of airing their generalized grievances—already have their own counsel and have filed at least four actions in state court this year alone.  *E.g.*, *Andre Long v. SCDJJ*, No. 2022-CP-40-02216 (S.C. Ct. Comm. Pl. filed Apr. 28, 2022); *Sequan Smith v. SCDJJ*, No. 2022-CP-40-02142 (S.C. Ct. Comm. Pl. filed Apr. 25, 2022); *Jonathan Paz v. SCDJJ*, No. 2022-CP-40-02144 (S.C. Ct. Comm. Pl. filed Apr. 25, 2022); *Myan McCray v. SCDJJ*, No. 2022-CP-40-01960 (S.C. Ct. Comm. Pl. filed Apr. 15, 2022).[5]  Hardly a hindrance.  Indeed, it shows that state court remedies are very much available, rendering this unprecedented federal action even more inappropriate.

Irrespective of the theory of standing, Plaintiffs notably only mention BRRC and the Juvenile Detention Center in their Complaint.  Because they failed to allege an injury-in-fact on behalf of themselves or anyone housed in DJJ's other facilities, they plainly lack standing to bring any constitutional or statutory challenges related to those other facilities.

    B.    *Plaintiffs lack statutory standing to bring Section 1983 claims.*

The question of "statutory standing" involves whether a plaintiff has "a cause of action under the statute."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014).  When analyzing this question, the Court's "task is essentially one of statutory

---

[5] The Court can take judicial notice of state court dockets.  *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239-40 (4th Cir. 1989).

construction," and if "the statutory language provides a clear answer, [the] analysis begins and

ends with that language." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 53 (4th Cir.

2011) (cleaned up). Plaintiffs purport to bring at least four claims of Fourteenth Amendment

violations arising under Section 1983. Pls.' Compl. ¶¶ 179–201. Section 1983 provides:

> Every person who, under color of [state law,] . . . subjects, or causes
> to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, *shall
> be liable to the party injured* in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

Under "the language of § 1983," "[t]he appropriate plaintiff is obvious." *Andrews v. Neer*,

253 F.3d 1052, 1056 (8th Cir. 2001). Only "the party injured" may bring an action, not "a party

injured." *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that

'the' is a function word indicating that a following noun or noun equivalent is definite or has been

previously specified by context." (cleaned up)); *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*,

139 S. Ct. 1507, 1514 (2019) (stating "the use of the definite article indicates that there is generally

only one person covered" (cleaned up)).

"The only antecedent possible" here is the "citizen" or "other person" identified earlier in

the sentence. *Miller's Apple Valley Chevrolet Olds-Geo, Inc. v. Goodwin*, 177 F.3d 232, 234 (4th

Cir. 1999). Because "courts must presume that a legislature says in a statute what it means and

means in a statute what it says there," and the words of Section 1983 "are unambiguous," the

"judicial inquiry is complete." *Lee v. Boeing Co.*, 123 F.3d 801, 805 (4th Cir. 1997) (cleaned up).

Put simply, "[a] section 1983 claim must be based upon the violation of plaintiff's personal rights,

and not the rights of someone else." *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000)

(quoting *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990)).

As special interest groups, not juvenile detainees, Plaintiffs lack statutory standing to bring the Section 1983 claims in Counts 1 through 4.  Plaintiffs have not alleged a single deprivation of *their* constitutional rights.  Instead, they argue in the abstract about alleged violations of others' constitutional rights.  Because Section 1983 is limited to the individual who was actually deprived of rights secured by the Constitution and laws, Plaintiffs' claims fail as a matter of law.

By the same token, Plaintiffs lack statutory standing to bring their remaining federal claims.  In this regard, Plaintiffs put all their eggs in DRSC's basket.  According to Plaintiffs, three federal statutes—none of which is found in the three Acts under which they purport to bring claims—give them the right to bring this action.  *See* Pls.' Compl. ¶ 10 (citing the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 15041 *et seq.*; Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. §§ 10801 *et seq.*; and the Protection and Advocacy of Individual Rights Act, 42 U.S.C. §§ 794e *et seq.*).  "But it is a commonplace of statutory construction that the specific governs the general."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  "That is particularly true" when "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up).  "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission.  To eliminate the contradiction, the specific provision is construed as an exception to the general one."  *Id.*

Admittedly, this argument bleeds into the exhaustion discussion below.  Even if DRSC were able to press the three federal statutory claims, which Defendants deny, they still must be brought on behalf of—and be based upon injuries to—individuals.  A plain reading of the ADA, Rehabilitation Act, and IDEA proves as much.  No *individuals* are identified here, and no

*individuals* have exhausted their administrative remedies under the IDEA.  Because that has a domino effect on the ADA and Rehabilitation Act claims, they all fail.

