# EXHIBIT A

## *DEFENDANTS MOTION TO DISMISS*

*Voltz-Loomis v. McMaster*

*5:20-cv-01533-DCC*

*Hearing Transcript*

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

```
* * * * * * * * * * * * * * *
JEANNE VOLTZ-LOOMIS, ET AL.,* CIVIL NO. 5:20-CV-01533
                            * JULY 1, 2020 10:20 A.M.
              Petitioners,  * STATUS CONFERENCE
                            *
vs.                         *
                            *
HENRY MCMASTER, ET AL.,     * Before:
                            * HONORABLE DONALD C. COGGINS, JR.
                            * UNITED STATES DISTRICT JUDGE
              Defendants.   * DISTRICT OF SOUTH CAROLINA
* * * * * * * * * * * * * * *
```

APPEARANCES:

For the Petitioners:        MARSHALL WINN, ESQUIRE
                            Wyche PA
                            200 E. Camperdown Way
                            Greenville, SC  29601


For Respondent Henry McMaster:

                            THOMAS ASHLEY LIMEHOUSE, JR., ESQUIRE
                            Office of the Governor
                            State of South Carolina
                            South Carolina State House
                            1100 Gervais Street
                            Columbia, SC  29201


Court Reporter:             Michele E. Becker, RMR, CRR, RPR
                            201 Magnolia Street
                            Spartanburg, SC  29301
                            (864) 905-8888


Proceedings recorded by mechanical stenography, transcript
produced by computer.

2

```
1    APPEARANCES (Continued):

2    For the Petitioners:

3            SHIRENE CAROLE HANSOTIA, ESQUIRE (via phone)
             American Civil Liberties Union of SC Foundation
4            P.O. Box 20998
             Charleston, SC  29413
5
             SUSAN KING DUNN, ESQUIRE  (via teleconference)
6            American Civil Liberties Union of SC Foundation
             P.O. Box 20998
7            Charleston, SC  29413

8            DAPHNE O'CONNOR, ESQUIRE  (via video conference)
             Arnold & Porter Kaye Scholer, LLP
9            601 Massachusetts Avenue N.W.
             Washington, DC  20001
10
             JONATHAN W. HUGHES, ESQUIRE (via video conference)
11           Arnold & Porter
             3 Enbarcadero Center, 10th Floor
12           San Francisco, CA  94111

13
     For Respondent Henry McMaster:
14
             VORDMAN CARLISLE TRAYWICK, ESQUIRE
15           Robinson Gray Stepp & Laffitte, LLC
             1310 Gadsden Street
16           Columbia, SC  29201

17
     For Respondent Bryan Stirling:
18
             DANIEL R. SETTANA, JR., ESQUIRE
19           McKay Cauthen Settana & Stubley
             1303 Blanding Street
20           Columbia, SC  29201

21           JANET BROOKS HOLMES, ESQUIRE
             McKay Cauthen Settana & Stubley
22           1303 Blanding Street
             Columbia, SC  29201
23

24

25


                    Michele Becker, RMR, CRR, RPR
                         US District Court
                    District of South Carolina
```

3

```
1   ALSO PRESENT:    BART VINCENT, ESQUIRE
                     General Counsel, Dept. of Corrections
2                    4444 Broad River Road
                     Columbia, SC  29221
3

4                    MATTHEW C. BUCHANAN, ESQUIRE
                     General Counsel
5                    Dept. of Probation Pardons and Paroles
                     Columbia, SC 29201
6

7                    ANNA MARIA DARWIN CONNOR, ESQUIRE.
                     Protection and Advocacy for People
8                    with Disabilities, Inc.
                     3710 Landmark Drive, Suite 208
9                    Columbia, SC 29204

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1          (Court convened at 10:20 a.m.)

2          **THE COURT:**   Thank you.   Please be seated.   All

3    right, folks.   We're here for a status conference in the

4    Voltz-Loomis, et al. versus McMaster, et al.   Case No.

5    20-1533.   I will note for the record that pursuant to the

6    current District operating order, we have some people

7    appearing by video conference, and we also have at least one

8    attorney on the phone listening in by way of phone conference.

9    Again, with respect to current operating procedures and Chief

10   Judge Harwell's order regarding mask wearing in the

11   courthouse, I'll note everybody is appropriately attired with

12   a mask or face covering.   With regard to that, I will tell you

13   that you will need to keep your mask on throughout the course

14   of the hearing.   Except if you are speaking, you can lower

15   your mask because it is easier for the court reporter to be

16   able to tell what you're saying.   But other than that, please

17   keep your mask on.   And I want to apologize for the delay in

18   getting started this morning.   We had some technical issues

19   which unfortunately happen from time to time in this new

20   atmosphere of video conferences and remote hearings.

21          Now, folks, as you might imagine, given the nature

22   of the pleadings, and the scope of the pleadings, and the

23   relief requested, my staff and I have spent a good deal of

24   time on this case already.   Normally, when we have a status

25   conference or a hearing the lawyers do most of the talking and

1  then I just say something at the end.  This morning is going

2  to be a little different.  This morning I'm going to give you

3  my thoughts and impressions for what they're worth, and then I

4  will be happy to hear from you folks.  I apologize for reading

5  to you in advance.  But quite frankly, the breadth of what I

6  need to cover is such that I need to have some fairly direct

7  notes in order to make sure I don't leave anything out.

8          At the outset, I want to let all of you know that

9  this Court is acutely aware of the gravity of the COVID-19

10  pandemic in South Carolina.  As all of you are aware, our

11  numbers have increased exponentially, especially within the

12  last several days, which is very alarming from a public health

13  perspective.  Members of the federal bench in South Carolina

14  are having regular meetings, mostly by telephone, and are

15  being briefed regularly about the pandemic both from DHEC

16  representatives as well as some of the primary healthcare

17  providers at the Medical University of South Carolina.  And we

18  have significantly altered our daily functioning as a result,

19  as you can tell from the standing orders that Judge Harwell

20  has issued that I referenced earlier.  That said, I want to

21  emphasize to each of you that this is a courtroom and not a

22  legislative chamber.  This Court is charged with interpreting

23  and enforcing the law.  It does not create law.  Now, to be

24  sure, federal courts do have a significant role in national

25  emergencies like this COVID-19 pandemic both internally and

1　externally.　The courts have an obligation to ensure the

2　orderly and fairness position of civil and criminal cases in

3　an environment that makes doing so very difficult these days,

4　and we are often called to arbitrate the legality or

5　constitutionality of legislative and executive action or

6　inaction.

