IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE OF NAACP; <br><br> DISABILITY RIGHTS SOUTH CAROLINA; <br><br> JUSTICE 360; <br><br>         *Plaintiffs*, <br>    v. <br><br> SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE; <br><br> EDEN HENDRICK, individually and in her official capacity as Executive Director of the South Carolina Department of Juvenile Justice; <br><br>         *Defendants*. | Case No. 0:22-cv-1338-MGL-PJG |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS ............................................................................................2

    I.     Children detained at DJJ are subjected to rampant violence and fear of violence. ...................................................................................................3

          A.    DJJ is responsible for the violence in its facilities. .........................4
          B.    DJJ violence causes substantial harm. ............................................5

    II.    Children held at DJJ often suffer from excessive forms of isolation. ..........7

          A.    DJJ frequently uses isolation as a punishment and as a solution to violence and understaffing. .....................................................7
          B.    Children in isolation suffer from dismal conditions and nearly nonexistent services. ........................................................................9
          C.    Isolation causes profound and lifelong damage to children. .........10

    III.   Children held at DJJ do not receive meaningful rehabilitative services and are detained in conditions that actively prevent rehabilitation. ................11

          A.    DJJ does not provide adequate mental health care. ......................12
          B.    DJJ does not provide an adequate education or rehabilitative services to youth in custody. ......................................................13
          C.    Unsanitary conditions further set back rehabilitation. ..................14

LEGAL STANDARD .................................................................................................15

ARGUMENT ...............................................................................................................16

    I.     Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment claims. .............................................................................16

          A.    Plaintiffs' Fourteenth Amendment claims are governed by the "professional judgment" standard from *Youngberg v. Romeo* .......16
          B.    Count 1: Defendants' failure to protect the children detained in DJJ facilities violates the Fourteenth Amendment. .............................19
          C.    Count 2: Defendants use isolation more extensively than the Fourteenth Amendment allows. ....................................................21
          D.    Count 3: Defendants' failure to provide reasonable rehabilitative services violates the Fourteenth Amendment. ...............................25

    II.    Plaintiffs, and the children they represent, will continue to suffer irreparable harm unless the Court grants preliminary injunctive relief. ....27

          A.    Harms from DJJ's failure to protect youth from violence .............29
          B.    Harms from DJJ's use of isolation ................................................30
          C.    Harms from DJJ's failure to provide rehabilitative services ........31

    III.   The balance of hardships and public interest favor preliminary injunctive relief. .......................................................................................................32

CONCLUSION ............................................................................................................33

## INTRODUCTION

In 1990, a class of juveniles successfully sued the South Carolina Department of Juvenile Justice ("DJJ") to vindicate their constitutional rights. But over three decades later, nothing has materially changed. Children in DJJ continue to suffer from frequent and extreme violence, both at the hands of other children and DJJ staff. They are kept in damaging isolation for excessive amounts of time. They are forced to live in inhumane conditions without reliable access to sanitary food or functioning plumbing. And they are not provided anything that even remotely resembles the rehabilitative services to which they are entitled. Children invariably leave DJJ in worse condition than when they entered.

These well-documented conditions clearly violate these children's Fourteenth Amendment rights, as they fall far short of what professional judgment requires of juvenile detention facilities. Tellingly, DJJ recently settled with the U.S. Department of Justice concerning some of these very same issues. But that settlement does not go far enough: it covers only one of DJJ's five secure facilities (the Broad River Road Complex ("BRRC")), and DJJ need not implement many necessary changes until 2024 at the earliest.

South Carolina's most vulnerable children need help now. Plaintiffs—on behalf of themselves and the vulnerable children they represent—move to preliminarily enjoin DJJ from continuing to egregiously breach its Fourteenth Amendment obligations to protect its charges from violence (Count 1), observe clear limits on the use of solitary confinement (Count 2), and provide an environment and services conducive to rehabilitation (Count 3). The Court should compel DJJ to immediately take concrete steps to give all of the children in its care what the Constitution demands: an environment in which they are free from the constant fear of violence and excessive use of isolation and where they can have their basic needs met and have a chance at emerging rehabilitated. Without relief, both the children in DJJ's custody and the Plaintiffs that advocate on their behalf will continue to experience severe and irreparable harm.

## STATEMENT OF FACTS

South Carolina law entitles children detained in DJJ's five secure facilities to rehabilitative services and treatment. *See, e.g.*, S.C. Code Ann. § 63-19-360(5) ("The Department of Juvenile Justice shall provide educational programs and services to all pre-adjudicatory juveniles in its custody."); *Alexander S. by & through Bowers v. Boyd*, 876 F. Supp. 773, 796 (D.S.C. 1995) ("South Carolina law clearly establishes that the purpose of confining juveniles who violate the law is not to punish them, but to provide training and services to correct their delinquent behavior—that is to say, to rehabilitate them."). In order for such services to have any chance at efficacy, DJJ must also keep the children in its care safe. Prevailing standards of professional judgment require not only that DJJ protect children from violence at the hands of other youth or staff. *See* Ex. 8, Declaration of Phyllis Becker ("Becker Decl.") ¶¶ 23-24, 27, 31-32. They also require DJJ to protect children from frequent, prolonged periods of isolation, which are antithetical to the rehabilitative goals of juvenile detention. *See* Ex. 9, Declaration of David Muhammad ("Muhammad Decl.") ¶¶ 18-19, 27-31; Becker Decl. ¶ 83.

As detailed below, DJJ fails to satisfy its professional obligation to protect the children in its care from frequent violence and from frequent, prolonged, and psychologically damaging isolation. And children in DJJ custody do not receive the treatment and services they need and are entitled to receive, including mental health care, educational programming, or even recreational time. These facts are amply established by multiple public investigations (by both South Carolina's Legislative Audit Committee and the Department of Justice), and by numerous fact and expert witnesses who have submitted declarations in support of this motion (including the monitor of the state's designated protection and advocacy organization, the mother of a child recently detained in a DJJ facility, the advocate of a child currently detained in a DJJ facility, a youth advocate, and four experts in child psychology and juvenile detention administration).

## I.    Children detained at DJJ are subjected to rampant violence and fear of violence.

Violence is rampant in DJJ's facilities. Between January and February 2022, DJJ reported 89 youth-on-youth assaults, 46 fights, and 61 injuries across DJJ's five secure facilities. Ex. 6, Declaration of Beth Franco ("Franco Decl.") at Ex. A. This means that, for those two months, an average day at DJJ included at least two fights and one injured child. Children often suffer severe injuries as a result of this widespread violence—including fractured skulls, broken cheek bones, stab wounds, deep lacerations, and broken noses. ECF 1, ¶¶ 67-83.

The violence is so relentless that all children risk being attacked. One child in Defendants' custody reports being attacked more than 50 times by other children. Ex. 3, Declaration of Lakysha Nelson ("Nelson Decl.") ¶ 17. New admissions are targets of violence, and children who cannot defend themselves become persistent victims. Ex. 2, Declaration of Hannah Freedman ("Freedman Decl.") ¶ 19. These include younger or smaller children and children with limited intellectual ability or mental health issues. *Id.* ¶ 18.

Children and staff have developed their own taxonomy to describe different forms of attacks. "Friendlies," for example, are planned fights between children out of security camera range. In just one pod at the Broad River Road Complex ("BRRC"), DJJ's secure long-term facility, friendlies occur at least twice per week. Freedman Decl. ¶ 23. They frequently take place with staff knowledge and without staff intervention—in one instance, a DJJ staff member took her hearing aid out to avoid having to listen to a scheduled fight. Ex. 1, Declaration of Phyllis Ross ("Ross Decl.") ¶ 37. "Hits" are targeted attacks, in which a child or even a staff member will solicit an assault on a specific child. *Id.* ¶ 19, 31-33. Hits are often put out by gangs with presences in DJJ facilities; one child, for example, was assaulted four times on a single day because he refused to be recruited by a gang. *Id.* ¶ 33. "Blitzes" are attacks in which multiple children team-up to attack one child. *Id.* ¶ 23; *e.g.*, Nelson Decl. ¶ 18 (describing attack in which "other children used pipes pulled out of the ceiling to beat" a child).

A.    **DJJ is responsible for the violence in its facilities.**

Violence in DJJ facilities is the result of DJJ's failure to maintain appropriate staffing

levels, adequately train its staff, or sustain basic physical security measures at its facilities.

