## DECLARATION OF PHYLLIS ROSS

I, Phyllis Ross, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

## I.    BACKGROUND

1.      My name is Phyllis Ross.  From 1990 to March 31, 2022, I worked full time as a detainee advocate with Disability Rights South Carolina ("DRSC"), a South Carolina nonprofit organization whose mission is to protect and advance the legal, civil, and human rights of people with disabilities in South Carolina.  I continue to work with DRSC on a part time basis.

2.      From 1990 through March 2022, I conducted regular monitoring visits to DJJ facilities to investigate incidents of assaults by peers and/or staff and ensure the safety and wellbeing of the children in DJJ's facilities. I continue to monitor facilities as needed. As a result of these monitoring visits, I have spent significant time in DJJ facilities. My last monitoring visit was on May 12, 2022, when I visited the Midlands Evaluation Center ("MEC").

3.      Throughout my time as a detainee advocate, Disability Rights South Carolina participated in the Protection and Advocacy for Individuals with Mental Illness ("PAIMI") program under 42 U.S.C. § 114 (2009).

4.      Over the past few years, and over this past year in particular, the problems in DJJ facilities negatively impacted my ability to do my work as a detainee advocate. Conditions in DJJ are extremely dangerous for the children detained, and DJJ fails to provide children with regular treatment, educational services, or even time outside.  As a result, many children are less trusting of adults—including me, so I had to work harder during my monitoring visits to gain the trust of the children DRSC advocates for. Children would at times refuse to speak to me. And it was

extremely difficult to record and grapple with the frequent assaults and attacks occurring within DJJ facilities.

5.　　Disruptions in treatment and a lack of any schedule also make it much harder to advocate for children in DJJ custody. For example, children often do not receive the medications they're prescribed at the time they're prescribed to take them. And their medications are also frequently interrupted, because there is not sufficient nursing staff available to provide the medications to them. So children who have severe mental health needs are more irritable, upset, or likely to lash out.  In turn, DJJ staff commonly punish those children with severe mental health needs, creating a vicious cycle in which they have even less access to services and are more traumatized by the conditions in which they are being detained.

## II.　　STAFFING AND FACILITIES MAINTENANCE

6.　　I have worked with youth detained in the following DJJ facilities:  Broad River Road Complex ("BRRC"); the Juvenile Detention Center ("JDC"); Upstate Evaluation Center ("UEC"); Midlands Evaluation Center ("MEC"); and Coastal Evaluation Center ("CEC").  Prior to limitations imposed by COVID-19, I also frequently visited children in treatment facilities outside of DJJ and at DJJ camps.

### JUVENILE DETENTION CENTER (JDC)

7.　　At the JDC, youth awaiting trial on criminal or family court matters are detained until disposition. JDC holds a maximum of 72 children. But it is often extremely overcrowded. For example, when I visited on February 28, 2022, there were 98 children in JDC—down from 120 a few days prior.  JDC can no longer double bunk, so new arrivals sleep in makeshift beds commonly referred to as "boat beds," lined up in the halls of JDC and, if room is available, on the floors of the small common areas in the individual units.

8.     The "rooms" where children are detained at JDC are small cells, with a bed, a sink, a toilet and a single window that looks out into the unit's common area.  There are eight cells on each side of a unit.

9.     The JDC cells are often dirty and unhygienic—sometimes they have graffiti on the walls, often there is mold on the walls, and occasionally the toilets overflow or are clogged, resulting in a severe stench and sometimes feces overflowing into the cells.  In early March 2022, for example, one child's toilet was clogged with excrement and rendered inoperable for over a week.  After using the toilet for a few days, the child housed in the cell had no option but to cover the toilet bowl and sink with a blanket or sheet, at which time he was finally allowed to exit the room to use the restroom in an adjacent room. When the child requested to be moved, DJJ denied that request.

10.     Like the cells, the common areas of the units in JDC are also often dirty. The walls often contain explicit graffiti, and these common areas smell bad because the units do not appear to be cleaned regularly.

## EVALUATION CENTERS (CEC, MEC, UEC)

11.     The CEC, MEC, and UEC are evaluation centers where juveniles are taken for secure evaluations. These evaluations are supposed to be completed within 45 days.

12.     Each of the evaluation centers have basically the same floor plan and design.  Each floor has a central control area in the middle and is surrounded by dorm housing for children.

13.     Like the JDC, the evaluation centers are understaffed.  For example, during my monitoring visit to MEC on May 19, 2022, there were 27 female detainees in a single dorm, and I was told by the children that there is often only one JCO monitoring the dorm, resulting in a child-to-guard ratio of 27-to-1 at this MEC dorm.

14.     As a result of understaffing, outdoor recreational time, education services, and all other forms of programming or services are frequently cancelled at the evaluation centers. Also like the JDC, the evaluation centers are plagued by frequent assaults and fights.

### BROAD RIVER ROAD COMPLEX (BRRC)

15.     The BRRC is the DJJ's long-term commitment facility. The BRRC facility includes over 40 buildings, which include single resident cells, multiple occupancy cells, 72 segregation or isolation cells, and four open bay/dorm housing units. Each dorm unit at the BRRC includes three "pods"—A, B, and C—each of which houses 8 detained children. The pods do not have private units and the children in each pod are forced to congregate in the center, except for when DJJ staff orders the children to stay isolated in their individual rooms.

16.     DJJ policy requires there to be at least one juvenile corrections officer ("JCO") in each pod with the children. But the DJJ is so understaffed that it is frequently unable to meet this requirement. Often only one JCO is available for all three pods, which creates a safety risk for the children because one JCO cannot adequately supervise all of the children in all three pods.

17.     The lack of staffing has resulted in the loss of important activities for children. Children are not allowed out of their unit unless accompanied by a JCO. But there are not enough JCOs to allow one JCO to escort children outside and another JCO to stay in the unit with any remaining children who do not want to go outside. As a result, the children usually do not get any outside recreation because there is only one JCO in the unit.

18.     The current number of JCOs at BRRC often is inadequate to supervise the facility. In my experience, DJJ's record keeping is inadequate on this issue, because JCOs sometimes come into work for a shift, then leave or are called to another area after they've reported to their supervisor. But even taking into account DJJ's reported statistics, staffing is inadequate. As an

indication of this inadequate staffing, at the start of February 2022, BRRC administrators reported needing 221 JCOs to fully staff the facility, but there were only 96 JCOs available.

19.    Due to lax oversight and an insufficient number of JCOs for each housing unit, DJJ is slow to intervene and has difficulty breaking up fights or separating children into different units when they are at higher risk for fighting one another due to feuding and/or gang activity. Sometimes, children from one pod will put out a "hit" on a child in another pod, meaning that they'll communicate with children in the other child's pod and convince them to fight or assault that child. Sometimes entire pods will fight each other. These types of fighting incidents have recently become more common.

20.    Because of JCO staffing shortages, there has been an increase in DJJ relying on administrative staff and private security guards taking on JCO responsibilities. Allied Universal, a private security company, has contracted with DJJ to provide security guards. However, Allied personnel do not provide meaningful security for the children. For instance, they do not enter the dorms to stop fights when they occur because they are not trained to do so. Allied employees do occasionally harass and attack youth. For example, at the end of March 2022, one Allied employee karate chopped a child when the child moved quickly to try to help the Allied employee bring food into a unit.

21.    Over the weekend of May 16, 2022, children detained in one of the dorms on BRRC's campus broke out through a window and attempted to break into buildings on the campus, including the building that houses BRRC's information technology infrastructure. No JCO was in the dorm when the children broke out. After the children had broken into at least two locked offices on the BRRC campus, public safety officers arrived on the scene and aggressively detained the children using pepper spray.

### III.    VIOLENCE AT THE FACILITIES

22.    During my time monitoring DJJ facilities, violence has become more and more common. This violence includes youth-on-youth violence that is sometimes instigated by DJJ staff, as well as direct violence perpetuated by DJJ staff against the detained children they are supposed to supervise.

23.    Although violence has been prevalent throughout my time monitoring DJJ, the violence I have heard about from children in 2022 is more frequent and more severe than I have ever heard about during my time monitoring the DJJ.  For example, things have gotten so bad that children who take medications to sleep have told me that they do not want to take the medications anymore—they are afraid to sleep because sleeping puts them at risk of being "blitzed," or attacked by a group of their peers, while asleep.

24.    Based on conversations from my monitoring visits, it is not uncommon for there to be two or more incidents of violence daily at the BRRC.  Many of the assaults that occur at BRRC go unreported.  DJJ staff typically report only severe incidents of violence, and sometimes not even those.  Fights often occur without DJJ staff even knowing that there was an assault or attack.

25.    Low functioning and mentally ill children are a particular target at DJJ facilities, especially at BRRC.  Due to their disabilities, they are sometimes targeted and forced to assault others under threat of being assaulted themselves.

26.    DJJ staff must use its internal records management system, known as ERMIS, to report serious events (e.g., assaults).  This system is not being used properly to report serious events.  For example, I reviewed a set of 3 or 4 allegedly independent reports that were virtually identical to each other, such that it was clear to me that the individuals creating the reports were simply copying one another rather than independently reporting the incident. Based on my

conversations with detained children and clients of the DRSC, I believe that these ERMIS reports are inadequate to allow the DJJ to track incidents of serious violence. Moreover, based on conversations from my monitoring visits and my observations during those visits, many children are unwilling or afraid to report violence they experience to DJJ staff. Children have, for example, told me that they worry about retaliation from staff if they make a formal grievance about violence or conditions in DJJ facilities. Other children have reported to me that JCOs have told them not to bother filing a grievance, because nothing would come of it, or even refused to allow them to file a grievance. Even when children do file a grievance or make a complaint, my understanding from my conversations with these children is that DJJ investigators almost never follow up with them at all.

27.     The violence at BRRC has become so frequent that children often do not attend school for days or weeks at a time. Children often go to school for only half a day because full day attendance with inadequate supervision causes too many fights, and many times children do not receive even limited educational instruction.  I understand that the DJJ superintendent has requested additional, specially designated JCOs to staff BRRC's school, but the response to this request has thus far been inadequate to ensure continuous educational services.

28.     During the summer of 2021, the violence was so severe that South Carolina Law Enforcement Division ("SLED") officers would sometimes be called to come to BRRC to contain fights and disruptions. According to children I have spoken to, SLED officers were very aggressive with the children and were often violent and manhandled them.

29.     Some staff incite violence. During my regular monitoring visits, I have heard about staff providing kids with special privileges or food from outside DJJ facilities in exchange for

engaging in fights. Staff have also verbally provoked children into fighting by prodding at known sensitivities until they lash out.

30.    At times, JCOs are themselves simply violent to detained youth. For instance, children have told me about some JCOs engaging in "play fights" with children outside of camera visuals.  When the JCO no longer wants to continue, the JCO will step back in front of the camera and, when the child continues to fight, claim he was assaulted. These "play fights" help create a culture of aggression and contribute to worsening violence in the facilities.

31.    Some JCOs are known by detained youth to be gang-affiliated and have targeted (or solicited "hits" on) children who are affiliated with a different gang.

32.    Hits are a frequent occurrence at DJJ facilities, especially at the BRRC and JDC.

33.    In mid-January of 2022, one child was assaulted four times on a single day because he refused to be recruited by a gang with a presence in DJJ facilities, known as "The Folk."  The Folk is one of two gangs with a major presence in DJJ facilities—both among the detained children and among some DJJ staff. The Folk had been trying to recruit the child into joining their gang. But he continuously refused the Folk's invitations. In retaliation, the Folk put a "hit" out on him. Despite his warnings to DJJ staff that he feared being attacked, the child was transferred from Pod A to Pod C (known to be a more dangerous dorm) as punishment for a minor infraction.

34.    The day after the child was moved, he was assaulted 4 times. The child was attacked while he was in Poplar dorm in Pod C. The attackers gained access to his dorm by threatening one of the JCOs with violence. Rather than prevent the attack, the JCO gave the attackers the keys to the child's dorm in response to being threatened. The assailants hit the child on his head, above his eyebrow, and all across his face. One of the juveniles who assaulted the child told a private security guard in the control room not to call for help. The security guard obeyed this instruction

and did not call for help, even though the private security guard was in close proximity to the assault and in a position to intervene or call for help.

35.    As a result of this brutal assault, the child suffered a broken nose, a hematoma on his right ear, a black eye, a split lip, injuries on his back and ribs, and bruises all over his body. Despite these horrific injuries, the child was not taken to the Infirmary until the following day.  At the time I spoke to this child, no investigator had come to speak with him about the fact that he was moved to Pod C despite his warnings to staff that he would be assaulted there.

36.    Notably, the first assault on this child occurred in Room 1, which lacks a working camera. DJJ is not supposed to allow children to go into Rooms 1 or 10 because of the lack of a clear camera visual into those rooms. But children often go into Rooms 1 or 10 so that they can fight outside of camera view.

37.    Some fights at DJJ facilities are regularly scheduled—these are known to juveniles in custody as "friendlies." The JCOs are aware that these fights occur, but they often choose not to intervene. According to one of the children I spoke to on a monitoring visit, in one incident, a JCO knew that a fight was going on and took her hearing aid out to avoid listening to it. This was confirmed to me by a DJJ staff member.

## IV.    USE OF ISOLATION

38.    DJJ relies heavily on a variety of forms of isolation.  JCOs place children in isolation for a mixture of punitive and administrative reasons, often without adequate justification or recordkeeping.

39.    Based on my observations and discussions with detained children, the DJJ does not follow its progressive discipline policy or use "time-out" rooms where children can calm down

after behavioral incidents. Instead, DJJ often puts children into isolation as punishment if they act out in any way, including just verbally. Often, this isolation is for an extended period of time.

40.    Children at the BRRC are placed in isolation even if they have not committed disciplinary offenses. Children have reported being placed in isolation for protective custody and their own safety, often after being assaulted.

41.    At BRRC, children in isolation were until recently placed in Laurel Building. At present, DJJ is isolating children at BRRC in cells within the units or in specific dorms. Children have reported being forced to stay in their cells for days or even weeks.

42.    The same is true at JDC and other DJJ facilities. In March, for example, one child at JDC spent over a week confined to his cell for more than 23 hours a day because of behavioral difficulties related to his mental illness. Rather than provide treatment or supportive services, JDC staff and JCOs kept him in his cell throughout the day. When I visited JDC to monitor the facility during this period, I would see the child standing at the window of his cell, looking into the interior common area.

43.    Other children at JDC also spend weeks in one form or another of isolation. At the beginning of March 2022, for example, children in F-wing, where the older children in JDC are detained, were spending 22 hours a day in their cells, because JDC was overcrowded and there were not enough JCOs to maintain adequate child-to-staff ratios.

44.    DJJ does not check in on children in isolation periodically, as its policies and procedures require, to make sure they are ok and to see whether they can be released from isolation. Rather than check on children before extending stays in isolation, JCOs will sometimes pre-fill paperwork when they put a child in isolation to extend isolation beyond an initial few-hour period.

45.    DJJ's paperwork and documentation about isolation appears to be inadequate. When JCOs lock children in their cells, as opposed to officially sending the child to a solitary confinement cell, the JCOs rarely do any paperwork to document the isolation that's being imposed. I understand that this is true from my conversations with children on monitoring visits, and because I have requested paperwork and that request has been denied by DJJ staff because it does not exist.

46.    Based on my observations, the DJJ's heavy reliance on solitary confinement or isolation, the overall lack of services, and the absence of positive interactions with adults contribute to the violence across DJJ facilities. Children have often told me that they feel bored and cooped up while in custody and that fights or disturbances are a means of breaking up the monotony of their days.

47.    The use of isolation has also contributed to the increased violence in DJJ facilities because it exacerbates underlying mental health issues of the children. Because JCOs frequently lock up or isolate children on arbitrary grounds, the children are also less trusting and feel antagonistic toward JCOs.

## V.    EDUCATION & REHABILITATIVE SERVICES

48.    DJJ operates its own school district. But, because of staffing and administrative challenges, DJJ has not been able to provide educational services to the children it detains.

