# EXHIBIT 1

*DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR MANDATORY PRELIMINARY INJUNCTION*

## DECLARATION OF

## EDEN HENDRICK,

Executive Director of the South Carolina Department of Juvenile Justice

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| South Carolina State Conference of NAACP; | |
| Disability Rights of South Carolina; and | Case No.: 0:22-cv-01338-MGL-PJG |
| Justice 360; | |
| *Plaintiffs*, | |
| v. | **DECLARATION OF** |
| | **L. EDEN HENDRICK** |
| South Carolina Department of Juvenile Justice; and | |
| Eden Hendrick, individually and in her official capacity as Executive Director of the South Carolina Department of Juvenile Justice; | |
| *Defendants.* | |

I, L. Eden Hendrick, upon my personal knowledge, hereby submit this Declaration pursuant to 28 U.S.C. § 1746 under penalty of perjury and declare as follows:

**I.      BACKGROUND ON EXECUTIVE DIRECTOR EDEN HENDRICK.**

1.      My name is L. Eden Hendrick, the Executive Director for the South Carolina Department of Juvenile Justice ("SCDJJ"). The Honorable Henry D. McMaster, Governor of the State of South Carolina, appointed me Acting Director of the SCDJJ on September 21, 2021. Governor McMaster later nominated me to become the Executive Director of the SCDJJ on February 22, 2022. The South Carolina Senate confirmed my nomination by unanimous vote on May 11, 2022.

2.      When appointed as Acting Director, I immediately began focusing my efforts on employee retention and recruitment, facility upgrades, reviewing policies, enhancing educational services, restructuring the agency organization and services, and reviewing mental health services

for SCDJJ youth  As I have consistently explained to staff, although we are implementing many changes as part of the Settlement Agreement, we are also making these important transformations as part of the shift in culture and mission from a corrections-based juvenile justice model to a more contemporary and effective rehabilitative model. I did not wait for the finalization of the Settlement Agreement, and I am not limiting the changes at SCDJJ to only BRRC as required in the Settlement Agreement.  It is important to me to implement the long overdue cultural transformation of SCDJJ systemwide.

3.     Prior to becoming Executive Director at SCDJJ, I dedicated most of my career to improving the lives of children and families in South Carolina.  Beginning in 2005, I began my legal career as a Family Court Assistant Solicitor in the Fifth Circuit Solicitor's Office which included working with Department of Juvenile Justice.  After five years of working in family court, magistrate court and general sessions court, I left the Fifth Circuit Solicitor's Office to work for the Governor's Office of Executive Policy and Programs as the staff attorney for the Foster Care Review Board. I traveled around the state advocating for permanency for youth in foster care. I then was an attorney for the Department of Social Services in Richland, Chester, and Fairfield Counties representing the agency in abuse and neglect and termination of parental rights actions.

4.     In January 2015, I returned to the Fifth Circuit Solicitor's Office to manage the Richland County Family Court Division which included prosecuting all juvenile criminal matters in Richland County, supervising a team of support staff, victim advocates, junior attorneys, law clerks, two diversion programs, and two diversion courts.  In this role, I worked with SCDJJ staff in the Richland County Office. I  also coordinated with SCDJJ's Office of the Inspector General when SCDJJ Investigators forwarded delinquency allegations against youth housed at the three SCDJJ secure facilities in Richland County to the Solicitor's Office for prosecution.

5.      Beginning in May 2020, I served as Assistant General Counsel at the South Carolina Department of Administration, focusing on providing legal support to the Division of State Human Resources.  In this role, I was part of the special task force of human resources professionals tasked by the Governor in the summer of 2021 to assess and improve DJJ's human resources division.

6.      I graduated with honors from the University of Georgia in 2002 prior to receiving a Juris Doctor from the University of South Carolina School of Law in 2005.  I received the 2016 Ernest F. Hollings Award for Excellence in State Prosecution in Family Court and was previously a member of the Children's Justice Act Task Force.

## II.    U.S. DEPARTMENT OF JUSTICE INVESTIGATION AND SETTLEMENT AGREEMENT.

7.      Since coming to DJJ as Director, I have learned that the South Carolina Legislative Audit Council ("LAC") issued a report critical of SCDJJ in 2017.  The LAC Report made numerous recommendations for improvement.

