# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE OF NAACP; <br><br> DISABILITY RIGHTS SOUTH CAROLINA; <br><br> JUSTICE 360; <br><br>     *Plaintiffs*, <br> v. <br><br> SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE; <br><br> EDEN HENDRICK, individually and in her official capacity as Executive Director of the South Carolina Department of Juvenile Justice; <br><br>     *Defendants*. | Case No. 0:22-cv-1338-MGL-PJG <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF A PRELIMINARY INJUNCTION** |

## INTRODUCTION

On May 19, 2022, Defendants informed this Court that "the vast majority of [Plaintiffs' claims] are moot and have already been redressed." ECF 10 at 4. Five days later, a 13-year-old child was allowed to enter JDC with a loaded gun, which he kept in his cell for twenty-four hours before he was caught. Ex. A ("Ross Decl") ¶¶ 8-9. A week after that, a 16-year-old, D.Y., was beaten by eight other teens until he was unconscious:



*Id.* ¶ 25.[1] BRRC staff ran the other way during the assault. *Id.* ¶ 27. And on June 4, 2022, just days before Defendants again insisted that Plaintiffs' claims are somehow moot, a group of children at MEC stripped a child, D.H; dragged him naked through one of the wings at the facility; and then violently sexually assaulted him. *Id.* ¶¶ 36-38.

Against this backdrop, Defendants argue that Plaintiffs' allegations are "overstated" and "far-fetched," that there are no children with "real, actual, [and] personal" injuries, and that Plaintiffs are nothing more than "special interest groups" seeking to push an agenda. ECF 16 at 2-3. That is false and completely belied by the evidence Plaintiffs have presented. Children detained by DJJ are exposed to nonstop violence. They are injured frequently and severely. They are isolated for extended periods of time. And they are denied vitally necessary—and legally mandated—rehabilitative services. In other words, there are ongoing constitutional violations that require immediate injunctive relief.

---

[1] Plaintiffs file this and other similar photographs of the child with the permission of the child's family and family's attorney.

Instead of confronting the evidence, Defendants fall back on their stock line: "Trust us, it's getting fixed." To start, this argument misconstrues the law. When the State puts children behind bars, it assumes the basic constitutional burden of ensuring that those children are kept safe from harm and are provided with meaningful access to rehabilitative services. *See Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) ("duty to *provide* adequate food, shelter, clothing, and medical care" and "unquestioned duty to *provide* reasonable safety for all residents") (emphasis added). It is not enough to *start trying* to keep kids safe; the Constitution demands that children are *actually* safe from harm. At that task (and others) Defendants are currently failing.

But even on its own terms, Defendants' refrain of "trust us" rings hollow. Consider their history of broken promises: Twenty years ago, DJJ argued for termination of court supervision by claiming that "conditions at [DJJ] surpass constitutional standards in every respect" and that, "[w]ith improvements continuing to occur over time, the areas of concern have decreased to the point of nonexistence." Ex. B at 1-3. Five years ago, DJJ responded to a scathing legislative audit by touting how—since the period that the auditors measured—it had "implement[ed] a number of strategic initiatives" and "made great strides." Ex. C at 2. A year after that, DJJ claimed to have "completed 97% of the [legislative audit's] recommendations to date," which was later proven false. Ex. D at 2. In April of last year, DJJ claimed to be "revising policies in critical areas such as use of isolation, facilitating culture change, [and] improving recruitment and retention of training staff." ECF 1-2 at 186. And in May of last year, DJJ's then director told legislators that, during his three-year tenure, DJJ "[had] made great progress" and "ask[ed] that [DJJ] be allowed to receive the help that we need and the support that we need to continue the work that we have begun." *Hearing on Report of the Legislative Audit Council Before the Joint Meeting of the Law Enforcement and Criminal Justice Subcommittee* at 34:07-35:16, 2021 Leg., 124th Sess. S.C. Gen. Assem. (S.C. 2021) (oral testimony of Freddie Pough, former Director of SCDJJ), *available at* https://video.scstatehouse.gov/mp4/20210520JJointMeetingoftheLaw11427_1.mp4.

