# EXHIBIT A

## SUPPLEMENTAL DECLARATION OF PHYLLIS ROSS

I, Phyllis Ross, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

### I.      BACKGROUND

1.      I work with Disability Rights South Carolina ("DRSC") on a part time basis. My work involves conducting monitoring visits to DJJ to investigate incidents of assaults by peers and/or staff and to ensure the safety and wellbeing of the children in DJJ's facilities.

2.      I previously submitted a declaration documenting the dangerous conditions for children detained in DJJ on behalf of the plaintiffs in this case. *See* ECF 13-2.

3.      Over the past two years, I have visited BRRC approximately 15 times; JDC approximately 5 times; and I have visited each evaluation center (MEC and UEC) on multiple occasions (CEC was shut down for a large part of this period).

4.      During my visits, I have spent time throughout the DJJ facilities, including in both common areas and the dorms.

5.      Since DRSC's lawsuit against DJJ was filed on April 26, 22, I have continued in my role as a detainee advocate. My last monitoring visit was on June 4, 2022, when I visited an assault victim in the infirmary of BRRC.

6.      Since signing my last declaration on May 20, 2022, the conditions at DJJ facilities have continued to be extremely dangerous. I submit this declaration to highlight a few especially alarming incidents that have occurred at DJJ facilities since my last declaration.

7.      I have monitored DJJ facilities as an advocate for over thirty years. The DJJ is in the worst shape I've ever seen it. The current environment at DJJ facilities is more dangerous for

detained children than at any other time during my tenure, and that applies across the board to all of its facilities that house children.

## II. SECURITY FAILURES AT JDC

8.    On May 24, 2022, a 13-year-old child entered DJJ facilities with a loaded gun. Despite passing through JDC's intake process, the child had a loaded gun on the JDC premises for over 24 hours. The child showed the loaded gun to other children, who were scared for their safety and reported him to DJJ staff, who apparently had not known anything about it.

9.    This incident was reported in the local news. *See* Julia Kauffman, *Teenager Snuck Loaded Gun Passed Officers and into DJJ Facility, Police Say*, WLTX (May 26, 2022, 9:03 PM), https://www.wltx.com/article/news/crime/teenager-sneaked-loaded-gun-djj-facility-police/101-320da9ad-3e6f-459a-b723-f0ea2e64c54a.

10.    After this incident occurred, I visited the JDC to meet with children involved and to try to understand what happened. The children who saw and heard about the gun were clearly traumatized by the incident.

11.    One of the children I spoke to is C.H., who is detained at JDC on a status offense. C.H. was charged as a runaway after leaving his mom's house to stay with his girlfriend, because he was fighting with his step-father.

12.    C.H. has autism and is prescribed various medications for anxiety, ADHD, and depression. C.H. is 16 years old and has been in JDC for a short period of time.

13.    C.H. has been in nonstop isolation because of his vulnerability due to his autism and other factors. C.H. was especially disturbed by the presence of the loaded gun. When we spoke about the incident, C.H. was sobbing almost the whole time. C.H. told me, "I was scared that with that gun that I might die. The room was closing in on me." C.H. was so traumatized by

the event that he no longer wants his door closed, and would prefer to be in a boat bed to avoid the feeling that he is closed in.

14.     Given his disability, this incident has been extremely difficult for C.H. to handle. Because of C.H.'s poor mental state following this incident, I requested for a therapist to come and meet with him and that he be given a place to sleep where he felt safer (either with his door open at night or on a "boat bed" in the open common area).

15.     I spoke to another child, J.H., about the incident. J.H. also saw the loaded gun that the child brought in. Like C.H., J.H. has clearly been traumatized by the presence of a loaded gun in the JDC. J.H. told me that he is especially afraid because he is on crutches and therefore can't run if he fears for his safety.

16.     After the loaded-gun incident occurred, it took over 24 hours for someone on DJJ's clinical staff to talk to the children about what had happened to help them process the traumatic event.

17.     When I visited JDC, I asked to be shown the facility's intake procedures to try and understand how a child could possibly have entered the facility with a loaded firearm.

18.     DJJ intake procedures require staff to put youth through a metal detector, remove their clothes, and be stripped search. Clearly, these procedures were not followed in this case.

19.     I was told by a supervisory employee at DJJ that the gun was simply "missed" during intake. I was also told that there are no dedicated JCOs for intake; rather they are pulled from units to handle intake even though they may not be familiar with the intake process.

20.     JDC staff told me that they are very understaffed. One staffer, for example, stated that, prior to the incident at JDC, there were not enough JCOs to directly supervise children in JDC. Instead, staffers relied on camera coverage to try to watch the detained kids.