      C.       *Plaintiffs' claims are moot.*

As "the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved," "an actual controversy must be extant at all stages of review." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (internal quotation marks omitted).  "When a case or controversy ceases to exist, the litigation is moot, and the court's subject matter jurisdiction ceases to exist also." *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015).

To be sure, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).  But that is not the case here.  DJJ did not just voluntarily cease practices in its system.  Rather, it consummated a settlement with DOJ that is subject to this Court's jurisdiction in the event of an alleged material breach.  Under these circumstances, the case is thus still moot because "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."[6] *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968).  If it does occur, DOJ and the Court can handle these issues.  That makes the most sense where, as here, the Attorney General has standing to pursue and enforce the practices at issue, *see* 34 U.S.C. § 12601(b), whereas Plaintiffs do not.

---

[6] Relatedly, to the extent Plaintiffs seek to bring suit over matters that occurred in 2017, 2018, and the first quarter of 2019, their claims are time-barred as a matter of law.  *See Owens v. Okure*, 488 U.S. 235, 245 (1989) (holding the applicable statute of limitations for Section 1983 claims is the "general or residual statute of limitations governing personal injury actions" for the state); S.C. Code Ann. § 15-3-530(5) (stating statute of limitations for personal injury claims is three years).

Courts have wrestled with the overlap between standing and mootness.  *E.g.*, *Friends of the Earth, Inc.*, 528 U.S. at 189.  Irrespective of the theory on which the Court decides to land, Plaintiffs cannot move forward with their claims.  The past harms about which they complain are covered by the DOJ agreement, and DJJ has begun implementing remedial solutions.  It is rank speculation to assume that the agreed upon reforms will not work.  Plaintiffs' alleged harms, which is generous given the standing and exhaustion problems, are thus stale and not concrete because they have already been addressed or will be addressed under the settlement agreement with DOJ.

It is worth noting that the Complaint references the February 5, 2020 DOJ Findings Notice, which is based on records and information from the years 2016–2018 that were provided to DOJ during its initial reviews and visits.  Since the release of the 2020 Findings, DJJ has undertaken many improvements, even before the settlement agreement was signed with DOJ.  For example, DJJ procured and installed a new state-of-the-art camera surveillance system not only at BRRC but at all DJJ secure facilities.  Among other things, this new system will assist the DJJ Inspector General's Office in its criminal and management review investigations. While DJJ acknowledges that staffing is an issue (not only for its facilities but for governmental and private industries across the United States), it has undertaken many avenues to recruit and retain staff, for example, by hiring additional recruiters and creating enhanced bonus, referral, and retention incentives.

Further, DJJ has implemented alternatives to isolation to give staff members tools to use instead of isolation and increased incentives for youth as a positive behavior management tool that staff can use to motivate youth to meet behavioral expectations and reduce youth altercations and reliance on isolation.  Also, DJJ has identified funding for doors to be installed on each room occupied by a youth so that the Laurel Building can cease to be used for isolation.  Until the installation of the doors is completed, the Laurel Building is being renovated so that conditions

will be improved until the use of that building for isolation can cease completely.  In light of these developments, many of Plaintiffs' claims are moot.  Again, had Plaintiffs reached out before filing a lawsuit, they would have learned as much.

III.    *Plaintiffs' failure to exhaust their administrative remedies bars their claims.*

Putting aside their tenuous assertion of standing, Plaintiffs' claims necessarily fail for an even more fundamental reason: they did not exhaust any administrative remedies under the PLRA, IDEA, ADA, or Rehabilitation Act.

A.    *Plaintiffs failed to satisfy the mandatory exhaustion requirement under PLRA.*

In recognition of the fact that prisoner litigation drains the dockets of federal district courts around the country, "Congress enacted a variety of reforms [in the PLRA] designed to filter out the bad claims and facilitate consideration of the good.  Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit."  *Jones v. Bock*, 549 U.S. 199 204 (2007).  To that end, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , *or any other Federal law*, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a) (emphasis added).