7　　　　　After reviewing the pleadings in this case and the

8　briefing from the parties, this Court has grave concerns that

9　the petitioners are asking this Court to act in a

10　quasi-legislative capacity.　One of the main remedies that the

11　petitioners are seeking, that is the creation of a Corona

12　Virus release committee with a court-appointed Special Master,

13　is an unprecedented step.　Habeas corpus is an extraordinary

14　writ, which is rarely used by the federal courts.　And that is

15　due in no small part to Congress having enacted the

16　Antiterrorism and Effective Death Penalty Act of 1996, which

17　significantly limits the federal court's authority to issue

18　the writ.　But the petitioners in this case are not just

19　asking this Court to take that extraordinary step; instead,

20　they are asking me to delegate my limited authority to public

21　health and public safety experts.　And yet you have not

22　provided me with any legal authority to delegate my Article

23　III authority to a committee of lay persons.　If this Court

24　were to take such a step, I am confident that Fourth Circuit

25　and/or the Supreme Court of the United States would intervene

1    before the ink was dry on my opinion.

2         Moreover, I am alarmed at the breadth of the

3    petition.  Very few successful cases brought by inmates across

4    the country have typically dealt with high-risk inmates at

5    specific correctional facilities.  However, here, the

6    petitioners are asking this Court to issue a ruling, albeit

7    indirectly by way of a committee of public health experts,

8    that applies to all SCDC inmates.  Significantly, as of this

9    morning, several SCDC facilities, including Leath, Lieber,

10   Palmer, and Ridgeland have had zero-confirmed cases of

11   COVID-19 in staff or inmates.  Other facilities have had zero

12   confirmed cases at least among inmates, even though they have

13   had cases among the staff.  In fact, as of the information

14   that I have available to me this morning, out of 21 SCDC

15   facilities only six have had inmate infections, although three

16   or four of those have had significant numbers of infections.

17        In a perfect world, we would not have to consider

18   the relative risk of COVID-19 infection on prisoners as a

19   court could simply commute custodial sentences to

20   non-custodial sentences such as home confinement.  But the

21   reality is that there are many inmates in the South Carolina

22   Department of Corrections who are simply too dangerous to

23   release to society, and each of those inmates was sentenced to

24   his or her term of imprisonment by a state judge after a trial

25   or guilty plea.  Each of those inmates had the opportunity to

1  appeal, file for state post conviction relief, and seek the

2  extraordinary writ of habeas corpus in a federal court.  And

3  while the COVID-19 pandemic is causing far too many deaths

4  across the country, and the world, it does not transform the

5  black letter of the law.  Only legislators can do that.

6         I am not insensitive to the petitioners' concerns

7  however.  Many of the named petitioners and the class members

8  they seek to represent are at risk for COVID-19 in the South

9  Carolina Department of Corrections.  It pains me to think of

10  the fear that these inmates must live in on a daily basis.  I

11  am a federal judge, but I am also a citizen of the State of

12  South Carolina, and the recent increase in cases is nothing

13  short of terrifying.  We have set records each of the last

14  three or four days.  Our state government has made it clear

15  that it considers compliance with CDC and World Health

16  Organization guidelines a matter of personal responsibility

17  rather than a subject for government regulation.  But this

18  Court does not have the constitutional authority to weigh in

19  on matters of public policy; instead, I have a constitutional

20  mandate to resolve cases and controversies.  And cases like

21  this must be decided based on the law, not on the emotion or

22  equitable considerations.

23         The Court is also somewhat perplexed at the

24  petitioners' litigation strategy and their filings in this

25  case.  A few days after this petition was filed, the

1    petitioners filed a motion to expedite, which the Court

2    granted.  In that motion, the petitioners requested expedited

3    consideration of the petition and asked the Court to "schedule

4    a hearing immediately thereafter."  But the petitioners have

5    not filed a motion for preliminary injunction, a motion for

6    class certification, or any other filings to expedite

7    consideration of this case.  While the caption of the petition

8    states that it is a "complaint for injunctive and declaratory

9    relief," but there is no request for an injunction.  The word

10   "injunction" or "injunctive" is only mentioned three times in

11   the complaint.  Once in the caption, once in a quoted

12   statement of the law, and once when discussing the application

13   of Federal Rules of Civil Procedure 23(b)(2).  Even to the

14   extent this Court might want to act emergently, there is

15   currently no basis to do so on the pleadings before the Court.

16        Additionally, when the Court scheduled a hearing in

17   this case, it proved very difficult to secure the attendance

18   of any of the petitioners' attorneys.  The Court certainly

19   understands that some of the petitioners' counsel live out of

20   state and others have age or health considerations that

21   justifiably preclude their appearing in court; however, it is

22   important to remember that the petitioners filed this case and

23   asked the Court to set aside other pressing matters to resolve

24   this case on an expedited basis.  Going forward, I expect the

25   petitioners to have an attorney available to attend any

1    hearings that are scheduled in this case absent extraordinary

2    circumstances.  I certainly appreciate Mr. Winn's attendance

3    today, but the parties need to understand that my staff and I

4    have devoted substantial time and resources to accommodate the

5    petitioners' request for a hearing.  We have endeavored to

6    make this courtroom a safe environment for the lawyers and

7    parties, and, absent a justifiable reason, counsel should

8    attend all hearings in the future.

9         Now, let me turn to the substance of the

10   petitioners' case.  The petitioners' extraordinary request

11   relies in large part on a District Court decision from the

12   Northern District of Ohio, that case being Wilson versus

13   Williams.  That decision addressed a case brought by inmates

14   at Elkton Federal Correctional Institution who brought an

15   emergency habeas action seeking release from Elkton due to the

16   spread of COVID-19 within the prison.  The case was filed on

17   April 13, 2020.  And the District Court held a hearing on the

18   petitioners' motion for preliminary injunction on April 17th,

19   2020, and the parties filed supplemental briefing the

20   following day.  I also note that the Court issued an order

21   granting the preliminary injunction in part on April 22nd,

22   nine days after that petition was filed.