To start, DJJ does not come close to necessary, baseline staff-to-child ratios at any of its

facilities. Ross Decl. ¶¶ 5, 13-14, 16-20, 43; ECF No. 1-2 at 13-14; ECF No. 1-4 at 23-24. The

South Carolina Code requires that "[s]taff on duty must be sufficient to provide for a juvenile-

staff ratio adequate for custody, control, and supervision, and to provide full coverage of all

designated security posts, excluding administrative, program, and other support staff." S.C. Code

Ann. § 63-19-360(5). Federal standards under the Prison Rape Elimination Act ("PREA")

mandate a minimum juvenile-to-security staff ratio of 8:1. *See* 28 C.F.R. § 115.313(c). But a

PREA audit in 2021 revealed that the Juvenile Detention Center ("JDC"), DJJ's pretrial

detention center, routinely operated at ratios of between 11:1 and 15:1. ECF No. 1-4 at 23-24.

These figures have likely only worsened as a result of JDC's recent overcrowding. Ross Decl. ¶¶

7, 60; Freedman Decl. ¶¶ 13-17.

Because there are too many children and not enough staff, children are often left

unattended, and staff are unable to prevent or promptly break up fights. Ross Decl. ¶¶ 18-21.

"[A] common situation is that a large fight breaks out when there is only one female guard on a

unit. The guard, realizing she cannot stop the fight herself, calls for help, but does nothing to

disrupt or stop the fighting. When this happens, juveniles are placed in danger." Freedman Decl.

¶ 24. As described further below, Juvenile Correctional Officers ("JCOs") frequently resort to

isolating children in their cells when there are not enough staff present.

What staff DJJ does have are inadequately trained. *See, e.g.*, ECF No. 1-2 at 12 (audit

reporting that 74% of correctional officers found DJJ's de-escalation training to be inadequate);

*id.* at 14-15 (reporting an "increase in work hours logged by … untrained and inexperienced

staff"); *id.* at 29, 32, 33. And they are prone to misconduct. JCOs frequently fail to intervene

promptly, and, when they do intervene, they often escalate the violence and cause additional harm to children. Ross Decl. ¶¶ 20, 28-31; Freedman Decl. ¶¶ 25-28; Nelson Decl. ¶ 21 (describing how a "JCO slammed my son to the ground during an attack by other kids and struck her fingernail through his skin to hold him down.").

Sometimes, DJJ staff are directly responsible for instigating violence against children. For example, they may roughhouse with children, verbally provoke them into lashing out, or bribe children with special privileges or outside food in exchange for engaging in fights. Ross Decl. ¶ 29; Freedman Decl. ¶ 25. A few JCOs are themselves affiliated with gangs present in DJJ facilities and have solicited "hits" on children affiliated with a different gang. Ross Decl. ¶ 31; Freedman Decl. ¶¶ 27-28.

Finally, DJJ does not maintain necessary physical security features in its facilities. In a secure detention facility, doors, locks, and surveillance cameras stop violence by separating antagonistic groups or individuals and ensuring that staff can respond immediately to violent episodes and hold responsible parties accountable after incidents. *See* Becker Decl. ¶ 28. But in DJJ facilities, these security features are broken, missing, or ignored by staff. For example, the 2021 PREA audit of JDC found that locks to sixteen private cells were malfunctioning. ECF No. 1-4 at 25. And although DJJ uses security cameras to surveil its facilities, many cameras are broken, creating blind spots exploited by staff and children alike to perpetuate violence. *See* Ross Decl. ¶¶ 30, 36; Freedman Decl. ¶¶ 23, 25-26.

Between understaffing, undertraining, and busted surveillance, many fights and assaults occur at DJJ without any staff knowledge at all. When staff are aware, there is often no proper internal reporting or formal investigation as required by DJJ's written policies. Ross Decl. ¶¶ 24, 26; ECF No. 1 ¶ 78.

**B.    DJJ violence causes substantial harm.**

Violence at DJJ causes profound harm in addition to the physical injuries of its victims.

For one thing, a climate of violence is traumatic. Whether or not personally victimized, DJJ residents live with the fear that violence can break out at any point. This chronic uncertainty about their safety places youth at significant risk of developing Post-Traumatic Stress Disorder—with attendant hypervigilance, including exaggerated startle response, problems concentrating, sleep disturbance, and irritable behavior. Ex. 10, Declaration of Louis M. Kraus, M.D. ("Kraus Decl.") ¶¶ 68-71. And that same symptomology may lead children to act out, resulting in punishments for their mental health issues. *Id.* ¶ 72. Unsurprisingly, one witness reports that, "[d]ue to the constant fear of being targeted by a gang—including by gang-affiliated DJJ staff—detained youth are constantly on alert, leading to an atmosphere that exacerbates trauma and behavioral problems because of the constant violence." Freedman Decl. ¶ 28. Another reports that children in custody resist taking prescribed medications that cause sleepiness, out of fear that they will be attacked while asleep. Ross Decl. ¶ 23.

The hovering specter of violence also impedes education and recreation, which further sets back children's progress and defeats the purpose of their ostensibly rehabilitative detention. DJJ's own concerns that it does not have the resources to control violence has led it to deny education by cutting classes short or canceling them altogether; at one facility, "violence has become so frequent that children often do not attend school for days or weeks at a time." Ross Decl. ¶¶ 27, 48-55. Likewise, in combination with understaffing, the prospect of violence results in children only infrequently going outside, because DJJ cannot adequately supervise children outdoors. Freedman Decl. ¶ 50; Ross Decl. ¶ 17.

The declaration of Ms. Nelson, whose son has been the victim of brutal assaults while under DJJ care, demonstrates how DJJ's failure to create a safe environment produces cascading harms. Because DJJ could not or would not otherwise protect her son from violence, DJJ staff began putting him in "protective" solitary confinement for *months at a time*, with little to no human contact or opportunity for exercise or play. Nelson Decl. ¶¶ 11-12, 28. As for education,

even before he was placed in protective custody, the combination of violence and understaffing meant he has attended only very few classes over *the last two years*. *Id.* ¶ 24.

## II.    Children held at DJJ often suffer from excessive forms of isolation.

### A.    DJJ frequently uses isolation as a punishment and as a solution to violence and understaffing.

Expert and professional standards leave no doubt that juvenile detention officials should subject children to solitary confinement or isolation at most in only the rarest of instances, and for no more than a few hours. Becker Decl. ¶¶ 81-92; Kraus Decl. ¶¶ 45-53; Muhammad Decl. ¶¶ 18-40. This is because solitary confinement is an extreme state of being that can have profound negative impacts on children. *Id.* In Plaintiff's expert David Muhammad's words: "solitary confinement should not be utilized frequently or for lengthy periods of time for any reason for children. My view is shared by juvenile justice experts nationwide, has been memorialized in professional standards for juvenile justice administrators, and has been supported by federal and state government efforts to minimize or eliminate the use of solitary confinement for youth." Muhammad Decl. ¶ 31.

But, in DJJ facilities, isolation, like violence, is commonplace. DJJ staff often use isolation to punish children for minor offenses, such as "showing disrespect, not complying with officers' directions, or using profanity towards officers … masturbating in their beds[,] or exposing themselves to officers." ECF No. 1-6 at 14; *accord* Freedman Decl. ¶ 29. DJJ staff even subject children to isolation for behavior that does not qualify as an offense, like having playing cards or being unable to urinate for a drug test. ECF No. 1-6 at 14. These practices are contrary to DJJ's own written policies. *See* Ross Decl. Ex. B at 6-7 (DJJ policy requiring interventions other than isolation where a child "is safe, but is not calm and/or cooperative").

DJJ also uses isolation as an administrative or security procedure to compensate for its inadequate staff-to-child ratio and poor staff training. Perhaps most alarmingly, DJJ uses such

isolation when it cannot treat or respond to the needs of children with disabilities. For example, DJJ staff put one child at JDC into isolation because they could not manage his mental illness. Freedman Decl. ¶ 34. Other times, DJJ staff resort to solitary confinement of *victims* of violence because they cannot otherwise keep these victims safe. Freedman Decl. ¶ 22; Nelson Decl. ¶¶ 11-14, 25 ("BRRC began routinely putting my son into what they told me was 'protective custody,' supposedly in order to separate him from his assailants. From my discussions with him and DJJ staff, I understand that BRRC was so understaffed that they could not protect my son from other children."). And, when there are not enough staff members at a facility, as is often the case, DJJ confines children to their individual cells, using isolation as a population management and "protection" tool. Ross Decl. ¶¶ 40-43, 51. These *de facto* forms of isolation are rarely documented. Ross Decl. ¶ 45.

Children are often isolated for prolonged periods of times—days, weeks, or even months. In March 2022, for example, a mentally ill child at JDC spent over a week confined to his cell for more than 23 hours a day. Ross Decl. ¶ 42. This around-the-clock isolation is such a part of life at DJJ that it has its own name—"23-and-1." Another child, who was recently in DJJ custody, reported spending over half of his nearly three years at JDC in solitary confinement. Freedman Decl. ¶ 35.