49.    JDC, for example, claims to hold class every-other-day for children, so that they receive a total of four hours of classroom time a week. But classes are cancelled often and for all sorts of reasons. Sometimes there are disturbances, which cause the whole facility to shut down for a period. Or there are too few JCOs to let children out of their units (or even their cells).

50.     Due to the BRRC's inability to control youth violence, children at the BRRC have been attending school very irregularly and, at best, only for half-days over the past few years.

51.     I understand that the superintendent of DJJ's education programs has requested that at least 6 additional JCOs be dedicated to the Birchwood School—the BRRC's school facility. Despite that request, Birchwood School has not received the additional JCOs required to resume regular educational services. Currently there are not even enough JCOs to staff the residential pods.

52.     The lack of security staff at the school has resulted in severely disruptive incidents that further restrict students' access to education. For example, on New Year's Day in 2022, several children broke into the school. The youth shattered a window and broke into a social worker's office.

53.     Disturbances that disrupt the school's operations occur frequently at the BRRC, although not all disturbances are as extreme as the incident on New Year's Day. When these disturbances occur, none of the teachers or the superintendent are allowed into the school.

54.     Educational services are sometimes even more limited at other facilities, where there aren't designated schools. At the start of March, for example, children at JDC had gone weeks with only a single day of class, because there were no teachers or enough JCOs to supervise the children in the room used as a classroom.

55.     Instead of classes, children sometimes receive worksheets. These are short, fill-in-the-blank style documents. Children can choose to fill them out or not. Based on my observations and conversations with children, these worksheets are rarely if ever reviewed with a child to further their educational instruction.

56.    Children who have IEPs face particular challenges due to the DJJ's lack of educational services. Because DJJ does not provide classes on a regular basis, DJJ is not able to provide individualized educational support.

## VI.    MENTAL HEALTH CARE

57.    Children detained at DJJ do not receive adequate mental health care or treatment. This is true at all DJJ facilities, but particularly so at JDC and the Evaluation Centers, which are not treatment facilities and offer only limited service providers and mental health care.

58.    From my observations and conversations with children, detained children often do not receive prescribed medications at the same prescribed time each day—and sometimes the children do not receive their medications at all. The lack of timely medication at DJJ facilities is exacerbated by the fact that there are not sufficient nurses to staff the facilities, so there are periods during which no child receives medication. The lack of staff also means that sometimes there is no one to take children to the infirmary for their medication. And clinical staff is sometimes denied access to units when there are disturbances.

59.    DJJ has a severe shortage of psychiatrists. As of early April 2022, my understanding is that the JDC did not have a full time psychiatrist. But the facility needs multiple psychiatrists to meet the needs of the children detained there. The lack of psychiatrists makes it very difficult, if not impossible, for DJJ adequately to prescribe or maintain children's medications.

60.    Other basic, important services are also limited or disrupted because of staffing and security issues. For example, based on my observations, I do not believe that DJJ is able to implement treatment plans for children. Treatment meetings often do not include all the adults who work with or supervise a child, including teachers and, perhaps most importantly, the JCOs who interact daily with the child. And due to understaffing, even children who are not sent to isolation

are still frequently locked in their dorms for significant periods of each day. The children are rarely allowed outside, and they rarely partake in sports or any other recreational activity. This is because there are not enough JCOs to escort the children outside, and so JCOs keep the children in locked units. When I monitored JDC in early March 2022, for example, most of the children had only been outside once over the course of two weeks, due to overcrowding and understaffing.

61.     DJJ used to have recreational and intramural leagues, but it no longer does. For the children in JDC, the Evaluation Centers, and BRRC, there is almost no outdoor programming. Some of the programs and curricula, including the BRRC's woodshop, have in the past provided many children with positive experiences that have lessened behavioral problems and improved the rehabilitative function of DJJ. But programs like the woodshop are now accessible only to a few children.

62.     Children at BRRC often do not eat together in a common place, but rather eat in their dorms. DJJ delivers boxed and prepackaged food for the children to eat in the units. Sometimes children go without meals. Children in isolation sometimes have to wait for JCOs to bring them water, and some children have reported being thirsty for extended periods of time.

63.     Attached as Exhibit A is a true and correct copy of a DJJ policy regarding behavior management, entitled "Juvenile Behavior Management – Incentive System and Progressive Discipline." I received this policy document pursuant to my monitoring role at DRSC.

64.     Attached as Exhibit B is a true and correct copy of a DJJ policy regarding the use of isolation, entitled "Isolation of Youth." I received this policy document pursuant to my monitoring role at DRSC.

Date:    May 20, 2022

Phyllis Ross

# EXHIBIT A

## STATE OF SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
### POLICY AND PROCEDURES

| Title: | Juvenile Behavior Management – Incentive System and Progressive Discipline | Policy No.: | 924 | Page(s): | 1 of 11 |
|---|---|---|---|---|---|
| Folder 900: | Rehabilitative Services | | | Old Policy No.: | G-9.19 |
| Originator: | Institutional Programs Manager | | | | |
| Juvenile Justice Code: | n/a | | | | |
| PbS Related Standard(s): | Order Goal: OS3; and, Programming Goal: PS2 | | | | |
| February 03, 2020 <br> Effective Date | | SIGNED/ *Freddie B. Pough* <br> Freddie B. Pough <br> Director | | | |

**POLICY:** The South Carolina Department of Juvenile Justice (SCDJJ) will use a formal system of rewards and incentives in secure juvenile residential facilities that provides for planned therapeutic interventions to reward responsible juvenile behavior, and to discourage negative juvenile behavior. The SCDJJ philosophy is that adolescents favorably respond to developmentally appropriate rewards and sanctions and SCDJJ will reinforce responses by rewarding appropriate behavior while giving sanctions for inappropriate behavior. The South Carolina Department of Juvenile Justice (SCDJJ) will impose appropriate sanctions to juveniles for conduct and rule violation(s) with the intent and purpose of juveniles changing/improving their behavior and not for the purpose of punishment. Staff will follow a continuum of responses from least restrictive to more restrictive to respond to juvenile misbehavior, as set forth in and consistent with the Juvenile Progressive Discipline Chart (Exhibit 924A). Each secure juvenile residential facility will implement a juvenile behavior management system that includes components for rewarding positive behavior and discouraging negative behavior. The behavior management systems will be applied fairly and equitably for both rewards and sanctions. The focus will be to acknowledge and support positive behavior and to assist the juvenile to change negative behavior. SCDJJ will not use isolation or restrictive housing or any other sanctions for purposes of retribution or punishment, but may utilize placement in, or transfers to, more restrictive housing units, where specialized programming, education, and treatment exists in those units, which would benefit the juvenile and ensure a greater degree of safety for other juveniles and/or staff.

**INTRODUCTION:**

There are eight (8) SCDJJ systems that include authorized methods used to manage juvenile behavior. They are: (1) rewarding positive behavior, (2) juvenile progressive discipline, (3) Calm/Cooperative/Safe (CCS) Compliance Assessments, (4) determinate sentence good behavior credit, (5) the behavior management level systems, (6) Disciplinary Hearings, (7) placement in/reassignment to specialized program housing (to include intensive treatment) and (8) isolation/room confinement.

**DEFINITIONS:**

1.  CCS Compliance ("Calm, Cooperative, Safe") is a set of standards that will guide SCDJJ staff to respond appropriately to a juvenile's behavior and make assessments during or

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 2 of 11 |
|---|---|---|---|---|---|

shortly after an offense. CCS Assessment: the process of listening for and observing characteristics in a juvenile's behavior. In accordance with Policy 323, Isolation of Youth.

2. Isolation means being confined alone in a room or cell, other than the room or cell in which the juvenile usually sleeps, for cause for 15 minutes or more. In accordance with Policy 323, Isolation of Youth.

3. Room Confinement means being confined alone in a room or cell, in which the juvenile usually sleeps, for cause for 15 minutes or more. In accordance with Policy 323, Isolation of Youth.

4. Progressive Discipline is a continuum of responses from least restrictive to more restrictive to juvenile misbehavior in an effort to change that behavior.

5. Determinate Sentence Good Behavior Credit is a sentence reduction given to eligible juveniles who received a determinate sentence from the family court and who have maintained favorable behavior. In accordance with Policy 516, Determinate Sentence Good Behavior Credit.

6. Behavior Management Level Systems is the process that the facilities utilize to reward good behavior and discourage negative behavior.

7. Disciplinary Hearing/ is the process used to determine whether a Level 3 rule violation committed by a juvenile in SCDJJ's secure residential facilities has occurred and if so, the appropriate sanctions to impose to correct and prevent a reoccurrence of the misbehavior. In accordance with Policy 923, Disciplinary Hearing.

**PROCEDURAL GUIDELINES:**

A. Behavior Incentive System

The Behavior Incentive System (BIS) will be based on behavior and treatment goals and will determine the rewards and incentives associated with behavior. Although behavior is a component of the SCDJJ classification system, the Behavior Incentive System does not determine a juvenile's custody level, supervision level, or placement. Each residential facility will have a written behavior level system that will allow a juvenile to earn an increase in incentives for positive behaviors and a loss of incentives for negative behaviors.

1. The incentive system will be simple to understand and will be explained to juveniles during orientation. It is expected that juveniles understand that behaving appropriately will result in incentives and behaving inappropriately will result in losing them. It is important that this system be objective and not subjective, and that each juvenile understands that he/she controls his/her incentives by controlling his/her actions.

| Title: | Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 3 of 11 |
|--------|------|------|-----|------|------|------|

2.      Incentives will be in writing and applied fairly. Juveniles residing in different units who are on the same level will receive the same rewards and incentives.

3.      The Unit Manager/Captain of Security, Program Manager, and Level System Coordinator will ensure that rewards and incentives described in the written incentive system are actually provided. Earned rewards must be provided to the juveniles in a timely manner.

4.      The incentive system will include:

   a.      The minimum requirements necessary for advancement in the system;

   b.      Actions and behavior that will earn increases in incentives;

   c.      Actions and behavior that will result in reduction of incentives; and,

   d.      A description of specific incentives, including recreation [in addition to the minimum requirement of one (1) hour per weekday] personal property, juvenile paid jobs, and supervised trips.

5.      Only documented behavior will be acknowledged in the incentive system. Event Reports, and Behavior Reports are examples of documented behavior.

6.      Juvenile behavior while participating in recreational, religious, and volunteer activities will be considered in the incentive system. Behavior and progress during clinical treatment programs, educational classes, and any other appropriate programs will be considered in the incentive system. Any staff working with juveniles will report behavior and progress in treatment, education and other programs using a method approved by the Level System Coordinator.

7.      Other factors that can influence earned incentives include:

   a.      Volunteerism and community services project participation;

   b.      Special Services (e.g., Student Council, Peer Mediation, JROTC Command, Leadership Roles);

   c.      Behavior while participating in activities and groups (e.g., Work Programs, organized sports, religious activities, etc.);

   d.      The type and number of positive and negative Behavior Reports (Level 1 or 2 Rule Violations) received during the level system evaluation period; and/or,

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 4 of 11 |
|---|---|---|---|---|---|

    e.    The type and number of documented (Level 3 and founded) Rule Violations.

8.    A staff member will be designated at each facility to be responsible to calculate and monitor juveniles' earned incentives.

9.    The Level System Coordinator will ensure that appropriate staff members are notified of the status of juveniles to ensure that the incentives are appropriately awarded.

10.    Determinate Sentence Good Behavior Credit System (SCDJJ Policy 516) and Disciplinary Hearing (SCDJJ Policy 923) are processes used in conjunction with progressive discipline. SCDJJ staff will be trained in behavior management and progressive discipline as part of the facility's on-the-job training.

B.    Juvenile Behavior Systems

    1.    Rewarding positive behavior

        a.    Rewarding positive behavior means looking for opportunities to immediately reinforce positive behaviors as a juvenile demonstrates them. These reinforcements should be documented by the staff person who witnesses the positive behavior through a Juvenile Positive Behavior Report (Form 924B) or through a Positive Behavior check, if utilized at the facility, and submitted to the appropriate personnel by the end of the shift. The Shift Supervisor will document the approved reward(s) on the Behavior System Log (Form 924D) immediately. Some reinforcements will need to have prior approval from the Unit Team or Shift Supervisor before being rewarded.

        b.    These positive behaviors may be as small as cleaning up a dirty living area without being directed or as large as a juvenile expressing empathy to another juvenile's distress. Positive behaviors will change as the juvenile progresses through his/her treatment and the facilities' incentive system.

        c.    Examples of reinforcements for positive behavior:

- Positive Behavior Checks
- Positive Behavior Reports
- Youth of the Week award
- Written recognition
- Written peer recognition
- Posted recognitions on bulletin board
- Recognition at the Community Meeting

| Title: | Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 5 of 11 |
|--------|------|------|------|------|------|------|

- Certificates
- Phone time as approved by Social Worker
- Freebies (such as greeting cards, sample shampoos, art supplies, paperbacks, etc.)
- Access to video games, TV, musical instruments
- Choice of seating during meals
- Choice of unit chores
- Watching special videos or shows
- Extra Free Time or Courtyard time
- Access to multipurpose rooms
- Longer showers
- Excuse from chores
- Later bedtime

    d.    Positive Behavior checks are utilized at some facilities so that staff may issue checks to youth who are demonstrating positive behavior and/or improved behavior. The youth use the checks to purchase extra incentives.

2. Disciplining Negative Behavior of the Youth

    a.    Progressive discipline addresses minor (Level 1), medium (Level 2), and maximum (Level 3) Rule Violation(s) and sanctions for those rule violations outlined in the Juvenile Progressive Discipline Chart (Exhibit 924A). The sanctions imposed are to be directly targeted to address the juvenile's specific inappropriate behavior with the intent and purpose of prompting the juvenile to comply with rules. Sanction(s) will be imposed fairly and equitably, and staff will practice imposing the same level of sanction(s) for the same types of violation(s). Multiple sanctions may be given when appropriate to the situation (e.g., loss of privilege, written letter of apology, referral to clinician, and work/chore assignment).

    b.    Level 1 Rule Violation(s): All staff are authorized to apply sanctions for minor misbehavior:

        1)    Staff will exercise discretion in deciding whether or not to document Level 1 Rule Violation(s). Minor behavior can be addressed within the unit/facility and does not require documentation. All staff may choose and impose one or more of the sanctions listed for Level 1 Rule Violation(s) in the Juvenile Progressive Discipline Chart (Exhibit 924A) and will be responsible for carrying out those sanctions.

        2)    Minor behavior of a more significant level can be documented on a Juvenile Negative Behavior Report (Form 924C). The form must be

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 6 of 11 |
|---|---|---|---|---|---|

fully completed and submitted to the appropriate personnel by the end of shift. The Shift Supervisor will document the approved sanction(s) on the Behavior System Log (Form 924D) immediately. These reports will be considered for classification, parole, and treatment planning decisions.

c.  Level 2 Rule Violation(s): Level 2 Rule Violation(s) are behavior that has increased in severity or repetitiveness. The Unit and/or Shift Supervisor may address the matter with the juvenile without imposing sanctions or, after determining that a Level 2 Rule Violation has occurred, issue and enforce sanctions consistent with those allowed in the Juvenile Progressive Discipline Chart (Exhibit 924A). Level 2 Rule Violation(s) must be documented on a Juvenile Negative Behavior Report (924C). The form must be fully completed and submitted to the appropriate personnel by the end of the shift. The Shift Supervisor will document the approved sanction(s) on the Behavior System Log (Form 924D) immediately. The Unit Manager/Captain of Security will review the Juvenile Negative Behavior Report (924C) and talk with the juvenile about the rule violation(s) by the next business day, at which time the juvenile will be given the opportunity to explain/speak about the incident from his/her perspective. These reports will be considered for classification, parole, and treatment planning decisions.

d.  Level 3 Rule Violation(s): A juvenile will be referred for a Disciplinary Hearing when a serious offense as defined by the Juvenile Progressive Discipline Chart (Exhibit 924A) occurs. This will be documented on a Juvenile Negative Behavior Report (924C). It must be fully completed and submitted to the appropriate personnel by the end of the shift. The process will proceed as directed by the Disciplinary Hearing Policy, 923. In accordance with the CCS Compliance principles, the Shift Supervisor may place a juvenile in restrictive room confinement or temporarily place in isolation, according to Isolation of Youth Policy, 323 or the Shift Supervisor may determine to leave the juvenile in his/her assigned area/living unit, and refer the matter for a Disciplinary Hearing. The Shift Supervisor can also issue Level 1 and 2 sanctions at this time consistent with the Juvenile Progressive Discipline Chart (Exhibit 924A). The sanctions given must be documented on the Juvenile Negative Behavior Report form (924C). The Shift Supervisor will document any approved Level 1 or Level 2 sanction(s) on the Behavior System Log (Form 924D) immediately. Sanctions by the Shift Supervisor will be taken into consideration by the Disciplinary Hearing Officer following a Disciplinary Hearing when additional sanctions may be imposed. Any sanction(s) issued by the Disciplinary Hearing Panel

| Title: | Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 7 of 11 |
|---|---|---|---|---|---|---|

shall be documented by the Shift Supervisor on the Behavior System Log (Form 924D).

    e.    When a youth has completed their assigned sanction, the Shift Supervisor shall document on the Behavior System Log (Form 924D). The completed Behavior System Log will be submitted weekly to be entered into the Disciplinary database by assigned personnel.