8.      I also have become aware that on September 27, 2017, the USDOJ Civil Rights Division began an investigation into the SCDJJ at the Broad River Road Campus ("BRRC") in Columbia, South Carolina.  The purpose of the investigation was to assess the following:

     i.    whether SCDJJ fails to protect youth from assaults by other youth;

     ii.   whether SCDJJ subjects youth to prolonged isolation;

     iii.  whether SCDJJ fails to protect youth from physical abuse by staff, specifically focusing on "use of force"; and

     iv.   whether SCDJJ violates the Americans with Disabilities Act ("ADA") in its use of pre-sentencing residential evaluation centers.

9.      I understand that USDOJ Civil Rights Division utilized an investigative team of lawyers out of its Washington, D.C. headquarters and a local Assistant U.S. Attorney in South Carolina's U.S. Attorney's Office.  It also utilized a team of four nationally recognized subject matter experts who specialized in juvenile facility issues relating to conditions of confinement and the ADA.

10.     My understanding is that USDOJ began its investigation in 2017 by conducting onsite tours and inspections of BRRC and other SCDJJ locations throughout South Carolina, holding several periodic meetings and interviews at these locations.  These meetings and interviews included those of SCDJJ former Executive Director Freddie Pough and other agency senior and lower-level management, as well as BRRC leadership, supervisors, non-security staff, and Juvenile Correctional Officers.

11.     Further, I understand the investigation included several information requests from USDOJ to SCDJJ, requiring production of several thousands of documents surrounding the varied investigation topics.  Based on my understanding, the investigation also included meetings between USDOJ, various local and national advocacy groups and a few South Carolina State legislators.

12.     To my knowledge, USDOJ never disclosed the names of any advocacy groups or the nature and scope of their involvement.  USDOJ also reportedly received numerous complaints and correspondence from parents of incarcerated youth about their treatment and living conditions.

13.     I also understand that USDOJ attorneys conducted interviews of incarcerated youth at BRRC while also reviewing video surveillance and related documents, to include incident reports.  This investigation led to the finding of two violations of 42 U.S.C. § 1997b related to BRRC, specifically that SCDJJ failed to keep youth reasonably safe from harm and SCDJJ's use

4

of isolation violated the constitutional rights of youth. USDOJ also reported SCDJJ failed to properly train staff, implement effective behavior management tools, and establish key safety protocols. Based upon the investigation of the SCDJJ, USDOJ determined that "there is reasonable cause to believe that conditions at "BRRC" violated the constitutional rights of incarcerated youth, resulting in serious harm and/or placing youth at substantial risk of serious harm."

14.     I am aware that on February 5, 2020, USDOJ informed Governor McMaster and SCDJJ that a conclusion had been reached for several of the above stated conditions, i.e., youth-on-youth violence and staff-on-youth violence, prolonged isolation and whether SCDJJ violated the ADA. The investigation relating to "use of force" remained ongoing.

15.     On February 5, 2020, USDOJ issued an investigative report finding reasonable cause to believe that the conditions of youth-on-youth violence and prolonged isolation violated the constitutional rights of youth at BRRC, pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997b. USDOJ also notified SCDJJ of their finding of no reasonable cause to believe SCDJJ violated the ADA in its use of pre-sentencing residential evaluation centers.

16.     My understanding is that based upon these findings regarding conditions at BRRC, SCDJJ immediately started working with USDOJ to negotiate resolution of these matters. These negotiations not only covered issues at BRRC, but also affected SCDJJ policies that overlaid the entire Department. SCDJJ policies apply state-wide and agency-wide, so changes made to policies in accordance with the USDOJ findings will apply to and will be implemented state-wide at every SCDJJ secure facility to ensure consistency in the execution of these remedial actions.

17.     My understanding is that following the February 5, 2020, notice letter, and accompanying report, SCDJJ and its legal counsel began providing additional documents and

information to USDOJ related to the ongoing use of force investigation, while simultaneously continuing to implement changes and reforms, including to areas related to use of force. SCDJJ did so in order to demonstrate the agency's willingness and desire to comply with federal statutes, but primarily because SCDJJ wanted to ensure a healthier and safer environment for incarcerated youth and SCDJJ staff.

18.    My understanding is that USDOJ sought to enter a settlement agreement with SCDJJ, as opposed to pursuing litigation or a Consent Decree, due to SCDJJ's cooperation in providing information and access to personnel, SCDJJ's responsiveness, and the agency's earnest desire and effort to implement genuine reform, during and following the investigation. Further, SCDJJ acknowledged that a lawsuit would negatively impact SCDJJ's ability to implement a much-needed culture change and limit needed time to recruit and hire new talent in order to implement meaningful and sustainable reform. Also, and most importantly, the remedial measures recommended by USDOJ to remedy the potential constitutional violations were steps/improvements SCDJJ already planned to implement or had already begun to implement.