2

DJJ's statements to this Court are no more credible than those before. If Defendants' recent efforts actually had resolved the egregious safety problems in DJJ, a loaded gun would not have made its way into JDC, D.Y. would not have been brutally beaten, and D.H. would not have been sexually assaulted. Instead, *even while* Defendants repeatedly claim this case is moot, the violence at their facilities continues unabated, excessive isolation persists, and children are regularly denied classroom instruction and mental health services.

The chorus of false promises must stop. Defendants' proclamation of "a new day at DJJ," ECF 17 at 2, will only arrive if this Court requires the constitutional minima: safety from violence, restricted use of isolation, and a dramatic increase in rehabilitative services. This is not a case based on "inflated generalized grievances," ECF 16 at 4, any more than it is a case about the "personal policy preferences" of "special interest groups," *id.* at 1, 3, 18, 27. It is a case about keeping kids safe, *because that is what the Constitution demands today*.

## ARGUMENT

I.  **Defendants cannot show that this case is moot.[2]**

Plaintiffs' motion offered substantial, concrete, and recent evidence of Defendants' ongoing constitutional violations and the harm those violations are causing to the children in their care. Instead of rebutting Plaintiffs' evidence, Defendants ask the Court to treat Plaintiffs' record as old news, arguing that, "[i]n light of the significant strides [Defendants have] made to date, coupled with the clarification that [reforms] are being implemented on a systemwide basis, Plaintiffs' request for mandatory injunctive relief to address past policies, actions, and procedures is moot." ECF 16 at 12.

Defendants' rosy self-portrayal declines to mention—and is belied by—the arrival of a loaded gun, the beating of D.J., and the sexual assault of D.H. on their watch days before Defendants' filing. DJJ's own data is just as devastating to Defendants' unsupported claim that "tremendous progress has been made" in DJJ facilities, ECF 16-1 at 25. In March, there were 90

---

[2] Plaintiffs incorporate by reference their arguments in opposition to Defendants' motion to dismiss. ECF 15 at 24-28.

youth-on-youth attacks that caused 39 injuries across DJJ's five facilities. Ross Decl. Ex. A at 4-8. And in April, the most recent month for which DJJ has released its PbS statistics, there were 69 youth-on-youth attacks that caused 34 injuries. Ross Decl. Ex. B at 4-8.

In any event, mootness on the basis that unconstitutional conduct or conditions have ceased is a high bar.[3] Defendants "'bear[] the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 323 (4th Cir. 2021) (quoting *Friends of the Earth v. Laidlaw Envt'l Servs. (TOC)*, 528 U.S. 167, 190 (2000)). Otherwise, "'a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.'" *Courthouse News*, 2 F.4th at 323 (quoting *Alreayd, LLC v. Nike*, 568 U.S. 84, 91 (2013)).

Defendants' agreement with DOJ does not meet the high bar for mootness. That agreement is limited in scope to just the BRRC, whereas the preliminary injunctive relief Plaintiffs seek concerns violations at *all* DJJ facilities. Director Hendrick's non-binding promise that "SCDJJ will implement the[] policies [identified in the DOJ agreement] state-wide at every SCDJJ secure facility," ECF 16-1 ¶ 31, does not improve Defendants' argument. Unenforceable promises are meaningless, given that Defendants "retain[] the authority and capacity to repeat [the] alleged harm[s]." *Courthouse News*, 2 F.4th at 323 (internal quotation marks omitted). If history is any guide, they will do so. Accordingly, Plaintiffs' claims "should not be dismissed as moot." *Id.* (internal quotation marks omitted).