21.    The result is that staff and children were put in serious danger and some are now afraid for their lives.

22.    Furthermore, I have learned from talking to DJJ staff and detained children that the JDC E-Pod is currently being monitored virtually, rather than a JCO actually being present in E-Pod. A child detained at JDC communicated to me that JCOs are thus taking a long time before intervening to stop violence and also that JCO response times are slow even when a JCO is physically present on the pod.

### III.    VIOLENT ASSAULT AT BRRC

23.    On June 2, 2022, I was informed by DJJ staff member that a child, D.J., had been brutally assaulted by other children at BRRC.

24.    D.J. is 16 years old. He has a history of traumatic brain injuries and neurological issues.

25.    On June 2, 2022, around dinner time, D.J. was fighting with another child in the courtyard of the BRRC. After this fight ended, the door to a nearby pod opened and 8 other children ran out and began attacking D.J. The assailants put locks in socks and used these weapons to beat D.J. They had also put on their combat boots, which were available to them because they participated in a JROTC program, and used those boots to kick D.J. He suffered multiple blows to the head and face, which is where the beating was concentrated.

26.    While D.J. was being beaten, there were at least two guards present—one a captain and one a lieutenant—but both watched the assault without attempting to stop it.

27.    I was told by a supervisory employee at DJJ that they have seen video footage of DJJ staff running away from the fight instead of trying to help. I was told by this same employee that, after this incident, staff members are scared. And I was further told by this same employee

that understaffing at BRRC continues to be a serious issue—during at least one shift, there were only 5 staff for the entire BRRC campus.

28.     Because none of the guards tried to break up the fight, another child, D.R., intervened to try to stop D.J.'s beating. D.R. was assaulted with a lock in a sock in the top of his head and on his back. D.R. fled into the vestibule where he was pursued by one of the juveniles.

29.     D.R., the child who tried to protect D.J., was also injured as a result. He was taken to the emergency room where he received stitches. When I interviewed D.R., he informed me that SLED officers had interviewed him and taken pictures of his injuries; however, I do not have those photos in my possession.

30.     I visited D.J. in the infirmary on June 4, 2022, two days after the incident occurred. While there, I took photos of his injuries. Below are true and accurate copies of four of the photos:









31.     When I visited D.J., he could not remember how the fight ended because he was knocked unconscious by his attackers.

32.     D.J. is now traumatized and is very concerned about JCOs keeping him safe.

33.     D.J. believes that a JCO encouraged the other children to gang up on him.

34.     In all my time working as a detainee advocate at DJJ facilities, this was one of the most serious beatings I have seen.

35.     In the course of investigating D.J.'s beating, I had occasion to speak to a DJJ employee at BRRC who informed me that juveniles have been using shower heads, mop handles,

doorknobs, and padlocks to assault other juveniles. The staff person described this as a present-tense issue as opposed to a problem that had occurred in the past but had been resolved.

## IV.     SEXUAL ASSAULT AT MEC

36.     On or about June 4, 2022, a child detained at MEC was sexually assaulted by male peers. The assault occurred on the second floor of the Delta Unit in Room 4.

37.     The assault victim, D.H., was in the upper level of the Delta Unit. At least three other male peers removed D.H.'s clothes and dragged D.H. naked into Room 4 and sexually assaulted him through digital penetration.

38.     Prior to and during the assault, there was one JCO in the vicinity downstairs where the JCOs typically monitor children in MEC's Delta Unit. At least one JCO was present during the assault but did not intervene to stop it from happening. Based on my understanding, when the JCO saw D.H. being dragged naked, the JCO went upstairs toward Room 4 and called for assistance, but neither the on-duty JCO nor the back-up JCO who came to the scene was able to intervene in time to stop the assault.

39.     DJJ has now transferred D.H. to a different facility, but I am not sure to which facility he has been transferred.

40.     I have been told by DJJ staff that there was an ERMIS report created after this incident. "ERMIS" stands for Event Reporting Management Information System, and ERMIS reports are used to track and record serious events occurring in DJJ facilities.

## V.     FLAWED GRIEVANCE PROCEDURES & FEAR OF RETALIATION

41.     I am aware of children who have been assaulted and do not receive the support to file grievances after being assaulted in DJJ facilities.

42.    For example, S.S. was brutally assaulted on November 17, 2021, at BRRC by a group of kids from another dorm.  The fight stopped after PSOs arrived on the unit and stood outside the bars and pepper sprayed everyone involved.  S.S. was taken to the infirmary where his injuries were treated, and a JCO took pictures of his injuries.  I visited S.S. in February 2022, and he stated that he did not believe investigators had followed up on the investigation of this incident. Multiple children and DJJ staff have similarly conveyed to me that DJJ staff does not follow up on investigations of serious incidents.