And the PLRA "undoubtedly encompasses juvenile detention facilities."  *Alexander S. v. Boyd*, 113 F.3d 1373, 1383 (4th Cir. 1997), *abrogated on other grounds by* 42 U.S.C. § 1997e(d) (Supp. II 1996); *accord Lewis ex rel. Lewis v. Gagne*, 281 F. Supp. 2d 429, 433 (N.D.N.Y. 2003).  After all, the PLRA defines a prisoner as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or *adjudicated delinquent* for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h) (emphasis added).

In their Complaint, Plaintiffs do not even attempt to explain how the individual juvenile detainees—none of whom they name or represent—exhausted administrative remedies through use of formalized grievance procedures. Rather, Plaintiffs contend—in conclusory fashion—that no exhaustion was required and, in any event, it would have been futile. *See Iqbal*, 556 U.S. at 678 (stating "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions"). In reality, juvenile detainees could have filed grievances with DJJ. *See* Ex. C, SCDJJ Policy No. 920, Youth Grievance Procedure, at 1–8. What is more, "[e]ven where exhaustion may be considered futile or inadequate, this requirement cannot be waived." *Johnson v. Ozmint*, 567 F. Supp. 2d 806, 814 (D.S.C. 2008).

Like the Second Circuit, this Court should reject "Plaintiffs' attempt to avoid the PLRA's exhaustion requirement" by using their status as organizations because "it attempts to whipsaw" the PLRA "in a manner that vitiates the PLRA's requirements." *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative v. NYDOC*, No. 21-1027, 2022 WL 1295719 (U.S. May 2, 2022). As in *Green* Haven, this action was "brought to vindicate the rights of [Plaintiffs'] members, and those members, as prisoners, are bound by the requirements of the PLRA." *Id.* Plaintiffs' alleged constituents cannot circumvent those requirements by "suing in the name of that organization." *Id.* Accordingly, Plaintiffs' entire lawsuit fails as a matter of law at the outset. *See* 42 U.S.C. § 1997e(a) (applying PLRA's exhaustion requirement to prison-conditions claims arising "under section 1983 . . . *or any other Federal law*" (emphasis added)); *Nolan v. Hamidullah*, No. 4:07-1141-JFA-TER, 2009 WL 2982746, at *4 (D.S.C. Sept. 10, 2009) ("Exhaustion under the PLRA is required for both ADA claims and claims under the Rehabilitation Act." (citing *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1061 (9th Cir. 2007))).

Even if Plaintiffs could move forward at some point, the requested relief is both overbroad and premature under PLRA.  The PLRA states that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1).  In fashioning an appropriate remedy, courts are to "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the relief."  *Id.*  And the PLRA defines "civil action with respect to prison conditions" broadly to include "any civil proceeding arising under Federal law with respect to the conditions of confinement and the effects of actions by government officials on the lives of persons confined in prisons."  18 U.S.C. § 3626(g)(2).

One of the aims of this lawsuit is to reduce the population in DJJ's facilities.  Plaintiffs' counsel said as much in the Complaint and their accompanying press release.  *See* Pls.' Compl. ¶ 6; *Press Release*, ACLU OF SC (Apr. 27, 2022), https://www.aclusc.org/en/press-releases/sc-djj-case-apr-2022.  So the PLRA's special procedures for a "prisoner release order" are triggered.  18 U.S.C. § 3626(a)(3).  Under the PLRA, any order "that has the purpose or effect of reducing or limiting a prison population, or that directs the release from or nonadmission of prisoners to a prison" is exclusively within the province of a three-judge panel.  18 U.S.C. § 3626(g)(4).  Importantly, the panel cannot enter a prisoner release order unless it "has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied" and "defendant has had a reasonable amount of time to comply with the previous court orders."  18 U.S.C. § 3626(a)(1)–(2).  Needless to say, we are nowhere close to that point.

In sum, Plaintiffs failed to state a plausible claim for relief under any theory of the case because—despite their attempts to thread the procedural needle—the PLRA's exhaustion requirement bars all their claims.

     *B.*     *Plaintiffs failed to exhaust their administrative remedies as required by IDEA, ADA, and Rehabilitation Act.*

When a plaintiff "seeks redress for a school's failure to provide a [free appropriate public education]" IDEA applies, even if the complaint is "not phrased or framed in precisely that way." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017). IDEA requires that "before the filing of a civil action under [the ADA and the Rehabilitation Act] seeking relief that is also available under this subchapter, [administrative] procedures . . . shall be exhausted." 20 U.S.C. § 1415(l).