23        At the time of filing, Elkton, which houses 2,400

24   inmates, had 59 confirmed cases of COVID-19 among inmates and

25   an additional 46 cases among staff members.  Despite the

1  rapidly increasing number of COVID-19 cases, Elkton had very

2  few tests available.   The inmates brought suit seeking relief

3  for a class of all Elkton inmates as well as a subclass of

4  medically vulnerable inmates.   And the inmates defined their

5  proposed subclass as follows, and I quote:

6           All current and future persons incarcerated at

7  Elkton over the age of 50, as well as all current and future

8  persons incarcerated at Elkton of any age who experience

9  chronic lung disease or moderate to severe asthma; serious

10  heart conditions; conditions that can cause a person to be

11  immunocompromised; including cancer treatment, smoking, bone

12  marrow or organ transplantation, immune deficiencies, poorly

13  controlled HIV or AIDS or prolonged use of corticosteroids and

14  other immune weakening medications, severe obesity -- defined

15  as a body mass index of 40 or higher -- diabetes, chronic

16  kidney disease or undergoing dialysis; or liver disease.

17           That case was filed pursuant to Title 28 United

18  States Code § 2241, and the inmates sought a temporary

19  restraining order, a preliminary injunction, a permanent

20  injunction and/or a writ of habeas corpus requiring the

21  respondents to identify within six hours of the Court's order

22  all medically-vulnerable subclass members and to release those

23  individuals within 24 hours.   Additionally, the inmates asked

24  the District Court to order the Federal Bureau of Prisons to

25  include supports to ensure social distancing and other expert

1   recommended measures to prevent spread of Corona Virus.  After

2   the release of the subclass members, the petitioners requested

3   "a plan to be immediately submitted to the Court and overseen

4   by a qualified public health expert that provides for

5   mitigation efforts in line with CDC guidelines and housing

6   and/or public support plan for released inmates."  They also

7   sought the release of class members so that the remaining

8   inmates could follow CDC guidance to maintain six feet of

9   space between them while in the prison.  The immediacy and

10  scope of the relief that the inmates sought in that case was

11  astonishing.  Not only did they seek immediate release of a

12  large number of inmates, seemingly without any individualized

13  public safety evaluation, they also sought a court order

14  requiring the BOP to provide the released inmates with housing

15  and public support, all within a 24-hour period.

16        The District Court began its analysis by noting that

17  Section 2241 was the appropriate vehicle for, quote, claims

18  challenging the execution or manner in which a sentence is

19  served, closed quote.  The District Court then found that the

20  petitioner subclass definition is likely too broad, and

21  limited the subclass to individuals that the Centers for

22  Disease Control defined at being at higher risk, which

23  included all inmates 65 years or older, and those with

24  documented, pre-existing medical conditions including heart,

25  lung, kidney, liver conditions, diabetes, conditions causing a

1   person to be immunocompromised, and severe obesity.  The Court

2   excluded inmates whose only risk factor is a history of

3   smoking, given the difficulty of documenting such occurrence

4   and identifying those individuals through BOP records alone.

5   Based on this limited subclass, the District Court found that

6   the inmates made a sufficient showing to satisfy the Rule

7   23(a) factors.

8           The Court then turned to the preliminary injunction

9   factors, and found that the inmates were likely to succeed on

10  the merits of their claims, that they would suffer irreparable

11  harm absent an injunction, that they could be moved to, quote,

12  various other types of confinement so that they are no longer

13  at risk of dying from the virus, closed quote, and that the

14  public interest was served by granting the injunctive relief

15  requested.  In light of these findings, the Court ordered the

16  Bureau of Prisons to identify within one day all members of

17  the subclass.  Following that identification, the Court

18  ordered the BOP to evaluate each member's eligibility for

19  transfer out of Elkton through any means, including but not

20  limited to compassionate release, parole or community

21  supervision, transfer furlough, or non-transfer furlough

22  within two weeks.  In the event a subclass member did not fall

23  into one of these categories of release, the District Court

24  ordered that they, quote, be transferred to another BOP

25  facility where appropriate measures such as testing and

1    single-cell placement, or social distancing, may be

2    accomplished, closed quote.  Nearly a month later, on May 19,

3    2020, the District Court issued an enforcement order, due to

4    BOP failure to comply with the preliminary injunction.

5           Not surprisingly, the Government appealed to the

6    Sixth Circuit.  Prior to oral argument, on June 4th, 2020,

7    Justice Sonia Sotomayor stayed the District Court's order

8    pending disposition of the Government's appeal, and the next

9    day the Sixth Circuit heard oral arguments in the case.  Four

10   days later, on June 9th, 2020, the Sixth Circuit issued an

11   opinion vacating the preliminary injunction.  A majority of

12   the panel found that the inmates were not likely to succeed on

13   the subjective prong of their Eighth Amendment deliberate

14   indifference claim.  The panel found that the BOP had, quote,

15   responded reasonably to the risk, closed quote, and therefore

16   had not been deliberately indifferent to the inmates' rights.

17   The panel detailed the BOP six-phase action plan to reduce the

18   risk of COVID-19 spread at Elkton, and found that, quote, the

19   BOP's efforts to expand testing demonstrate the opposite of a

20   disregard of a serious health risk, closed quote.  The panel

21   further noted that other Circuit Courts, including the

22   Eleventh and the Fifth Circuits, have similarly concluded that

23   similar actions by prison officials, quote, demonstrate a

24   reasonable response to the risk posed by COVID-19, closed

25   quote.  Chief Judge Cole concurred in part and dissented in

1  part, agreeing with the panel's finding that jurisdiction was

2  proper but disagreeing with the panel's vacatur of the

3  preliminary injunction.   That case is now back pending on the

4  merits in the District Court.

5        Now, for our purposes there are several salient

6  points that this Court takes away from the Williams case.

7  First, the Court notes that Williams dealt with widespread

8  COVID-19 infections at a single facility.   Second, the

9  petitioners in Williams named two respondents, Elkton's warden

10  and the director of BOP.   Finally, even the District Court in

11  Williams found that the proposed subclass was too broad.

12  Extrapolating those points to this case, I would note that the

13  petitioners' claims deal with all SCDC inmates, including

14  those at facilities that have had no COVID-19 infections.

15  Moreover, petitioners have named a number of respondents who

16  are, quite frankly, not proper defendants to a habeas claim,

17  and petitioners have not named the wardens at any of the SCDC

18  facilities.   And finally, the proposed subclasses in this case

19  are exceedingly broad.