DJJ's isolation practices are contrary to its own mandatory policies on the criteria for, duration of, and supervision of isolation. DJJ policy says that "juveniles placed in isolation or room confinement must be closely monitored," "receive encouragement and support from the staff," and be "assessed by a staff member at least every 15 minutes until all [] compliance criteria are met." *See* Ross Decl. Ex. B at 6-7. Also, within four hours of placement, a manager must conduct an investigation, interview the juvenile, return them to their unit unless they are, or are under, a "*severe* threat of harm," and complete documentation of the same. *Id.* at 6-7, 11-12 (emphasis added). Contrary to these requirements, JCOs will fill out paperwork extending

children's time in solitary confinement past four hours without ever evaluating or checking on them; in fact, they will pre-emptively prepare that paperwork before four hours has even passed. Ross Decl. ¶ 44. Moreover, the required documentation is often neither "thorough [nor] accurate" and is almost never completed in full. ECF No. 1-2 at 34.

### B.    Children in isolation suffer from dismal conditions and nearly nonexistent services.

Isolation in DJJ facilities occurs in conditions that resemble the worst forms of adult solitary confinement. At JDC, for example, children are isolated in cells that are approximately 9 feet by 9 feet in size. Freedman Decl. ¶ 32. Each cell has a bed, a "desk" (a plank sticking out of the wall for a table and two planks sticking out of the wall on either side, lower to the ground, to sit on), a sink, and a toilet. *Id.* The door to each cell has a small, approximately 1.5-by-1.5-foot window and a small window behind the bed. *Id.* These windows have been coated with a substance that makes them opaque and that limits the amount of natural light in the cells. *Id.* Because DJJ is so inadequately staffed, there are often insufficient adults available to walk by the cells, meaning that children locked alone may not even *see* an adult for hours or days on end. *Id.*

Isolation at DJJ is an extraordinary deprivation. When children are isolated, they often do not receive rehabilitative services—no matter their need or the reason for the solitary confinement. Isolated children cannot attend classes in person and only rarely receive insufficient substitutes for instruction like worksheets. Ross Decl. ¶ 55; Freedman Decl. ¶ 39; Nelson Decl. ¶ 25. They are often unable to go outside at all. Ross Decl. ¶ 60; Freedman Decl. ¶ 50. Sometimes even their basic needs are not met—children in isolation have, for example, reported being unable to use the restroom or access water unless they are let out of their cells. Ross Decl. ¶¶ 9, 62.

**C.      Isolation causes profound and lifelong damage to children.**

Isolating children, even for short periods of time, has grave consequences for children's mental health. *See* Kraus Decl. ¶¶ 28-36. Dr. Louis Kraus is a Professor and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois. *Id.* ¶ 2. He has worked with youth in correctional settings for over thirty years, including nine years as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois. *Id.* Dr. Kraus describes how children are in the process of developing socially, psychologically, and neurologically; that in-progress development makes the risk of psychological harm even greater when youth are in isolation. *Id.* ¶ 28. Not only do children have a greater need for social stimulation, they experience time differently from adults—a day to a child feels longer than a day to an adult. *Id.* ¶ 30.

Removing children from regular routines, school, mental health treatment, and socialization with their peers and adults can result in long-term trust issues, hypervigilance, and paranoia. *Id.* ¶¶ 28-29. For children with pre-existing mental health issues, isolation risks worsening those issues or precipitating additional mental health problems, including post-traumatic stress disorders, psychosis, anxiety disorders, major depression, agitation, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior. *Id.* ¶ 29. Indeed, a nationwide survey documented that "50.6 percent of youth who committed suicide did so while in isolation." Muhammad Decl. ¶ 29; *see also* Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 442 (2014) (finding that 53.3% of acts of self-harm and 45.0% of acts of potentially fatal self-harm in New York City jails occurred within the group of individuals in solitary confinement).

Children in DJJ's custody exhibit these adverse mental health effects following time spent in isolation. Freedman Decl. ¶¶ 35-36, 39. The consequences can be lasting. *Id.* And for some, they are dire—a child who was detained at UEC, for example, tried to hang herself in the

shower after she was released from isolation. Freedman Decl. ¶ 39; ECF No. 1-6 at 16-17 (DOJ report from February 2020 noting that numerous youth in isolation at DJJ facilities "displayed deteriorating mental health conditions attributable to the unreasonable length and conditions of confinement in isolation" and that "[s]everal of these youth displayed suicidal ideations.").

DJJ's use of isolation creates a vicious cycle. Children in DJJ custody report that the isolation they experience causes them to resort to fights or disturbances as a means of breaking up the monotony of their days. Ross Decl. ¶ 46. In general, lengthy periods of isolation in no way help change children's behavior in a productive or positive manner. Muhammad Decl. ¶ 28. In fact, research confirms that isolation increases violence, because it exacerbates other underlying mental health issues and deprives children of important, stabilizing social connections with other children and staff. *Id.* ¶ 47; Kraus Decl. ¶ 52; Becker Decl. ¶¶ 85-87.

### III.    Children held at DJJ do not receive meaningful rehabilitative services and are detained in conditions that actively prevent rehabilitation.

DJJ's mandate goes beyond cabining harm to children in its care. Rather, the entire point of DJJ detention is to affirmatively rehabilitate children. *See Alexander S.*, 876 F. Supp. at 781 ("In South Carolina, incarceration of juveniles is said to be for beneficent rather than punitive purposes."). Thus, DJJ must provide services and an environment conducive to rehabilitation. As this Court explained in *Alexander S.*:

> South Carolina law clearly establishes that the purpose of confining juveniles who violate the law is not to punish them, but to provide training and services to correct their delinquent behavior—that is to say, to rehabilitate them. For example, the Children's Code, the statutory authority for confining juveniles at DJJ facilities, declares as a part of its "Children's Policy" that "[f]or children in need of services, care and guidance, the State shall secure those services as are needed to serve the emotional, mental and physical welfare of the children and the best interests of the community." S.C. Code Ann. § 20–7–20(D) (Law. Co-op. 1985). Furthermore, this policy applies to "children ... who by their circumstance or action violate the laws of this State and are found to be in need of treatment or rehabilitation." S.C. Code Ann. § 20–7–20(B) (Law. Co-op. 1985).

876 F. Supp. at 795-96 (alterations in original). Furthermore, DJJ is a school district, making DJJ responsible for the academic education of its residents as part of its overall rehabilitative mandate. *Id.* at 787, 790.

As discussed above, DJJ's endemic violence and isolation practices impede rehabilitation by traumatizing children and causing the cancellation of school and time outdoors. But this is just part of how DJJ flunks its mandate and hurts the children in its custody. Overstretched and understaffed, DJJ fails across the board to provide the children in its care what they need.

### A.     DJJ does not provide adequate mental health care.

Many of the children in DJJ's custody have mental health needs and disabilities. Freedman Decl. ¶ 37. While South Carolina law prohibits the commitment of children with severe mental or developmental disabilities, DJJ detains those children anyway. In 2017, for example, 117 young people with serious mental illness entered the BRRC, with a majority of those children never being transferred to psychiatric residential treatment. ECF 1-6 at 7.

DJJ does not provide adequate mental health services to the children detained in its facilities. Ross Decl. ¶¶ 57-59; Freedman Decl. ¶¶ 38-39. To start, DJJ does not have enough psychiatrists. Ross Decl. ¶ 59. As a result, DJJ is often unable to evaluate children for mental health risks prior to isolating them—in fact, as noted, DJJ staff frequently *use* isolation to manage the behavior of children with disabilities. *Supra* pp. 7-8. And if that isolation precipitates a mental health crisis, *see supra* p. 10, DJJ staff cannot provide critically necessary care.

Understaffing disrupts clinical care in other ways. It can prevent children from receiving medications at the time when they are prescribed to be taken each day, because no one can bring them those medications. Sometimes children do not receive their medications at all. Ross Decl. ¶ 5. More structurally, DJJ often fails to develop treatment plans for the children in its care, and it almost always fails to implement these plans. As Dr. Louis Kraus notes, treatment plans "should be individualized for each youth, and should include a diagnosis, treatment goals, and a

clean plan on how to achieve those goals." Kraus Decl. ¶ 73; *see also* Becker Decl. ¶¶ 50-52, 55. Because DJJ does not have adequate clinical providers, or even enough JCOs, DJJ is not able to implement treatment plans for children, and treatment meetings often do not include all the adults who work with or supervise a child. Ross Decl. ¶ 60; Becker Decl. ¶ 53. "When an institution is unable to implement treatment plans for youth in its custody, it puts those youth at high risk of suffering significant health damage." Kraus Decl. ¶ 74. Finally, understaffing prevents adequate supervision of juveniles, allowing the proliferation of violence that often targets low functioning and mentally ill children. Ross Decl. ¶ 25.