3.    The following practices will NOT BE DONE for the purpose of punishment or retribution:

    a.    Taking foods, snacks or drinks from a juvenile provided by food service.

    b.    Mechanical, physical, or medication restraint.

    c.    Forced administration of medication.

    d.    Physical force.

    e.    Isolating, secluding, or otherwise confining a juvenile to any locked, unlocked, or enclosed area and/or leaving the juvenile unsupervised in any locked room, holding cell or area not designed and equipped to be used for extended or overnight confinement.

    f.    Mass punishment (group punishment for an offense by one juvenile).

    g.    Placement of a juvenile in a physical position (standing, placed on knees/stomach, arms behind head).

    h.    Taking juvenile's property (other than privilege/earned property that may be temporarily taken for behavior management purposes).

    i.    Taking a juvenile's contact with their family.

    j.    Depriving the juvenile of receiving educational services.

    k.    Administration of consequences by a peer.

    l.    Corporal punishment.

    m.    Verbal abuse.

    n.    Denial of elements of the juvenile's treatment plan.

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 8 of 11 |
|---|---|---|---|---|---|

o.     Assignment of excessive exercise or excessive work.

p.     Deprivation of meals, sleep, bedding, clothing, medical attention, or minimum required recreation.

q.     Taking a juvenile out of doors in extreme weather or at night or without appropriate clothing for weather conditions.

r.     Changing of indoor environmental factors (heat/cold).

s.     Denial of shelter.

C.     Behavior principles

Management of negative behavior will be administered quickly, fairly, and consistently. Specific consequences consistent with the Juvenile Progressive Discipline Chart (Exhibit 924A) will be individualized, considering developmental and emotional differences in adolescents, and will target the juvenile's specific behavior. Any disciplinary actions addressing behavioral management will include these principles:

1.     The witnessing staff member will address the negative behavior immediately, or otherwise addressed as soon as possible.

2.     SCDJJ will practice behavior strategies and interventions utilizing the least restrictive intervention necessary for the juvenile to change his/her behavior, before progressing to more restrictive alternate sanctions.

3.     Clinical staff will counsel with the juvenile to discuss the choices the juvenile made and the alternate appropriate choices the juvenile could have made in the situation. The juvenile's assigned Social Worker will meet with the juvenile as soon as possible, but no later than two (2) business days following notification of a behavioral incident. Among other things, Clinical staff should guide the juvenile to accept responsibility for his/her actions, develop empathy, and develop remorse. The treatment plan will be updated as needed to assist the juvenile to prevent repeating the negative behavior.

4.     The juvenile should be required to make appropriate reparations through the disciplinary process.

5.     Behavior management encompasses the juvenile, security staff, health services staff, education staff, clinical staff (social workers, psychologists, psychiatrists and chaplains), activity coordinators, parents, volunteers, and any other persons that can affect a juvenile's behavior. All SCDJJ staff is responsible for setting the standards

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 9 of 11 |
|---|---|---|---|---|---|

and expectations for behavior and take appropriate action to assist a juvenile in managing his/her own behavior.

6.    Staff will use progressive discipline to informally resolve minor juvenile inappropriate behavior and as an alternative to placement in restrictive room/unit reassignment. SCDJJ supports the following types of behavior management techniques:

a.    Active Listening:

1)    The listener will take care to attend to the speaker fully, and then repeat, in the listener's own words, what he or she thinks the speaker has said. The listener does not have to agree with the speaker. He or she must simply state what he/she thinks the speaker said. This enables the speaker to find out whether the listener really understood. If the listener did not, the speaker can explain some further.

2)    The listener is encouraged to interpret the speaker's words in terms of feelings. Thus, instead of just repeating what happened, the active listener might gather that the speaker felt angry or frustrated or confused when a particular event happened. Then the speaker can go beyond confirming that the listener understood what happened but can indicate that he or she also understood the speaker's response to it. Active listening involves listening with all senses.

3)    Active listening not only means focusing fully on the speaker but also actively showing verbal and non-verbal signs of listening.

b.    Redirection:

1)    If it becomes evident that staff's use of verbal redirection and/or physical contact to assist, guide, or redirect the juvenile is aversive or the juvenile is physically resisting, staff will refrain from further redirection efforts. If a juvenile appears to be further agitated by verbal redirection and/or physical contact to assist, guide, or redirect him/her, staff will refrain from further redirection efforts. In such instances, staff will employ efforts to de-escalate and calm the juvenile. An alternate behavior management method will be attempted, or the staff member will seek assistance from another staff member to talk with the juvenile and try to get compliance.

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 10 of 11 |
|---|---|---|---|---|---|

2)   Procedures

   A)   Staff will use the methods taught in SCDJJ Training to properly direct and escort a juvenile's movement.

   B)   The juvenile's freedom of movement or access to his/her own body will not be restricted.

c.   Separation:

1)   Staff takes a juvenile away from his/her peers in a quiet area/location for no more than 15 minutes to provide the juvenile the opportunity to regain self-control. The juvenile must be placed in an area where a staff member can hear or see the juvenile, e.g., in a staff member's office, in a chair in the hallway close to a staff member/staff member's office. Separation is not placing a juvenile in isolation/seclusion in a locked or unlocked room or area without supervision. Younger adolescents and those with diagnosed behavior disorders (attention deficit, hyperactive) may not be able to successfully complete separation. A work detail may be more appropriate for these type juveniles.

2)   Contraindications:   Separation will not be used to manage a juvenile's behavior if the juvenile is known to have a physical or mental health condition that must be closely monitored.

3)   Procedures

   A)   Separation periods may be initiated by staff or upon the juvenile's request for separation, if available.

   B)   A juvenile who is disrupting will be asked to accompany staff to an area away from his/her peers to allow him/her the opportunity to regain his/her composure and to avoid further incident.

   C)   A juvenile who feels that he/she is becoming agitated and/or angry may request a separation period to assist him/her in managing problematic behavior.  However, juveniles will not be able to utilize separation periods to avoid completing daily tasks or other therapeutic activities. When a juvenile requests a separation, staff will allow the juvenile separation as soon as possible after the request is made.

| Title: | Juvenile Behavior Management – Incentive System and Progressive Discipline | SCDJJ Policy No.: | 924 | Originator: | Institutional Programs Manager | Page: 11 of 11 |
|--------|------|------|------|------|------|------|

D)   When the juvenile is calm, staff will discuss the circumstances leading up to the use of separation with the juvenile to determine the source of the juvenile's behavior. Appropriate action will be taken to address the juvenile's concerns.

E)   In the event the juvenile is unable to calm down after the 15 minute period of time, the Shift Supervisor may be requested to assist in the matter.

**RELATED FORMS AND ATTACHMENTS:**
Exhibit 924A, Juvenile Progressive Discipline Chart
Form 924B, Juvenile Positive Behavior Report
Form 924C, Juvenile Negative Behavior Report
Form 924D, Behavior System Log

**REFERENCED POLICIES:**
323, Isolation of Youth
516, Determinate Sentence Good Behavior Credit System
923, Disciplinary Hearing/Review Board Process

**SCOPE:**
This policy applies to all direct service staff in secure juvenile residential facilities.

**STANDARD OPERATING PROCEDURES:**
Not required.

**TRAINING REQUIREMENT:**
Employees providing direct service to juveniles are required to review this policy within 30 calendar days of its publication.

**UPDATED:**
February 19, 2019, Policy # change
January 17, 2019, New policy and form numbers
September 19, 2018, Agency and policy reorganization

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

| | LEVEL 1 RULE VIOLATIONS | LEVEL 1 SANCTIONS |
|---|---|---|
| 1. | **Disorderly Conduct:** Any action by a juvenile that disrupts or may lead to disruption of the orderly operation of the facility. | **Extra Work /Chore:** Not to exceed two hour period |
| 2. | **Disrespect:** The failure of any juvenile to observe proper conventions of polite behavior or who willfully engages in actions or makes statements to or about any person that are discourteous in nature, which may or may not include the use of profanity. | **Writing Assignment:** Must address the specific negative behavior; no more than one (1) page; must provide time to complete; must provide paper and pencil; must ensure juvenile can write. |
| 3. | **Horseplay:** Wrestling, rough contact, or roughhousing between juveniles that rises to the level of an incident but is not considered by staff to constitute assault. | **Loss of Privilege** (not to exceed 2 days)<br><br>**Counsel by Appropriate Staff** |
| 4. | **Refusing to Obey Verbal or Written Instructions:** The failure to promptly obey or failure to promptly comply with direct instructions by any employee of the Department of Juvenile Justice (DJJ) or other official who has authority over juveniles. | **Counsel by Unit Manager.**<br><br>**Apology** (Written or Verbal)<br><br>**Referral to Clinician for counseling** |

## Level 1 sanctions can be imposed by all staff

| | LEVEL 2 RULE VIOLATIONS | LEVEL 2 SANCTIONS |
|---|---|---|
| 5. | **Behavioral Escalation:** After distinct steps of progressive discipline have been utilized and the negative behavior continues to increase to include threats of bodily harm or property destruction, violence, and/or not responding to directions. | **All sanctions from Level 1, plus**<br><br>**Outside Work Detail** (not to exceed three hours)<br><br>**Loss of Privilege** (not to exceed 14 days)<br>*See List of Privileges at the end of this chart |
| 6. | **Complicity:**<br>Any juvenile may be primarily responsible for a violation even though another person actually committed the violation. When a juvenile commands, causes or helps another person commit or attempt to commit a violation (by action or failure to take action), the juvenile is as responsible as the one that committed the violation.<br>No juvenile will be held responsible under this section for the actions of another person if, prior to the violation, he/she withdrew from participating in the violation and made a reasonable effort to prevent the violation by informing proper authority | **Social Worker telephone parent/guardian** and have juvenile explain behavior to them. The Social Worker may request the support of the parent/guardian by asking them to talk with the juvenile, visit the juvenile, or participate in a family therapy session.<br><br>**Behavior Contract:** If a juvenile needs to be placed on a behavior contract, the Unit Manager/Captain of Security or designee will meet with the juvenile and the juvenile's assigned social worker to develop a Juvenile Behavior Contract (Form G-9.20E) to assist the juvenile with the following: |
| 7. | **Damaging, Defacing or Destruction of State or Private Property (under $100):** The willful damaging, destruction or defacing of property belonging to the facility, the State or any person. | Increase his/her strength and frequency of appropriate behavior while decreasing the frequency of inappropriate behavior.<br>Specifically identify the inappropriate behavior. |
| 8. | **Fight Without Injury:** A physical altercation involving two or more individuals acting in a mutually aggressive or offensive manner that does not result in medical treatment. No medical assessment is necessary; or assessment conducted and no injuries noted, or assessment is conducted and minor injuries are treated | Establish a specific goal with objectives to correct the behavior, and determine an allotted amount of time the juvenile has to reach the goal. |

Exhibit G-9.19A<br>05-09-2016

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

|   | | |
|---|---|---|
| | with the type of treatment that the juvenile would receive in a home environment (e.g. pain reliever, ice pack, Band-Aid). | If a need arises to develop the contract after hours, input should be received from Clinical on the next business day |
| 9. | **Forgery/Fraud:** The act, with intent to defraud or deceive another person, of falsely making, completing or altering any document; or knowingly issuing or possessing such document. | **Mentor/Privilege food restriction** (not to exceed 2 weeks) |
| 10. | **Gambling or Betting:** Gambling or betting includes the act of participating in a game of chance, or other unpredictable event, with or without the use of cards or dice, in which there is some form of compensation (monetary or otherwise) "paid" to the winner. | **Solo Recreation:** Juvenile will have recreation alone<br><br>**Temporary Suspension from Job:** (not to exceed 1 week) |
| 11. | **Inappropriate Physical Contact/Battery:** Any unauthorized contact with the body/person of another in a non-aggressive but offensive manner that occurs intentionally but without the intent to do harm (e.g., bumping, leaning, face mushing). | **Refer to Treatment Team** (reassessment of treatment plan)<br><br>**Statement of Charges/Restitution** (if property damaged). |
| 12. | **Making a False Statement to or Against Another Person:** The intentional making of untrue statements, as evidenced by any juvenile who:<br>(1) Makes a false statement, oath or affirmation or swears or affirms the truth of such a statement previously made; or<br>(2) Makes inconsistent statements under oath or affirmation, one of which is false to any DJJ employee; or<br>(3) Makes a false statement to or against an employee or other person (e.g. juvenile, volunteer); or<br>(4) Files a false allegation/grievance (Inspector General's Office will initiate discipline). | **Make something for victim**<br><br>**Address fault in Community Meeting**<br><br>**Research offense for better understanding of wrong**<br><br>**Partnered Activity to increase teamwork**<br><br>**Other related sanctions to improve acceptance and acknowledgement of harms** |
| 13. | **Out of Place:** The act of any juvenile who without proper authority:<br>(1) Is found to be in an unauthorized area, or<br>(2) Does not have a pass in a facility or area where passes are required, or<br>(3) Is in an area authorized for juveniles, but does not have staff permission to be in the area, or<br>(4) Is intentionally hiding from staff. | |
| 14. | **Possession of Contraband (Not Weapons or Drugs):** Possession of any matter declared to be contraband by State/Federal law (SC Law Section 63-19-1670) or by the Director of DJJ. (see Exhibit H-3.1) excludes weapons or drugs but includes all items prohibited by the agency or facility management based on written policy, e.g. jewelry, money, pornography, and cell phones. | |
| 15. | **Possession of Unauthorized Item/Property:** A juvenile found to be in possession of property not listed as authorized in the juvenile property policy, or an amount of property that exceeds the quantity allowed for a juvenile to possess. | |
| 16. | **Stealing/Possession of Stolen Goods:** Taking or possessing an item not belonging to that person from any other person or place without consent and authorization. | |
| 17. | **Threatening Conduct 1:** A verbal or written communication or gesture by a juvenile indicating that they intend to assault or otherwise injure another person. | |
| 18. | **Unauthorized use or misuse of a computer or other electronic device:** Any use of an electronic device without permission and/or the use of any device to utilize social media sites or any other unauthorized websites. | |