19.    On April 13, 2022, SCDJJ and USDOJ signed a settlement agreement (hereinafter "Settlement Agreement") to ensure the conditions at BRRC improved, thereby encouraging rehabilitation and the likelihood that youth would succeed upon their release and decrease the chances of recidivism.

## III.    SETTLEMENT AGREEMENT APPROVAL PROCESS.

20.    I have learned that the Parties of the Settlement Agreement negotiated its terms over the process of approximately 21-month period, to include reaching agreement on terms related to use of force once USDOJ concluded that portion of the investigation. Also during this timeframe, once the parties agreed to terms, the Settlement Agreement then had to be

independently reviewed for approval through an internal review process within USDOJ and various South Carolina governmental bodies.  Since being named Acting Director of SCDJJ, I have been involved in this process to conclude negotiations and reach agreement with USDOJ.

21.     Based on my understanding, USDOJ had to submit the proposed draft Settlement Agreement through multiple channels or layers of USDOJ's upper-level management.  This process took several weeks.

22.     SCDJJ, during the course of final negotiations, coordinated with both the Governor's Office and the South Carolina Attorney General's Office in review of provisions to ensure compliance with South Carolina statutory laws and legal precedent.

23.     Additionally, once the parties reached an agreement to the final terms and the terms were approved by USDOJ, SCDJJ was required to obtain approval of the South Carolina State Fiscal Accountability Authority ("SFAA") consisting of various Governmental Bodies due to the financial obligations of the Agreement, as mandated by S.C. Code Ann. § 11-1-45.

24.     The SFAA Authority Members are the Governor of South Carolina (serves as Chair), Chairman of the South Carolina Senate Finance Committee, Chairman of the South Carolina House of Representatives Ways and Means Committee, State Treasurer, and State Comptroller General.

25.     Each of these SFAA Authority Members were allowed the opportunity to review materials related to the Settlement Agreement, and most met with me and outside legal counsel to discuss and ask any questions regarding the terms of the Agreement.

26.     Prior to the SFAA approval of the Agreement, the State Comptroller General requested and participated in a tour of the BRRC for approximately 3 hours to see first-hand the issues being addressed by the Settlement Agreement.

27.    On April 5, 2022, the SFAA Authority Members unanimously approved the Settlement Agreement without debate.

28.    The following week, the Settlement Agreement was signed and executed by all Parties and approved by this Court.

## IV.    BENEFITS OF SETTLEMENT AGREEMENT.

29.    The comprehensive agreement covers a wide range of programs and services provided by SCDJJ.  The specific concerns included the following: (1) protecting youth from violence; (2) staffing; (3) video surveillance, (4) rehabilitative programming, (5) behavior management; (6) use of force; (7) investigations into youth-on-youth physical harm, excessive or unnecessary use of force, or improper use of isolation; (8) isolation policies and practices; (9) housing vulnerable youth and youth on suicide watch; (10) training staff; and (11) quality assurance.

30.    Since my arrival approximately 9 months ago, I have overseen SCDJJ's efforts to comply with the potential terms of the Settlement Agreement.  This included making inroads on isolation usage, use of force policies and practices, behavior management, investigations, additions of cameras, and the retraining of current staff.

31.    Although the Settlement Agreement was geared to "remedy the alleged constitutional violations identified by USDOJ" at BRRC, which is SCDJJ's long-term facility for youth committed to the juvenile justice system in South Carolina, it was designed to implement the reforms, policy revisions, processes, hiring practices, and upgrades set forth in the Settlement Agreement on a state-wide basis.  SCDJJ will implement these polices state-wide at every SCDJJ secure facility.

### A.  *SCDJJ IMPROVEMENTS IN ADMINISTRATION AND EXPERT HIRES.*

32.     Within two weeks of becoming the acting director, I supported making key staffing changes responsible for the management of BRRC.  The agency's entire organizational structure needed to completely revamped.  We have implemented the first stage of that plan, to include the hiring of new executive staff.

33.     The Settlement Agreement required that SCDJJ undertake a thorough review of its staff.  SCDJJ has completed the USDOJ required staffing study.

34.     Since becoming Director, I have been committed to purposefully searching for, both locally and nationally, and hiring the necessary talent at the staff level and in upper-level management.

35.     Hiring new staff is part of my strategy to implement a much-needed culture change at SCDJJ, which in turn facilitates implementation of the reforms included in the Agreement.  The Agreement allows SCDJJ to efficiently implement reform internally within the time frames agreed upon by the USDOJ and SCDJJ.