Notably, even if the Court were to fully credit Defendants' assertions about what the DOJ settlement or its other purportedly in-process reforms will accomplish, those reforms and the settlement do not fully address all the relief Plaintiffs seek. At least as to that unaddressed relief,

---

[3] Defendants repeatedly stop short of claiming (much less proving) that conditions at their five secure facilities are safe, that isolation is no longer used for inappropriate purposes (*e.g.*, to accommodate insufficient staffing levels), that children have regular access to mental health treatment, or that children are receiving sufficient classroom instruction. Policy changes only matter if they yield constitutional conditions for children at DJJ.

4

Defendants' mootness argument unquestionably fails. For example, Plaintiffs seek an end to the "23-and-1" isolation endured by the children described in Plaintiffs' supporting declarations. Yet the DOJ settlement does not specifically address this, nor do Defendants have anything to say about it other than that it is "not an authorized practice." ECF 16 at 28. Of course, it is immaterial whether or not an unconstitutional practice is "authorized" on paper if that practice is actually occurring *in reality* at DJJ facilities. And Plaintiffs have presented ample, concrete evidence that DJJ staff frequently use 23-and-1. *See* ECF 13-1 at 8. The DOJ settlement similarly does not address the general youth population's counseling, therapy, and mental health needs; education needs;[4] and needs for clean drinking water, hygienically prepared meals, and sanitary conditions of confinement. *Id.* at 35 ¶¶ 8, 10–11.

## II. DJJ's continued failures show that federal intervention is required.

Defendants repeatedly invoke principles of federalism and comity, asserting that this Court should defer to their judgment in all administrative matters. But that deference is not without limits. "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011). And where courts do find constitutional violations, they have "broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction." *Todaro v. Ward*, 565 F.2d 48, 54 n.7 (2d Cir. 1977); *see also Milliken v. Bradley*, 433 U.S. 267, 280 (1977); *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) ("[O]nce a plaintiff has established the violation of a constitutional or statutory right in the civil rights area, courts have broad and flexible equitable powers to fashion a remedy."); *Missouri v. Jenkins*, 515 U.S. 70, 124-25 (1995) (Thomas, J., concurring) (when the Constitution is violated, courts have "virtually boundless discretion in crafting remedies").

---

[4] Defendants assert that this request is "outside the scope of Plaintiffs' motion" because "they did not seek injunctive relief regarding their IDEA claims," ECF 16 at 28, entirely ignoring the fact that Plaintiffs' motion addresses DJJ's failure to provide reasonable rehabilitative services, such as education, in violation of the Fourteenth Amendment. *See* ECF 13-1 at 25.

Myriad cases make clear that courts cannot—and do not—shrink from their duty to remedy constitutional violations, even when that remedy involves administration of a custodial facility. That is, of course, exactly what happened in *Alexander S. v. Boyd*. More recently, *Braggs v. Dunn* is illustrative. No. 14-cv-601, 2020 WL 2789880 (M.D. Ala. May 29, 2020). *Braggs* involved the conditions of confinement and mental health care available to inmates in the custody of the Alabama Department of Corrections. *Id.* at *1. After finding that the mental health care provided was "horrendously inadequate," *id.*, the court ordered a number of remedial measures, including ordering the defendants to take affirmative steps in connection with mental health treatment, *id.* at *11-12, suicide-resistant cells, *id.* at *12-13, and cell temperature management, *id.* at *14-15. *See also, e.g.*, *Porretti v. Dzurenda*, 11 F.4th 1037, 1052 (9th Cir. 2021) (affirming grant of preliminary injunction ordering defendants to provide specific medications to treat plaintiff's serious medical illnesses); *Banks v. Booth*, 468 F. Supp. 3d 101, 125 (D.D.C. 2020) (granting mandatory preliminary injunction related to conditions of confinement where "[t]he D.C. Circuit has previously authorized injunctive relief against correctional facilities, even where the injunctive relief imposes a particular set of conditions").

This Court may not merely rubber-stamp Defendants' administration of their facilities when doing so would allow the continuation of grave constitutional violations. As history has repeatedly made clear, inaction will allow violence against children to persist—perhaps indefinitely.