43.    Another child I spoke to, T.M., had a similar experience. On February 10, 2022, T.M. was assaulted by several peers at the Holly building in the BRRC.  After two violent incidents in the same day, he was taken to the infirmary, and then to the ER where he received 6 stitches. He had two black eyes and a possible nose fracture. T.M. wrote 5 allegations. As of the February 14, 2022, no investigator had come to speak to him about his allegations.

44.    Despite the seriousness of his injuries, no one from DJJ took pictures of T.M.'s injuries and no investigator came to speak with him.  A DJJ psychologist did see his injuries, but that was the extent of the follow-up T.M. received, to my knowledge, and T.M. was not offered support for filing a grievance.

45.    Multiple detained children have told me that DJJ staff at MEC and UEC told them that there was no point in filing grievances. In some cases, DJJ staff simply deny access to grievance forms.  Multiple children have also reported requesting grievance forms but being denied those forms by DJJ staff.

46.    Children are also *afraid* to file grievances because the violence is so out-of-control in DJJ facilities. Children are afraid that if they report bad behavior by JCOs, for example, the JCOs will look the other way when the complainant is attacked by peers (which is inevitable given

the endemic violence at DJJ). Multiple children have conveyed their fears that guards will look the other way when the children are subjected to violence. Both staff and children have expressed to me that children are afraid of filing grievances because in some cases children would be required to request grievance forms from the very DJJ staff members that the grievance is against, and then turn in those grievances to the same staff members. The children fear that turning in grievance forms could lead to retaliation in some form from DJJ staff.

## VI.    RECENT MONITORING DATA

47.    Attached as Exhibits A and B are true and correct copies of DJJ's monthly Performance-based Standard Youth Assault/Injury Data from March and April 2022.

\

Executed June 14, 2022

_Phyllis Ross_

Phyllis Ross

# EXHIBIT A

**L. Eden Hendrick**
Executive Director

P.O. Box 21069
Columbia, SC 29221-1069

djj.sc.gov

**Henry McMaster**
Governor



**SOUTH CAROLINA**
**DEPARTMENT OF**
**JUVENILE JUSTICE**

May 16, 2022

**Via Email Only (franco@pandasc.org)**
Beth Franco, Executive Director
Disability Rights South Carolina
3710 Landmark Drive, Suite 208
Columbia, South Carolina 29204

Re:    March 2022 Youth Assault/Injury Data

Dear Ms. Franco:

Attached please find reports from each of the South Carolina Department of Juvenile Justice's (SCDJJ) secure evaluation, detention, and commitment facilities for the month of March 2022. These reports reflect Performance-based Standards (PbS) data regarding juvenile assaults/fights and juvenile-on-juvenile injuries in each facility.

Regarding injuries during the month of March as documented by SCDJJ Health Services, there were 146 sick call appointments for juvenile/juvenile aggression, eleven referrals to the emergency room due to an injury, and no hospitalizations due to an injury. Please refer to my letter dated November 8, 2018, to Gloria Prevost, a copy of which was previously provided, for an explanation as to why the number of incidents or injuries reported by PbS will differ from the number of sick call appointments for juvenile/juvenile aggression.

At the end of March, 125 committed youth were confined in SCDJJ's commitment facilities, 42 youth were temporarily committed to one of SCDJJ's three secure evaluation centers for evaluation, and 98 youth were detained in SCDJJ's Juvenile Detention Center for a total of 265 youth in secure custody. In addition, 194 youth were assigned to wilderness programs, marine institutes, mental health placements, or other community residence placements.

Please let me know if you have any questions about this data or if I can be of assistance.

With kindest personal regards, I am,

Sincerely,

Sara M. Bunge
Assistant General Counsel

cc:    L. Eden Hendrick, Executive Director
       Lisa Engram, Deputy Director
       Mack McGhee, Deputy Director

Attachment

*Empowering Our Youth for the Future*

## Performance-based Standards (PbS) Report Information Sheet

## Report for: Disability Rights South Carolina

*Information in this PbS report is based on information collected from agency submitted event reports and are based on Performance-based Standards (PbS) category definitions. Data may have been extracted both from hard copy and electronic event report documents. This report may only include categories specifically requested.*

*Note: Identified incidents are not mutually exclusive and may relate to or are part of the same reported event. For example, a single reported event can have several occurrences that may include multiple categories such as an assault, fight, contraband, disturbances, etc.*

*This monthly report includes information relating to the current month, the current month one year ago, and the previous month.*

### A glossary of critical PbS terminology (limited):

**Assault:** Any instance in which a youth or staff member is involved in a physical contact with another individual(s), even if no one is injured. This includes unprovoked and provoked attacks and sexual assaults. Distinctions should be made between assaults and fights where fights are defined as mutual physical attacks. This distinction was made for analysis purposes to further define assaults. Assault outcome measures will combine these events to create a single score. (Revised April 2015)

**Fight**: Fight is a subcategory of youth on youth assault. A fight is defined as a mutual physical assault between two or more youths.