The IDEA provides federal funds to states in exchange for a commitment to furnish a FAPE to children with disabilities and establishes formal administrative procedures for resolving disputes between parents and schools concerning the provision of a FAPE. *Fry*, 137 S. Ct. at 748. "As defined in the Act, a FAPE comprises special education and related services—both instruction tailored to meet a child's unique needs and sufficient supportive services to permit the child to benefit from that instruction." *Id.* at 748–49 (internal quotation marks omitted).

"[U]nder the IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE." *Id.* at 749 (citing *Honig v. Doe*, 484 U.S. 305, 311 (1988)). "The IEP spells out a personalized plan to meet all of the child's 'educational needs' and documents the child's current 'levels of academic achievement,' specifies 'measurable annual goals' for how she can 'make progress in the general education curriculum,' and lists the 'special education and related services' to be provided so that she can 'advance appropriately toward [those] goals.'" *Id.* at 749 (internal citations omitted).

When a plaintiff brings a claim under the ADA or Rehabilitation Act that "seek[s] relief that is also available under" the IDEA, he must first exhaust the IDEA's administrative remedies. *Id.* at 748. The IDEA requires that a *parent* submit a complaint to the state or local education agency, and then provides for (1) a "preliminary meeting" between *parents* and the local education

23

agency to informally resolve the complaint; (2) an "impartial due process hearing" before the relevant State or local education agency that allows the hearing officer to decide a resolution, if any; (3) an appeal to the State educational agency by the losing party. 20 U.S.C. § 1415(f)–(g). If the *parent* finds the outcome insufficient, the *parent* may sue in federal court.[7] *Id.* § 1415(i)(2)(A).

"Failure to exhaust the [IDEA's] administrative remedies deprives the court of subject matter jurisdiction." *Z.G. by & through C.G. v. Pamlico Cty. Pub. Sch. Bd. of Educ.*, 744 Fed. Appx. 769, 777 (4th Cir. 2018). The IDEA's exhaustion rule "hinges on whether a lawsuit seeks relief for the denial of a FAPE." *Fry*, 137 S. Ct. at 754. If a lawsuit charges such a denial, the plaintiff cannot escape the exhaustion requirement merely by bringing the suit under a statute other than the IDEA. *Id.* Importantly, in determining whether a plaintiff seeks relief for the denial of a FAPE, what matters is the "gravamen" of the plaintiff's complaint, "setting aside any attempts at artful pleading." *Id.* at 755. To determine if IDEA applies, the Court should answer two questions: "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school . . . [a]nd second, could an adult at the school— say, an employee or visitor—have pressed essentially the same grievance?" *Fry*, 137 S. Ct. at 756.

Here, the answer to both is unquestionably, "No." To their credit, Plaintiffs do not hide the ball. In their Complaint, they allege that "DJJ does not provide FAPE to DRSC's incarcerated juvenile constituents." Pls.' Compl. ¶ 225(a). The Court's inquiry is thus at an end, and IDEA's administrative exhaustion requirements apply. Indeed, the state administrative procedures are readily available. *See MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 527 (4th Cir. 2002) ("If the parents or guardian are not satisfied with the IEP, they are entitled to request a

---

[7] Despite the inherently personal and individualized nature of IEPs, as well as the IDEA in general, we do not have a single named plaintiff here. Nor is there a single parent or guardian ad litem.

due process hearing.  In South Carolina, that hearing is conducted before a local Hearing Officer and is appealable to a state-level Reviewing Officer.  Any party aggrieved by the findings and decision of a Reviewing Officer may then bring suit in state or federal court." (citing 20 U.S.C. § 1415(f)); *see also* S.C. Code Ann. §§ 59-33-10 through -110; S.C. Code Ann. Regs. 43-243 ("promulgat[ing] the state's requirements of educational programs for students with disabilities, as outlined by the" IDEA, "delineat[ing] state-specific requirements of the IDEA," and outlining hearing procedures); *State Complaint*, OFFICE OF SPECIAL EDUC. SERVS., S.C. DEP'T OF EDUC. (last visited May 18, 2022), https://ed.sc.gov/districts-schools/special-education-services/parent-resources/dispute-resolution-information/state-complaint/.