20        To illustrate that point I would note that the

21  petitioners in this case have plead six subclasses:

22        Number 1.   People in custody who are over the age of

23  50 as to whom the SCDC has no basis to contend that the

24  release of those older inmates would pose any threat to the

25  community.

1            Number 2.  People in custody who have serious
2   underlying medical conditions that put them at particular risk
3   of serious harm or death from COVID-19.
4            Number 3.  People in custody with serious
5   developmental disabilities or mental conditions accompanied
6   with an inability to maintain good hygiene habits or an
7   inability to take medications as directed.
8            Number 4.  People in custody who are within six
9   months of their anticipated release date and qualify for home
10  detention pursuant to Section 24-13-1530 of the South Carolina
11  Code of Laws.
12           Number 5.  People in custody who are eligible for
13  parole and who have been disciplinary free for the past year.
14           And Number 6.  People in custody for technical
15  violations of parole or probation.
16           Folks, these subclasses are far too broad.
17  Conceivably, inmates on death row could fall into one or more
18  petitioners' subclasses, as could inmates in facilities where
19  there are no COVID-19 infections, nor have there been any.
20  Petitioners caution that the relief they are seeking by
21  placing the onus on respondents to show, quote, why the public
22  health and safety of the community, closed quote, would
23  preclude immediate release.  That would require hundreds if
24  not thousands of individualized public safety determinations
25  made pursuant to guidelines presumably created by this

1    committee that the petitioners are asking for this Court to

2    create.   That is simply not feasible given the breadth of

3    these subclasses.   This Court would strongly suggest that

4    petitioners reevaluate the breadth of their subclasses if this

5    case gets past dispositive motions.

6           Now, that brings the Court to one of the most

7    obvious problems with the petitioners' requested relief and

8    that is that South Carolina state law simply does not provide

9    many avenues for any official or governmental body to legally

10   release inmates at risk for COVID-19.   While petitioners can

11   argue that it is bad public policy, it most certainly poses

12   serious problems for the goals they are seeking to achieve

13   through this litigation.

14          At the outset of this case, the Court posed a number

15   of interrogatories to the respondents to better understand the

16   spread of COVID-19 in SCDC facilities.   And one of the issues

17   the Court wanted to better understand was what mechanisms

18   exist for releasing inmates at risk for COVID-19

19   complications.   The respondents informed this Court that,

20   quote, SCDC has no statutory or other authority for releasing

21   inmates based upon the COVID-19 pandemic, closed quote, and

22   that, quote, SCDC has no power to shorten or amend an inmate's

23   sentence, closed quote.   Additionally, in response to a

24   question asking the respondents to, quote, identify every

25   statute or regulation that authorizes respondents to release

1    an inmate early from his or her term of imprisonment, closed

2    quote, the respondents identified twelve statutes.  Each of

3    these statutes deals with the Board of Paroles and Pardons

4    criteria for granting parole; provisional parole orders;

5    special parole with persons needing psychiatric care; parole

6    for terminally ill, geriatric, or permanently disabled

7    inmates; or pardons.  There simply does not appear to be any

8    mechanism for anyone other than the Board of Paroles and

9    Pardons to release anyone from SCDC.  And certainly, the SCDC

10   and the governor do not have any authority to do so.

11          Now, the Court understands that the fundamental

12   remedy available in habeas corpus actions is the release of an

13   inmate from custody, and that remedy is independent of any

14   state statute permitting release for other reasons.  But, as I

15   will discuss with you in a few moments, there are a number of

16   significant problems with the manner in which petitioners have

17   pled their habeas claims.  The absence of any state statutes

18   meaningfully permitting early release perhaps, in a way,

19   illustrates why petitioners have brought such a sweeping

20   lawsuit, but it also significantly distinguishes the remedies

21   that the petitioners request in this case from the actions

22   this Court and other federal courts have taken in response to

23   COVID-19 for federal inmates.

24          And this provides as good a time as any for me to

25   discuss how compassionate release is functioning in the

1   federal courts.  I am sure all of you are familiar with this

2   Court's order in the case of United States v Griggs, where I

3   granted compassionate release to a federal inmate at FCI

4   Butner.  I believe it was one of the first, if not the first,

5   COVID-19 related compassionate release orders in this

6   District.  In that case, Mr. Griggs was serving a 25-month

7   sentence for being a felon in possession of more than 25

8   firearms, including several stolen firearms.  Mr. Griggs would

9   have received a significantly higher sentence but-for his

10  medical conditions as his case was one of the more egregious

11  felon in possession cases this Court has encountered.

12  However, despite the Court's feelings about the severity of

13  Mr. Griggs criminal conduct, I was faced with a difficult

14  decision under unique circumstances.  It is important for you

15  to understand the state of federal law to understand the

16  import of the Griggs decision.  Prior to passage of the First

17  Step Act, only the BOP could move the Court for compassionate

18  release of an incarcerated defendant for extraordinary and

19  compelling reasons under Title 18 United States Code §

20  3582(c)(1)(A)(i).  With the passage of the First Step Act,

21  inmates may now move for compassionate release after they have

22  exhausted their administrative remedies.  And under the unique

23  circumstances of Mr. Griggs' case, the Court very reluctantly

24  granted his motion for compassionate release.

25          I understand that there may be some temptation by

1    the parties to use Griggs in an attempt to read the tea leaves
2    as to what the Court might do in this case.   To do so would be
3    a mistake.   Congress has established a clear administrative
4    process for federal inmates with health conditions or other
5    extraordinary circumstances to seek early release.   If an
6    inmate's request is denied, he or she may then petition the
7    federal court for release.   Even prior to the First Step Act,
8    BOP had the statutory authority to move for compassionate
9    release.   South Carolina has no such law, and if there was
10    such a process, it would almost certainly require judicial
11    review by the state courts, not a federal court.
12          In the absence of any state statute allowing for the
13    widespread release of inmates from the SCDC, the petitioners
14    have chosen to file a class action pursuant to Section 2254.