### B.    DJJ does not provide an adequate education or rehabilitative services to youth in custody.

DJJ regularly fails to provide educational or rehabilitative services, especially to youth in isolation. Unsurprisingly, children with disabilities—who are entitled by federal and state statutes to additional services—do not receive the services they should and instead suffer the most from DJJ's overall denial of services. Freedman Decl. ¶ 41.

Children frequently go for extended periods of time without classroom instruction. Freedman Decl. ¶ 40; Ross Decl. ¶ 27. JDC claims to provide children with a paltry four hours of classes per week. Ross Decl. ¶ 49. In practice, however, classes are frequently cancelled because of violent incidents or understaffing. At the start of March, children at JDC had gone weeks with only a single day of class due to a lack of staffing. *Id.* ¶¶ 27, 54. One Justice 360 client at JDC received exactly one day of education over the previous nine-month period. Freedman Decl. ¶ 11. Another client received a total of two hours of classroom instruction over nearly a year of custody at JDC. *Id.* ¶ 40. Overall, the education actually provided is not "even remotely comparable to what is required in the South Carolina public school system." *Id.*

Other forms of programming are also limited. Ross Decl. ¶ 61. Schedules provide stability to children who have been removed from their homes, and activities—from structured

programs to basic team sports—help foster important social skills. Becker Decl. ¶¶ 23, 37, 40, 55; Kraus Decl. ¶ 28. But in DJJ custody, children routinely spend weeks without any scheduled activities beyond eating, sleeping, and showering. Ross Decl. ¶¶ 5, 60; *see also* Nelson Decl. ¶¶ 24, 25, 28. Sometimes they go days or weeks without even going outside. Ross Decl. ¶ 60.

### C.    Unsanitary conditions further set back rehabilitation.

Finally, DJJ impedes rehabilitation by maintaining dismal conditions of confinement. A safe and secure environment is a "must" because physical and emotional safety are pre-requisites to rehabilitation. Becker Decl. ¶¶ 23-24. Thus, to give children in detention a meaningful chance, professionals in the space emphasize common sense basics: protection from violence; adequate food, clothing, and hygiene; a clean and neat environment; engaged staff supervision; and a predictable and balanced daily schedule, among other things. *Id*.

DJJ's facilities do not provide a safe and calm environment that sets baseline expectations for behavior. Units are not cleaned regularly, smell terribly, and are covered in graffiti. Ross Decl. ¶¶ 9-10. Children in DJJ custody report seeing cockroaches crawling out of shower drains, and at least one Justice 360 client reported finding cockroaches in his food on multiple occasions. Freedman Decl. ¶¶ 45-47. JDC is often so over capacity that up to several dozen boys must sleep in makeshift beds, known as "boat beds," that are lined up in the halls of the facility or on the floors of the small common areas in the individual units. *Id*. ¶ 16; Ross Decl. ¶ 7. The children appear disheveled and their clothes are dirty. Freedman Decl. ¶ 47. The toilet in one child's cell at JDC was recently clogged and left inoperable for over a week. Ross Decl. ¶ 9. After he covered the toilet with a blanket or sheet, DJJ staff permitted him to go to an adjacent room to use its facilities when he needed, but denied his request to be moved to a different room. *Id*.

The declaration of Teresa Owen, who is the informal guardian of a child detained at JDC since February 2022, underscores the human toll of these conditions. The boy, L.Y., entered

foster care when he was five and his history of trauma includes significant physical and verbal abuse. Ex. 4, Declaration of Teresa Owen ("Owen Decl.") ¶¶ 3-7. At JDC, he spends up to 23 hours per day in a dirty and rodent-infested windowless room. *Id.* ¶ 12. He may use the remaining time for hygiene—but the shower is dirty, he has found other boys' feces in the drain, and he has been assaulted there. *Id.* ¶¶ 13, 23. He might go to a recreation area—but he has also been attacked there too, several times. *Id.* ¶¶ 14, 23. Food is inconsistent and at risk of theft under threat of violence. *Id.* ¶¶ 15, 22-23. He rarely gets to go outside, *id.* ¶ 14, and cannot get a haircut. *Id.* ¶ 16. And, with four hours of GED-type educational instruction per *week*, he sees his pre-detention academic progress going to waste. *Id.* ¶ 18. Somehow, assailants have attacked him inside his own cell – the doors to which are operated by JCOs. *Id.* ¶ 23.

The ongoing result is that L.Y. is deteriorating, physically and emotionally. *Id.* ¶¶ 9, 17, 18. He lives with pain from repeated beatings. *Id.* ¶¶ 22. He lives in neurotic vigilance about the next attack, scanning his surroundings even during video calls with Ms. Owen. *Id.* ¶ 29. Amidst these conditions, DJJ staff will not provide a psychiatrist—but will provide him sedatives. *Id.* ¶ 20.

All told, the conditions in DJJ's facilities represent bedlam and punishment rather than treatment and care.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is the opposing party, the last two factors may be considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020).

**ARGUMENT**

**I.     Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment claims.**

The Fourteenth Amendment requires DJJ to provide a safe and rehabilitative environment for every child in its care. *See Alexander S.*, 876 F. Supp. at 798 n.44 (applying the standards of *Youngberg v. Romeo*, 457 U.S. 307 (1982)). Instead, DJJ subjects those children to unreasonable dangers, extended and frequent periods of isolation, and inadequate rehabilitative services. In doing so, DJJ violates those children's baseline constitutional rights—just as it did twenty-five years ago, when this Court ruled against DJJ for similar systemic violations. *See Alexander S.*, 876 F. Supp. at 797. Plaintiffs are therefore likely to prevail on the merits of their Fourteenth Amendment claims.[1]

**A.     Plaintiffs' Fourteenth Amendment claims are governed by the "professional judgment" standard from *Youngberg v. Romeo*.**

Juvenile detention institutions are subject to heightened standards of scrutiny under the Due Process Clause of the Fourteenth Amendment. For one thing, "[t]he objectives [of children's detention] are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment." *Kent v. United States*, 383 U.S. 541, 554 (1966). For another, "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982). Overall, "children are constitutionally different," *Miller v. Alabama*, 567 U.S. 460, 471 (2012), and "because the state has no legitimate interest in punishment, the conditions of juvenile confinement, like those of confinement of the mentally ill,

---

[1] In cases brought by prisoners, courts typically consider whether a correctional facility's available administrative remedies have been exhausted when evaluating likelihood of success on the merits. 42 U.S.C. § 1997e(a) ("PLRA"). But the PLRA's exhaustion requirement applies only to cases brought by "prisoner[s] confined in any jail, prison, or other correctional facility." 42 U.S.C. § 1997e. This case is not brought by prisoners—it is brought by three plaintiff organizations. *See Ala. Disabilities Advocacy Program v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008) ("[Alabama Disabilities Advocacy Program] is clearly not a 'prisoner' under the statute.").

are subject to more exacting scrutiny than conditions imposed on convicted criminals." *Santana v. Collazo*, 714 F.2d 1172, 1180 (1st Cir. 1983).

The nature and constitutional status of children's detention means that courts review Fourteenth Amendment claims arising in that context under the protective standards of *Youngberg v. Romeo*. *See Alexander S.*, 876 F. Supp. at 798 n.44; *Doe 4 by & through Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 342 (4th Cir. 2021) (discussing "the unique psychological needs of children and the state's corresponding duty to care for them"), *cert. denied*, 142 S. Ct. 583 (2021). The *Youngberg* standard requires that detention facilities act according to professional judgment in balancing the goals of confinement and confined persons' rights and needs, and it prohibits any "substantial departure from accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323. This standard guarantees baseline protections, such as having a safe environment conducive to rehabilitation, limiting the use of isolation only to "when and to the extent professional judgment deems . . . necessary," and providing the rehabilitative services "an appropriate professional would consider reasonable." *Id.* at 324; *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("[A]t the least, due process requires that the nature . . . of commitment bear some reasonable relation to the purpose for which the individual is committed.").

*Youngberg* itself concerned the due process rights of an individual with the "mental capacity of an 18-month-old child" who had been involuntarily committed to a mental hospital. 457 U.S. at 309, 315. *Youngberg* explained that the state "has the unquestioned duty to provide reasonable safety for all residents and personnel within [an] institution," "may not restrain residents except when and to the extent professional judgment deems . . . necessary," and has "a duty to provide . . . [habilitative] training as an appropriate professional would consider reasonable." *Id.* at 324. By requiring state officials to provide for conditions and care that an

appropriate professional deems reasonable, *Youngberg*'s standard ensures that the "conditions of confinement . . . comport fully with the purpose of respondent's commitment." *Id.*

Subsequent cases have applied *Youngberg* to custodial settings that are similar to—and, indeed, *identical* to—juvenile detention at DJJ. In *Alexander S.*, the Court held that *Youngberg* supplied the appropriate constitutional standard against which to evaluate conditions at DJJ facilities because "South Carolina law clearly establishes that the purpose of confining juveniles who violate the law is not to punish them, but to provide training and services to correct their delinquent behavior—that is to say, to rehabilitate them." 876 F. Supp. at 796. The Court therefore directed its inquiry at "identify[ing] minimally acceptable standards for treatment and rehabilitation . . . to ensure the protected interests of the Plaintiffs," which, "[o]bviously . . . incorporates the security, program, and service functions that are basic to juvenile corrections." *Id.* at 798.