Exhibit G-9.19A
05-09-2016

## SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
### JUVENILE PROGRESSIVE DISCIPLINE CHART

**Level 2 sanctions can be imposed by Shift Supervisor and/or Captain of Security**

| | LEVEL 3  RULE VIOLATIONS | LEVEL 3 SANCTIONS |
|---|---|---|
| 19. | **Arson/Attempted Arson to State and/or Private Property:** The willful starting of a fire or attempting to start a fire causing a threat to the safety of staff or juveniles in that facility. | All sanctions from Lists 1, 2, plus<br><br>All sanctions listed above but time limits can be doubled.<br><br>**Priority Admission to one of the three Secured Housing Units at BRRC - Reorientation Unit, Resocialization Unit, or Intensive Treatment Unit   (Long Term Institution only)**<br><br>**Temporary transfer to another room in the same living unit and referral to classification for possible reassignment to another room in the same unit.**<br><br>**Refer to Classification for possible reassignment of Living Unit**<br><br>**Refer to Gang Coordinator for Intervention counseling**<br><br>**Refer for Sexual Behavior Problem Counseling** |
| 20. | **Assault and Battery:** Any instance in which a youth or staff member is involved in a physical contact or altercation with sufficient force that could cause bodily injury to another individual even if no one is injured. Physical contact of another person is:<br>(1) The striking or punching of an individual, which is not considered to be "mutual combat" or both/participants equally engaged; or<br>(2) The throwing of any object on an individual; or<br>(3) The spitting on an individual; or<br>(4) The throwing of any substance on an individual. | |
| 21. | **Damaging, Defacing or Destruction of State or Private Property over $100:** The willful damaging, destruction or defacing of property belonging to the facility, the State or any person amounting to $100 or more and verified. | |
| 22. | **Escape or Attempted Escape:** To flee from custody or supervision of someone assigned to supervise the youth, or the unlawful departure of a youth from an institution or from custody while being transported or failure to return to the facility while on leave.  The absence of any juvenile from a school/facility or specific area of assignment that necessitates a thorough search for that juvenile may be considered escape or attempted escape. | |
| 23. | **Fight With Injury:** A physical altercation involving two or more individuals acting in a mutually aggressive or offensive manner that does result in medical treatment. Treatment administered by health care professional (e.g., sutures, x-ray) at any location; or when a person is admitted to any health care facility for observation | |
| 24. | **Gang Activity/Unauthorized Group Activity:** A group or association of three or more persons who may have a common identifying sign, symbol, or name, and who individually or collectively engage in, or have engaged in, criminal activity which creates an atmosphere of fear and intimidation. Also being in possession of gang paraphernalia | |
| 25. | **Group Disturbance:**  The disruption or interference of normal facility operations resulting from three or more offenders participating in actions, threats, demands, suggestions to encourage others to advocate disruption or disturbance. | |
| 26. | **Possession of Contraband- Weapons, Drugs or Alcohol:** Possession of any matter declared to be contraband by State/Federal law (SC Law Section 63-19-1670) or which is illegal for a juvenile to possess, as declared by the Director of DJJ. (see Exhibit H-3.1).<br>**Contraband Weapons** includes possessing an item or items that have been made or adapted for use as a weapon that may cause injury or bodily harm.<br>**Contraband Drugs or Alcohol** includes possessing or using any unauthorized substance, including controlled substances or intoxicants [including alcohol and tobacco], synthetic drugs and | |

Exhibit G-9.19A
05-09-2016

## SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
### JUVENILE PROGRESSIVE DISCIPLINE CHART

| | |
|---|---|
| | medications that have been hoarded and/or not prescribed for use of the juvenile by agency or healthcare staff |
| 27. | **Sexual Assault:** The act of sexual intercourse with another person by: <br> (1) Substantially impairing the power of the other person to appraise or control his/her conduct by giving or using drugs, intoxicants or similar items; or <br> (2) Forcing or inducing the other person to engage in sexual activity by violence or threat of violence; or <br> (3) Having sexual intercourse with a person who suffers from a mental disease, defect or inadequacy which renders the other person substantially incapable of appraising the nature of his/her conduct or being aware of the nature of the act committed; or <br> (4) Having sexual intercourse with another person that is unconscious/asleep or otherwise physically incapable of resisting or who does not willingly consent to the sex act; or <br> (5) Any other penetration of another person's body orifice with any object; |
| 28. | **Sexual Harassment:** Sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a sexual derogatory or offensive nature by a juvenile. |
| 29. | **Sexual Misconduct:** (Consensual sex with another person is not permitted at DJJ) <br> (1) The act of sexual intercourse with another person even if consent is given by the other person, <br> (2) The intentional touching either directly or through the person's clothing, of the genitalia, anus, groin, breast, inner thighs or buttocks of another person (excluding incidental touching during a physical altercation) <br> (3) The intentional exposure of one's genitalia (must be without the expectation of privacy) |
| 30. | **Tampering with Surveillance Equipment:** Any attempt or Actual act of tampering with any cameras, tapes, or other surveillance equipment. |
| 31. | **Threatening Conduct 2:** A physical act that is of such a threatening nature it causes the victim(s) to fear immediate bodily injury. |
| 32. | **Under the Influence of Narcotic Drugs, Alcohol, or Other Substance:** Any juvenile found to be under the influence by his/her own admission, by testing positive with a drug/alcohol-screen, or by health services examination of any narcotic drug not prescribed by authorized medical personnel. |

## Level 3 sanctions can only be imposed by a Disciplinary Hearing Officer/Review Board

Exhibit G-9.19A
05-09-2016

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

*List of privileges that can be restricted

- Weekly Canteen
- Weekly incentive activity
- Kitchen Duty
- Arts and Crafts
- Special Snacks or treats
- Video games
- Incentive Movie with popcorn
- Extra 5 minute phone call
- Special Spa or Hair (Girls)
- Youth Advisory Council
- Television time
- Courtyard time
- Any item that is not state issued
- Game room time/video games
- Recreational game bin time
- Daily earned incentives, such as later bed time, extra phone call, or extra TV time
- Blazers, Toastmasters, Junior Achievement
- Recreational game bin time
- Attendance at special events
- Special hair care for girls
- Personal set of shower shoes- $30 limit
- Intramural Sports activities
- Special Sport teams
- Skills USA
- Work Program
- Personal art supplies
- Personal plant
- Use of personal DVD player
- Camping
- On-grounds, limited supervision activities
- Student Council
- Insiders
- Lunch with Administrator(s)
- Off-grounds activities
- Phase 3 clothing
- Live in Honors Unit
- Personal shoes
- Personalized haircut
- Any Special activity that is not considered the required 1 hour of recreation.

Weekly visits or phone calls are not included in these restrictions

Exhibit G-9.19A
05-09-2016

### STATE OF SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
POLICY AND PROCEDURES

| Title: | Juvenile Behavior Management -- Incentive System and Progressive Discipline | Policy No.: | G-9.19 | Page(s): | 1 of 11 |
|---|---|---|---|---|---|
| Authority: | Division of Rehabilitative Services | | | | |
| Juvenile Justice Code: | n/a | | | | |
| PbS Related Standard(s): | Order Goal: OS3; and, Programming Goal: PS2 | | | | |

| May 09, 2016 _____ Effective Date | SIGNED/ *Sylvia Murray* _____ Sylvia Murray Director |
|---|---|

**POLICY:** The Department of Juvenile Justice (DJJ) will use a formal system of rewards and incentives in juvenile residential facilities that provides for planned therapeutic interventions to reward responsible juvenile behavior, and to discourage negative juvenile behavior. The DJJ philosophy is that adolescents favorably respond to developmentally appropriate rewards and sanctions and DJJ will reinforce responses by rewarding appropriate behavior while giving sanctions for inappropriate behavior. The Department of Juvenile Justice (DJJ) will impose appropriate sanctions to juveniles for conduct and rule violation(s) with the intent and purpose of juveniles changing/improving their behavior and not for the purpose of punishment. Staff will follow a continuum of responses from least restrictive to more restrictive to respond to juvenile misbehavior, as set forth in and consistent with the Juvenile Progressive Discipline Chart (Exhibit G-9.19A). Each juvenile residential facility will implement a juvenile behavior management system that includes components for rewarding positive behavior and discouraging negative behavior. The behavior management systems will be applied fairly and equitably for both rewards and sanctions. The focus will be to acknowledge and support positive behavior and to assist the juvenile to change negative behavior. DJJ will not use isolation or restrictive housing or any other sanctions for purposes of retribution or punishment, but may utilize placement in, or transfers to, more restrictive housing units, where specialized programming, education, and treatment exists in those units, which would benefit the juvenile and ensure a greater degree of safety for other juveniles and/or staff.

**INTRODUCTION:**

There are eight (8) DJJ systems that include authorized methods used to manage juvenile behavior. They are: (1) rewarding positive behavior, (2) juvenile progressive discipline, (3) Calm/Cooperative/Safe (CCS) Compliance Assessments, (4) determinate sentence good behavior credit, (5) the behavior management level systems, (6) Disciplinary Hearings/Review Board, (7) placement in/reassignment to specialized program housing (to include intensive treatment, resocialization and reorientation units) and (8) isolation/room confinement.

Definitions

1.  CCS Compliance ("Calm, Cooperative, Safe") is a set of standards that will guide DJJ staff to respond appropriately to a juvenile's behavior and make assessments during or shortly after an offense. CCS Assessment: the process of listening for

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 2 of 11 |
|---|---|---|---|---|---|

and observing characteristics in a juvenile's behavior. In accordance with Policy G-3.4, Isolation of Youth.

2. Isolation means being confined alone in a room or cell, other than the room or cell in which the juvenile usually sleeps, for cause for 15 minutes or more. In accordance with Policy G-3.4, Isolation of Youth.

3. Room Confinement means being confined alone in a room or cell, in which the juvenile usually sleeps, for cause for 15 minutes or more. In accordance with Policy G-3.4, Isolation of Youth.

4. Progressive Discipline is a continuum of responses from least restrictive to more restrictive to juvenile misbehavior in an effort to change that behavior per this policy.

5. Determinate Sentence Good Behavior Credit is a sentence reduction given to eligible juveniles who received a determinate sentence from the family court and who have maintained favorable behavior. In accordance with Policy G-9.17, Determinate Sentence Good Behavior Credit.

6. Behavior Management Level Systems is the process that the facilities utilize to reward good behavior and discourage negative behavior per this policy.

7. Disciplinary Hearing/Review Board is the process used to determine whether a Level 3 rule violation committed by a juvenile in DJJ's secure residential facilities has occurred and if so, the appropriate sanctions to impose to correct and prevent a reoccurrence of the misbehavior. In accordance with Policy E-1.14, Disciplinary Hearing/Review Board Process.

## PROCEDURAL GUIDELINES:

A. Behavior Incentive System

The Behavior Incentive System (BIS) will be based on behavior and treatment goals and will determine the rewards and incentives associated with behavior. Although behavior is a component of the DJJ classification system, the Behavior Incentive System does not determine a juvenile's custody level, supervision level, or placement. Each residential facility will have a written behavior level system that will allow a juvenile to earn an increase in incentives for positive behaviors and a loss of incentives for negative behaviors.

1. The incentive system will be simple to understand and will be explained to juveniles during orientation. It is expected that juveniles understand that behaving appropriately will result in incentives and behaving inappropriately will result in

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 3 of 11 |
|---|---|---|---|---|---|

losing them. It is important that this system be objective and not subjective and that each juvenile understands that they control their incentives by controlling their actions.

2. Incentives will be in writing and applied fairly. Juveniles residing in different units that are on the same level will receive the same rewards and incentives.

3. The Unit Manager/Captain of Security, Program Manager, and Level System Coordinator will ensure that rewards and incentives described in the written incentive system are actually provided. Earned rewards must be provided to the juveniles in a timely manner.

4. The incentive system will include:

   a. The minimum requirements necessary for advancement in the system.

   b. Actions and behavior that will earn increases in incentives.

   c. Actions and behavior that will result in reduction of incentives.

   d. A description of specific incentives, including recreation [in addition to the minimum requirement of one (1) hour per weekday and up to two (2) hours per weekend day large muscle development], personal property, juvenile paid jobs, and supervised trips.

5. Only documented behavior will be acknowledged in the incentive system. Event Reports, and Behavior Reports are examples of documented behavior.

6. Juvenile behavior while participating in recreational, religious, and volunteer activities will be considered in the incentive system. Behavior and progress during clinical treatment programs, educational classes, and any other appropriate programs will be considered in the incentive system. Any staff working with juveniles will report behavior and progress in treatment, education and other programs using a method approved by the Level System Coordinator.

7. Other factors that can influence earned incentives include:

   a. Volunteerism and community services project participation.

   b. Special Services (e.g., Student Council, Peer Mediation, JROTC Command, Leadership Roles).

   c. Behavior while participating in activities and groups (e.g., Work Programs, organized sports, religious activities, etc.).

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 4 of 11 |
|---|---|---|---|---|---|

    d.    The type and number of positive and negative Behavior Reports (Level 1 or 2 Rule Violations) received during the level system evaluation period.

    e.    The type and number of documented (Level 3 and founded) Rule Violations.

8.    A staff member will be designated at each facility to be responsible to calculate and monitor juveniles' earned incentives.

9.    The Level System Coordinator will ensure that appropriate staff members are notified of the status of juveniles to ensure that the incentives are appropriately awarded.

B.    Juvenile Behavior Systems

    1.    Rewarding positive behavior

        a.    Rewarding positive behavior is looking for opportunities to immediately reinforce positive behaviors as a juvenile demonstrates them. These reinforcements should be documented by the staff person who witnesses the positive behavior through a Juvenile Positive Behavior Report (Form G-9.19B) and submitted to the appropriate personnel by the end of the shift. The Shift Supervisor will document the approved reward(s) on the Behavior System Log (Form G-9.19D) immediately. Some reinforcements will need to have prior approval from the Unit Team or Shift Supervisor before being rewarded.

        b.    These positive behaviors may be something as small as cleaning up a dirty living area without being directed or as large as a juvenile expressing empathy to another juvenile's distress. Positive behaviors will change as the juvenile progresses through their treatment and the facilities' incentive system.

        c.    Examples of reinforcements for positive behavior:

- Positive Behavior Reports
- Youth of the Week
- Written recognition
- Written peer recognition
- Posted recognitions on bulletin board
- Certificates
- Phone time as approved by Social Worker
- Freebies (such as greeting cards, sample shampoos, art supplies,

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 5 of 11 |
|---|---|---|---|---|---|

paperbacks, etc.)
- Access to video games, TV, musical instruments
- Choice of seating during meals
- Choice of unit chores
- Watching special videos or shows
- Courtyard time
- Access to multipurpose rooms
- Longer showers
- Excuse from chores
- Later bedtime

2. Progressive discipline addresses minor (Level 1), medium (Level 2), and maximum (Level 3) Rule Violation(s) and sanctions for those rule violations outlined in the Juvenile Progressive Discipline Chart (Exhibit G-9.19A). The sanctions imposed are to be directly targeted to address the juvenile's specific inappropriate behavior with the intent and purpose of prompting the juvenile to comply with rules. Sanction(s) will be imposed fairly and equitably, and staff will practice imposing the same level of sanction(s) for the same types of violation(s). Multiple sanctions may be given when appropriate to the situation (e.g., loss of privilege, written letter of apology, referral to clinician, and work/chore assignment). The following list is to be used as a guide.

   a. Level 1 Rule Violation(s): All staff are authorized to apply sanctions for minor misbehavior:

      1) Staff will exercise discretion in deciding whether or not to document Level 1 Rule Violation(s). Minor behavior can be addressed within the unit/facility and does not require documentation. All staff may choose and impose one or more of the sanctions listed for Level 1 Rule Violation(s) in the Juvenile Progressive Discipline Chart (Exhibit G-9.19A) and will be responsible for carrying out those sanctions.