36.     The Agreement allows SCDJJ flexibility in seeking and hiring extremely well-qualified and experienced independent and external consultants and/or experts, who have "hands on" national juvenile facility reform experience.  Additionally, the Settlement Agreement required SCDJJ and USDOJ to work in partnership to interview and select a Subject Matter Expert ("SME").

37.     The SME will serve a similar role as a Court monitor, except the SME agreed-upon jointly by SCDJJ and USDOJ will report not just criticisms about non-compliance with the Settlement Agreement, should such occur, but also report progress towards meeting the goals within the Settlement Agreement.  This SME will also provide select technical assistance when needed and make recommendations to SCDJJ and USDOJ to assist SCDJJ in its reform efforts.

9

SCDJJ and USDOJ have already selected the SME pursuant to the Settlement Agreement. The selected SME is uniquely qualified to provide these services due to her 30+ years of experience working in the justice system, with more than seven years as a state agency director responsible for the operations and oversight of juvenile detention and long-term secure facilities. Key exemplar areas are youth confinement operations, constitutional levels of care, safety and security in juvenile facilities, and behavioral management. Additional areas of expertise include trauma-informed and positive youth development approaches for system-involved youth, and the application of evidence-based practices for risk reduction, including using validated actuarial risk and need assessment instruments and applying risk-need-responsivity in case planning and programming dosage requirements. This expert has extensive experience advising various jurisdictions (local, state, and federal) on strategies to improve justice system operations and conditions of confinement in juvenile facilities. She serves as a subject matter expert for the Length of Stay Academy, a national academy supported by the Council of Juvenile Justice Administrators (CJJA), the Center for Juvenile Justice Reform (CJJR) at Georgetown University McCourt School of Public Policy, and Pew Charitable Trust. She is also a subject matter expert for the CJJR Youth in Custody Certificate Program. The program is designed to help leaders implement or accelerate change to improve outcomes for youth in custodial settings. Specifically, the program utilizes modules that review and integrate best practices around culture change and leadership, addressing racial and ethnic disparities, family engagement, assessment, case planning, facility-based education, trauma-informed treatment services, strength-based approaches, and reentry planning and support. Overall, she has extensive experience on a state and national level providing consulting services and practical experience operating and reforming a youth correctional system.

38.     The Agreement also requires SCDJJ to hire a Director of Settlement Compliance ("DSC").  SCDJJ, with the approval of USDOJ and five months prior to the signing of the formal Settlement Agreement, hired this DSC effective November 2021.  This expert's first on-site visit was in December 2021, and she has made a total of six week-long visits to BRRC.  The DSC is named specifically in the Agreement and is uniquely qualified to serve in this role due to her experience in the areas of youth confinement, constitutional levels of care, and safety and security in juvenile facilities.  This expert has extensive experience advising federal, state and local governments throughout the United States on strategies to improve conditions of confinement in juvenile facilities, including work in more than eleven states to assess and improve juvenile justice programs and facilities. She has assisted agencies in complying with national and best practice standards for juvenile facilities.  She is a lawyer and former prosecutor and is able to understand the Agreement as well as coordinate and effectively communicate with the legal team at SCDJJ and the lawyers at the USDOJ.  She has worked in a jurisdiction on a USDOJ settlement agreement involving the conditions of confinement at three juvenile facilities, oversaw compliance, and successfully exited federal oversight on time.  She has experience working with five federal monitors, has written articles on juvenile facility safety, spoken at numerous national conferences, and is a PREA certified auditor for juvenile facilities as well as faculty for national PREA training. She has created and revised juvenile facility policies, trainings, staffing plans, and procedures, and has extensive experience building rapport with and training staff on new processes.  She is a former quality improvement director and understands the requirements of QA within a USDOJ settlement, to include how to create and maintain a QA program for long term sustainability.  Finally, the DSC has provided technical assistance and training in intake processes, classification, screening, incident response, senior management review, physical plant, suicide prevention, behavior

management, overuse of restraints, isolation, sexual safety, restrictive housing practices and PREA. As soon as she was hired, the DSC began identifying problem areas and working with both staff and upper-level management to find and implement solutions in order to improve conditions of confinement and work towards being in compliance and staying in compliance with the Agreement. The DSC also provides technical assistance to SCDJJ and will work with the SME and USDOJ in addressing identified concerns. The DSC works directly for and reports directly to me as Director.