### III. Defendants' other challenges to this Court's jurisdiction lack merit.

#### A. Plaintiffs have established associational standing.[5]

In an effort to chip away at Plaintiffs' strong showing of associational standing, Defendants claim that they lack information about specific constituents referenced in the Complaint and therefore cannot "investigate the veracity of or provide contrary evidence" to the allegations. ECF 16 at 4. This argument is not credible, given Defendants' admission that they

---

[5] Plaintiffs incorporate by reference their arguments in opposition to Defendants' motion to dismiss. ECF 15 at 8-10, 12-14.

6

know *exactly* who these youth are, because they are plaintiffs in other lawsuits. *See id.* at 2 n.1.[6]

More to the point, neither SC NAACP nor DRSC is required to provide specific identifying information for its members or the DJJ facilities where they are housed in order to establish associational standing. Defendants' proposal for such an exacting requirement has no basis in the law, especially where, as here, the case remains in its early stages. *See Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) ("Under Article III . . . we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought and we decline to create such a requirement [for a P&A]."); *see also Florida State Conference of N.A.A.C.P v. Browning*, 522 F.3d 1153,1160-61 (11th Cir. 2008) (concluding at preliminary injunction stage that organizational plaintiffs had associational standing without identifying individual members and noting that "when the alleged harm is prospective . . . [it is] not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future").

With respect to the SC NAACP, President Brenda Murphy stated in her declaration that SC NAACP has at least one child member and one parent member with a child who is currently in DJJ custody. ECF 13-6 ¶ 5. And, as Plaintiffs have noted, children are consistently shuffled between DJJ facilities. *See* ECF 1 ¶ 56 (discussing temporary closure of CEC and movement of children to BRRC). In light of Defendants' across-the-board constitutional violations, SC NAACP does not need to demonstrate anything else to satisfy any associational standing requirements at this point.

---

[6] At bottom, many of Defendants' contentions derive from their continued unwillingness to recognize that organizations may sue both on behalf of their members and to redress their own injuries. *See, e.g*, ECF 16 at 22 (arguing that Plaintiffs "seek[] the benefit of classwide relief without having to meet the elements under Federal Rule of Civil Procedure 23"). Not only may organizations do so, but the Supreme Court has also even specifically emphasized the *benefits* organizational plaintiffs may bring "both to the individuals represented and to the judicial system as a whole," *International Union v. Brock*, 477 U.S. 274, 289 (1986): "While a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital," *id.* This case—in which leading juvenile justice and civil rights organizations sue to protect the children whom they advocate for and represent from grave constitutional violations—is a prime example of these benefits.

As to DRSC, Defendants concede that "DRSC can litigate actions on behalf of individuals with disabilities," ECF 16 at 19, but argue that DRSC cannot rely on associational standing to pursue claims such as those asserted here. In effect, Defendants ask this Court to become the first in this circuit to conclude that a statutorily designated protection and advocacy ("P&A") organization cannot sue in federal court to vindicate the rights of the individuals they protect. *See, e.g.*, *Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014) (disability rights organization had standing on behalf of disabled individuals to challenge North Carolina's driver licensing practices).[7] This Court should reject that offer. As with the state-created commission in *Hunt v. Washington State Apple Advertising Comm'n*, DRSC's clear, statutorily-created constituency, mission, and structure mean that, "for all practical purposes, [it] performs the functions of a traditional" membership organization and so has associational standing on behalf of the disabled and mentally ill children in Defendants' custody. 432 U.S. 333, 344 (1977); *see also Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110-12 (9th Cir. 2003) (concluding that P&As are "sufficiently identified with and subject to the influence of those [they] seek[] to represent as to have a personal stake in the outcome of the controversy").