**Injury**: Any instance in which a youth or staff member is hurt even if treatment is not provided. This includes minor injuries such as scratches or swellings, injuries from assaults/fights, accidental injuries from playing sports or other environmental hazards, cases where a youth or staff member is injured during the application of restraints.

*https://users.pbstandards.org/resources (April 2020)*





**PbS Monthly Report for Disability Rights South Carolina**
For the Period March 2021, February 2022, March 2022

Niaja Kennedy
Standards Manager

**May 2, 2022**











# EXHIBIT B

**L. Eden Hendrick**
Executive Director

**P.O. Box 21069**
**Columbia, SC 29221-1069**

djj.sc.gov

**Henry McMaster**
Governor

**SOUTH CAROLINA**
**DEPARTMENT OF**
**JUVENILE JUSTICE**

June 9, 2022

**Via Email Only (franco@pandasc.org)**
Beth Franco, Executive Director
Disability Rights South Carolina
3710 Landmark Drive, Suite 208
Columbia, South Carolina 29204

Re:      April 2022 Youth Assault/Injury Data

Dear Ms. Franco:

Attached please find reports from each of the South Carolina Department of Juvenile Justice's (SCDJJ) secure evaluation, detention, and commitment facilities for the month of April 2022. These reports reflect Performance-based Standards (PbS) data regarding juvenile assaults/fights and juvenile-on-juvenile injuries in each facility.

Regarding injuries during the month of April as documented by SCDJJ Health Services, there were 132 sick call appointments for juvenile/juvenile aggression, five referrals to the emergency room due to an injury, and no hospitalizations due to an injury. Please refer to my letter dated November 8, 2018, to Gloria Prevost, a copy of which was previously provided, for an explanation as to why the number of incidents or injuries reported by PbS will differ from the number of sick call appointments for juvenile/juvenile aggression.

At the end of April, 115 committed youth were confined in SCDJJ's commitment facilities, 53 youth were temporarily committed to one of SCDJJ's three secure evaluation centers for evaluation, and 97 youth were detained in SCDJJ's Juvenile Detention Center for a total of 265 youth in secure custody. In addition, 191 youth were assigned to wilderness programs, marine institutes, mental health placements, or other community residence placements.

Please let me know if you have any questions about this data or if I can be of assistance.

With kindest personal regards, I am,

Sincerely,

Sara M. Bunge
Assistant General Counsel

cc:      L. Eden Hendrick, Executive Director
         Mack McGhee, Deputy Director

Attachment

*Empowering Our Youth for the Future*

## Performance-based Standards (PbS) Report Information Sheet

## Report for: Disability Rights South Carolina

*Information in this PbS report is based on information collected from agency submitted event reports and are based on Performance-based Standards (PbS) category definitions. Data may have been extracted both from hard copy and electronic event report documents. This report may only include categories specifically requested.*

*Note: Identified incidents are not mutually exclusive and may relate to or are part of the same reported event. For example, a single reported event can have several occurrences that may include multiple categories such as an assault, fight, contraband, disturbances, etc.*

*This monthly report includes information relating to the current month, the current month one year ago, and the previous month.*

### A glossary of critical PbS terminology (limited):

**Assault:** Any instance in which a youth or staff member is involved in a physical contact with another individual(s), even if no one is injured. This includes unprovoked and provoked attacks and sexual assaults. Distinctions should be made between assaults and fights where fights are defined as mutual physical attacks. This distinction was made for analysis purposes to further define assaults. Assault outcome measures will combine these events to create a single score. (Revised April 2015)

**Fight**: Fight is a subcategory of youth on youth assault. A fight is defined as a mutual physical assault between two or more youths.

**Injury**: Any instance in which a youth or staff member is hurt even if treatment is not provided. This includes minor injuries such as scratches or swellings, injuries from assaults/fights, accidental injuries from playing sports or other environmental hazards, cases where a youth or staff member is injured during the application of restraints.

*https://users.pbstandards.org/resources (April 2020)*





**PbS Monthly Report for Disability Rights South Carolina**
For the Period April 2021, March2022, April 2022


Niaja Kennedy
Standards Administrator

**June 1, 2022**