Plaintiffs' effort to invoke the futility exception is thus unavailing.  Factually speaking, it is simply not true.  DJJ is a "special school district," S.C. Code Ann. § 63-19-380(A), and follows the IDEA hearing procedures established by the State Department of Education outlined above. Nothing about this robust process is futile, and Plaintiffs do not endeavor to explain otherwise. Legally speaking, "Section 1415(l) does not come with a 'futility' exception, and the Supreme Court has instructed [courts] not to create exceptions to statutory exhaustion requirements." *Perez v. Sturgis Pub. Sch.*, 3 F.4th 236, 242 (6th Cir. 2021); *see also Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 62 (1st Cir. 2002) (holding IDEA's "statutory exhaustion requirement means that a party must exhaust all available avenues of administrative review regardless of whether the administrative process offers the particular type of relief that is being sought").

Furthermore, given that "[h]undreds of students cannot sue individually here without IDEA exhaustion," "there is no clear reason why the organizations should be able to essentially press those students' claims in the aggregate without that exhaustion." *Parent/Pro. Advoc. League v. City of Springfield, Mass.*, 934 F.3d 13, 34 (1st Cir. 2019).  Here, as in *Parent/Protection Advocacy*

*League*, Plaintiffs seek "to sue on behalf of hundreds of children who have not chosen to sue or even to pursue related administrative remedies." *Id.* at 35. But at least the plaintiffs there sought to bring a class action. Plaintiffs make no similar effort here and, thus, their claims are even more specious. Perhaps Plaintiffs recognized, as they must, that courts have routinely rejected efforts to bring IDEA class actions for failure to meet the commonality requirement under Federal Rule of Civil Procedure 23(a)(2). *E.g.*, *id.* at 29–31; *DL v. District of Columbia*, 713 F.3d 120, 127–28 (D.C. Cir. 2013); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497–98 (7th Cir. 2012).

Irrespective of their motives, Plaintiffs failed to plead a plausible claim for relief. So the Court should dismiss their IDEA, ADA, and Rehabilitation Act claims for failure to exhaust the requisite administrative remedies. Assuming without conceding that Plaintiffs represent the juveniles designated as Child 1 through Child 15 in their Complaint, which is altogether unclear, their claims under the ADA, Rehabilitation Act, and IDEA must fail.

IV.    *Director Hendrick cannot be held liable in her individual capacity.*

"Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In the detention context, the "official must have a 'sufficiently culpable state of mind' to be held liable." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). And here "that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* Presumably, Plaintiffs limit their individual-capacity claims to those arising under Section 1983. *See Barnes v. Young*, 565 F. App'x 272, 273 (4th Cir. 2014) ("Title II of the ADA . . . [does not] provide[] for individual capacity suits against state officials." (quoting *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 107 (2d Cir.2001))); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) ("To the extent possible, [courts] construe the ADA and Rehabilitation Act to impose similar requirements.").

In any event, Plaintiffs make zero allegations of deliberate indifference against Director Hendrick. *Cf.* Pls.' Compl. ¶ 182 (alleging "DJJ is aware of ongoing violations at its facilities and the resulting harms to the children in its care" and "[y]et *it* remains deliberately indifferent to the ongoing violence"). Nor could they. She just took over as Acting Director on September 21, 2021, became Interim Director on February 2, 2022, and received advice and consent of the Senate to become Executive Director on May 11, 2022. During that timeframe, DJJ settled with DOJ on the vast majority of the issues in Plaintiffs' Complaint. That cannot be deliberate indifference. Perhaps that is why Director Hendrick is not once mentioned in a single cause of action. Every claim is against DJJ, not Director Hendrick or "Defendants." *See* Pls.' Compl. ¶¶ 179–227. What is more, Plaintiffs do not even seek money damages in this case.

Plaintiffs therefore failed to state a plausible claim for relief against Director Hendrick in her individual capacity.[8] The Court should dismiss.

V.     *The Eleventh Amendment bars Plaintiffs' official-capacity claims and underscores that DJJ is not a proper party.*

Without the individual-capacity claims, the rest of Plaintiffs' claims collapse too. Because South Carolina has not consented to be sued in this manner, DJJ and Director Hendrick—as agents of the State—are entitled to sovereign immunity under the Eleventh Amendment.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

---

[8] Likewise, they failed to allege—and cannot show—Director Hendrick should be subject to supervisory liability. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (stating to establish supervisory liability under § 1983, a plaintiff must show (1) that the supervisor had actual or constructive knowledge" her "subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff").

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Supreme Court has long held the Eleventh Amendment precludes a suit against a state by its own citizen based on the claim that it arises under the Constitution and laws of the United States. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). This sovereign immunity extends not only to suits against the state but also suits against agents and instrumentalities of the state. *Cash v. Greenville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001).