15    It looks like petitioners may have alternatively pled under
16    Section 2241, though paragraph 81 of the petition refers to
17    alternative pleading under Section 2441.   A District Court in
18    the Northern District of Illinois addressed a very similar
19    case in Money versus Pritzker.   That Court started its
20    analysis of the habeas claims by stating the well-established
21    requirement that prior to filing a habeas petition in federal
22    court, a petitioner seeking relief from state custody must
23    exhaust available state remedies, which means the petitioner
24    has fully and fairly presented his claims to the state or
25    appellate courts, thus giving the state courts a meaningful

1   opportunity to consider the substance of the claims that he

2   later presents in his federal challenge.   The Court further

3   noted that this exhaustion requirement serves an interest in

4   federal-state comity by giving state courts the first

5   opportunity to address and correct potential violations of a

6   prisoner's federal rights.

7           The petitioners here attempt to excuse their failure

8   to exhaust by claiming that it would be futile and that state

9   remedies are unavailable.   Petitioners claim that there are no

10  state remedies available, and note that the South Carolina

11  Post Conviction Relief Act would not permit a challenge like

12  the one they are bringing in this case.   While petitioners are

13  correct that the Supreme Court of South Carolina limited the

14  scope of the PCR Act in the case of Al-Shabazz versus State,

15  they failed to note that there is still a writ of habeas

16  corpus available to South Carolina inmates.

17          The South Carolina Supreme Court noted in Gibson v.

18  State and the site for that is 495 S.E 2nd 426 (1998) case.

19  That, quote, Habeas corpus continues to be available as a

20  constitutional remedy provided a petitioner qualifies for this

21  extraordinary relief and clears the procedural hurdles, closed

22  quote.   The Supreme Court explained that the purpose of habeas

23  corpus is to test the legality of the prisoner's present

24  detention.   And the only remedy that can be granted is release

25  from custody.   However, quote, Habeas corpus is available only

1    when other remedies such as PCR, are inadequate or

2    unavailable, closed quote.  Accordingly, the state courts can

3    entertain a petition for a writ of habeas corpus when a

4    petitioner is challenging detention but not challenging the

5    validity of his or her conviction or sentence.  Based on the

6    language of the Supreme Court's remand in Gibson, it appears

7    that such petition may be filed in the Circuit Courts of South

8    Carolina and should contain an allegation that PCR remedies

9    have been exhausted or, quote, factual justification why other

10   remedies, such as PCR, are unavailable or inadequate, closed

11   quote.

12         Additionally or, perhaps alternatively, petitioners

13   could seek habeas relief in the original jurisdiction of the

14   Supreme Court of South Carolina.  Such petition commonly known

15   as Butler Petitions based on the 1990 Supreme Court case of

16   Butler versus State.  That case is 397 S.E.2nd 87.  Moreover,

17   to the extent any petitioners are denied parole, those

18   decisions can be challenged under the Administrative

19   Procedures Act.  At any rate, in sum, the petitioners do have

20   several remedies available to them in state court.  Those

21   remedies are only available in the most extraordinary of

22   circumstances, but so too is the federal habeas corpus relief,

23   particularly when requested on a class-wide basis.

24         Now, petitioners claim that the state courts are not

25   functioning at full capacity, and attempt to use this

1   justification to file directly in federal Court.    To that end,

2   petitioner notes in paragraph 85 of their petition that state

3   court remedies would be ineffective in protecting petitioners'

4   federal constitutional rights, particularly given reduced

5   court function as a response to the COVID-19 outbreak.    While

6   petitioners are correct that the state courts are operating in

7   a limited capacity, so too are the federal courts.    I will

8   also note at the time of the filing of this petition, the

9   courts were in a much more limited condition than they are

10  today.    In fact, it is my understanding that our state court

11  across the street in the Spartanburg County Courthouse has

12  resumed operation just this week with mask requirement such as

13  the federal Court is requiring here.    While petitioners are

14  correct that the -- excuse me.    State courts are hearing

15  emergency civil matters, and this case would certainly qualify

16  in the category of cases that a state court would hear under

17  the circumstances.    In fact, the Supreme Court of South

18  Carolina recently heard an original jurisdiction action

19  involving absentee voting and held those arguments remotely by

20  video, and that case is Bailey versus South Carolina State

21  Election Commission.

22          I would note that it is unclear whether the

23  petitioners in this case have named the correct parties to

24  their habeas action.    They have not named the wardens of any

25  correctional institutions and instead they have named the

1    Governor, SCDC's director, the Board of Pardons and Paroles,

2    and the members of that Board.  The only respondent that is

3    conceivably appropriate based upon the initial review by this

4    Court would be Director Stirling.  Petitioners are not in the

5    custody of any of the remaining respondents.  Nonetheless, the

6    Court may not even need to reach this issue, as the

7    petitioners, quote, have not made a satisfactory showing that

8    the state court system was not every bit as available as the

9    federal courts, if not more so, closed quote.  To be frank

10   with the parties, the Court does not see any avenue to habeas

11   corpus relief on the pleadings as they are currently before

12   the Court.

13           Now, I would like to touch on the petitioners'

14   request for declaratory relief.  The petitioners seek a

15   declaration that SCDC's policies violate petitioners' Eighth

16   and Fourteenth Amendment rights against cruel and unusual

17   punishment.  At first blush, this appears to be a cognizable

18   claim, at least as to Respondent Bryan Stirling; however it is

19   a claim that will likely require extensive written discovery,

20   depositions, and potentially a lengthy trial.  It is also a

21   claim that likely does not lend itself to this position on a

22   class-wide basis.  For example, how could SCDC's policies

23   violate the constitutional rights of inmates in facilities

24   where there are no COVID-19 infections?  Moreover, at the end

25   of the day, even if petitioners prevail on this claim, the

1    only relief the Court can award is a declaration of rights.

2            Petitioners' declaratory judgment request is also

3    likely insufficient to justify petitioners' request for

4    attorneys' fees and costs.  Petitioners have not pled a cause

5    of action under 42 U.S.C. § 1983.  Nor have they pled any

6    statutory cause of action that would entitle them to

7    attorneys' fees under 42 U.S.C. § 1988.  It appears to me that

8    this issue is relatively straightforward, which is illustrated

9    to my mind by petitioners' failure to even address the issue

10   in their briefing.