More recently, in *Doe 4 by and through Lopez v. Shenandoah Valley Juvenile Center Comm'n*, the Fourth Circuit applied the *Youngberg* standard to evaluate claims that a juvenile detention center was providing inadequate mental health care to unaccompanied immigrant children in its custody. 985 F.3d at 342. In rejecting the state's proposed application of a more forgiving constitutional standard, the Fourth Circuit held that "the *Youngberg* standard is particularly warranted here, given the unique psychological needs of children and the state's corresponding duty to care for them." *Id.* The Fourth Circuit reversed the district court's grant of summary judgment to the state, given its failure to assess plaintiffs' claims against the appropriate standard of professional care in a juvenile detention setting. *Id.* at 346; *see id.* at 344 ("[A] court must do more than determine that some treatment has been provided—it must determine whether the treatment provided is adequate to address a person's needs under a relevant standard of professional judgment.").

In support of this motion, Plaintiffs submit testimony from three qualified professionals, each of whom has decades of experience with youth correctional settings. *See generally* Becker Decl. (testimony of Phyllis Becker, a 26-year veteran and former Director of the Missouri Division of Youth Services); Muhammad Decl. (testimony of David Muhammad, a former senior officer at several juvenile and adult corrections departments, and a court-appointed monitor for Illinois's juvenile justice system); Kraus Decl. (testimony of Dr. Louis Kraus, Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, who has worked with youth in correctional settings for 30 years). When assessed in combination with precedent, this expert testimony informs the standards of professional judgment against which the constitutionality of DJJ's conduct should be measured. As explained below, that testimony makes clear that DJJ falls far short of professional standards for rehabilitating and keeping safe children in a juvenile detention facility. As a result, DJJ has violated its constitutional obligations and Plaintiffs are likely to prevail on the merits of their claims. *See Youngberg*, 457 U.S. at 323.

**B.      Count 1: Defendants' failure to protect the children detained in DJJ facilities violates the Fourteenth Amendment.**

"[W]hen the State takes a person," let alone a child, "into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Doe 4*, 985 F.3d at 338 (quotation marks omitted); *see also Youngberg*, 457 U.S. at 324 ("The State . . . has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution."). Here, as in *Alexander S.*, "[s]afety, in the context of this case, encompasses the [children's] right to reasonable protection from the aggression of others, whether 'others' be juveniles or staff." 876 F. Supp. at 798; *see also Savidge v. Fincannon*, 836 F.2d 898, 907-08 (5th Cir. 1988) (under *Youngberg* standard, Fourteenth Amendment requires state to provide a "reasonably safe physical environment" to institutionalized persons).

As set forth above, violence within DJJ facilities is endemic, and the children confined there are simply not safe—either from the other children they are detained alongside or from the staff who are supposed to look after them. *Supra* pp. 3-5. Some children are attacked repeatedly, and all children are at risk of being attacked. According to juvenile corrections expert David Muhammad, the "extremely high level of violence [at DJJ] is far beyond the norm in youth facilities nationally." Muhammad Decl. ¶ 56. In fact, despite supervising three different juvenile facilities and serving three and a half years as a federal court monitor, Muhammad claims that he has "never witnessed anywhere near the level of violence that is reported to occur in South Carolina's DJJ facilities." *Id.*

Expert Phyllis Becker has 26 years working in and overseeing youth correctional institutions. She explains that the high incidents of violence at DJJ result from Defendants' failure to adhere to basic professional standards of care for a juvenile custodial setting—including appropriate staffing levels, staff training, and building security. *See* Becker Decl. ¶¶ 21-31, 56-73. Chronic understaffing—below "even the minimal staffing patterns set forth in the staffing plans"—prevents effective supervision and has facilitated violent episodes. *Id.* ¶ 57, Ex. 2 at 14; *see* Becker Decl. ¶ 59 (noting how "incidents of sexual assault reported in a 2021 audit were due to insufficient staff supervision and overage, resulting in staff not having line of sight supervision."). In addition, "the limited staff in place ... are not equipped to facilitate basic safety building blocks and a rehabilitative environment," and are behind in required "certifications in topics such as trauma awareness, emergency procedures, and suicide prevention, intervention, and security." *Id.* ¶ 25. Moreover, DJJ fails to "adhere[] to basic security measures such as functioning door locks, successful key control, and adequate camera coverage." *Id.* ¶ 28.

In addition, some DJJ staff *are* the dangers children face in Defendants' care, instigating and even directly ordering violence, or responding to youth-on-youth violence with excessive force rather than de-escalation. *Supra* pp. 4-5. Staff participation in and wanton infliction of

violence represent egregious violations of every professional standard governing staff care for detained children. Becker Decl. ¶ 31; *accord* Muhammad Decl. ¶ 61.

In short, Plaintiffs are likely to succeed on the merits of Count 1 ("Failure to Protect Children Entrusted to DJJ Care"). *Youngberg* demands that DJJ act in accordance with appropriate professional judgment to protect the children in its care from violence. DJJ's broad failure to do so violates these children's Fourteenth Amendment right to be free from "unsafe conditions." 457 U.S. at 315-16.

### C. Count 2: Defendants use isolation more extensively than the Fourteenth Amendment allows.

DJJ's duty to create a safe environment for detained children dovetails with its constitutional obligation not to overuse isolation. Isolation is an extreme restraint that can be used only for a legitimate government purpose, *see Santana*, 714 F.2d at 1180, which means that, in the context of juvenile detention, isolation is constitutional only when deployed as a rare and short-term tool of last resort. *See generally R.G. v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006) (applying *Youngberg* and collecting authorities). In contravention of this standard, DJJ makes liberal use of sustained, around-the-clock isolation, for all sorts of purposes.

In *Youngberg*, the Supreme Court held that an institution like DJJ can impose additional restraints on individuals in its custody only "when and to the extent professional judgment deems this necessary to assure . . . safety." *Youngberg*, 457 U.S. at 324. The First Circuit elaborated on this standard in *Santana v. Collazo*. *See* 714 F.2d at 1178-82. The plaintiffs in that case challenged isolation practices used by Puerto Rico's juvenile detention system. *Id.* In siding with the plaintiffs, the First Circuit explained that *Youngberg*'s professional judgment standard mandates an assessment of whether solitary confinement is justified in light of available alternatives. "[I]f the state can avoid the current extensive use of isolation by minimal additional attention . . . it may well be unreasonable for the state not to do so." *Id.* at 1182; *see also G.H. v.*

21

*Tamayo*, 339 F.R.D. 584, 587 (N.D. Fla. 2021) ("Used without a sufficient basis, or under unjustifiably harsh conditions, solitary confinement can be unconstitutional.")

Courts have repeatedly made clear that isolating children is legitimate only in the rarest of circumstances. The court in *R.G. v. Koller*, for example, sided with plaintiffs who challenged the Hawaii juvenile justice system's use of indefinite isolation ostensibly to protect youth who were, or were perceived to be, gay or lesbian. 415 F. Supp. 2d at 1155. The court considered and credited "expert evidence before the court [which] uniformly indicate[d] that long-term segregation or isolation of youth is inherently punitive and is well outside the range of accepted professional practices." *Id*. Based on this evidence, the court concluded that, even if Defendants were attempting to "respon[d] to legitimate safety needs," their "practices [we]re, at best, an excessive, and therefore unconstitutional, response." *Id.* at 1155-56.