      2) Minor behavior of a more significant level can be documented on a Juvenile Negative Behavior Report (Form G-9.19C). The form must be fully completed and submitted to the appropriate personnel by the end of shift.  The Shift Supervisor will document the approved sanction(s) on the Behavior System Log (Form G-9.19D) immediately. These reports will be considered for classification, parole, and treatment planning decisions.

   b. Level 2 Rule Violation(s): Level 2 Rule Violation(s) are behavior that has increased in severity or repetitiveness. The Unit and/or Shift Supervisor may address the matter with the juvenile without imposing sanctions or,

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 6 of 11 |
|---|---|---|---|---|---|

after determining that a Level 2 Rule Violation has occurred, issue and enforce sanctions consistent with those allowed in the Juvenile Progressive Discipline Chart (Exhibit G-9.19A). Level 2 Rule Violation(s) must be documented on a Juvenile Negative Behavior Report (G-9.19C). The form must be fully completed and submitted to the appropriate personnel by the end of the shift. The Shift Supervisor will document the approved sanction(s) on the Behavior System Log (Form G-9.19D) immediately. The Unit Manager/Captain of Security will review the Juvenile Negative Behavior Report (G-9.19C) and talk with the juvenile about the rule violation(s) by the next business day, at which time the juvenile will be given the opportunity to explain/speak about the incident from his/her perspective. These reports will be considered for classification, parole, and treatment planning decisions.

c.    Level 3 Rule Violation(s): A juvenile will be referred for a Disciplinary Hearing/Review Board when a serious offense as defined by the Juvenile Progressive Discipline Chart (Exhibit G-9.19A) occurs. This will be documented on a Juvenile Negative Behavior Report (G-9.19C). It must be fully completed and submitted to the appropriate personnel by the end of the shift. The process will proceed as directed by the Disciplinary Hearing/Review Board Process Policy, E-1.14. In accordance with the CCS Compliance principles, the Shift Supervisor may place a juvenile in restrictive room confinement or temporarily place in isolation, according to Isolation of Youth Policy, G-3.4 or the Shift Supervisor may determine to leave the juvenile in his/her assigned area/living unit, and refer the matter for a Disciplinary Hearing/Review Board. The Shift Supervisor can also issue Level 1 and 2 sanctions at this time consistent with the Juvenile Progressive Discipline Chart (Exhibit G-9.19A). The sanctions given must be documented on the Juvenile Negative Behavior Report form (G-9.19C). The Shift Supervisor will document any approved Level 1 or Level 2 sanction(s) on the Behavior System Log (Form G-9.19D) immediately. Sanctions by the Shift Supervisor will be taken into consideration by the Disciplinary Hearing Officer/Review Board following a Disciplinary Hearing/Review Board when additional sanctions may be imposed. Any sanction(s) issued by the Disciplinary Hearing Panel/Review Board shall be documented by the Shift Supervisor on the Behavior System Log (Form G-9.19D).

C.    Behavior principles

Management of negative behavior will be administered quickly, fairly, and consistently. Specific consequences consistent with the Juvenile Progressive Discipline Chart (Exhibit G-9.19A) will be individualized, considering developmental and emotional differences in

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 7 of 11 |
|---|---|---|---|---|---|

adolescents, and will target the juvenile's specific behavior. Any disciplinary actions addressing behavioral management will include these principles:

1.  The negative behavior is immediately addressed by the witnessing staff member, or otherwise addressed as soon as possible.

2.  Clinical staff will counsel with the juvenile to discuss the choices the juvenile made and the alternate appropriate choices the juvenile could have made in the situation. The juvenile's assigned Social Worker will meet with the juvenile as soon as possible, but no later than two (2) business days following notification of a behavioral incident. Among other things, Clinical staff should guide the juvenile to accept responsibility for his/her actions, develop empathy, and show remorse. The treatment plan will be updated as needed to assist the juvenile to prevent repeating the negative behavior.

3.  The juvenile should be required to make appropriate reparations through the disciplinary process.

4.  DJJ will practice behavior strategies and interventions utilizing the least restrictive intervention necessary for the juvenile to change his/her behavior, before progressing to more restrictive alternate sanctions. Staff will use progressive discipline to informally resolve minor juvenile inappropriate behavior and as an alternative to placement in restrictive room/unit reassignment. DJJ supports the following types of behavior management techniques:

    a.  Active Listening is a structured form of listening and responding that focuses the attention on the speaker.

        1)  Purpose: The proper use of active listening results in getting the juvenile to de-escalate, open up, avoid misunderstanding, resolve conflict, and build rapport and trust.

        2)  The listener must take care to attend to the speaker fully, and then repeat, in the listener's own words, what he or she thinks the speaker has said. The listener does not have to agree with the speaker. He or she must simply state what they think the speaker said. This enables the speaker to find out whether the listener really understood. If the listener did not, the speaker can explain some more.

        3)  The listener is encouraged to interpret the speaker's words in terms of feelings. Thus, instead of just repeating what happened, the active listener might gather that the speaker felt angry or frustrated or confused when a particular event happened. Then the speaker

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 8 of 11 |
|---|---|---|---|---|---|

can go beyond confirming that the listener understood what happened, but can indicate that he or she also understood the speaker's response to it. Active listening involves listening with all senses.

4)      Active listening not only means focusing fully on the speaker but also actively showing verbal and non-verbal signs of listening.

b.      Redirection is when staff uses verbal instruction and minimal physical contact to relocate a juvenile that is not behaviorally or emotionally out of control.

1)      Purpose: Staff may use redirection to assist, guide, and redirect a juvenile from a negative and/or escalating situation.

2)      If it becomes evident that staff's use of verbal redirection and/or physical contact to assist, guide, or redirect him/her is aversive or the juvenile is physically resisting, staff will refrain from further redirection efforts. If a juvenile appears to be further agitated from verbal redirection and/or physical contact to assist, guide, or redirect him/her, staff will refrain from further redirection efforts. In such instances, staff will employ efforts to de-escalate and calm the juvenile. An alternate behavior management method will be attempted, or the staff member will seek assistance from another staff member to talk with the juvenile and try to get compliance.

3)      Procedures

A)      Methods taught in DJJ Training to properly direct and escort a juvenile's movement will be used.

B)      The juvenile's freedom of movement or access to his/her own body is not restricted.

c.      Separation is when staff takes a juvenile away from his/her peers in a quiet area/location for no more than 15 minutes to provide the juvenile the opportunity to regain self-control. The juvenile must be placed in an area where a staff member can hear or see the juvenile, e.g., in a staff member's office, in a chair in the hallway close to a staff member/staff member's office. Separation is not placing a juvenile in isolation/seclusion in a locked or unlocked room or area without supervision. Younger adolescents and those with diagnosed behavior disorders (attention deficit,

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 9 of 11 |
|---|---|---|---|---|---|

hyperactive) may not be able to successfully complete separation. A work detail may be more appropriate for these type juveniles.

1) Purpose: Staff may use separation if staff deems that a period of time away from others will assist a juvenile in the management of his/her anger. This period of time is intended to provide a short cooling off period to enable the juvenile to regain his/her composure.

2) Contraindications:  Separation will not be used to manage a juvenile's behavior if the juvenile is known to have a physical or mental health condition that must be closely monitored.

3) Procedures

A) Separation periods may be initiated by staff or upon the juvenile's request for separation.

B) A juvenile that is disrupting will be asked to accompany staff to an area away from his/her peers to allow him/her the opportunity to regain his/her composure and to avoid further incident.

C) A juvenile that feels that he/she is becoming agitated and/or angry may request a separation period to assist him/her in managing problematic behavior.  However, juveniles will not be able to utilize separation periods to avoid completing daily tasks or other therapeutic activities. When a juvenile requests a separation, staff will allow the juvenile separation as soon as possible after the request is made.

D) When the juvenile is calm, staff will discuss the circumstances leading up to the use of separation with the juvenile to determine the source of the juvenile's behavior. Appropriate action will be taken to address the juvenile's concerns.

E) In the event the juvenile is unable to calm down after the 15 minute period of time, the Shift Supervisor may be requested to assist in the matter.

D. All juveniles will be informed of the facility's incentive systems and progressive discipline during juvenile orientation.  Determinate Sentence Good Behavior Credit System (DJJ Policy G-9.17) and Disciplinary Hearing/Review Board Process (DJJ Policy

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 10 of 11 |
|---|---|---|---|---|---|

E-1.14), are processes used in conjunction with progressive discipline. DJJ staff will be trained in behavior management and progressive discipline as part of the facility's on-the-job training.

E.     Behavior management encompasses the juvenile, security staff, health services staff, education staff, clinical staff (social workers, psychologists, psychiatrists and chaplains), activity therapists, parents, volunteers, and any other persons that can affect a juvenile's behavior. It is everyone's responsibility to set the standards and expectations for behavior and take appropriate action to assist a juvenile in managing his/her own behavior.

F.     The following practices will NOT BE DONE for the purpose of punishment or retribution:

   1.     Taking foods, snacks or drinks from a juvenile provided by food service.

   2.     Mechanical, physical, or medication restraint.

   3.     Forced administration of medication.

   4.     Physical force.

   5.     Isolating, secluding, or otherwise confining a juvenile to any locked, unlocked, or enclosed area and/or leaving the juvenile unsupervised in any locked room, holding cell or area not designed and equipped to be used for extended or overnight confinement.

   6.     Mass punishment (group punishment for an offense by one juvenile).

   7.     Placement of a juvenile in a physical position (standing, placed on knees/stomach, arms behind head).

   8.     Taking juvenile's property (other than privilege/earned property that may be temporarily taken for behavior management purposes).

   9.     Taking juvenile's visitation privileges.

   10.     Depriving the juvenile of receiving educational services.

   11.     Administration of consequences by a peer.

   12.     Corporal punishment.

   13.     Verbal abuse.

| Title: Juvenile Behavior Management – Incentive System and Progressive Discipline | Authority: | Rehabilitative Services | DJJ Policy No.: | G-9.19 | Page: 11 of 11 |
|---|---|---|---|---|---|

14. Denial of elements of the juvenile's treatment plan.

15. Assignment of excessive exercise or excessive work.

16. Deprivation of meals, sleep, bedding, clothing, medical attention, or minimum required recreation.

17. Taking a juvenile out of doors in extreme weather or at night or without appropriate clothing for weather conditions.

18. Changing of indoor environmental factors (heat/cold).

19. Denial of shelter.

**RELATED FORMS AND ATTACHMENTS:**
Exhibit G-9.19A, Juvenile Progressive Discipline Chart
Form G-9.19B, Juvenile Positive Behavior Report
Form G-9.19C, Juvenile Negative Behavior Report
Form G-9.19D, Behavior System Log

**REFERENCED POLICIES:**
G-3.4, Isolation of Youth
G-9.17, Determinate Sentence Good Behavior Credit System
E-1.14, Disciplinary Hearing/Review Board Process

**SCOPE:**
This policy applies to all direct service staff in juvenile residential facilities.

**LOCAL PROCEDURAL GUIDE:**
Not required.

**TRAINING REQUIREMENT:**
Employees providing direct service to juveniles are required to review this policy within 30 calendar days of its publication.

# EXHIBIT B

## STATE OF SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
### POLICY AND PROCEDURES

| Title: | Isolation of Youth | | Policy No.: | G-3.4 | Page(s): | 1 of 10 |
|---|---|---|---|---|---|---|
| Authority: | Division of Rehabilitative Services | | | | | |
| Juvenile Justice Code: | n/a | | | | | |
| PbS Related Standard(s): | Order Standard #2, O8-011 | | | | | |

| | |
|---|---|
| May 09, 2016 | SIGNED/ *Sylvia Murray* |
| Effective Date | Sylvia Murray |
| | Director |

The Department of Juvenile Justice (DJJ) may temporarily remove juveniles from the general population and place them in an isolation cell or room under strict supervision. This option is to be used for the sole purposes of neutralizing out-of-control, unsafe behavior and to provide a safe environment for juveniles and staff.  Isolation will never be used as punishment.

**PROCEDURAL GUIDELINES:**

A.    Introduction:

    1.    CCS Compliance ("Calm, Cooperative, Safe") is a set of standards that will guide DJJ staff to respond appropriately to a juvenile's Level 3 Rule Violation(s) (in accordance with Policy E-1.14) and make assessments during or shortly after the rule violation(s).  This set of standards will consist of three criteria: Calm, the juvenile demonstrates his/her ability to communicate clearly and is not verbally or physically aggressive; Cooperative, the juvenile responds to directives given by staff in a compliant manner; and Safe, the juvenile is safe from harming his/her self, staff, or other juveniles, as well as safe from being harmed by staff, juveniles, or outside sources.  The CCS Compliance criteria will determine whether the juvenile will remain in the area where the offense occurred or be removed to isolation/room confinement.  A juvenile will only be removed to isolation/room confinement when the compliance criteria of safe cannot be met.  If the juvenile is safe, but is not calm and/or cooperative, the juvenile will remain in his/her assigned area and receive encouragement and support, as outlined below, in order to become fully CCS compliant.

        a.    DJJ Evaluation Centers have designated wings with cells for isolating unsafe juveniles.

        b.    The Juvenile Detention Center utilizes room confinement to isolate unsafe juveniles.

        c.    The Broad River Road Complex maintains a Crisis Management Unit to separate unsafe juveniles.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 2 of 10 |
|---|---|---|---|

2. Definitions

    a. CCS Assessment: the process of listening for and observing characteristics in a juvenile's behavior.

    b. Isolation: being confined alone in a room or cell, other than the room or cell in which the juvenile usually sleeps, for cause for 15 minutes or more.

    c. Room Confinement: being confined alone in a room or cell, in which the juvenile usually sleeps, for cause for 15 minutes or more.

B. CCS Assessment and Compliance

1. CCS Assessment

    a. When determining if a juvenile is Calm, the assessor will ask open-ended questions meaning the questions cannot be answered with yes or no. This allows for a wide range of responses, and staff will observe if the juvenile is able to talk to staff in a reasonable (not extreme or excessive) tone of voice without cursing. If staff determines the juvenile is not Calm, then the following techniques should be utilized (see 2 below).

    b. When determining if a juvenile is Cooperative, the assessor will state simple commands and rules and observe if the juvenile physically responds. The juvenile should follow reasonable instructions from staff. If staff determines the juvenile is not Cooperative, then the following techniques should be utilized (see 2. below).

    c. When determining if a juvenile is Safe, the staff will observe the juvenile's present behavior to determine if the juvenile demonstrates threat of self-harm, harming others, and/or harming property, and/or assaults staff or juvenile. The assessor should ask open-ended questions to discover present thoughts, feelings and urges. If the juvenile expresses fear of others or demonstrates any of the above behaviors, the juvenile will be placed temporarily in restrictive room confinement or in isolation (see 2. below).

2. Techniques used to Gain CCS Compliance (Calm and Cooperative)

    a. Active Listening is a structured form of listening and responding that focuses the attention on the speaker.

        1) Purpose: The proper use of active listening results in getting the juvenile to de-escalate, open up, avoid misunderstanding, resolve conflict, and build rapport and trust.

| Title:  Isolation of Youth | Authority:  Division of Rehabilitative Services | DJJ Policy   G-3.4 No.: | Page: 3 of 10 |
|---|---|---|---|

2)    The listener must take care to attend to the speaker fully, and then repeat, in the listener's own words, what he or she thinks the speaker has said. The listener does not have to agree with the speaker. He or she must simply state what they think the speaker said. This enables the speaker to find out whether the listener really understood. If the listener did not, the speaker can explain some more.

3)    The listener is encouraged to interpret the speaker's words in terms of feelings. Thus, instead of just repeating what happened, the active listener might gather that the speaker felt angry or frustrated or confused when a particular event happened. Then the speaker can go beyond confirming that the listener understood what happened, but can indicate that he or she also understood the speaker's response to it. Active listening involves listening with all senses.

4)    Active listening not only means focusing fully on the speaker but also actively showing verbal and non-verbal signs of listening.

b.    Redirection is when staff uses verbal instruction and minimal physical contact to relocate a juvenile that is not behaviorally or emotionally out of control.

1)    Purpose: Staff may use redirection to assist, guide, and redirect a juvenile from a negative and/or escalating situation.

2)    If it becomes evident that staff's use of verbal redirection and/or physical contact to assist, guide, or redirect him/her is aversive or the juvenile is physically resisting, staff will refrain from further redirection efforts. If a juvenile appears to be further agitated from verbal redirection and/or physical contact to assist, guide, or redirect him/her, staff will refrain from further redirection efforts. In such instances, staff will employ efforts to de-escalate and calm the juvenile. An alternate behavior management method will be attempted, or the staff member will seek assistance from another staff member to talk with the juvenile and try to get compliance.

3)    Procedures

A)    Methods taught in DJJ Training to properly direct and escort a juvenile's movement will be used.