39.    SCDJJ has hired a new Director of Human Resources. This person has full responsibility to oversee the hiring process to employ new competent employees and ensure the current staff has the best training available for it to perform its job competently.

40.    SCDJJ has hired a new Inspector General. This position had been vacant for over 18 months. The new Inspector General has extensive law enforcement management and investigative experience, including with incidents involving at-risk youth and working with DOJ settlement agreements. The Complaint in this matter alleges SCDJJ has not conducted sufficient investigations. However, SCDJJ now has someone with significant law enforcement experience and experience in investigations.

41.    SCDJJ hired a new Chief Financial Officer. This person has refocused SCDJJ's finances to be used strategically to meet SCDJJ's purpose and fulfill the requirements of the USDOJ Settlement Agreement and other reforms and improvements.

42.    SCDJJ has a new Deputy Director of Security and Operations. This experienced leader has a proven history of working in agencies making cultural changes under USDOJ consent degrees in Chicago, Illinois and the District of Columbia.

43. SCDJJ has hired a new Chief of Staff who has significant experience in managing multiple programs while ensuring SCDJJ's mission is met and holding staff accountable.

44. SCDJJ has continued to partner with the South Carolina Department of Administration ("SCDA"). SCDA has played a key role in instituting reform in the handling of SCDJJ finances, human resource management, capital projects, facility maintenance management, and information technology, all of which has resulted in progress towards the fulfillment of the provisions of the Agreement and overall reform of SCDJJ.

### B. RECRUITMENT AND RETENTION.

45. Under prior leadership, SCDJJ received funds from the SC General Assembly to implement a classification and compensation plan for juvenile correctional officers and community specialists.

46. Under my leadership, SCDJJ implemented a separate classification and compensation plan for other employees who provide direct care services to youth within all secure facilities. This includes psychologists, mental health professionals, social workers, clinical staff, behavior and recreational staff, chaplains, administrative assistants, dietary, and law enforcement. SCDJJ is currently in the process of assessing the remaining divisions of the agency that did not receive increases with these two plans.

47. SCDJJ has revamped its entire recruiting staff in the Office of Human Resources. Specifically, SCDJJ has a new full-time recruiter, a new part-time recruiter and is planning to hire a recruiting manager.

48. SCDJJ contracted with Warren Averett, LLC, a consulting firm specializing in working with employers with difficult to hire positions. Warren Averett LLC conducted research and onsite visits at SCDJJ to create a psychological profile for certain SCDJJ positions. It created

and implemented a targeted social media recruitment campaign and developed a landing page for initial recruiting and applicants. Early success is already apparent in numbers of applicants and new hires. SCDJJ plans to extend the contract based on these positive results.

49.    SCDJJ revamped all staff appreciation activities and designated staff in charge of employee appreciation.

50.    SCDJJ is aggressively using social media to showcase positive activities of youth and staff.

51.    SCDJJ is recruiting individuals from outside South Carolina with specific experience in reforming juvenile justice facilities and agencies.  Also, SCDJJ has changed its onboarding and orientation program to begin building employee morale and unity from the onset.

52.    SCDJJ is constantly assessing and altering human resource processes and procedures to improve the efficiency of the hiring process.

53.    SCDJJ is in the process of changing the agency's mission, vision, values, and motto.

### C. FACILITY AND OPERATIONAL IMPROVEMENTS.

54.    SCDJJ has made significant upgrades in its Information Technology (IT) services to better meet SCDJJ's mission.  Specifically, SCDJJ has relocated all servers from the BRRC campus to the South Carolina Data Center managed by State IT through the Department of Administration.

55.    SCDJJ hired a third-party contractor which conducted an information security audit.

56.    SCDJJ is partnering with the IT professionals from the Department of Administration to ensure the efficiency and security of IT processes. This includes expanding the backup server properties.

57.    SCDJJ is planning to upgrade numerous platforms such as the security badge program, maintenance work order system, and time keeping system.  These updated services will greatly enhance SCDJJ's ability to function more effectively and efficiently.

58.    SCDJJ's midlands campuses include over 250 acres off Shivers Road in Columbia, including the Midlands Evaluation Center and the Juvenile Detention Center.  In addition, the BRRC Campus on Broad River Road is approximately 220 acres and 45 buildings.  SCDJJ's secure facilities also include the Upstate Evaluation Center in Union, SC and the Coastal Evaluation Center in Ridgeville, SC.