---

[7] There is currently a circuit split over whether designated P&As are membership organizations for the purpose of associational standing under *Hunt*. The Ninth and Eleventh Circuits have concluded that P&As are membership organizations, but the Fifth and Eighth circuits have concluded that they are not. *See Disability Rts. Penn. v. Penn. Dep't Hum. Services*, No. 19-cv-737, 2020 WL 1491186, at *7 (M.D. Pa. Mar. 27, 2020). A nationwide survey, however, shows that "[m]ost, but not all, district courts have followed the Eleventh and Ninth Circuits in holding that P&As qualify for associational standing." Kelsey McCowan Heilman, *The Rights of Others: Protection and Advocacy Organizations' Associational Standing to Sue*, 157 U. Pa. L. Rev. 237, 258-59 (2008). Those courts more closely adhere to the reasoning of *Hunt*, which refused to "exalt form over substance" when assessing whether an organization had "indicia of membership." 432 U.S. at 344-45; *see Disability Rts. Penn.*, 2020 WL 1491186 *7-8 (following the Ninth and Eleventh Circuits and concluding that P&As may sue on behalf of constituents); *Rights of Others*, 157 U. Pa. L. Rev. at 259 (describing how *Hunt* rejected "overly formalistic" limits on associational standing).

### B. Plaintiffs have organizational standing.[8]

"[A] plaintiff has suffered an organizational injury if the challenged policy or practice frustrate[s] . . . its purpose and cause[s] a drain on its resources." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, 843 Fed. App'x 493 (4th Cir. 2021) (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand and Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013)).

Justice 360 has suffered organizational injury sufficient to establish standing. Justice 360's mission is to "provide[] direct representation to children in the custody of DJJ and the South Carolina Department of Corrections, [as well as to] provide[] legal resources and engage[] in public education and advocacy around youth detention and capital punishment." ECF 1 ¶ 13. This mission is consistently frustrated by the abhorrent conditions at DJJ. Children who are constantly in fear of attack, delirious from hours in solitary confinement, and ill equipped educationally because they do not attend school are far less capable of participating in their own defense. In response, Justice 360 is forced to expend its resources advocating for their clients' most basic needs. This reduces Justice 360's capacity to conduct its core mission, which confers it with standing to bring this suit. *See N.C. State Conference of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017) (NAACP had standing where it alleged "that it ha[d] been forced to divert its valuable and limited resources away from its core mission and planned voter-mobilization, voter-protection, and voter-education activities . . . in order to investigate, respond to, mitigate, and address the concerns of its members resulting from Defendants' unlawful *en masse* voter challenge and purging practices" (internal quotation marks omitted)); *Lee v. Va. State Bd. of Elecs.*, 155 F. Supp. 3d 572, 579 (E.D. Va. 2015) (Plaintiffs adequately alleged that "as a result of Virginia's voter ID law and the long wait times to vote,

---

[8] This section focuses on Justice 360 and SC NAACP's organizational standing to help further explain why all three organizations have organizational standing in this case. Plaintiffs have addressed DRSC's organizational standing elsewhere in the briefing and incorporate by reference their arguments in opposition to Defendants' motion to dismiss, which addresses the DRSC standing argument. ECF 15 at 4-8, 12-14. The exclusion of DRSC here should not be taken as an admission that it lacks organizational standing.

they will be required to expend additional resources and effort. This includes both an educational component as well as the need to encourage voters to remain in line to casts their votes despite the time required").

Defendants argue that Justice 360 lacks organizational standing because its mission includes "extralegal advocacy on issues that impact [its] clients, including . . . the role of mental illness in the criminal justice system, and the impact of juvenile brain development on culpability and punishment," ECF 13-8 ¶ 7, and "[m]ental health permeates Plaintiffs' Complaint," ECF 16 at 15. But Plaintiffs' contentions in this case about mental health in DJJ's facilities have nothing to do with the overall role of mental illness in culpability or punishment. They relate to the daily denial of basic mental health and rehabilitative services, and the terrible cost violence and isolation in Defendants' facilities have on children's mental health. Defendants use the broad brush of "mental health" to create a false equivalency between mental illness and culpability in a criminal prosecution, on the one hand, and the detrimental effects of DJJ facility conditions on juveniles' mental health, on the other. The Court should reject this argument.