Sovereign immunity is only unavailable if (1) Congress unequivocally expresses its intent to abrogate a state's sovereign immunity or (2) a state voluntarily waives its immunity. *See Lane v. Pena*, 518 U.S. 187, 192 (1996). As noted above, Plaintiffs' federal-law claims are not properly before the Court because they failed to exhaust administrative remedies. And the Section 1983 claims—which are not even brought by the "citizen" or "person"—make no mention of a federal statute. The first exception is thus inapplicable. Turning to the second exception, "the test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).

Plaintiffs sued DJJ and its executive director, in part, in her official capacity. Official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). But South Carolina has not consented to be sued. *See* S.C. Code Ann. § 15-78-20(e) (stating nothing in the South Carolina Tort Claims Act "is construed as a waiver of the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States"). Given that Defendants, as agents of the State, are deemed to be the State itself, the Court is precluded from considering an official-capacity claim against them because they are not "persons"

28

within the meaning of Section 1983.[9]  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a state nor its officials acting in their official capacities are 'persons' under § 1983.").

Plaintiffs allege they are all South Carolina nonprofit organizations, *see* ECF No. 1 ¶¶ 8, 10, & 12, and, as such, are citizens of South Carolina.  *See Ferrell v. Express Check Advance of S.C., LLC*, 591 F.3d 698, 702 (4th Cir. 2010) (asserting that "[t]he citizenship of a corporation is determined by the State in which it is incorporated and the State in which it has its principal place of business").  Because the State of South Carolina has not consented to be sued in federal court by its own citizens, *see* S.C. Code Ann. § 15-78-80(e), and Plaintiffs are essentially suing the State itself by bringing the lawsuit against a state agency and its agent in her official capacity, *see Will*, 491 U.S. at 71, the Court should dismiss the Complaint because Plaintiffs failed to state a plausible claim upon which relief may be granted under Section 1983.  Courts in the District of South Carolina have summarily dismissed pro se prisoner complaints on this very ground.  *E.g.*, *Randolph v. Lawrence*, No. 3:16-cv-03011-MBS, 2017 WL 1531952, at *2 (D.S.C. Apr. 28, 2017).

Of course, Plaintiffs may try to invoke the *Ex parte Young* exception to sovereign immunity because they are seeking prospective injunctive relief.  209 U.S. 123 (1908).  But their request still fails for two reasons.  *First*, the Complaint contains zero allegations that Hendrick did anything in her individual or official capacity, under color of state law, that violated *Plaintiffs*' constitutional rights.  *See S.C. Elec. & Gas Co. v. Whitfield*, 329 F. Supp. 3d 191, 204 (D.S.C. 2018) (dismissing complaint as plaintiff "failed to state a plausible claim" because "without individual allegations

---

[9] Plaintiffs also unnecessarily added DJJ as a defendant, bringing claims against both Director Hendrick, in her official capacity, and DJJ.  *See Brissett v. Paul*, No. 97-6898, 1998 WL 195945, at *1 (4th Cir. Apr. 6, 1998) ("[Naming] the local governments that employed [the officials] and naming the local officials in their official capacities was, therefore, redundant and unnecessary."); *see also Will*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.").

against the individual commissioners, the court cannot infer that any actions by the Commissioners violated [its] constitutional rights under the color of state law"). In fact, she's only mentioned in four paragraphs. *See* Pls.' Compl. at ¶¶ 16, 48, 49 & 61. All other allegations concern DJJ.

*Second*, Plaintiffs failed to state a plausible claim for the mandatory injunctive relief they seek. *Cf. De La Fuente v. S.C. Democratic Party*, 164 F. Supp. 3d 794, 798 (D.S.C. 2016) ("Mandatory preliminary injunctive relief in any circumstance is disfavored[] and warranted only in the most extraordinary circumstances."). Notably, this is the first time they collectively refer to DJJ and Hendrick as "Defendants." *See id.* at 48–53, ¶¶ A–I. All other allegations were solely against DJJ. In any event, Plaintiffs skipped an important step and went straight to the ask. Nowhere in the Complaint do Plaintiffs make any effort to plead the elements of injunctive relief. *See Z-Man Fishing Prods., Inc. v. Renosky*, 790 F. Supp. 2d 418, 425 (D.S.C. 2011) (stating a plaintiff must show (1) it "is likely to succeed on the merits," (2) it "will suffer irreparable harm" if the Court does not grant a preliminary injunction, (3) "the balance of the equities favors" it, and (4) a preliminary "injunction is in the public interest." (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Perhaps that is because they cannot plausibly allege, much less carry their burden of proving, any of them. Defendants will briefly address them though.