11           Now, less the petitioners feel that the Court is

12   picking on them, let me turn to the respondents.  I want to

13   make clear that there are circumstances in which federal

14   courts may properly get involved in adjudicating prison

15   condition cases related to COVID-19.  As the Sixth Circuit

16   explained in Wi\\\iams, when a prison official acts with both

17   subjective and objective deliberate indifference to the

18   constitutional rights of the inmate, habeas relief under

19   Section 2241 would likely be warranted.  The Constitution does

20   not permit inhumane prison conditions.  Additionally, it is

21   possible that many of the problems that the Court has pointed

22   out could be remedied by the petitioners through amendment or

23   exhaustion of claims in state court.  Obviously, that process

24   will take time and it will be exceedingly costly to both

25   sides.

1    So where does that leave us?  As all of you should

2    realize by now, this Court has grave concerns about whether

3    any of petitioners' claims as currently pled will survive the

4    pending mentions to dismiss.  And the Court is inclined to

5    dismiss all petitioners' claims except for the declaratory

6    judgment claim against Director Stirling and possibly Governor

7    McMaster.  This Court was hopeful that the parties would be

8    able to reach an amicable agreement at mediation, but that did

9    not occur.  Hopefully, the parties now have a better

10   understanding of where the Court currently stands relative to

11   the petition.  And I would strongly encourage the parties to

12   engage in additional discussion.  I want to emphasize to the

13   respondents that even if this Court grants their motions to

14   dismiss, they may have a long road of amendments, discovery,

15   dispositive motions, and trials in their future.  And I do

16   want to note that while SCDC's record has been exemplary given

17   the number of facilities and inmates in their custody, there

18   are a handful of institutions where there is obviously a

19   problem.

20   It seems to me, that at the end of the day, all of

21   the parties in this case want the same thing.  And that is to

22   protect these inmates that are in the care and custody of

23   SCDC.  Litigation is necessarily an adversarial process, but

24   it is not always the best process to achieve good results for

25   the parties.  The petitioners are represented by very capable

1    and experienced counsel, as are the respondents in this case.

2    The parties who are stakeholders in this case care about the

3    health and safety of every individual in SCDC custody.   The

4    Court is aware of efforts made by Director Stirling in this

5    regard, and the Court knows him to be a civil servant who has

6    selflessly served for the betterment of South Carolina

7    inmates.   I believe that if the parties are willing to be

8    reasonable and talk to each other with these shared goals in

9    mind, you may be surprised at the goals you were able to

10   achieve.   Will further discussions result in a mass release of

11   inmates from SCDC custody?  Absolutely not.   Nor should it.

12   It may not even result in the release of any inmates, but that

13   is a result of the absence of any state law vesting SCDC, or

14   any governmental official or body, with the authority to take

15   those actions.   To that end, this Court strongly encourages

16   the Board of Pardons and Paroles to use every means available

17   to fairly exercise its parole power.   That may mean having

18   extra hearings and using remote video conferencing technology.

19   If that's the case, so be it.   That is the job at hand, just

20   like holding hearings and resolving cases is this Court's job.

21   And we all must adjust to this pandemic so we can best serve

22   the citizens of the State of South Carolina, including those

23   citizens who are wards of the State.

24         Now, with respect to the Board of Pardons and

25   Paroles, it is my understanding that they have, in fact,

1  increased the number of hearings that they are holding, and

2  that they are trying to expedite cases where they can.  I

3  would simply encourage those efforts to be redoubled, and a

4  point of discussion between the parties might be something

5  along the lines of trying to get the cases of the most

6  eligible -- excuse me -- the most vulnerable parole eligible

7  inmates to the top of the list, or perhaps considering

8  requests from the facilities that seem to have been the

9  hardest hit on some type of priority basis.

10         Now folks, I've talked a long time.  And I know you

11  feel like a jury who has been a captive audience to a lengthy

12  charge, but I thought it was important to sort of set the

13  table so that you would know where the Court is.  At this

14  point what I would like to do is open up the floor because

15  this is a status conference for the respective parties to let

16  me know where you are in connection with this case.  And I

17  would like for each of you to specifically address whether you

18  want some time for additional discussions, whether you want me

19  to go ahead and rule in the next few days, or whether you

20  would like to have another shot at a facilitated discussion

21  with Judge Hodges, I have already spoken with her, and she

22  will be happy to serve in that role if you think it would be

23  beneficial.  Now, I will hear from the petitioners first, and

24  I know that we have some counsel for the petitioners here.  I

25  know we have some who are participating by video conference.

1    And I will play no favorites based on physical presence.  So,

2    if someone on video wants to respond to the Court, I'll be

3    happy to hear from you.  So, Mr. Winn?

4              MR. WINN:   Thank you, Your Honor.  On behalf of the

5    petitioners, I'm Marshall Winn, for the record.  We really do

6    appreciate the Court's previous rulings expediting matters in

7    this case.  It's a serious case as the Court has aptly

8    indicated.  The Court has actually recited several of the key

9    considerations that the petitioners have in this case.  And

10   based upon discussions that we have had principally with

11   counsel for the Department of Corrections, I think there is a

12   reasonable basis for us to expect to have some good faith

13   discussions within the next very few days with a view towards

14   perhaps coming to an agreement on new procedures, which can be

15   implemented within the Department of Corrections, particularly

16   in those facilities where the need is greatest.  We do point

17   out that for many of the facilities that currently -- I

18   believe I'm looking at the same figures that the Court has,

19   that are showing no cases, that may largely be the result of

20   the fact that there has been no testing.  Testing is something

21   that we think is very important, obviously.  And I think

22   frankly that the Department of Corrections would agree with

23   that.  It's a matter of --

24              THE COURT:   And I would hope, Mr. Winn, at this

25   point testing seems to be more readily available than it was

1   at the time the petition was filed.  So, I --

2          **MR. WINN:**  Yes, sir.

3          **THE COURT:**  -- I would hope that that would be

4   something that could be worked on.

5          **MR. WINN:**  We completely agree with that.  And there

6   are -- obviously we know that there are federal funds made

7   available for these kind of things, and simply a matter of

8   whether the Department of Corrections can move forward in

9   implementing these kind of perfectly reasonable and entirely

10  human things that I think everybody agrees need to be done.