Like the court in *R.G.*, numerous other courts have concluded that "the use of isolation for juveniles, except in extreme circumstances, is a violation of Due Process." *Id.* at 1155. In *Milonas v. Williams*, for example, the Tenth Circuit affirmed an injunction against placing children in isolation for any reason "other than to contain a boy who is physically violent." 691 F.2d 931, 942-43 (10th Cir. 1982). Similarly, in *D.B. v. Tewksbury,* the District Court for the District of Oregon held that "[p]lacement of younger children in isolation cells as a means of protecting them from older children" violates plaintiffs' Due Process rights under the Fourteenth Amendment. 545 F. Supp. 896, 905 (D. Or. 1982). *See also Lollis v. N.Y. State Dep't of Soc. Servs.*, 322 F. Supp. 473, 480 (S.D.N.Y. 1970) (concluding that solitary confinement endured by a child was unconstitutional in light of expert testimony that extended use of isolation for children is "cruel and inhuman" and "counterproductive to the development of the child"); *Feliciano v. Barcelo*, 497 F. Supp. 14, 35 (D.P.R. 1979) ("Solitary confinement of young adults is unconstitutional."); *cf. Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1372 (D.R.I. 1972) ("This Court is convinced that solitary confinement may be psychologically

damaging, anti-rehabilitative, and, at times inhumane."); *Turner v. Palmer*, 84 F. Supp. 3d 880, 883 (S.D. Iowa 2015); *Orange v. Cnty. of Grundy*, 950 F. Supp. 1365, 1373 (E.D. Tenn. 1996).

Notably, some courts have found frequent and sustained solitary confinement of youth to be so abhorrent that the practice violates even the Eighth Amendment's proscription against cruel and unusual punishment, notwithstanding precedent affording the government more deference under that provision. In *Doe by & through Frazier v. Hommrich*, No. 3-16-0799, 2017 WL 1091864 (M.D. Tenn. Mar. 22, 2017), the court held that "solitary confinement of juveniles in government custody for punitive or disciplinary reasons, especially for extended periods of time and especially for youth who may suffer from mental illness, violates the Eighth Amendment's prohibitions against the inhuman treatment of detainees." *Id.* at *2; *see also G.H. by & through Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1116 (N.D. Fla. 2019) ("Plaintiffs have alleged sufficient facts to show that isolation of children violates contemporary standards of decency."); *V.W. by & through Williams v. Conway*, 236 F.Supp.3d 554, 584 (N.D.N.Y. 2017) ("[P]laintiffs have identified substantial data from other jurisdictions as well as their own experts showing that the use of disciplinary confinement on juveniles is not reasonably calculated to restore prison safety."). These cases acknowledge children's particular vulnerability to such an intense deprivation of liberty and courts' corresponding obligation "to analyze whether [such] conditions pose an unreasonable risk of serious damage to [the] future health or safety of a child." *Henry*, 424 F. Supp. 3d at 1115; *see also H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1088 (11th Cir. 1986) ("Juveniles are even more susceptible to mental anguish than adult convicts.").

Plaintiffs' experts confirm what courts across the country have held repeatedly—that isolation of juveniles cannot be justified as conforming to appropriate professional standards except in rare, exigent circumstances. That is so not only because isolation is profoundly damaging to children, but because it tends to *worsen* their mental health issues and *reduce* the overall safety of an institution.

23

Dr. Louis Kraus is a psychiatrist and highly experienced former corrections facility monitor. Kraus Decl. App. A. He discusses the Council of Juvenile Correctional Administrators' broad opposition to the isolation of detained juveniles, which is based upon research demonstrating that isolation has negative public safety consequences, does not reduce violence, and likely increases recidivism—in addition to causing permanent psychological damage to children and being highly correlated with suicidality.[2] *Id.* ¶ 52. Dr. Kraus adds from his own experience that "[s]olitary confinement inhibits youth's ability to cope with stressful situations and leaves them angrier and more disturbed, and therefore leads to more misbehavior and rules infraction." *Id.* ¶ 60. As a result, "solitary confinement at DJJ is counterproductive to safety." *Id.* ¶ 59. Dr. Kraus points to specific alternatives to isolation that are available to DJJ.

As noted, Ms. Phyllis Becker has over 26 years of service with the Missouri Division of Youth Services, including serving as its Director. She cites research showing that facilities that minimally use isolation are actually *safer*—experiencing fewer injuries to youth and staff, less suicidal behavior, and lower overall levels of violence. Becker Decl. ¶ 86 & n.82. Ms. Becker explains how, during her tenure with the state of Missouri, "our default practice was the use of de-escalation techniques." *Id.* ¶ 87. "Based on my experience and knowledge in the field, punitive practices and interventions, such as isolation have not been shown to improve safety for youth and staff compared to positive youth development and rehabilitation-based approaches." *Id.* ¶ 86. Isolation not only makes youth in facilities less safe and negatively impacts their mental health, *id.* ¶ 87, it "is ineffective in supporting behavioral change because it disrupts youth programming and educational services," *id.* ¶ 89. "Thus, the use of isolation purportedly to protect youth from harm is known to do the exact opposite." *Id.* ¶ 90.

---

[2] The Council of Juvenile Correctional Administrators "represents the youth correction chief executive officers in all 50 states, the District of Columbia, Puerto Rico and major metropolitan counties." CJJA, "About Us", https://www.cjja.net/about/ (last visited May 24, 2022).

Mr. David Muhammad has years of experience serving in management and monitoring roles in youth and adult corrections, including as Deputy Director of Washington D.C.'s juvenile justice system, as Deputy Commissioner of New York City's probation department, as Chief Probation Officer of Alameda County, as a lead consultant in reforming Los Angeles County's Probation Department, and as a court appointed monitor overseeing Illinois's juvenile justice system. Muhammad Decl. ¶¶ 1-14. He corroborates Plaintiffs' other experts, observing that "punitive use of lengthy periods of isolation has been found to be ineffective in fostering behavior change" and instead may "contribute to violent episodes of acting out." *Id.* ¶¶ 29, 31.

Finally, the observations of Plaintiffs' fact witnesses are consistent with what the experts would predict—solitary confinement at DJJ imposes a terrible toll on children, and makes discipline and violence worse, not better. Ross Decl. ¶¶ 46-47; Freedman Decl. ¶¶ 33-36, 39.

DJJ's overuse of isolation is "a substantial departure from accepted professional judgment, practice, or standards" and violates the Fourteenth Amendment. *Youngberg*, 457 U.S. at 323; *see supra* pp. 7-9 (detailing DJJ's practices). As such, Plaintiffs are likely to succeed on the merits of Count 2.

### D.   Count 3: Defendants' failure to provide reasonable rehabilitative services violates the Fourteenth Amendment.

The Fourteenth Amendment requires institutions like DJJ to provide children in their care with rehabilitative services and treatment. *See Youngberg*, 457 U.S. at 319 (concluding that Fourteenth Amendment liberty interests require the State to provide minimally adequate care and treatment); *Alexander S.*, 876 F. Supp. at 790 ("Programming geared toward correcting the behavior of juveniles is central to the very nature of a juvenile training facility."), 876 F. Supp. at 798 (requiring Defendants to ensure access to programming for all children); *Doe 4*, 985 F.3d at 338-39. This Fourteenth Amendment requirement aligns with Defendants' state law duties, which mandate that children at DJJ receive "effective" rehabilitative services. *See Alexander S.*,

876 F. Supp. at 790 ("Defendants conceded that they have an obligation to develop effective programming for all of the juveniles housed at DJJ facilities.").

From the beginning of custody to the end, every aspect of Defendants' detention system denies children the rehabilitative services they are entitled to under the Fourteenth Amendment. At the individual level, treatment plans are rarely implemented—if they are even developed. *See LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991) (finding that D.C. foster care system had failed to "exercise[] competent professional judgment" in violation of the *Youngberg* standard by, inter alia, "failing to prepare case plans"), *aff'd and remanded sub nom. LaShawn A. by Moore v. Kelly,* 990 F.2d 1319 (D.C. Cir. 1993). Access to medication and psychiatric care is frequently interrupted. Children go protracted periods of time without any access to educational programming, despite the fact that education is a core component of any rehabilitative program. Becker Decl. ¶¶ 23, 37, 40, 52, 55; Ex. 11, Declaration of Peter Leone ("Leone Decl.") ¶¶ 12-32; Kraus Decl. ¶¶ 54-58. Children are even routinely deprived of outdoor recreational time, which is critical for their mental and physical well-being, and hence a foundation of rehabilitative care. Becker Decl. ¶¶ 23, 37, 40, 55, 62.

Overall, DJJ fails the common-sense basics of creating an environment conducive to rehabilitation. Conditions in its facilities are atrocious, and its limited staff lack training and skill. Becker Decl. ¶¶ 23-26. Defendants' failure to provide appropriate rehabilitative services operates in an ugly cycle. Lack of services contributes to endemic violence and an unsafe environment, which in turn drives the further cancellation of school classes and other services. Because they do not have or use appropriate tools for rehabilitation and population management, JCOs overuse isolation, which further degrades the safety of the institution. *See* Becker Decl. ¶¶ 64, 90, 103; Kraus Decl. ¶¶ 37-44, 59-61; *compare with Alexander S.*, 876 F. Supp. at 790 ("[B]ecause such programming improves the juveniles' behavior while confined, it reduces the

need for disciplinary lock-up and enhances the safety of the institution for the juveniles and the staff.").