B)    The juvenile's freedom of movement or access to his/her own body is not restricted.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 4 of 10 |
|---|---|---|---|

c.      Separation is when staff takes a juvenile away from his/her peers in a quiet area/location for no more than 15 minutes to provide the juvenile the opportunity to regain self-control. The juvenile must be placed in an area where a staff member can hear or see the juvenile, e.g., in a staff member's office, in a chair in the hallway close to a staff member/staff member's office. Separation is not placing a juvenile in isolation/seclusion in a locked or unlocked room or area without supervision. Younger adolescents and those with diagnosed behavior disorders (attention deficit, hyperactive) may not be able to successfully complete separation. A work detail may be more appropriate for these type juveniles.

1)      Purpose: Staff may use separation if staff deems that a period of time away from others will assist a juvenile in the management of his/her anger. This period of time is intended to provide a short cooling off period to enable the juvenile to regain his/her composure.

2)      Contraindications: Separation will not be used to manage a juvenile's behavior if the juvenile is known to have a physical or mental health condition that must be closely monitored.

3)      Procedures

A)      Separation periods may be initiated by staff or upon the juvenile's request for separation.

B)      A juvenile that is disrupting will be asked to accompany staff to an area away from his/her peers to allow him/her the opportunity to regain his/her composure and to avoid further incident.

C)      A juvenile that feels that he/she is becoming agitated and/or angry may request a separation period to assist him/her in managing problematic behavior. However, juveniles will not be able to utilize separation periods to avoid completing daily tasks or other therapeutic activities. When a juvenile requests a separation, staff will allow the juvenile separation as soon as possible after the request is made.

D)      When the juvenile is calm, staff will discuss the circumstances leading up to the use of separation with the juvenile to determine the source of the juvenile's behavior. Appropriate action will be taken to address the juveniles' concerns.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 5 of 10 |
|---|---|---|---|

E)    In the event the juvenile is unable to calm down after the 15 minute period of time, the Shift Supervisor may be requested to assist in the matter.

3.    CCS Compliance

a.    When a Level 3 Rule Violation(s) occurs, the Reporting Officer will contact the Shift Supervisor immediately. In addition, the staff will submit a DJJ Event Report form (I-3.2A) and a Juvenile Negative Behavior Report form (G-9.19C) to the Shift Supervisor as soon as possible, but no later than the end of the shift.  The Shift Supervisor will consult with the Reporting Officer to determine whether CCS Compliance criteria can be met within the juvenile's assigned area.

b.    If all CCS Compliance criteria can be met, the Shift Supervisor shall allow the juvenile to remain in the assigned area under strict monitoring by staff, with support from the staff, where the juvenile will receive progressive discipline from unit staff/Shift Supervisors and await a Disciplinary Hearing/Review Board. The Shift Supervisor will document on the Juvenile Negative Behavior Report form (G-9.19C) the compliant behavior demonstrated by the juvenile. The Shift Supervisor will submit the completed Event Report (Form I-3.2A) and Juvenile Negative Behavior Report form (G-9.19C) to the Classification Case Manager, Social Worker, Unit Manager/Captain of Security, PbS, and Chief Disciplinary Hearing Officer/Review Board by the end of the shift.

c.    If CCS Compliance criteria of Safe cannot be met, the juvenile will be placed in restrictive room confinement or temporarily placed in isolation.

d.    The Shift Supervisor will document on the Juvenile Negative Behavior Report form (G-9.19C) the noncompliant behavior demonstrated by the juvenile and  all training techniques used to encourage the juvenile to become CCS compliant prior to placing the juvenile in isolation/room confinement.  The Juvenile Negative Behavior Report form (G-9.19C) authorizing isolation must be completed and submitted by the Shift Supervisor to the Crisis Management Unit within two (2) hours of when the juvenile was placed in isolation.

e.    The Shift Supervisor will submit a copy of the completed Event Report (I-3.2A) and Juvenile Negative Behavior Report form (G-9.19C) to all other appropriate personnel by the end of the shift.

f.    The Shift Supervisor may contact the juvenile's assigned Clinician to assist in helping the juvenile become CCS compliant.  If the juvenile's assigned Clinician is unavailable, a designated clinical staff member can be called on to replace the assigned Clinician. During holidays, weekends,

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 6 of 10 |
|---|---|---|---|

or after business hours, the Shift Supervisor should refer to the juvenile's Individual De-escalation Plan and may also contact the Clinician on-call. If the situation becomes a crisis, then normal crisis protocols will be followed.

C.    Isolation/Room Confinement

Juveniles placed in isolation or room confinement must be closely monitored. Staff on duty must conduct visual checks at staggered intervals not to exceed every 15 minutes. The visual checks will be documented on the Juvenile Room Confinement/Isolation Record Sheet and Cell Check Log form (G-3.4B). If juvenile is on suicide watch, the suicide protocol must be followed (Policy C-2.8).

1.    When a juvenile is placed in isolation/room confinement, he/she will receive encouragement and support from the staff in an effort to become CCS compliant. The juvenile will be assessed by a staff member at least every 15 minutes until all CCS Compliance criteria are met.  This will be documented on the Juvenile Room Confinement/Isolation Record Sheet and Cell Check Log (G-3.4B).  The CCS assessments every 15 minutes will cease at 9 p.m. each evening (lights out time) and will resume when the juveniles are awoken the following morning (wake-up time).  Staff will follow standard operating procedures for unit observation between lights out and wake-up times.

2.    When a juvenile is in isolation or room confinement for more than four (4) hours, a Clinician will meet with the juvenile at least once on regular business days to encourage and counsel the juvenile to help assist in achieving CCS compliance. On weekends and holidays, the staff should refer to the juvenile's Individual De-escalation Plan and can consult with the Clinician on-call as needed. Other pertinent staff will be notified in Medical, Education, Classification, and Clinical.

3.    If the juvenile remains in isolation/room confinement for more than four (4) hours, required staff will complete the Daily Confinement Checks form, (G-3.4A), each day. This form will be collected and secured with copies being distributed daily to the Unit Manager/Captain of Security, Clinical Manager, Classification Manager, Facility Administrator, Deputy Director of Rehabilitative Services, Associate Deputy Director for Treatment and Intervention Services, and the Deputy Director for Education.

4.    CCS Compliance assessment may cease in isolation/room confinement if the juvenile is able to maintain CCS compliance for a period of two (2) consecutive hours.  If the juvenile is CCS compliant, he/she can then return to the assigned area.  The Shift Supervisor from the juvenile's assigned area will be consulted to determine whether CCS Compliance criteria can be met within the juvenile's assigned area. This contact will be documented on the Juvenile Room Confinement/Isolation Record Sheet and Cell Check Log (G-3.4B). If CCS

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 7 of 10 |
|---|---|---|---|

compliance criteria can be met in the assigned living unit, the juvenile will return to the unit immediately.

5.  If the decision is made that CCS Compliance criteria of safe cannot be met if the juvenile were to return to his/her assigned area, the Shift Supervisor on duty will make necessary arrangements to make the area safe. The Shift Supervisor may make temporary moves of staff or juveniles to ensure a safe environment. Any juvenile movement will be reported to School Officials, Clinical, and Classification immediately during the business day and/or on the next business day if done after hours. The Shift Supervisor will then release the juvenile from isolation under strict monitoring and with support from the staff.

6.  A Juvenile Behavior Contract (Form G-3.4D) may be developed to assist in gaining and maintaining CCS compliance.

7.  In the Evaluation Centers, admissions status juveniles that continue to demonstrate serious unsafe behaviors may be transferred to the Crisis Management Unit at BRRC by the Deputy Director of Rehabilitative Services. Classification will arrange transportation and inform the Deputy Director of Rehabilitative Services, Deputy Director of Educational Services, and the Associate Deputy Director for Treatment and Intervention Services when the transport is scheduled and completed.

8.  When a juvenile is placed in isolation/room confinement, within four (4) hours the Unit Manager/Captain of Security or designee will review all pertinent documents, speak with the juvenile, and give him/her opportunity to explain/speak about the incident from his/her perspective. The Unit Manager/Captain of Security or designee will do one (1) of the following:

    a.  Dismiss the Level 3 Rule Violation(s), return the juvenile to the unit, and notify the Chief disciplinary hearing officer/review board of the dismissal;

    b.  Return the juvenile to the unit and continue with referral for a Disciplinary Hearing or Review Board;

    c.  Return the juvenile to the unit and handle the matter through the Juvenile Progressive Discipline process and document as a Level 1 or Level 2 offense on a Juvenile Negative Behavior Report (G-9.19C) and notify the Chief disciplinary hearing officer/review board of the reduction to a Level 1 or 2 offense; or

    d.  Determine that the juvenile will remain in isolation/room confinement and continue with referral for a Review Board or Disciplinary Hearing. The Unit Manager/Captain of Security or designee will contact the Facility Administrator immediately and inform him/her of this decision.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 8 of 10 |
|---|---|---|---|

9.  After contacting the Facility Administrator, the Unit Manager/Captain or designee will complete the Recommendation for Extended Use of Isolation form (G-3.4C) with all required supporting documentation and forward it to the Deputy Director of Rehabilitative Services through the Facility Administrator for approval or disapproval within twenty-four (24) hours or the next business day. This approval must be submitted when the safety concern is recognized. Once the recommendation form is completed by the Deputy Director for Rehabilitative Services, a copy will be forwarded immediately to both the Associate Deputy Director of Treatment and Intervention Services and the Deputy Director for Education.

10. If approved for extended isolation, the juvenile must be reviewed weekly in the BRRC Multidisciplinary Treatment Team staffing until a resolution for the unsafe situation is achieved.

D.  Other Uses of Isolation

1.  Protective Custody

a.  Juveniles known to be seriously victimized by evidence of physical injury or serious threat may be placed by the Unit Manager/Captain/Assistant Unit Manager (or higher authority) in temporary protective custody. If the juvenile must be held for more than four (4) hours, the Unit Manager/Captain will follow protocols established in section C.9. above. The authority placing the juvenile in temporary protective custody status will notify the Classification Case Manager (CCM) and assigned SW immediately or by 10 a.m. the next business day if after business hours. The CCM will convene the Unit Multidisciplinary Team (MDT) to review the placement as soon as possible but no later than one (1) business day of the juvenile's placement in confinement. The Unit MDT will, by majority vote, recommend that the juvenile either be released from or remain in protective custody status. There must be substantial, validated, documented information that protective custody is warranted and that no other reasonable alternative is available.

1)  If release is recommended, the Unit MDT will provide recommendations to the Facility Administrator and the Supervising Social Worker to address the issues surrounding the temporary placement in isolation. If release is not recommended, a safety plan will be developed by the Unit MDT. The safety plan will be sent immediately to the Facility Administrator and the Supervising Social Worker.

2)  If the decision is made for the juvenile to remain in isolation, the juvenile's safety plan developed by the Unit MDT plan will be implemented. The Unit MDT will provide a status report to the

| Title:  Isolation of Youth | Authority:  Division of Rehabilitative Services | DJJ Policy   G-3.4 No.: | Page: 9 of 10 |
|---|---|---|---|

Facility Administrator and Supervising Social Worker between the 7th and 10th day of the juvenile's confinement. This status report will include the specific goals and objectives met or not met and any other significant information concerning the juvenile's safety.

3)    If the juvenile has not been approved for release by the 14th day, the case will be referred to the Facility MDT, who will modify the juvenile's placement plan and recommend to the Facility Administrator appropriate placement for the juvenile out of isolation.

4)    In the event the Facility Administrator disapproves a juvenile's release by the 14th day, the Facility Administrator will provide a written summary report to the Deputy Director for Rehabilitative Services and the Associate Deputy Director for Treatment and Intervention Services for information. The Unit MDT will continue monitoring the safety plan and providing status reports to the Facility Administrator, who will continue the 7-day review process and recommendations until the juvenile is released from isolation. The Facility Administrator will continue to provide written summary reports to the Deputy Director and Associate Deputy Director.

2.    Mental Health Reason

a.    A juvenile that presents a risk of self-harm, threatens suicide, or gestures suicide will be placed in a room equipped with a camera in the Crisis Management Unit, consistent with DJJ Policy C-2.6, Clinical Crisis Intervention and C-2.8, Suicide Prevention and Intervention.

b.    A juvenile will be temporarily placed in a room equipped with a camera in the Crisis Management Unit when the Psychologist or Social Worker believes the juvenile needs close supervision for mental health observation/evaluation.

c.    The Shift Supervisor may temporarily place a juvenile in a room equipped with a camera in the Crisis Management Unit when he/she demonstrates self-harm, threatens suicide, or gestures suicide.  The Shift Supervisor will immediately contact the assigned clinician or clinician-on-call. The clinician will take immediate steps to stabilize the juvenile or have him/her transferred to an appropriate mental health facility when the situation requires such action.

**RELATED FORMS AND ATTACHMENTS:**
Form G-3.4A, Daily Confinement Checks
Form G-3.4B, Juvenile Room Confinement /Isolation Record Sheet and Cell Check Log

| Title:  Isolation of Youth | Authority:  Division of Rehabilitative Services | DJJ Policy   G-3.4 No.: | Page: 10 of 10 |
|---|---|---|---|

Form G-3.4C, Recommendation for Extended Use of Isolation
Form G-3.4D, Juvenile Behavior Contract
Form I-3.2A, DJJ Event Report
Form G-9.19C, Juvenile Negative Behavior Report

**REFERENCED POLICIES:**
G-9.19, Juvenile Behavior Management – Incentive System and Progressive Discipline
C-2.6, Clinical Crisis Intervention
C-2.8, Suicide Prevention and Intervention

**SCOPE:**
This policy applies to all of DJJ's hardware secure facilities.

**LOCAL PROCEDURAL GUIDE:**
Not required.

**TRAINING REQUIREMENT:**
All rehabilitative services employees are required to review this policy within 30 calendar days of its publication.

# South Carolina Department of Juvenile Justice

# Recommendation for Extended Use of Isolation



| Juvenile name: | JJMS#: |
|---|---|
| | |

This form is to be used by the Unit Manger/Captain to make a recommendation to the Deputy Director of Rehabilitative Services through the Facility Administrator that a juvenile be isolated from the general population for a period to exceed four hours. In making this referral, the Unit Manager/Captain must document the precise reasons and include adequate documentation. Only juveniles who represent a severe threat to the safety and security of the institution or are under severe threat of harm from other juveniles can be isolated in excess of 4 hours.

*Indicate (with a check) which of the following behavioral categories apply to the juvenile's proven behavior— check all that apply, and attach the supporting documents:*

☐ The juvenile has demonstrated physically or sexually assaultive and/or predatory behavior. Attach document(s) that support this category.

☐ The juvenile has led, organized, incited or participated in a disturbance or riot that resulted in the taking of a hostage, significant property damage, physical harm, or loss of life. Attach document(s) that support this category.

☐ The juvenile has conspired or attempted to convey, introduce or possess major contraband which poses a severe threat to the security of the institution. Attach document(s) that support this category.

☐ The juvenile is a leader, enforcer or recruiter of a security threat group. Attach document(s) supporting this category.

☐ The juvenile escaped, attempted to escape or committed acts to facilitate an escape from a hardware secure facility. Attach document(s) supporting this category.

☐ The juvenile otherwise presents a severe threat to the security of the institution. Attach document(s) supporting this category.

☐ The juvenile is under serious threat of harm from other juveniles. Attach document(s) supporting this category.