59.    SCDJJ has already begun a number of capital projects to improve the safety and security of these secure facilities.  Specifically, these improvements include the following:

- Added a state-of-the-art camera system to provide surveillance of every building area and the surrounding grounds at secure facilities to monitor and record the activities of youth to ensure their safety and that of staff. Under my leadership, the project was expanded to include additional camera coverage and sufficient server storage and backup, the project now totaling approximately $ 7 million dollars.

- SCDJJ was in the process of creating a capital project to convert the four open bay dorms on BRRC campus to closed bay by adding electronically controlled doors to allow youth additional safety. I expanded the scope of this project to allow for the eventual closure of the Laurel building, as required under the DOJ agreement. The total project cost is now $2.8 million.

- While SCDJJ is implementing the policy changes outlined in the USDOJ Agreement, it is necessary to still utilize the Laurel Building.  I immediately recognized the unsafe conditions of the building and requested emergency approval from JBRC and SFAA to begin a $1.8 million project to ensure the safety of that building until the open bay pods are converted to closed bay.

- I also plan to ask JBRC and SFAA for emergency approval to address needed repairs and infrastructure upgrades at the Midlands Evaluation Center to enhance health and safety conditions.

- We are currently renovating abandoned buildings so that all SCDJJ staff can be located on SCDJJ property, instead of offsite leased locations.

- Completed renovations to the Goldsmith Building so that the executive staff and other direct care providers are located at BRRC.

- Currently, replacing all the lexan glass throughout the pods on BRRC to enhance security and to protect youth and staff.

- Planning to improve and replace fencing throughout BRRC.

- Installed additional lighting throughout the BRRC campus.

### D. REDUCING ISOLATION.

60.    The summer before I arrived at SCDJJ, a number of the youth on the BRRC campus were held in isolation in the Laurel Building. Since September 2022, SCDJJ has significantly decreased use of isolation at BRRC.  At times, there are no youth at all in isolation at BRRC.  As USDOJ observed during their investigation, staff often viewed isolation as their only option to manage youth behavior.  SCDJJ's Agreement with USDOJ includes educating staff about the dangers and negative impacts of isolation on youth and re-training staff to focus on developing positive and professional relationships between youth and staff.  SCDJJ also will enhance the behavior management system, which includes a system of rewards and sanctions, which will complement other methods to decrease the use and duration of isolation.

61.    SCDJJ has initiated an overhaul of changes to its isolation policy to disallow isolation for punitive or disciplinary measures, protective custody or suicidality.

62.    SCDJJ's isolation procedures will include that youth will not remain in isolation for longer than 4 hours, except when approved by security leadership in the chain of command from Assistant Facility Administrator to Deputy Director.  Within the first 24 hours of isolation,

and every day thereafter, a qualified mental health professional must examine the youth in-person and document whether:

     i.    The youth poses a serious and immediate danger to self or others;

     ii.    The continued use of isolation will be detrimental to the youth's current mental health; and

     iii.    Less restrictive measures may help to eliminate the serious and immediate danger to the youth or others.

63.    SCDJJ will ensure that documentation of isolation identifies with specificity what youth action created a serious and immediate danger to self or others necessitating the use of isolation, and what less restrictive techniques an officer used prior to using isolation.

### E. EDUCATIONAL SERVICES.

64.    SCDJJ has dramatically improved and continues to improve the educational services offered to youth.

65.    Students are not denied educational services. Students are offered academic and GED courses. After graduating, students receive opportunities to attend college, work-based programs, and employability skills programs. The Education Division's Career Readiness program provides opportunities for students to take ASVAB testing and additional job skills training. Career and Technology Education (CTE) courses are offered, in JROTC, Welding, Agriculture, and Forklift to prepare students to reintegrate into society.

66.    All students are scheduled in their academic and elective classes, and students are given the opportunities to participate in the GED program.

67.    SCDJJ offers special education assistance and provides youth with a Special Education Teacher for the student needs.

68.    Under a prior administration, the South Carolina Department of Education approved Birchwood High School operating on a half-day schedule. Upon learning this, I informed staff of my belief that all youth, no matter the facility, deserve a full day of school. On specific occasions, I reallocated staff to ensure as many youth as possible could attend school in person. BRRC plans to return to a full day schedule beginning in the 2022-2023 school year.   The Education team has provided learning packets for students who are in isolation and even provided private tutoring sessions for youth not part of the general population. Additional changes to the educational experience for youth will be implemented in accordance with the DOJ Agreement.

## F.    GRIEVANCE PROCESS

69.    SCDJJ has a Director of Juvenile and Family Relations, Camelia Daley, whose role is to supervise and manage the receipt and resolution for youth grievances, allegations, and complaints providing a timely and fair resolution for the youth under the jurisdiction of SCDJJ.