SC NAACP has also suffered organizational injury sufficient to establish standing.[9] As President Murphy explained in her declaration, SC NAACP's mission is to end structural discrimination, including through advocacy for Black students' access to educational resources and opportunity in non-segregated and equitably funded school systems. ECF 13-6 ¶¶ 7-8. But conditions at DJJ force SC NAACP to divert its resources to ensure Black students are not needlessly and excessively placed in damaging solitary confinement, subjected to constant threats of violence, and forced to live in squalor and without educational services. That advocacy is compelled by Defendants' actions. SC NAACP simply cannot further its actual mission of addressing segregation and inequity in education while these violations continue. That constitutes a clear organizational injury and gives SC NAACP standing to bring this suit.

Defendants advance a nonsensical proposition that the mission of any organization

---

[9] This Court need not determine whether the SC NAAP has organizational standing to bring this suit because it also has associational standing. See infra section II.

working for children necessarily includes ensuring that their basic safety, physical and mental health, and hygiene needs are satisfied. But neither Justice 360 nor SC NAACP was founded to address the egregious constitutional and statutory violations present in Defendants' facilities. Both organizations are forced to do so because, absent change, they cannot fulfill their actual missions. As such, they have suffered organizational injury and have standing to bring this suit.

### C. Plaintiffs are entitled to sue under Section 1983.[10]

Defendants continue to push the false theory that Plaintiffs are not proper "persons" under Section 1983 and that, "[b]ecause Plaintiffs were not deprived of constitutional rights, they lack standing to bring claims under Section 1983." ECF 16 at 22-23. But, as Plaintiffs have explained (and as Defendants continue to ignore) this argument is wide of the mark. Nothing in the text of Section 1983 suggests that it reaches anything less than the full scope of Article III standing, under which organizations may sue both on their own behalf and on behalf of members. *See Gladstone Realtors v. Vill. of Belwood*, 441 U.S. 91, 100 (1979) (discussing previous version of § 810 of Fair Housing Act, which is analogous to Section 1983, and concluding that the private cause of action in that statute "provides standing to the fullest extent permitted by Art. III"). Instead, the text provides that any "any citizen" or "*other* person" may sue when "depriv[ed] of *any* rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). As noted, Plaintiffs are persons pursuant to Section 1983. *See White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179 (4th Cir. 2022) (noting that in Section 1983 "person . . . includes a corporation"). And, as in the mine-run of associational and organizational standing cases, Defendants' constitutional violations *do* violate Plaintiffs' protected rights—both by frustrating their missions and compelling them to divert scarce resources, and by injuring their members.

The language of Section 1983 does not excise Plaintiffs' injuries from the statute's scope. Plaintiffs sufficiently allege (and have shown, with evidence) that Defendants are violating the

---

[10] Plaintiffs incorporate by reference their arguments in opposition to Defendants' motion to dismiss. ECF 15 at 11-14.

11

constitutional rights of Plaintiffs' constituents and are unlawfully harming Plaintiffs themselves.