Initially, the request for injunctive relief fails because Plaintiffs cannot show *they* will "suffer irreparable harm." *Winter*, 555 U.S. at 22. None of them are subject to the alleged policies and practices they seek to challenge. For all the reasons explained throughout this motion, Plaintiffs are not likely to—indeed cannot—succeed on the merits of this unusual action. The balance of the equities certainly does not tip in their favor. Despite having knowledge of the 2017 LAC report, Plaintiffs sat on the sidelines for years and only filed suit when they did not get exactly what they wanted out of the DOJ agreement. *See De La Fuente*, 164 F. Supp. 3d at 806 (applying

laches in analyzing the balance of the equities and finding it "weighed heavily against" the plaintiff because he "unreasonably delayed in filing and pursuing this action and that the only relief available at this late date would prejudice Defendants"). Balance of the equities and public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, neither weighs in favor of the Court substituting its judgment for DOJ (which is led by the former chief judge of the DC Circuit), DJJ, and their jointly selected subject-matter expert.

VI.     *Like Plaintiffs, Defendants will briefly address the merits.*

The first 40 pages of Plaintiffs' Complaint makes generalized grievances about DJJ's operations and gives surface-level summaries of a smattering of alleged incidents involving unspecified juvenile detainees. When Plaintiffs get around to Counts 1 through 7, however, there is no meat on the bone. They never identify which allegations line up with which claims. *See ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019) (holding that "simply reciting the cause of actions' elements and supporting them by conclusory statements does not meet the required standard"). Further, a review of the relief sought reveals Plaintiffs are trying to elevate their own personal policy preferences—or a standard of perfection—into matters of federal and constitutional law. That is not a faithful application of the analysis.

Consider the Section 1983 claims. First, Plaintiffs allege that DJJ fails to adequately supervise juvenile detainees. But they neglect to identify a single policy enforced by a DJJ employee, acting under color of state law, that violates the Constitution. Instead, Plaintiffs merely allege deliberate indifference because DJJ has had issues in the past dating back to 1995. That is neither a fair nor a logical leap. Notably, Plaintiffs do not even mention the DOJ agreement. Regardless, because Count 1 consists of merely conclusory allegations and an (incomplete) recitation of the elements, Plaintiffs failed to state a plausible claim for relief under Section 1983.

Second, Plaintiffs aver that DJJ's isolation policy violates the Fourteenth Amendment.  For starters, that policy predated this lawsuit.  As a result, Plaintiffs' allegations of deliberate indifference are curious and contradict the exhibits to their own Complaint.  *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  It is simply not true that DJJ "has done nothing to alleviate this risk of harm."  Pls. Compl. ¶ 191.  Their arguments in this regard are self-defeating.  Plaintiffs, then, are left only with their demand for a two-hour initial isolation period instead of a four-hour isolation period along with a host of other conditions that tweak the DOJ agreement.  But as the Court said in *Alexander S.*, its role "is limited to establishing minimal constitutional standards."  876 F. Supp. at 779.  Like the plaintiffs there, Plaintiffs here are demanding perfection (or really something other than the DOJ agreement).  That is not the standard.  Plaintiffs failed to state a plausible claim for relief.

Third, Plaintiffs offer no explanation as to how or which of DJJ's current practices fail to meet the "professional judgment" standard.  Plaintiffs simply say "recreational and outdoor time, access to mental health services, and trauma-informed care" constitute "the professional standard for juvenile detention and rehabilitation," Pls.' Compl. ¶ 195, and "DJJ substantially departs from this standard," *id.* ¶ 196.  Plaintiffs do not identify the standard to which they are referring.  *See Bell*, 441 U.S. at 543 n.27 (stating advocacy groups' reports "simply do not establish constitutional minima; rather, they establish goals recommended by the organization[s] in question").  Plaintiffs, of course, fail to explain which officials—acting under color of state law—failed to exercise professional judgment.  And these allegations ignore the DOJ agreement attached and incorporated into the Complaint.  Consequently, Plaintiffs failed to state a plausible claim in Count 3.