11  Therefore, our suggestion would be, and this is the

12  petitioners' suggestion.  We haven't discussed this.  And I

13  cannot say, and I will not represent to the Court that we have

14  any agreement with the Department of Corrections.  But we

15  believe that it would be appropriate for the Court to consider

16  asking us, that is the petitioners and the Department of

17  Corrections and other defendants as they may see fit, to

18  report back in seven days.  My hope would be that we will have

19  seen some very substantial progress by that time and can

20  recommend to the Court at that point perhaps a stay pending

21  further resolution of the matter.  If, in what I hope is the

22  unlikely event that we would have to come back and say there

23  hasn't been any progress, we don't see any movement in the

24  direction that we believe is appropriate, then would move

25  to amend our pleadings perhaps along the lines that the Court

1   has suggested.  We have already been very much in

2   consideration of that.

3            THE COURT:  All right.

4            MR. WINN:  Thank you, Judge.

5            THE COURT:  Thank you, sir.

6            MR. WINN:  And please, let me call upon Mr. Hughes

7   and Ms. O'Connor and Ms. Dunn to comment because they

8   obviously have been in this case much longer than I have.

9            THE COURT:  I understand that.  And you anticipated

10  my next move, which was to ask if any of the other

11  petitioners' counsel would like to comment further.

12           MR. HUGHES:  Thank you, Your Honor.  This is

13  Jonathan Hughes for the petitioners.  I think Mr. Winn

14  expressed our views well.  We do want to thank the Court and

15  its staff for all of the time and consideration you've given

16  to this point.  We've heard loud and clear today what the

17  Court has said.  Of course when we filed this petition on

18  April 21st, the landscape for some of this litigation was less

19  clear than it is now.  We have a benefit of Your Honor's

20  comments of today, and of course a substantial number of

21  orders from other courts around the country that I think have

22  shown how best to style the petition, the complaint where it's

23  best directed, and relief that we would request.  I think the

24  Court has indicated quite correctly that I think we're all

25  interested in the same thing.  We're interested in making sure

1  that we understand what the threats are in the facilities.   We

2  really do think that testing is a key first step, because

3  although it's true that the reports indicated that there

4  aren't positive results at some of the facilities, our

5  understanding is that what's being done presently is testing

6  of symptomatic inmates.   And of course as the Court knows

7  because it's indicated it is receiving briefings and staying

8  up on the information about COVID, we know that it's

9  transmitting symptomatically and people don't show symptoms

10  that have it.   And so we think one of the key things in order

11  to be able to anticipate future outbreaks, is not be in a

12  situation where we're coming to the Court only when there are

13  death cases instead of at a time when also there's something

14  we can do about it.   We heard yesterday that there was a -- we

15  got a report of a death recently at one of the facilities due

16  to COVID of a prisoner who was being kept in quarantine.

17  There's been recent outbreaks at the Tyger River facility that

18  we're quite concerned about.   We've heard the Court loud and

19  clear on the need to be narrower targeted.   We're going to

20  consider what the Court has said today about availability of

21  state remedies.

22          But finally I will say, Your Honor, we have had an

23  open line of communication.   We've spent a fair amount of time

24  talking to Mr. Settana and Ms. Holmes, and we do think that

25  there's reason to think that those discussions could continue

1    and perhaps be productive.  And I think the suggestion of

2    reporting back to the Court in seven days with an indication

3    of the next step from our perspective would be appropriate.

4          I think at this stage we would not request that the

5    Court issue the ruling.  We've heard the Court's preliminary

6    indications about its concerns.  We think it would expedite

7    the matter, frankly, for us to consider amendments, and we

8    understand we would need to request leave to file amended

9    petition or complaints at this point.  We'd like to indicate

10   to the Court in seven days what our expectations in that

11   regard are.  And, again, thank you for the Court's time.

12         **THE COURT:**  All right.  Thank you, sir.  Anyone else

13   want to comment before I move to the respondents?

14         **MS. DUNN:**  No, Your Honor.

15         **MS. O'CONNOR:**  No, Your Honor.

16         **THE COURT:**  Hearing no further comments from the

17   petitioners' counsel, we'll move to the respondents.  And

18   Ms. Holmes, I'll let you go first -- or Mr. Settana.

19         **MR. SETTANA:**  Excuse me, Judge, my glasses fog when

20   I put my mask on.

21         Your Honor, I think we're going to defer to the

22   governor's counsel as to where we're heading with this.  I

23   will say we have had some discussions, and I just want to add

24   that both my clients, the triple Ps and SCDC, have been as

25   much out in front of this crisis as anybody has in this whole

1    country.  I think the whole COVID-19 pandemic has been dynamic

2    from the beginning.  It's changed.  We're learning more

3    information, more treatment, testing becoming more available.

4    And both agencies are trying to change and get ahead of it.

5    Even as we speak, we know we spoke this morning about things

6    that SCDC is doing to get more testing and to get more test

7    results more quickly, that triple Ps is doing to get more.  Of

8    course the whole parole system almost shut down in April when

9    the rest of the country shut down.  They're going to be out in

10   front of this by September, October at the latest, but

11   probably September because they're doing just an incredible

12   number of parole hearings as we speak.  So, I do think

13   everything you've mentioned as far as your concerns we're

14   addressing right now, Your Honor.  Thank you.

15            **THE COURT:**  All right.  Mr. Limehouse.

16            **MR. LIMEHOUSE:**  Thank you, Your Honor.  Thomas

17   Limehouse for Governor McMaster.  Like all here today, I first

18   want to thank the Court for its time and attention.  It's

19   obvious to all involved that a significant amount of energy

20   and interest has been devoted by the Court to this matter.  We

21   certainly appreciate that.

22            I think I can speak for all respondents that we're

23   more than happy to continue these discussions, and as SCDC was

24   doing before the lawsuit was filed, continue to collaborate.

25   We certainly appreciate the Court's acknowledgment of Director

1    Stirling's service and all that SCDC and Triple P entities are

2    doing in connection with the ongoing emergency.  They will

3    certainly continue to do that.  And to the extent that

4    plaintiffs have valuable insight they can offer the process,

5    we're more than happy to discuss that with them.  We've had

6    excellent discussions with Mr. Hughes and his colleagues to

7    date, and I have no reason to think that we couldn't continue

8    those discussions over the next seven days and report back.

9            I will note there was a reference to a stay

10   thereafter.  I would have some concerns about that approach

11   from a pure state sovereignty, and ongoing concerns about just

12   litigation being stayed is essentially leverage for ongoing

13   discussions.  We don't think that would be an appropriate

14   exercise or use of anyone's time, or the Court's jurisdiction.