Defendants' broad failure to provide education or other rehabilitative services, or to maintain an environment conducive to rehabilitation, is unsupported by professional judgment and "bear[s]" no "reasonable relation to the" rehabilitative "purpose[s] for which the" children in their custody are detained. *Jackson*, 406 U.S. at 738. DJJ's practice of "simply warehousing the juveniles and ignoring the statutory purpose of their confinement" violates the Fourteenth Amendment, and as a consequence Plaintiffs are likely to succeed on the merits of Count 3. *Alexander S.*, 876 F. Supp. at 790.

## II.  **Plaintiffs, and the children they represent, will continue to suffer irreparable harm unless the Court grants preliminary injunctive relief.**

The preliminary injunction requested by Plaintiffs is necessary to prevent continued, irreparable harm to Plaintiffs and their members. As an initial matter, all Plaintiffs are irreparably harmed by the frustration of their core missions and the need to divert scarce resources toward remedying conditions in DJJ facilities. *See Action NC v. Strach*, 216 F. Supp. 3d 597, 642-43 (M.D.N.C. 2016) ("That Organizational Plaintiffs would have to divert resources in the absence of such relief is enough to satisfy their burden of showing a likelihood of suffering irreparable harm."); *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) (diversion of resources and frustration of purpose suffered by nonprofit refugee resettlement agencies held sufficiently irreparable to support nationwide preliminary injunction against Executive Order 13,888).

Plaintiff Justice 360, for example, faces significant obstacles in achieving its mission of providing representation to children who face the possibility of being tried as adults. Freedman Decl. ¶¶ 7-12; Ex. 7, Declaration of Lindsay Vann ("Vann Decl.") ¶¶ 8-17. "[O]bstacles [that] unquestionably make it more difficult for [organizations] to accomplish their primary mission . . . provide injury for purposes both of standing and irreparable harm." *League of Women Voters*

*of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). In particular, conditions at DJJ have frustrated Justice 360 attorneys' ability to meet and confer with their clients about their important juvenile cases. Vann Decl. ¶¶ 10-13; *see Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1053 (C.D. Cal. 2019) (holding that Immigrant Lawyers Association could show direct organizational standing to challenge conditions of confinement at federal immigration facility because the conditions impaired the organization's attorneys' ability to represent their clients). Conditions at DJJ have also caused, and will continue to cause, Justice 360 to divert precious time and resources away from its core mission to address ongoing harms suffered by children at DJJ. Vann Decl. ¶¶ 14-17.

Plaintiffs Disability Rights South Carolina ("DRSC") and the South Carolina State Conference of NAACP ("SC NAACP") are further irreparably harmed through the members they represent—the children and parents of the children detained in DJJ facilities. Franco Decl. ¶¶ 3, 8; *Doe v. Stincer*, 175 F.3d 879, 881, 886 (11th Cir. 1999) (concluding that "federally-authorized protection and advocacy organization" "may sue on behalf of its constituents like a more traditional association may sue on behalf of its members"); *see also Disability Rts. Penn. v. Penn. Dep't of Hum. Servs.*, No. 1:19-CV-737, 2020 WL 1491186, at *8 (M.D. Pa. Mar. 27, 2020) (noting the "panoply of cases concluding that P&A systems have associational standing … to bring suits on behalf of [their] constituents.") (compiling cases); *Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014); Ex. 5, Declaration of Brenda Murphy ("Murphy Decl.") ¶¶ 5, 14; *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 969 (D. Md. 2020) (finding irreparable harm to organizational plaintiffs because "the kind of harm identified to the[ir] members is indisputably irreparable"); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020) (same).

"It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571

F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotation marks omitted). Here, that presumption of irreparable harm to children's legal rights and interests is reinforced by caselaw and expert evidence demonstrating the actual injuries suffered by these children as a result of Defendants' ongoing violations.

### A.    Harms from DJJ's failure to protect youth from violence

It is well-established that harm from exposure to violence—such as is omnipresent at DJJ facilities—cannot be redressed with awards of money and is irreparable. *See Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 956 (N.D. Cal. 2015) ("[P]ain, suffering and the risk of death constitute 'irreparable harm' sufficient to support a preliminary injunction in prison cases." (bracket in original)) (quoting *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001); *Von Colln v. Cnty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1999) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they.").

Phyllis Becker, one of Plaintiffs' experts, describes the harmful effects of violence and the threat of violence and explains that the ongoing and persistent violence at DJJ creates a lack of stability, or physical and emotional safety, for children detained in DJJ. *See* Becker Decl. ¶¶ 23-24, 29-33, 38, 95-101. This is particularly problematic because children involved in the juvenile justice system arrive there with higher rates of prior trauma as compared to the general population. *Id.* ¶ 35. Worse, when violence results in restrictions to youth access to programming, as is the case at DJJ facilities, the curtailment of such programming only makes future violence more likely. *Id.* ¶¶ 38, 102.

Likewise, Plaintiffs' expert, Dr. Louis Kraus, explains that trauma from violence, or the threat of violence, subjects youth to significant risk of developing Post-Traumatic Stress Disorder (PTSD). Kraus Decl. ¶ 62. Dr. Kraus has decades of experience in treating children and adolescents with mental health challenges, including over 30 years working with youth in correctional settings. *Id.* ¶¶ 1-2. He notes that violence-induced PTSD may cause children to

experience negative alterations in cognition (including dissociative amnesia) and to develop persistent and exaggerated negative beliefs about themselves. *Id.* ¶ 70. This trauma may also cause markedly diminished interest in participation in significant activities, feelings of detachment or estrangement from others, and a persistent inability to experience positive emotions. *Id.* Children may also suffer from hypervigilance that manifests in exaggerated startled responses, problems concentrating, sleep disturbance, and irritable behavior—in addition to persistent emotional states of fear, anger, guilt, and shame. *Id.* ¶ 71.

All of these developmental harms can cause detained youth exposed to violence to act out as part of their PTSD symptomatology, putting them at risk of being punished for inappropriate behavior. *Id.* ¶ 72. When compounded with DJJ's unconstitutional use of isolation to punish youth for minor infractions, this can lead to a cascading effect of harms.

### B.    Harms from DJJ's use of isolation

Like violence, "[t]he harm suffered in solitary confinement is not harm easily undone." *Hommrich*, 2017 WL 1091864, at *2; *see, e.g.*, *Friedmann v. Parker*, No. 3:21-CV-00721, 2021 WL 5494522, at *7 (M.D. Tenn. Nov. 23, 2021) (granting preliminary injunction based on irreparable injury caused by extended solitary confinement). Indeed, "[t]he potential emotional and psychological harm that prolonged periods of isolation . . . can wreak on prisoners is paradigmatic irreparable harm." *Porter v. Clarke*, 290 F. Supp. 3d 518, 533 (E.D. Va. 2018), *aff'd* 923 F.3d 348 (4th Cir. 2019) (observing that courts have "taken note" of an "extensive—and growing—body of literature" documenting the "serious psychological and emotional harm caused by segregated or solitary confinement"); *see also V.W.*, 236 F. Supp. 3d at 588-89 (finding irreparable harm because "solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage, and that the related deprivation of education . . . hinders important aspects of their adolescent development"); *accord A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 417 (N.D.N.Y. 2018); *United States v. Bowlson*, No. 01-CR-

80834-1, 2021 WL 2646091, at *3 (E.D. Mich. June 28, 2021) (explaining that uses of isolation are "not only ineffective in correcting behavior . . ., they have been found to worsen already debilitating conditions, as evidenced by the United Nations' classification of solitary confinement as torture"), *appeal docketed*, No. 21-2746 (6th Cir. July 23, 2021).

Plaintiffs' experts echo these findings and describe the unique dangers and acute consequences that solitary confinement creates for detained children. Youth in solitary confinement "exhibit fear, dissociative episodes, and anxiety, which may lead to increased levels of hopelessness, paranoia, and lack of trust in others." Kraus Decl. ¶ 30. For children with pre-existing mental health issues, isolation risks worsening those issues or precipitating additional mental health concerns, up to and including suicidal behavior. *Id.* ¶ 29. Many of these symptoms can persist long after youth are removed from solitary confinement, as the trauma they experience can permanently alter their brain development. *Id.* ¶¶ 32-34. Even when used for short periods of time, isolation can cause chronic conditions like depression, with symptoms like low self-esteem, vegetative features, and hopelessness. It can likewise cause youth to develop "long-term trust issues with adults, including paranoia, anger, and hatred," preventing these youth from establishing therapeutic relationships with mental health professionals in the future. *Id.* ¶ 33; *see also* Muhammad Decl. ¶¶ 28-30.