Form G-3.4C
05-09-2016

**Reasons for the Unit Manager/Captain's Recommendation:**_____

_____

_____

_____

_____

_____

_____    _____

**Unit Manager/Captain's Signature**                    **Date**

☐  **Approved** ☐ **Disapproved**  _____    _____

            **Facility Administrator's Signature**        **Date**

**Comments**_____

_____

_____

☐  **Approved** ☐ **Disapproved**  _____    _____

            **Deputy Director of Rehabilitative Services' Signature**    **Date**

**Comments**_____

_____

_____

Form G-3.4C
05-09-2016

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

| LEVEL 1  RULE VIOLATIONS | | LEVEL 1 SANCTIONS |
|---|---|---|
| 1. | **Disorderly Conduct:** Any action by a juvenile that disrupts or may lead to disruption of the orderly operation of the facility. | **Extra Work /Chore:** Not to exceed two hour period |
| 2. | **Disrespect:** The failure of any juvenile to observe proper conventions of polite behavior or who willfully engages in actions or makes statements to or about any person that are discourteous in nature, which may or may not include the use of profanity. | **Writing Assignment:** Must address the specific negative behavior; no more than one (1) page; must provide time to complete; must provide paper and pencil; must ensure juvenile can write. |
| 3. | **Horseplay:** Wrestling, rough contact, or roughhousing between juveniles that rises to the level of an incident but is not considered by staff to constitute assault. | **Loss of Privilege** (not to exceed 2 days)<br><br>**Counsel by Appropriate Staff** |
| 4. | **Refusing to Obey Verbal or Written Instructions:** The failure to promptly obey or failure to promptly comply with direct instructions by any employee of the Department of Juvenile Justice (DJJ) or other official who has authority over juveniles. | **Counsel by Unit Manager.**<br><br>**Apology** (Written or Verbal)<br><br>**Referral to Clinician for counseling** |

**Level 1 sanctions can be imposed by all staff**

| LEVEL 2  RULE VIOLATIONS | | LEVEL 2 SANCTIONS |
|---|---|---|
| 5. | **Behavioral Escalation:** After distinct steps of progressive discipline have been utilized and the negative behavior continues to increase to include threats of bodily harm or property destruction, violence, and/or not responding to directions. | **All sanctions from Level 1, plus**<br><br>**Outside Work Detail** (not to exceed three hours) |
| 6. | **Complicity:**<br>Any juvenile may be primarily responsible for a violation even though another person actually committed the violation. When a juvenile commands, causes or helps another person commit or attempt to commit a violation (by action or failure to take action), the juvenile is as responsible as the one that committed the violation.<br>No juvenile will be held responsible under this section for the actions of another person if, prior to the violation, he/she withdrew from participating in the violation and made a reasonable effort to prevent the violation by informing proper authority | **Loss of Privilege** (not to exceed 14 days)<br>*See List of Privileges at the end of this chart<br><br>**Social Worker telephone parent/guardian** and have juvenile explain behavior to them. The Social Worker may request the support of the parent/guardian by asking them to talk with the juvenile, visit the juvenile, or participate in a family therapy session.<br><br>**Behavior Contract:** If a juvenile needs to be placed on a behavior contract, the Unit Manager/Captain of Security or designee will meet with the juvenile and the juvenile's assigned social worker to develop a Juvenile Behavior Contract (Form G-9.20E) to assist the juvenile with the following: |
| 7. | **Damaging, Defacing or Destruction of State or Private Property (under $100):** The willful damaging, destruction or defacing of property belonging to the facility, the State or any person. | Increase his/her strength and frequency of appropriate behavior while decreasing the frequency of inappropriate behavior.<br>Specifically identify the inappropriate behavior. |
| 8. | **Fight Without Injury:** A physical altercation involving two or more individuals acting in a mutually aggressive or offensive manner that does not result in medical treatment. No medical assessment is necessary; or assessment conducted and no injuries noted, or assessment is conducted and minor injuries are treated | Establish a specific goal with objectives to correct the behavior, and determine an allotted amount of time the juvenile has to reach the goal. |

Exhibit G-9.19A
05-09-2016

## SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
### JUVENILE PROGRESSIVE DISCIPLINE CHART

| | | |
|---|---|---|
| | with the type of treatment that the juvenile would receive in a home environment (e.g. pain reliever, ice pack, Band-Aid). | If a need arises to develop the contract after hours, input should be received from Clinical on the next business day |
| 9. | **Forgery/Fraud:** The act, with intent to defraud or deceive another person, of falsely making, completing or altering any document; or knowingly issuing or possessing such document. | **Mentor/Privilege food restriction** (not to exceed 2 weeks) |
| 10. | **Gambling or Betting:** Gambling or betting includes the act of participating in a game of chance, or other unpredictable event, with or without the use of cards or dice, in which there is some form of compensation (monetary or otherwise) "paid" to the winner. | **Solo Recreation:** Juvenile will have recreation alone<br><br>**Temporary Suspension from Job:** (not to exceed 1 week) |
| 11. | **Inappropriate Physical Contact/Battery:** Any unauthorized contact with the body/person of another in a non-aggressive but offensive manner that occurs intentionally but without the intent to do harm (e.g., bumping, leaning, face mushing). | **Refer to Treatment Team** (reassessment of treatment plan)<br><br>**Statement of Charges/Restitution (if property damaged).** |
| 12. | **Making a False Statement to or Against Another Person:** The intentional making of untrue statements, as evidenced by any juvenile who:<br>(1) Makes a false statement, oath or affirmation or swears or affirms the truth of such a statement previously made; or<br>(2) Makes inconsistent statements under oath or affirmation, one of which is false to any DJJ employee; or<br>(3) Makes a false statement to or against an employee or other person (e.g. juvenile, volunteer); or<br>(4) Files a false allegation/grievance (Inspector General's Office will initiate discipline). | **Make something for victim**<br><br>**Address fault in Community Meeting**<br><br>**Research offense for better understanding of wrong**<br><br>**Partnered Activity to increase teamwork**<br><br>**Other related sanctions to improve acceptance and acknowledgement of harms** |
| 13. | **Out of Place:** The act of any juvenile who without proper authority:<br>(1) Is found to be in an unauthorized area, or<br>(2) Does not have a pass in a facility or area where passes are required, or<br>(3) Is in an area authorized for juveniles, but does not have staff permission to be in the area, or<br>(4) Is intentionally hiding from staff. | |
| 14. | **Possession of Contraband (Not Weapons or Drugs):** Possession of any matter declared to be contraband by State/Federal law (SC Law Section 63-19-1670) or by the Director of DJJ. (see Exhibit H-3.1) excludes weapons or drugs but includes all items prohibited by the agency or facility management based on written policy, e.g. jewelry, money, pornography, and cell phones. | |
| 15. | **Possession of Unauthorized Item/Property:** A juvenile found to be in possession of property not listed as authorized in the juvenile property policy, or an amount of property that exceeds the quantity allowed for a juvenile to possess. | |
| 16. | **Stealing/Possession of Stolen Goods:** Taking or possessing an item not belonging to that person from any other person or place without consent and authorization. | |
| 17. | **Threatening Conduct 1:** A verbal or written communication or gesture by a juvenile indicating that they intend to assault or otherwise injure another person. | |
| 18. | **Unauthorized use or misuse of a computer or other electronic device:** Any use of an electronic device without permission and/or the use of any device to utilize social media sites or any other unauthorized websites. | |

Exhibit G-9.19A<br>05-09-2016

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

| Level 2 sanctions can be imposed by Shift Supervisor and/or Captain of Security | | |
|---|---|---|
| | **LEVEL 3  RULE VIOLATIONS** | **LEVEL 3 SANCTIONS** |
| 19. | **Arson/Attempted Arson to State and/or Private Property:** The willful starting of a fire or attempting to start a fire causing a threat to the safety of staff or juveniles in that facility. | All sanctions from Lists 1, 2, plus |
| 20. | **Assault and Battery:** Any instance in which a youth or staff member is involved in a physical contact or altercation with sufficient force that could cause bodily injury to another individual even if no one is injured. Physical contact of another person is:<br>(1) The striking or punching of an individual, which is not considered to be "mutual combat" or both/participants equally engaged; or<br>(2) The throwing of any object on an individual; or<br>(3) The spitting on an individual; or<br>(4) The throwing of any substance on an individual. | All sanctions listed above but time limits can be doubled.<br><br>**Priority Admission to one of the three Secured Housing Units at BRRC - Reorientation Unit, Resocialization Unit, or Intensive Treatment Unit  (Long Term Institution only)**<br><br>**Temporary transfer to another room in the same living unit and referral to classification for possible reassignment to another room in the same unit.**<br><br>**Refer to Classification for possible reassignment of Living Unit**<br><br>**Refer to Gang Coordinator for Intervention counseling**<br><br>**Refer for Sexual Behavior Problem Counseling** |
| 21. | **Damaging, Defacing or Destruction of State or Private Property over $100:** The willful damaging, destruction or defacing of property belonging to the facility, the State or any person amounting to $100 or more and verified. | |
| 22. | **Escape or Attempted Escape:** To flee from custody or supervision of someone assigned to supervise the youth, or the unlawful departure of a youth from an institution or from custody while being transported or failure to return to the facility while on leave.  The absence of any juvenile from a school/facility or specific area of assignment that necessitates a thorough search for that juvenile may be considered escape or attempted escape. | |
| 23. | **Fight With Injury:** A physical altercation involving two or more individuals acting in a mutually aggressive or offensive manner that does result in medical treatment. Treatment administered by health care professional (e.g., sutures, x-ray) at any location; or when a person is admitted to any health care facility for observation | |
| 24. | **Gang Activity/Unauthorized Group Activity:** A group or association of three or more persons who may have a common identifying sign, symbol, or name, and who individually or collectively engage in, or have engaged in, criminal activity which creates an atmosphere of fear and intimidation. Also being in possession of gang paraphernalia | |
| 25. | **Group Disturbance:**  The disruption or interference of normal facility operations resulting from three or more offenders participating in actions, threats, demands, suggestions to encourage others to advocate disruption or disturbance. | |
| 26. | **Possession of Contraband- Weapons, Drugs or Alcohol:** Possession of any matter declared to be contraband by State/Federal law (SC Law Section 63-19-1670) or which is illegal for a juvenile to possess, as declared by the Director of DJJ. (see Exhibit H-3.1).<br>**Contraband Weapons** includes possessing an item or items that have been made or adapted for use as a weapon that may cause injury or bodily harm.<br>**Contraband Drugs or Alcohol** includes possessing or using any unauthorized substance, including controlled substances or intoxicants [including alcohol and tobacco], synthetic drugs and | |

Exhibit G-9.19A
05-09-2016

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

| | |
|---|---|
| | medications that have been hoarded and/or not prescribed for use of the juvenile by agency or healthcare staff |
| 27. | **Sexual Assault:** The act of sexual intercourse with another person by:<br>(1) Substantially impairing the power of the other person to appraise or control his/her conduct by giving or using drugs, intoxicants or similar items; or<br>(2) Forcing or inducing the other person to engage in sexual activity by violence or threat of violence; or<br>(3) Having sexual intercourse with a person who suffers from a mental disease, defect or inadequacy which renders the other person substantially incapable of appraising the nature of his/her conduct or being aware of the nature of the act committed; or<br>(4) Having sexual intercourse with another person that is unconscious/asleep or otherwise physically incapable of resisting or who does not willingly consent to the sex act; or<br>(5) Any other penetration of another person's body orifice with any object; |
| 28. | **Sexual Harassment:** Sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a sexual derogatory or offensive nature by a juvenile. |
| 29. | **Sexual Misconduct:** (Consensual sex with another person is not permitted at DJJ)<br>(1) The act of sexual intercourse with another person even if consent is given by the other person,<br>(2) The intentional touching either directly or through the person's clothing, of the genitalia, anus, groin, breast, inner thighs or buttocks of another person (excluding incidental touching during a physical altercation)<br>**(3)** The intentional exposure of one's genitalia (must be without the expectation of privacy) |
| 30. | **Tampering with Surveillance Equipment:** Any attempt or Actual act of tampering with any cameras, tapes, or other surveillance equipment. |
| 31. | **Threatening Conduct 2:** A physical act that is of such a threatening nature it causes the victim(s) to fear immediate bodily injury. |
| 32. | **Under the Influence of Narcotic Drugs, Alcohol, or Other Substance:** Any juvenile found to be under the influence by his/her own admission, by testing positive with a drug/alcohol-screen, or by health services examination of any narcotic drug not prescribed by authorized medical personnel. |

## Level 3 sanctions can only be imposed by a Disciplinary Hearing Officer/Review Board

Exhibit G-9.19A
05-09-2016

# SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
## JUVENILE PROGRESSIVE DISCIPLINE CHART

*List of privileges that can be restricted

- Weekly Canteen
- Weekly incentive activity
- Kitchen Duty
- Arts and Crafts
- Special Snacks or treats
- Video games
- Incentive Movie with popcorn
- Extra 5 minute phone call
- Special Spa or Hair (Girls)
- Youth Advisory Council
- Television time
- Courtyard time
- Any item that is not state issued
- Game room time/video games
- Recreational game bin time
- Daily earned incentives, such as later bed time, extra phone call,  or extra TV time
- Blazers, Toastmasters, Junior Achievement
- Recreational game bin time
- Attendance at special events
- Special hair care for girls
- Personal set of shower shoes- $30 limit
- Intramural Sports activities
- Special Sport teams
- Skills USA
- Work Program
- Personal art supplies
- Personal plant
- Use of personal DVD player
- Camping
- On-grounds, limited supervision activities
- Student Council
- Insiders
- Lunch with Administrator(s)
- Off-grounds activities
- Phase 3 clothing
- Live in Honors Unit
- Personal shoes
- Personalized haircut
- Any Special activity that is not considered the required 1 hour of recreation.

Weekly visits or phone calls are not included in these restrictions

Exhibit G-9.19A
05-09-2016

### STATE OF SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE
POLICY AND PROCEDURES

| Title: | Isolation of Youth | | | Policy No.: | 323 | Page(s): | 1 of 10 |
|---|---|---|---|---|---|---|---|
| Folder 300: | Safety and Security | | | Old Policy No.: | | G-3.4 | |
| Originator: | Institutional Manager | | | | | | |
| Juvenile Justice Code: | | n/a | | | | | |
| PbS Related Standard(s): | | Order Standard #2, O8-011 | | | | | |

| May 09, 2016<br>Effective Date | SIGNED/ *Sylvia Murray*<br>Sylvia Murray<br>Director | | |
|---|---|---|---|
| **Updated:** | New policy and form numbers<br>Agency and policy reorganization | **Date:** | February 19, 2019<br>September 19, 2018 |

**POLICY:** The Department of Juvenile Justice (DJJ) may temporarily remove juveniles from the general population and place them in an isolation cell or room under strict supervision. This option is to be used for the sole purposes of neutralizing out-of-control, unsafe behavior and to provide a safe environment for juveniles and staff. Isolation will never be used as punishment.

**PROCEDURAL GUIDELINES:**

A.  Introduction:

1.  CCS Compliance ("Calm, Cooperative, Safe") is a set of standards that will guide DJJ staff to respond appropriately to a juvenile's Level 3 Rule Violation(s) (in accordance with Policy E-1.14) and make assessments during or shortly after the rule violation(s). This set of standards will consist of three criteria: Calm, the juvenile demonstrates his/her ability to communicate clearly and is not verbally or physically aggressive; Cooperative, the juvenile responds to directives given by staff in a compliant manner; and Safe, the juvenile is safe from harming his/her self, staff, or other juveniles, as well as safe from being harmed by staff, juveniles, or outside sources. The CCS Compliance criteria will determine whether the juvenile will remain in the area where the offense occurred or be removed to isolation/room confinement. A juvenile will only be removed to isolation/room confinement when the compliance criteria of safe cannot be met. If the juvenile is safe, but is not calm and/or cooperative, the juvenile will remain in his/her assigned area and receive encouragement and support, as outlined below, in order to become fully CCS compliant.

a.  DJJ Evaluation Centers have designated wings with cells for isolating unsafe juveniles.

b.  The Juvenile Detention Center utilizes room confinement to isolate unsafe juveniles.

c.  The Broad River Road Complex maintains a Crisis Management Unit to separate unsafe juveniles.

| Title:  Isolation of Youth | Authority:  Division of Rehabilitative Services | DJJ Policy  G-3.4 No.: | Page: 2 of 10 |
|---|---|---|---|

2. Definitions

   a. CCS Assessment: the process of listening for and observing characteristics in a juvenile's behavior.

   b. Isolation: being confined alone in a room or cell, other than the room or cell in which the juvenile usually sleeps, for cause for 15 minutes or more.

   c. Room Confinement: being confined alone in a room or cell, in which the juvenile usually sleeps, for cause for 15 minutes or more.