70.    The Office of Juvenile and Family Relations oversees the youth grievance process at SCDJJ's five secure facilities: Juvenile Detention Center (JDC), Midland Evaluation Center (MEC), Upstate Evaluation Center (UEC), Coastal Evaluation Center (CEC), and Broad River Road Complex (BBRC).  Further, the Office receives grievances and/or inquiries from the youth and families in the community, to include SCDJJ contracted community-based placements.

72.    A grievance is a written or oral complaint filed by a youth or other involved person concerning an incident, policy, practice or condition with a facility, program, school, medical unit, or county office.

73.    The following complaints are investigated through the Youth Grievance Process.

   a.    Allegations that a department or facility policy, procedure or rule violates the rights of a youth as set forth in DJJ Policy 918 (Youth Rights and

Responsibilities) or that such policy or procedure has been unfairly implemented.

b.    Allegations that staff failed to respond and/or to report an allegation of abuse or neglect.

c.    Allegations that staff intimidated or retaliated against a youth either through written reprimand of a youth, withholding of privileges or any such punitive measure against a youth for filing any type of grievance or complaint and/or for participating in some other way in the grievance process.

d.    Allegations that staff failed to provide a youth access to the grievance process by refusing to provide a youth with a grievance form, refusing to assist a youth with filling out the grievance form, or refusing to allow a youth to place a completed form in a secure grievance box.

e.    Allegations that quality of life issues occurring within any SCDJJ facility have had a negative effect on a youth personally.

f.    Allegations that a youth was denied access to health care or that health care was not appropriate or adequate.

g.    Allegations that a youth was discriminated against by staff, other youth, third parties.

h.    Any other matter relating to the welfare of a youth in the care and custody of SCDJJ, unless otherwise prohibited in this process.

i.    Allegations of verbal abuse directed towards a youth by staff or another youth without any elements of physical abuse.

74. Forms are readily available near the secure grievance box for youth access. In addition, a youth's request to obtain a form must be fulfilled by the facility no later than the end of the shift during which the request was made. When a youth requests assistance in completing and submitting the form, staff are required to provide assistance and keep the matter confidential.

75. At no time should a youth be punished or harassed for having a grievance form in his/her possession. In the secure facilities, any youth can place a completed grievance form in a secure grievance box located in a central area easily accessible to all youth throughout the facilities. The Office of Juvenile and Family Relations can also receive grievances via email at JuvenileGrievance@djj.sc.gov, an email address that goes directly to that department if the youth does not wish to drop it in the secure grievance box. There is no time limit for making a report of a grieved issue or other allegations.

76. If a parent and/or legal guardian, or any representative, has issues regarding how the youth has been treated by any entity of SCDJJ they are encouraged to contact Juvenile and Family Relations.

77. There are currently 3 grievance coordinators employed in Juvenile and Family Relations. Each coordinator goes to their assigned facility and checks the grievance boxes located throughout their facility no less than twice a week. Once collected, the grievances forms that are retrieved will then be assigned a prepopulated grievance number once entered into the grievance database.

78. The coordinator will then determine if the matter is appropriate for handling within the youth grievance process. Once determined to be handled by our office, the

coordinator will conduct an impartial investigation of the grievance.  Juvenile and Family Relations works with the facility managers to ensure that proper resolutions to the grievance are completed. All grievances are completed within 10 business days of receipt of the grievance. After 10 business days has passed, due to unforeseen circumstances or issues, additional 10 business days can be requested.

79.  The youth will have opportunity to present witnesses to be interviewed and be able to provide evidence to support their grievance.  The accused, if applicable, will also be interviewed along with any of their witnesses. Once the investigation is completed, a written memorandum is generated with the findings.  Findings could be the following: Substantiated, Unsubstantiated, and Unfounded.

80.  If, in the course of conducting the investigation, a youth declines to have the grievance processed on his or her behalf, the coordinator will document the youth's response.  A youth withdrawal is not used as sole reason to terminate the investigation.  In some cases, the investigation still continues.

81.  A letter of notification is mailed or hand delivered to the youth with the results of the investigation of the grievance.  A formal memorandum of the investigation is written by the coordinator for cases that result in substantiated, unsubstantiated, and unfounded.  Once the memorandum is finalized, the coordinator then disburses the memorandum via email depending on the nature of the grievance to the appropriate area, including the Inspector General, Deputy Director of the Division, Associate Deputy of the Division, and Program Managers of the Division.