    **D.**     **Plaintiffs are not required to show exhaustion under the PLRA.**[11]

Under the plain text of the PLRA and recent authority, organizations such as Plaintiffs are not subject to the PLRA's exhaustion requirements. *See* ECF 15 at 25-28 (citing *Alabama Disabilities Advocacy Program v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008) (plaintiff organization "is clearly not a 'prisoner' under the statute"); *Vermont Protection & Advocacy, Inc. v. Vermont Department of Corrections*, No. 04-cv-245, ECF No. 24 (D. Vt. 2005) (denying motion to dismiss for failure to exhaust administrative remedies under the PLRA)). Defendants ignore that text and authority in their opposition. Defendants also ignore the detailed factual allegations and evidence of DJJ officials thwarting children's attempts to invoke the administrative process, instead perfunctorily asserting that, "[i]n reality, grievance procedures are available" citing nothing other than the mere existence of a policy. ECF 16 at 23 (citing ECF 10-3 at 1-9). But neither a written policy governing grievances (the contents of which Director Hendrick simply parrots in her declaration, *see* ECF 16-1 at 18-22) nor a cherry-picked post-suit example of Defendants investigating grievances purportedly consistent with that policy overcome the credible, concrete evidence from Phyllis Ross describing children who fear retaliation from DJJ staff, are not given access to grievance forms, and whose grievances are not investigated.[12]

**IV.**     **Plaintiffs have established irreparable harm.**

Plaintiffs have established ongoing irreparable harm both to the members they represent in this case and to themselves, in the form of the frustration of purpose and diversion of resources they experience. ECF 13-1 at 27-32. Organizations can properly seek injunctive relief based on the irreparable harm to unidentified members or constituents. *See Ass'n of Am. Publishers, Inc. v. Frosh*, No. 21-cv-3133, 2022 WL 484926, at *13 (D. Md. Feb. 16, 2022)

---

[11] Plaintiffs incorporate by reference their arguments in opposition to Defendants' motion to dismiss. ECF 15 at 25-30.

[12] Defendants do not and cannot assail Ms. Ross's credibility. *See* ECF 16 at 15-16 ("Indeed, Ms. Ross has done extraordinary work serving as the detainee advocate at DJJ.").

(granting preliminary injunction where organizational plaintiff showed irreparable harm to its members); *Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, 472 F. Supp. 3d 183, 227 (D. Md. 2020) (plaintiff organizations showed irreparable harm through their "members, their patients, and their families [being exposed] to increased risk of life-threatening disease"); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 969 (D. Md. 2020) (finding irreparable harm where "the kind of harm identified to [organizational plaintiffs'] members is indisputably irreparable"). Organizations can also prevent irreparable harm to themselves. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 957 (N.D. Cal.) *order reinstated*, 391 F. Supp. 3d 974, 983-84 (N.D. Cal. 2019), *aff'd*, 964 F.3d 832 (9th Cir. 2020); *see also Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016) ("Exodus has presented evidence that . . . its organizational objectives would be irreparably damaged by its inability to provide adequate social services to its clients."), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

And, as noted, *nothing* in Plaintiffs' motion for a preliminary injunction seeks to redress "past wrongs." ECF 16, 30. The constitutional violations Plaintiffs have identified persist and may be worsening, *see generally* Ex. A, creating irreparable harm to the children in Defendants' care. Defendants' purportedly in-progress improvements do not change the fact that ongoing harm is happening *now* and can and should be prevented by this Court.

V. **The equities and public interest favor preliminary injunctive relief.**

The ongoing harm that the children in Defendants' custody would be forced to endure absent the injunctive relief Plaintiffs seek here far outweighs any purported harm that Defendants would suffer from having to comply with a court order granting relief that simply compels Defendants to satisfy their constitutional obligations. "[I]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Defendants' characterization of the requested

relief as "expensive,"[13] "unrealistic," and "fanciful" does not change that.

First, *Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994), is inapplicable, because the Fourth Circuit's ruling was based on the district court's failure to engage in the extensive fact finding necessary to support the preliminary injunction granted. *Id.* at 271 (order "was premised upon conclusory findings that [the court] doubt[ed] could support even circumscribed intervention that reserved to prison officials the broadest authority to address the institution's problems in the first instance"). In criticizing the district court's ruling, the Fourth Circuit repeatedly highlighted both the dearth of evidence supporting the plaintiffs' allegations and the district court's failure to consider contrary evidence in the record. *Id.* at 273 (district court "failed even to mention the prison officials' evidence"). No such issues exist here. Plaintiffs' assertions are based on ample evidence of present harms, not mere conclusory statements. And, tellingly, Defendants do not actually suggest that constitutional violations have ceased.