Fourth, Plaintiffs' final Section 1983 claim suffers from the same defects.  Plaintiffs contend "South Carolina children detained at DJJ facilities are subject to an inhumane physical

and psychological environment" that "fail[s] to provide minimum standards of safety and health." Pls.' Compl. ¶ 200.  Aside from three (undated) pictures allegedly from the JDC appended to the Complaint, *see id.* at pp. 37–38, Plaintiffs failed to identify conditions at any other DJJ facility that fail to meet the standards.  Nor do they articulate what those standards are.  At the risk of beating a dead horse, Plaintiffs also ignore the DOJ agreement attached to their Complaint that addresses the BRRC—where most of the children they seem to rely on reside—and DJJ is implementing the reforms systemwide.  All this puts aside, for the moment, how the alleged conditions from an unknown timeframe "harm" three special interest groups who do not live at any of the facilities. Count 4, on its face, fails to state a plausible claim for relief.

Turn next to the ADA and Rehabilitation Act claims.  *See Halpern*, 669 F.3d at 461 ("To the extent possible, [courts] construe the ADA and Rehabilitation Act to impose similar requirements" because "despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability").  "[T]o prove a violation of either Act, the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the defendant's program, and (3) he was excluded from the program on the basis of his disability."  *Id.* (footnote omitted).  "Regarding the second requirement, an individual is not otherwise qualified if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation."  *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995).  "The two statutes differ only with respect to the third element, causation.  To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion."  *Halpern*, 669 F.3d at 461–62.

Because Plaintiffs' claim under Title II of the ADA contains no allegations as to whether DJJ's alleged deprivations were motivated by juvenile detainees' purported disabilities, the claim is implausible on its face. Because Plaintiffs' claim under Section 504 of the Rehabilitation Act contains no allegations as to whether juvenile detainees were excluded "solely by reason of" their purported disabilities, that claim is also implausible on its face. Notably, Plaintiffs fail to even entertain the notion that some of the juveniles may "pose a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation." *Doe*, 50 F.3d at 1265. Regardless, without a single named plaintiff in the caption, Plaintiffs cannot even get out of the batter's box because they failed to allege and cannot show that the alleged juvenile detainees on behalf of whom they seek systemwide relief (without pleading a class action) actually have a "disability" to trigger these Acts. Counts 5 and 6 therefore must be dismissed.

Finishing with the IDEA, "while a state 'must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, . . . the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.'" *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 527 (4th Cir. 2002) (quoting *Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997)). Plaintiffs again conflate the standard to one of perfection. But they have no individuals to whom they can tailor these standards to develop better IEPs or ensure a FAPE. Because Count 7 is implausible on its face, the Court must dismiss.

## CONCLUSION

In sum, "it is not for federal courts" or special interest groups "to . . . micromanage the Nation's prisons." *O'Dell v. Netherland*, 112 F.3d 773, 777 (4th Cir. 1997). "[C]ourts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the

trained penological authorities charged with the administration of such facilities." *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994). So too with juvenile detention facilities. Yet Plaintiffs demand that this Court (1) substitute its judgment, or really their attorneys' judgment, for that of DJJ; (2) strip DJJ of its authority and cede that authority to Plaintiffs' self-selected monitor; and (3) micromanage South Carolina's juvenile justice system—all based on generalized grievances. That is a bridge too far. Director Hendrick looks forward to continuing DJJ's commitment to collaborating with DOJ, complying with the terms of the settlement agreement, and implementing reforms on a systemwide basis. But responding meritless lawsuits like this one only makes her job harder. More to the point, it wastes resources that could otherwise be dedicated to promptly implementing important reforms for DJJ. Because Plaintiffs failed to state a plausible claim for relief under any theory of the case, the Court should dismiss their Complaint.

Respectfully submitted,

/s/Vordman Carlisle Traywick, III
Robert E. Tyson, Jr. (Fed. ID 7815)
J. Michael Montgomery (Fed. ID 10290)
Vordman Carlisle Traywick, III (Fed. ID 12483)
ROBINSON GRAY STEPP & LAFFITTE, LLC
Post Office Box 11449
Columbia, South Carolina 29211
(803) 929-1400
rtyson@robinsongray.com
mmontgomery@robinsongray.com
ltraywick@robinsongray.com

Clarence Davis (Fed. ID 433)
GRIFFIN | DAVIS LLC
Post Office Box 999
Columbia, South Carolina 29202
(803) 744-0800
cdavis@griffindavislaw.com

*Counsel for Defendants SCDJJ and Executive Director Eden Hendrick*

Columbia, South Carolina
May 19, 2022