15   But, again, in the meantime, more than happy to continue with

16   the discussions and report back as the Court sees fit.

17           **THE COURT:**  All right.  Thank you, sir.  All right.

18   I know we've got a large cast of folks here.  Anybody else on

19   the respondents side wish to comment at this point?  All

20   right.  Going once?  Going twice?  All right.

21           Mr. Settana, let me ask you this.  In the last

22   briefing that the federal district judges received from DHEC

23   officials and the physicians at MUSC that are kind of

24   overseeing the State's responses to COVID, it was our

25   understanding that the additional tests that were being

1   received by the State at that point in time, which would put

2   us back mid to late May --

3              **MR. SETTANA:**  Yes, sir.

4              **THE COURT:**  -- that the State was prioritizing those

5   for primarily two purposes, one, vulnerable adults in

6   congregate settings, i.e. nursing homes and assisted living

7   facilities, and then the other priority was the prison system,

8   was SCDC.

9          Can you give me some idea of not in hard numbers but

10   just, you know, ballpark figures, or percentages, or however

11   you want to describe it, can you give me some idea about how

12   the availability of tests to SCDC has improved since this I

13   think it was filed about the end of April?

14              **MR. SETTANA:**  I don't have the numbers.

15              (Attorneys conferring.)  (Inaudible.)

16              **MR. SETTANA:**  We were at a hundred tests, Judge,

17   from the State.  And then there was some additional tests -- I

18   think it was when I spoke with some people the day of the

19   mediation with Judge Hodges was about 150 a week.  And they

20   were really only testing those people showing symptoms.

21   That's what we are working on.  Now we're working on two

22   things on the testing that I know of.  Correct me if I'm

23   wrong.  Getting more tests.  The directors are beating the

24   bushes to get more tests, and to get the machines to test

25   those so you're not having a three- or four-day turnaround.

1    We have some machines.  We have one machine.  But as I've

2    learned with my own law firm last week, we had to get

3    everybody tested because someone in the firm tested positive.

4    Some machines turn around in six or seven days, and others in

5    a matter of hours.  We're trying to get this down.  And I

6    think another thing is exploring partnerships with medical

7    providers like MUSC and other medical providers to get this

8    testing to more institutions and get the turnaround faster.

9    Those are the areas we're looking to improve on.  As they

10   speak -- as we speak that's what they're working on, Judge.

11              THE COURT:  All right.  Well, when you have a

12   limited number of tests, I mean, obviously I think it's

13   reasonable that those tests go first toward people who are

14   symptomatic.  But Mr. Hughes is not wrong.  We all know of the

15   risk of asymptomatic infection and spread.  And so, you know,

16   that's a worthy goal for you to be working on to the extent

17   you can get additional tests.  I also know that all tests are

18   not created equal, and there are some tests out there that

19   while the positive test is pretty reliable, a negative test is

20   about as reliable as a shot in the dark.  So, you know, you

21   may still have more people infected than you're showing if you

22   don't have a good test.  So, the quality of test is important.

23              All right.  Here's what I'm going to do.  I'm going

24   to withhold any ruling until no earlier than a week from

25   Friday, which will be July 10th.  And I'm going to ask you to

1    give me a joint status report a week from today on Wednesday,

2    July 8th, as to where you are with your discussions.  And in

3    your discussions, obviously you principally are going to want

4    to cover how do you try to get the most effective and

5    efficient assistance to these inmates who are the most

6    vulnerable in light of the capacity you have both legal and

7    practical.  But I also want you to talk about in terms of if

8    the petitioners are looking at amendment or refiling a more

9    focused pleading, rather than having the Court jump through a

10   whole lot of hoops you may want to -- you may want to look at

11   sort of defining your issues.  And to the extent you're not

12   able to reach agreement on certain things, limit what -- limit

13   any future filings to specifically where you want to try to go

14   and what you can agree on.  Basically I'm asking you if you

15   don't get it all worked out, if it comes back to me, I would

16   prefer a rifle shot to a shotgun, okay?

17          All right.  Well, folks, I appreciate your hard work

18   on this.  I know that you have spent a lot of time and effort

19   on this.  It is a worthy thing to be doing.  It is a portion

20   of our population that we are all concerned about because the

21   nature of incarceration is such that it makes transmission of

22   a disease like this highly possible.  And the ability to

23   social distance and do some of the things that were being

24   recommended to do is oftentimes not practical.  And so it is

25   situation that needs some attention.

1          I will note that based upon the less than stellar

2    job we as un-incarcerated citizens are doing, there's a good

3    argument to be made that the likelihood of you getting COVID

4    is greater outside than inside some of these facilities.  And

5    so, you know, to the extent that's the case, I want to

6    congratulate the folks in charge of those facilities and tell

7    you to keep up the good work.  Obviously some of that is based

8    on what we know and don't know regarding asymptomatic

9    infections.  I would also note, as I did earlier and as I know

10   respondents counsel is aware, you have three or four

11   facilities where work needs to be done.  Mr. Hughes I think

12   mentioned Tyger River.  That's certainly one of them, but

13   there are two or three others where there are apparently some

14   issues for whatever reason.

15          So, I appreciate your willingness to try to get this

16   worked out for the benefit of all concerned.  And I will look

17   forward to hearing back from you middle of next week.

18          This was mentioned in your comments, and I just

19   throw it out because I think it could be a big issue in the

20   case.  Regardless of scope and focus of any future petition or

21   amended petition, I also want all of you to look at this

22   question of state court relief and whether that's the

23   appropriate way to go.  Federalism concerns require that I

24   look at that first.  And so I would ask you to do that

25   likewise.  But other than that, see what you can get worked

1    out, and I will look forward to hearing back from you next

2    week.   Hope everyone has a safe 4th of July.   Safest way may

3    be to spend it at home in your backyard, but be that as it

4    may, everybody have a good afternoon.   Stay safe.   Thank you.

5            (Court adjourned at 11:25 a.m.)

6

7                            CERTIFICATE

8            I,   Michele E. Becker, certify that the foregoing is

9            a correct transcript from the record of proceedings

10           in the above-entitled matter.

11

12   /s/   Michele E. Becker              Date:   07/02/2020

13

14

15

16

17

18

19

20

21

22

23

24

25