The experiences of particular children subjected to isolation at DJJ are consistent with the risks and lasting harm Dr. Kraus identifies. For instance, as noted above, one child attempted to hang herself in the shower after being released from isolation. *Supra* pp. 10-11. Another child who endured isolation while in DJJ custody reports persistent paranoia and anxiety. Freedman Decl. ¶ 35.

### C.    Harms from DJJ's failure to provide rehabilitative services

Defendants' failure to provide rehabilitative services to the children in its care severely impedes their prospects upon release and is contrary to DJJ's mandate.

It is well established that the denial of rehabilitative services for children, including educational programming and mental health care, comprises irreparable harm. *See, e.g.*, *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's schooling, raises a strong possibility of irreparable injury." (quotation marks omitted)); *Seaman v. Virginia*, No. 22-cv-6, _ F. Supp. 3d _, 2022 WL 872023, at *25 (W.D. Va. Mar. 23, 2022) ("The inability to access education constitutes irreparable harm because it is of critical importance to child development and its loss cannot be compensated with monetary damages." (quotation marks omitted)), *appeal docketed*, No. 22-1455 (4th Cir. Apr. 27, 2022); *C.P.X. through S.P.X. v. Garcia*, 450 F. Supp. 3d 854, 921 (S.D. Iowa 2020) ("[T]he provision of inadequate mental health care . . . creates risk that [children's] mental health wi[ll] deteriorate.").

Consistent with these cases, Plaintiffs' expert Peter Leone describes the specific impacts of educational failures on children's long-term development. Leone Decl. ¶¶ 25-31. Without access to education, children detained at DJJ are far more likely to face challenges reintegrating into society. *Id*. While detained youth who have access to education are far more likely to enter the workforce upon release, those without it are more likely to recidivate. *Id.* ¶ 27, 30-31. DJJ's failure to provide education is a "gross dereliction of [their] duty to provide custodial care and rehabilitation" to the children under its supervision. *Id.* ¶ 29 (internal quotation marks omitted).

**III.    The balance of hardships and public interest favor preliminary injunctive relief.**

The final requirement of a preliminary injunction is for plaintiffs "to establish clearly that the balance of equities tips in their favor and that an injunction also is in the public interest." *Thomas v. Andino*, No. 20-CV-01552, 2020 WL 2617329, at *22 (D.S.C. May 25, 2020). "In cases involving significant public interest, courts may consider the balance of the equities and the public interest factors together." *Id.* (cleaned up).

Here, Defendants' substantial departures from professional standards violate children's constitutional rights under the Fourteenth Amendment. More to the point, they cause acute and immediate harms. As set forth above, Defendants' acts and failings maim and traumatize the children in their care; worsen their prospects upon release; and render pointless the state's deprivation of those children's liberty for purported rehabilitation.

Moreover, these same acts also impair the *public*'s interest in reducing the recidivism of juvenile offenders. *See Alexander S.*, 876 F. Supp. at 793 (discussing the "compelling state interest in protecting the community from crime" (quotation marks omitted)). Research shows that "placing detained youth in isolation has 'negative public safety consequences, does not reduce violence and likely increases recidivism.'" Kraus Decl. ¶ 52; *see id.* ¶¶ 59-60. Similarly, "[t]here is substantial evidence that academic and vocational education programs are among the most cost-effective and efficient ways to reduce recidivism and improve outcomes as youth return to their communities and enter the workforce or continue their education." Leone Decl. ¶ 31. Conversely, the absence of services "centered around positive youth development" can "drive up recidivism." Becker Decl. ¶ 102.

In contrast to these compelling public interests, "a state is no way harmed by the issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). These equities cry out for injunctive relief now.

## CONCLUSION

DJJ has not been a responsible custodian to the children in its care. Despite years of litigation, and despite this Court's prior orders and findings, DJJ continues to flunk the rehabilitative mission to which the public entrusts it. The conditions in Defendants' facilities are deplorable in myriad ways and violate multiple Fourteenth Amendment rights. These conditions cause irreparable harm to the children in DJJ custody and, by extension, to Plaintiffs DRSC, SC

NAACP, and Justice 360. These harms will continue unless Defendants are compelled to remedy them, and the equities overwhelmingly favor immediate relief to protect children at DJJ and the public alike. This Court, therefore, should grant Plaintiffs' motion.

WHEREFORE, Plaintiffs respectfully request that this Court order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to:

1. Investigate and promptly terminate any DJJ personnel found to have participated in or facilitated any assault on any child detained by DJJ;

2. Repair all locks, cameras, and other security infrastructure within all DJJ facilities;

3. Maintain at least an 8:1 youth-to-staff ratio at all DJJ facilities at all times;

4. Immediately cease the use of solitary confinement of forced isolation, including room or cell confinement, of detained children as a punitive or disciplinary measure, or for any other reason other than an immediate and substantial risk of great bodily harm to self or others;

5. Immediately cease the practice of "23-and-1";

6. Observe the following conditions, where isolation or separation of detained children is reasonably necessary to address an immediate and substantial risk of great bodily harm:

   a) No child shall be placed in isolation for an initial period of greater than two hours, after which a reevaluation must be conducted by DJJ staff;

   b) Children placed in solitary confinement or isolation should receive regular, in-person safety checks from DJJ staff;

   c) Ensure that youth in isolation for more than two hours:

      i. Have access to property items similar to or the same as those items allowed in general population, though specific items of property may be restricted on a case-by-case basis as needed for the safety of the youth and staff;

      ii. Receive all regularly scheduled social worker visits, mental health services, and other health services;

      iii. Receive any rehabilitative programming that was scheduled or in process before placement in isolation;

      iv. Receive educational services with the general population, unless such attendance is determined to present an immediate and substantial threat of physical harm to

others, or an unreasonable risk of significant disruption of the classroom environment, in which such case youth in restrictive isolation shall receive alternative educational services of a comparable type and quality on the same days and at the same time as the general population receives such services;

7. Undertake a review of placements of all youth currently held in solitary confinement or forced isolation, with any youth held in such settings to be immediately released to the general population if their continued placement in isolation otherwise violates the terms of the Court's Order;

8. Ensure each detained youth has access to regular counseling and therapy to address mental health needs and underlying trauma;

9. Ensure that, within 30 days, each detained youth receives the same number of hours of classroom instruction per week that they would receive from South Carolina's public schools if not detained, under court-approved conditions for such instruction to be held safely;

10. Immediately provide unrestricted access to clean drinking water and meals free of any contaminants and prepared in a hygienic and sanitary environment;

11. Establish and file with the Court a written plan, designed to be implemented immediately, for providing sanitary conditions of confinement, with such plan to specifically address (1) steps to assist youth in maintaining their hygiene, (2) steps to achieve a clean and safe living space in all dorms, units, pods, and common areas, and (3) ongoing maintenance and cleaning of the physical plant of each DJJ facility; and

12. Immediately implement other measures deemed by the Court necessary to ensure adequate sanitation, nutrition, education, and basic health needs of children detained in DJJ facilities.

WHEREFORE, Plaintiffs further respectfully request that this Court appoint an interim independent monitor of the Plaintiffs' choosing to oversee Defendants' compliance with the Court's order.

[*Signature on following page*]

Dated: May 24, 2022

Respectfully submitted,

**WYCHE, P.A.**

**JENNER & BLOCK LLP**

/s/ *Rita Bolt Barker*
Wallace K. Lightsey (D.S.C. Bar No. 1037)
Rita Bolt Barker (D.S.C. Bar No. 77600)
Meliah Bowers Jefferson (D.S.C. Bar No. 10018)
Jessica Monsell (D.S.C. Bar No. 13645)
200 E. Broad Street, Suite 400
Greenville, South Carolina 29601
Tel: (864) 242-8200
Fax: (864) 235-8900
rbarker@wyche.com
wlightsey@wyche.com
mjefferson@wyche.com
jmonsell@wyche.com

Previn Warren*
William R. Weaver*
Mary E. Marshall*
Jessica J.W. Sawadogo*
1099 New York Ave. NW Suite 900
Washington DC 20001
Tel: (202) 637-6300
pwarren@jenner.com
wweaver@jenner.com
mmarshall@jenner.com
jsawadogo@jenner.com

**ACLU OF SOUTH CAROLINA**

Jeremy M. Creelan*
Jacob D. Alderdice*
Jeremy Ershow*
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
jcreelan@jenner.com
jalderdice@jenner.com
jershow@jenner.com

Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org

**NAACP**

Amit B. Patel*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
apatel@jenner.com

Janette Louard*
Anna Kathryn Barnes*
Joe Schottenfeld*
Martina Tiku*
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
abarnes@naacpnet.org
jschottenfeld@naacpnet.org
mtiku@naacpnet.org

*\*PRO HAC VICE APPLICATIONS TO BE FILED*