B. CCS Assessment and Compliance

  1. CCS Assessment

   a. When determining if a juvenile is Calm, the assessor will ask open-ended questions meaning the questions cannot be answered with yes or no. This allows for a wide range of responses, and staff will observe if the juvenile is able to talk to staff in a reasonable (not extreme or excessive) tone of voice without cursing.  If staff determines the juvenile is not Calm, then the following techniques should be utilized (see 2 below).

   b. When determining if a juvenile is Cooperative, the assessor will state simple commands and rules and observe if the juvenile physically responds. The juvenile should follow reasonable instructions from staff. If staff determines the juvenile is not Cooperative, then the following techniques should be utilized (see 2. below).

   c. When determining if a juvenile is Safe, the staff will observe the juvenile's present behavior to determine if the juvenile demonstrates threat of self-harm, harming others, and/or harming property, and/or assaults staff or juvenile. The assessor should ask open-ended questions to discover present thoughts, feelings and urges. If the juvenile expresses fear of others or demonstrates any of the above behaviors, the juvenile will be placed temporarily in restrictive room confinement or in isolation (see 2. below).

  2. Techniques used to Gain CCS Compliance (Calm and Cooperative)

   a. Active Listening is a structured form of listening and responding that focuses the attention on the speaker.

     1) Purpose: The proper use of active listening results in getting the juvenile to de-escalate, open up, avoid misunderstanding, resolve conflict, and build rapport and trust.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 3 of 10 |
|---|---|---|---|

2)  The listener must take care to attend to the speaker fully, and then repeat, in the listener's own words, what he or she thinks the speaker has said. The listener does not have to agree with the speaker. He or she must simply state what they think the speaker said. This enables the speaker to find out whether the listener really understood. If the listener did not, the speaker can explain some more.

3)  The listener is encouraged to interpret the speaker's words in terms of feelings. Thus, instead of just repeating what happened, the active listener might gather that the speaker felt angry or frustrated or confused when a particular event happened. Then the speaker can go beyond confirming that the listener understood what happened, but can indicate that he or she also understood the speaker's response to it. Active listening involves listening with all senses.

4)  Active listening not only means focusing fully on the speaker but also actively showing verbal and non-verbal signs of listening.

b.  Redirection is when staff uses verbal instruction and minimal physical contact to relocate a juvenile that is not behaviorally or emotionally out of control.

1)  Purpose: Staff may use redirection to assist, guide, and redirect a juvenile from a negative and/or escalating situation.

2)  If it becomes evident that staff's use of verbal redirection and/or physical contact to assist, guide, or redirect him/her is aversive or the juvenile is physically resisting, staff will refrain from further redirection efforts. If a juvenile appears to be further agitated from verbal redirection and/or physical contact to assist, guide, or redirect him/her, staff will refrain from further redirection efforts. In such instances, staff will employ efforts to de-escalate and calm the juvenile. An alternate behavior management method will be attempted, or the staff member will seek assistance from another staff member to talk with the juvenile and try to get compliance.

3)  Procedures

A)  Methods taught in DJJ Training to properly direct and escort a juvenile's movement will be used.

B)  The juvenile's freedom of movement or access to his/her own body is not restricted.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 4 of 10 |
|---|---|---|---|

c.  Separation is when staff takes a juvenile away from his/her peers in a quiet area/location for no more than 15 minutes to provide the juvenile the opportunity to regain self-control. The juvenile must be placed in an area where a staff member can hear or see the juvenile, e.g., in a staff member's office, in a chair in the hallway close to a staff member/staff member's office. Separation is not placing a juvenile in isolation/seclusion in a locked or unlocked room or area without supervision. Younger adolescents and those with diagnosed behavior disorders (attention deficit, hyperactive) may not be able to successfully complete separation. A work detail may be more appropriate for these type juveniles.

1)  Purpose: Staff may use separation if staff deems that a period of time away from others will assist a juvenile in the management of his/her anger. This period of time is intended to provide a short cooling off period to enable the juvenile to regain his/her composure.

2)  Contraindications:  Separation will not be used to manage a juvenile's behavior if the juvenile is known to have a physical or mental health condition that must be closely monitored.

3)  Procedures

A)  Separation periods may be initiated by staff or upon the juvenile's request for separation.

B)  A juvenile that is disrupting will be asked to accompany staff to an area away from his/her peers to allow him/her the opportunity to regain his/her composure and to avoid further incident.

C)  A juvenile that feels that he/she is becoming agitated and/or angry may request a separation period to assist him/her in managing problematic behavior.  However, juveniles will not be able to utilize separation periods to avoid completing daily tasks or other therapeutic activities. When a juvenile requests a separation, staff will allow the juvenile separation as soon as possible after the request is made.

D)  When the juvenile is calm, staff will discuss the circumstances leading up to the use of separation with the juvenile to determine the source of the juvenile's behavior. Appropriate action will be taken to address the juveniles' concerns.

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 5 of 10 |
|---|---|---|---|

E)      In the event the juvenile is unable to calm down after the 15 minute period of time, the Shift Supervisor may be requested to assist in the matter.

3.      CCS Compliance

a.      When a Level 3 Rule Violation(s) occurs, the Reporting Officer will contact the Shift Supervisor immediately. In addition, the staff will submit a DJJ Event Report form (326A) and a Juvenile Negative Behavior Report form (924C) to the Shift Supervisor as soon as possible, but no later than the end of the shift. The Shift Supervisor will consult with the Reporting Officer to determine whether CCS Compliance criteria can be met within the juvenile's assigned area.

b.      If all CCS Compliance criteria can be met, the Shift Supervisor shall allow the juvenile to remain in the assigned area under strict monitoring by staff, with support from the staff, where the juvenile will receive progressive discipline from unit staff/Shift Supervisors and await a Disciplinary Hearing/Review Board. The Shift Supervisor will document on the Juvenile Negative Behavior Report form (924C) the compliant behavior demonstrated by the juvenile. The Shift Supervisor will submit the completed Event Report (Form 326A) and Juvenile Negative Behavior Report form (924C) to the Classification Case Manager, Social Worker, Unit Manager/Captain of Security, PbS, and Chief Disciplinary Hearing Officer/Review Board by the end of the shift.

c.      If CCS Compliance criteria of Safe cannot be met, the juvenile will be placed in restrictive room confinement or temporarily placed in isolation.

d.      The Shift Supervisor will document on the Juvenile Negative Behavior Report form (924C) the noncompliant behavior demonstrated by the juvenile and all training techniques used to encourage the juvenile to become CCS compliant prior to placing the juvenile in isolation/room confinement. The Juvenile Negative Behavior Report form (924C) authorizing isolation must be completed and submitted by the Shift Supervisor to the Crisis Management Unit within two (2) hours of when the juvenile was placed in isolation.

e.      The Shift Supervisor will submit a copy of the completed Event Report (326A) and Juvenile Negative Behavior Report form (924C) to all other appropriate personnel by the end of the shift.

f.      The Shift Supervisor may contact the juvenile's assigned Clinician to assist in helping the juvenile become CCS compliant. If the juvenile's assigned Clinician is unavailable, a designated clinical staff member can be called on to replace the assigned Clinician. During holidays, weekends,

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 6 of 10 |
|---|---|---|---|

or after business hours, the Shift Supervisor should refer to the juvenile's Individual De-escalation Plan and may also contact the Clinician on-call. If the situation becomes a crisis, then normal crisis protocols will be followed.

C.    Isolation/Room Confinement

Juveniles placed in isolation or room confinement must be closely monitored. Staff on duty must conduct visual checks at staggered intervals not to exceed every 15 minutes. The visual checks will be documented on the Juvenile Room Confinement/Isolation Record Sheet and Cell Check Log form (323B). If juvenile is on suicide watch, the suicide protocol must be followed (Policy 912).

1.    When a juvenile is placed in isolation / room confinement, he/she will receive encouragement and support from the staff in an effort to become CCS compliant. The juvenile will be assessed by a staff member at least every 15 minutes until all CCS Compliance criteria are met. This will be documented on the Juvenile Room Confinement/Isolation Record Sheet and Cell Check Log (323B). The CCS assessments every 15 minutes will cease at 9 p.m. each evening (lights out time) and will resume when the juveniles are awoken the following morning (wake-up time). Staff will follow standard operating procedures for unit observation between lights out and wake-up times.

2.    If the juvenile remains in isolation/room confinement for more than four (4) hours, required staff will complete the Daily Confinement Checks form, (323A), each day. This form will be collected and secured with copies being distributed daily to the Unit Manager/Captain of Security, Clinical Manager, Classification Manager, Facility Administrator, Deputy Director of Rehabilitative Services, Associate Deputy Director for Treatment and Intervention Services, and the Deputy Director for Education.

3.    CCS Compliance assessment may cease in isolation/room confinement if the juvenile is able to maintain CCS compliance for a period of two (2) consecutive hours. If the juvenile is CCS compliant, he/she can then return to the assigned area. The Shift Supervisor from the juvenile's assigned area will be consulted to determine whether CCS Compliance criteria can be met within the juvenile's assigned area. This contact will be documented on the Juvenile Room Confinement/Isolation Record Sheet and Cell Check Log (323B). If CCS compliance criteria can be met in the assigned living unit, the juvenile will return to the unit immediately.

4.    If the decision is made that CCS Compliance criteria of safe cannot be met if the juvenile were to return to his/her assigned area, the Shift Supervisor on duty will make necessary arrangements to make the area safe. The Shift Supervisor may make temporary moves of staff or juveniles to ensure a safe environment. Any juvenile movement will be reported to School Officials, Clinical, and

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 7 of 10 |
|---|---|---|---|

Classification immediately during the business day and/or on the next business day if done after hours. The Shift Supervisor will then release the juvenile from isolation under strict monitoring and with support from the staff.

5.  A Juvenile Behavior Contract (Form 323D) may be developed to assist in gaining and maintaining CCS compliance.

6.  In the Evaluation Centers, admissions status juveniles that continue to demonstrate serious unsafe behaviors may be transferred to the Crisis Management Unit at BRRC by the Deputy Director of Rehabilitative Services. Classification will arrange transportation and inform the Deputy Director of Rehabilitative Services, Deputy Director of Educational Services, and the Associate Deputy Director for Treatment and Intervention Services when the transport is scheduled and completed.

7.  When a juvenile is placed in isolation/room confinement, within four (4) hours the Unit Manager/Captain of Security or designee will review all pertinent documents, speak with the juvenile, and give him/her opportunity to explain/speak about the incident from his/her perspective. The Unit Manager/Captain of Security or designee will do one (1) of the following:

    a.  Dismiss the Level 3 Rule Violation(s), return the juvenile to the unit, and notify the Chief disciplinary hearing officer/review board of the dismissal;

    b.  Return the juvenile to the unit and continue with referral for a Disciplinary Hearing or Review Board;

    c.  Return the juvenile to the unit and handle the matter through the Juvenile Progressive Discipline process and document as a Level 1 or Level 2 offense on a Juvenile Negative Behavior Report (924C) and notify the Chief disciplinary hearing officer/review board of the reduction to a Level 1 or 2 offense; or

    d.  Determine that the juvenile will remain in isolation/room confinement and continue with referral for a Review Board or Disciplinary Hearing. The Unit Manager/Captain of Security or designee will contact the Facility Administrator immediately and inform him/her of this decision.

8.  After contacting the Facility Administrator, the Unit Manager/Captain or designee will complete the Recommendation for Extended Use of Isolation form (323C) with all required supporting documentation and forward it to the Deputy Director of Rehabilitative Services through the Facility Administrator for approval or disapproval within twenty-four (24) hours or the next business day. This approval must be submitted when the safety concern is recognized. Once the recommendation form is completed by the Deputy Director for Rehabilitative Services, a copy will be forwarded immediately to both the Associate Deputy

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 8 of 10 |
|---|---|---|---|

Director of Treatment and Intervention Services and the Deputy Director for Education.

9.  If approved for extended isolation, the juvenile must be reviewed weekly in the BRRC Multidisciplinary Treatment Team staffing until a resolution for the unsafe situation is achieved.

D.  Other Uses of Isolation

1.  Protective Custody

a.  Juveniles known to be seriously victimized by evidence of physical injury or serious threat may be placed by the Unit Manager/Captain/Assistant Unit Manager (or higher authority) in temporary protective custody. If the juvenile must be held for more than four (4) hours, the Unit Manager/Captain will follow protocols established in section C.9. above. The authority placing the juvenile in temporary protective custody status will notify the Classification Case Manager (CCM) and assigned SW immediately or by 10 a.m. the next business day if after business hours. The CCM will convene the Unit Multidisciplinary Team (MDT) to review the placement as soon as possible but no later than one (1) business day of the juvenile's placement in confinement. The Unit MDT will, by majority vote, recommend that the juvenile either be released from or remain in protective custody status. There must be substantial, validated, documented information that protective custody is warranted and that no other reasonable alternative is available.

1)  If release is recommended, the Unit MDT will provide recommendations to the Facility Administrator and the Supervising Social Worker to address the issues surrounding the temporary placement in isolation. If release is not recommended, a safety plan will be developed by the Unit MDT. The safety plan will be sent immediately to the Facility Administrator and the Supervising Social Worker.

2)  If the decision is made for the juvenile to remain in isolation, the juvenile's safety plan developed by the Unit MDT plan will be implemented. The Unit MDT will provide a status report to the Facility Administrator and Supervising Social Worker between the 7th and 10th day of the juvenile's confinement. This status report will include the specific goals and objectives met or not met and any other significant information concerning the juvenile's safety.

3)  If the juvenile has not been approved for release by the 14th day, the case will be referred to the Facility MDT, who will modify the juvenile's placement plan and recommend to the Facility

| Title: Isolation of Youth | Authority: Division of Rehabilitative Services | DJJ Policy No.: G-3.4 | Page: 9 of 10 |
|---|---|---|---|

Administrator appropriate placement for the juvenile out of isolation.

4) In the event the Facility Administrator disapproves a juvenile's release by the 14th day, the Facility Administrator will provide a written summary report to the Deputy Director for Rehabilitative Services and the Associate Deputy Director for Treatment and Intervention Services for information. The Unit MDT will continue monitoring the safety plan and providing status reports to the Facility Administrator, who will continue the 7-day review process and recommendations until the juvenile is released from isolation. The Facility Administrator will continue to provide written summary reports to the Deputy Director and Associate Deputy Director.

2. Mental Health Reason

a. A juvenile that presents a risk of self-harm, threatens suicide, or gestures suicide will be placed in a room equipped with a camera in the Crisis Management Unit, consistent with DJJ Policy 911, Clinical Crisis Intervention and 912, Suicide Prevention and Intervention.

b. A juvenile will be temporarily placed in a room equipped with a camera in the Crisis Management Unit when the Psychologist or Social Worker believes the juvenile needs close supervision for mental health observation/evaluation.

c. The Shift Supervisor may temporarily place a juvenile in a room equipped with a camera in the Crisis Management Unit when he/she demonstrates self-harm, threatens suicide, or gestures suicide. The Shift Supervisor will immediately contact the assigned clinician or clinician-on-call. The clinician will take immediate steps to stabilize the juvenile or have him/her transferred to an appropriate mental health facility when the situation requires such action.

**RELATED FORMS AND ATTACHMENTS:**
Form 323A, Daily Confinement Checks
Form 323B, Juvenile Room Confinement /Isolation Record Sheet and Cell Check Log
Form 323C, Recommendation for Extended Use of Isolation
Form 323D, Juvenile Behavior Contract
Form 326A, DJJ Event Report
Form 924C, Juvenile Negative Behavior Report

**REFERENCED POLICIES:**
924, Juvenile Behavior Management – Incentive System and Progressive Discipline
911, Clinical Crisis Intervention

| Title:  Isolation of Youth | Authority:  Division of Rehabilitative Services | DJJ Policy    G-3.4 No.: | Page: 10 of 10 |
|---|---|---|---|

912, Suicide Prevention and Intervention

## SCOPE:
This policy applies to all of DJJ's hardware secure facilities.

## LOCAL PROCEDURAL GUIDE:
Not required.

## TRAINING REQUIREMENT:
All rehabilitative services employees are required to review this policy within 30 calendar days of its publication.