82.  Copies of the grievance or grievance memoranda are not filed in any youth's record or in any other record of file in the living unit, school, or social worker's office.

The intent of separation of files is to prevent potential retaliation against a youth for filing a grievance and using the grievance process. A youth may appeal unfounded grievances to the Division of Investigative Services within 30 days of receiving a final response from the coordinator.

83. Specifically relating to the Declaration of Owens, Juvenile and Family Relations staff reports to me that:

    a.    Since L.Y.'s detainment at Juvenile Detention Center (JDC) through June 2, 2022, L.Y has had 11 formal grievance complaints, with 10 of the formal grievances being initiated by Teresa Owens and one resulting from concerns shared by L.Y.'s attorney with the Family Court at a detention hearing.

    b.    SCDJJ has reviewed all of Ms. Owens' grievances and found some not to be as alleged.

    c.    One of those grievances was initiated by the SCDJJ Pickens County Office after Ms. Owens provided that office with a copy of her Declaration which was ultimately filed in this case. This Declaration covered prior grievances that had all been addressed. The Office of Juvenile and Family Relations did a welfare check on L.Y. on May 26, 2022. An investigation was conducted, and L.Y. provided a witness statement during his face-to-face interview and indicated he has been attending school and has passed his Science and Social Studies portion of his GED and will be taking his remaining portion on Tuesday (05/31/2022). L.Y. stated he would like to obtain a GED and is working on that goal. L.Y. stated he is looking forward to college courses after he receives his GED. L.Y. stated he is receiving his

meals and snacks and the food has improved at JDC and he is getting fruits and vegetables. The OJFR Investigator also obtained a 4-week cycle menu from Dietary staff that reflects there are vegetables and fruit that are served with breakfast, lunch, and dinner. Also, milk is served with every breakfast and lunch. L.Y. stated he had not had a haircut. The facility was notified, and the barber was requested to C pod. L.Y. did receive conditioner from the chaplain as his previous one was confiscated in a shakedown as it was considered contraband for the size of the bottle. L.Y. stated he has gone to the outside recreation court and is scheduled to go to the game room. He states he regularly gets leisure time on the unit however is on split rec from certain youth for safety. He watches TV, plays cards, and talks to his family and girlfriend on the telephone. L.Y. is aware he can refuse his recommended/prescribed medication as he is 16 years old. L.Y. denies he is in his room for 23 hours per day. OJFR has personally observed him out on the unit and on the telephone several times. Chaplaincy was contacted and stated L.Y. does attend Bible studies, Bible Devotion, art therapy, and spiritual services when outside church ministries visit JDC. L.Y.'s Social Worker confirmed to OJFR that she sees L.Y. weekly and sometimes twice a week. L.Y. states he feels safe and wants to remain on his wing. The only other pod he is willing to go is on "A" pod, however he wants to remain on his wing. L.Y.'s room was inspected by OJFR on the reported living conditions. L.Y. has a working toilet and sink. L.Y.'s room was observed to be clean with his bed made with a window in his room. Graffiti was

observed to be on the walls including L.Y.'s graffiti, to which he admitted to writing his nickname on the walls.

84. Throughout every grievance, Ms. Owens has been in constant communication with OJFR and with L.Y.

## V.    CONCLUSION

85. While the Plaintiffs' requests are admirable, given the current status of SCDJJ and confines of operating under state procurement and human resources regulations, the implementation of such policies in the proposed time frames are simply not possible. I do not fundamentally disagree with implementing best practices and going beyond constitutional minimums to provide the best care possible for our youth.  However, having duplicate monitors and standards will only cause confusion and frustration. As evidenced in jurisdiction after jurisdiction, in facility after facility, implementing successful, meaningful and lasting reform takes tremendous effort and several years.

86. Allowing this Settlement Agreement to remain in place and permitting SCDJJ to operate under its terms will produce the best outcome and is in the best interest of the youth housed within the SCDJJ and the State of South Carolina.

87. As the Court can see, tremendous progress has been made since my brief tenure at SCDJJ. I am committed to making changes at SCDJJ above and beyond the USDOJ Settlement Agreement in due time and when it is actually feasible. Plaintiffs' demands are, unfortunately, not realistic and go beyond the constitutional minimum.  I, along with the staff of SCDJJ and outside legal counsel, strongly recommend and request this Court maintain the obligations under the Settlement Agreement to continue the progress and momentum already underway.

L. Eden Hendrick, Esq.
Executive Director
South Carolina Department of Juvenile Justice

June 7, 2022