Defendants' reliance on *Maryland v. King*, 567 U.S. 1301 (2012), is similarly misplaced. There, the Supreme Court addressed a state's request to stay a state appeals court's judgment overturning a conviction where the conviction was based on a DNA sample collection statute that was, according to the state appeals court, unconstitutional. *Id.* at 1302. The Supreme Court found a "reasonable probability that [it] would grant certiorari" because the state appeals court decision conflicted with several other decisions upholding similar DNA sample collection statutes. *Id.* That is why the Supreme Court found that the lower court's decision—striking down a statute that the Supreme Court was likely to uphold—would subject the state to "ongoing irreparable harm." *Id.* at 1303. Here, there is no such finding of a "reasonable probability" of

---

[13] Expense is not a valid consideration—the State must comport with the constitution, whatever the cost. *E.g.*, *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 201 (8th Cir. 1974) ("Lack of funds is not an acceptable excuse for unconstitutional conditions of incarceration."); *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) ("Lack of resources is not a defense to a claim of prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations."); *see also Watson v. City of Memphis*, 373 U.S. 526, 537 (1963) ("[V]indication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them.").

Defendants' actions being upheld by the Supreme Court. Moreover, Plaintiffs do not seek to enjoin Defendants from effectuating statutes enacted by the representatives of South Carolina; indeed, many of Plaintiffs' claims arise out of Defendants' repeated and ongoing failures to administer DJJ facilities consistent with South Carolina statutes. Plaintiffs do not seek to halt enforcement of any law; Plaintiffs simply want, once and for all, for Defendants to actually *comply* with it.

## CONCLUSION

Defendants' narrative is nothing new: Reforms are underway, and courts should not meddle in the affairs of administrators such as Defendants. But the circumstances here are anything but usual. Defendants have known about the problems Plaintiffs seek to remedy for at least five years, and during those five years, they have failed to materially improve the lives of the children in their custody. Although Plaintiffs do not suggest a straight line between DJJ during the *Alexander S.* litigation and today, it is nonetheless clear that history is repeating itself. This Court should step in before more kids get hurt.

Dated: June 14, 2022

**ACLU OF SOUTH CAROLINA**

*/s/ Allen Chaney*
Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org

**WYCHE, P.A.**

Wallace K. Lightsey (D.S.C. Bar No. 1037)
Rita Bolt Barker (D.S.C. Bar No. 77600)
Meliah Bowers Jefferson (D.S.C. Bar No. 10018)
Jessica Monsell (D.S.C. Bar No. 13645)
200 E. Broad Street, Suite 400
Greenville, South Carolina 29601
Tel: (864) 242-8200
Fax: (864) 235-8900
rbarker@wyche.com
wlightsey@wyche.com
mjefferson@wyche.com
jmonsell@wyche.com

**NAACP**

Janette Louard*
Anna Kathryn Barnes*
Joe Schottenfeld*
Martina Tiku*
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
jlouard@naacpnet.org
abarnes@naacpnet.org
jschottenfeld@naacpnet.org
mtiku@naacpnet.org

Respectfully submitted,

**JENNER & BLOCK LLP**

Previn Warren*
William R. Weaver*
Mary E. Marshall*
Jessica J.W. Sawadogo*
1099 New York Ave. NW Suite 900
Washington DC 20001
Tel: (202) 637-6300
pwarren@jenner.com
wweaver@jenner.com
mmarshall@jenner.com
jsawadogo@jenner.com

Jeremy M. Creelan*
Jacob D. Alderdice*
Jeremy Ershow*
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
jcreelan@jenner.com
jalderdice@jenner.com
jershow@jenner.com

Amit B. Patel*
353 N Clark Street
Chicago, IL 60654
Tel: (312) 222-9350
apatel@jenner.com

**PRO HAC VICE APPLICATIONS TO BE FILED*