**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-1032**

SOUTH CAROLINA STATE CONFERENCE OF THE NAACP; DISABILITY RIGHTS SOUTH CAROLINA; JUSTICE 360,

Plaintiffs – Appellants,

v.

SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE; EDEN HENDRICK, in her official capacity as Executive Director of the South Carolina Department of Juvenile Justice,

Defendants – Appellees.

------------------------------

GOVERNOR HENRY DARGAN MCMASTER,

Amicus Supporting Appellees.

Appeal from the United States District Court for the District of South Carolina, at Rock Hill. Jacquelyn Denise Austin, District Judge. (0:22−cv−01338−JDA−PJG)

Argued: October 22, 2025 Decided: January 29, 2026

Before WILKINSON, WYNN, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Rushing joined. Judge Wynn wrote a dissenting opinion.

**ARGUED:** Jacob D. Alderdice, JENNER & BLOCK LLP, New York, New York, for Appellants. Beth Richardson, ROBINSON GRAY STEPP & LAFFITTE, LLC, Columbia, South Carolina, for Appellees. **ON BRIEF:** Allen Chaney, ACLU OF SOUTH CAROLINA, Columbia, South Carolina; Jeremy Creelan, Todd Costa, New York, New York, William R. Weaver, Mary E. Marshall, Washington, D.C., Amit Patel, JENNER & BLOCK LLP, Chicago, Illinois; Rita Bolt Barker, WYCHE, PA, Greenville, South Carolina; Janette Louard, Anthony Ashton, Quiana-Joy Ochiagha, NAACP, Baltimore, Maryland, for Appellants. Robert E. Tyson, Jr., Sarah C. Frierson, ROBINSON GRAY STEPP & LAFFITTE, LLC, Columbia, South Carolina, for Appellees. Thomas A. Limehouse, Jr., Chief Legal Counsel, Wm. Grayson Lambert, Chief Deputy Legal Counsel & Senior Litigation Counsel, Erica W. Shedd, Deputy Legal Counsel, Tyra S. McBride, Deputy Legal Counsel, OFFICE OF THE GOVERNOR OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus Curiae.

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 3 of 27

WILKINSON, Circuit Judge:

This action was initiated by three advocacy organizations seeking institutional reform of South Carolina's Department of Juvenile Justice (DJJ). They claim that the conditions in DJJ's facilities violate juveniles' constitutional and statutory rights. Because plaintiffs do not have a personal stake in the litigation, we affirm the district court's dismissal of the complaint without prejudice.

We do not doubt the sincerity of plaintiffs' desire to ameliorate the harm that may befall juveniles in DJJ's custody, only the wisdom of their decision to sue in place of those whose interests they seek to advance. The youth detained by DJJ should be driving this litigation forward, not advocacy organizations. Article III of the Constitution requires nothing less. It does not countenance suits by concerned citizens, only injured parties.

I.

Plaintiffs are three civil rights advocacy organizations that work with youth detained by DJJ. J.A. 72, 74.

Justice 360 is a South Carolina nonprofit organization whose mission is to promote fairness in the criminal justice system for juveniles facing lengthy sentences and for individuals facing the death penalty. It provides direct representation to juveniles in DJJ's custody and engages in public education and advocacy surrounding youth detention and capital punishment. J.A. 74. The organization also provides training and support to other attorneys and practitioners that represent juveniles. J.A. 123–24.

Disability Rights South Carolina (DRSC) is a nonprofit corporation that advances the rights of disabled people in South Carolina. In exchange for federal funding under the

Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, South Carolina has designated DRSC as the state's protection and advocacy system. J.A. 125. In this capacity, DRSC has the responsibility to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B). Accordingly, DRSC conducts routine monitoring visits of DJJ's facilities and formally advocates on behalf of dozens of juveniles detained by DJJ. J.A. 127, 130.

The South Carolina Conference of the National Association for the Advancement of Colored People (SC NAACP) is a nonprofit membership organization that, on behalf of its members, "advocates for a society in which all individuals have equal rights, all children have access to a free, high quality public education, and all persons are free from disproportionate incarceration and racially motivated practices." J.A. 72.

Plaintiffs brought this suit against DJJ and its executive director, Eden Hendrick, to improve the conditions of confinement at DJJ's five facilities, which they say are overcrowded, understaffed, and poorly maintained. J.A. 108–14. Plaintiffs allege that youth detained in these facilities are regularly subjected to violence, isolation, and inhumane living conditions and are denied adequate rehabilitative, educational, and medical services. J.A. 86–112. The complaint recounts the experiences of four of Justice 360's clients ("Child 1" through "Child 4") and nine of DRSC's statutory constituents ("Child 5" through "Child 13") to illustrate the conditions-related harm that plaintiffs say befalls every juvenile in DJJ's custody. J.A. 115–32. The complaint also describes how plaintiffs' activities have been impacted by these conditions. J.A. 118–32.

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 5 of 27

To remedy the alleged harm to plaintiffs and the juveniles they serve, plaintiffs seek injunctive relief and institutional reform of DJJ. J.A. 141–47. They assert four causes of action against Hendrick under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment and three causes of action against DJJ for violations of the Americans with Disabilities Act, the Rehabilitation Act, and the Individuals with Disabilities Education Act. J.A. 133–41.

DJJ and Hendrick moved to dismiss the amended complaint for failing to state a claim and for a lack of standing. The district court granted their motion and dismissed the complaint without prejudice. The court found that DRSC had standing to sue on behalf of its constituents but held that these claims were moot after Child 5 through Child 13 left DJJ's custody. The court also found that Justice 360 had standing to sue but concluded that its organizational claims failed on the merits. J.A. 391–403.

Plaintiffs timely appealed the district court's decision, which we review de novo. *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187, 190 (4th Cir. 2018); *Fairfax v. CBS Corp.*, 2 F.4th 286, 291 (4th Cir. 2021).

II.

As a threshold matter, DJJ and Hendrick dispute plaintiffs' standing to bring this suit. They argue that the juveniles detained by DJJ, not plaintiffs, are the proper parties to challenge the conditions in DJJ's facilities. We agree.

Article III of the Constitution confines the jurisdiction of federal courts to resolving "Cases" and "Controversies." U.S. Const. art. III, § 2. This limitation assigns federal courts "the traditional role of Anglo-American courts, which is to redress or prevent actual or

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 6 of 27

imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

Standing is an element of the case-or-controversy requirement that "focuses on whether the plaintiff is the proper party" to seek judicial relief. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "It requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers*, 555 U.S. at 493 (internal quotation marks omitted). To meet this standard, a plaintiff must show that (i) he has suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) the injury is fairly traceable to the challenged action of the defendant; and (iii) the injury would likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

By limiting who can sue, standing maintains "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). Indeed, the very distinction between executive and judicial authority "would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly." *Id.* at 350. Accordingly, the standing inquiry is "especially rigorous" in cases where the judiciary is called upon to supervise executive (mal)administration. *Raines*, 521 U.S. at 819–20.

The need for plaintiffs to have a personal stake in the litigation also ensures that decisions regarding whether and how to challenge the defendant's conduct are made by those who are most directly affected by it rather than citizens who might "roam the country in search of governmental wrongdoing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982). Standing thereby serves to prevent "the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 687 (1973).

Where the plaintiff is an organization, Article III standing can be established in one of two ways: "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (internal quotation marks omitted). Plaintiffs pursue both theories of standing on appeal, so we consider each of them.

A.

Plaintiffs first claim DRSC has standing to sue as a representative of its statutory constituents. The doctrine of associational standing permits an organization "to assert the claims of its members even where it has suffered no injury." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). As one might expect, associational standing is generally invoked by membership organizations that have members to represent. *Id.* However, in *Hunt*, the Supreme Court held that the doctrine also applies to organizations

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 8 of 27

that do not have members so long as they operate as genuine membership organizations "for all practical purposes." *Id.* at 344.

The plaintiff in *Hunt* was a state agency, the Washington State Apple Advertising Commission, which was created to promote and protect the state's apple industry. *Id.* at 336–37. While the Court acknowledged that apple growers and dealers were not members of the Commission in the traditional sense, it found that they "possess all of the indicia of membership in an organization." *Id.* at 344. "They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them." *Id.* at 344–45. The Court thus concluded that, as a practical matter, "the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests." *Id.* at 345.

Like the Commission in *Hunt*, DRSC concedes it does not have traditional members but says its constituents possess the indicia of membership necessary for DRSC to sue on their behalf. DRSC emphasizes that its board of directors includes "significant representation" of individuals with mental illness and their family members, guardians, or authorized representatives. J.A. 126; *see also* 42 C.F.R. § 51.22(b)(2). DRSC also says its activities are guided by an advisory council that is "comprised primarily" of individuals who have received or are receiving mental health services and their family members. J.A. 126; *see also* 42 U.S.C. § 10805(a)(6)(B).

Such equivocal allegations do not suffice to show that DRSC functions as a genuine membership organization "for all practical purposes." *Hunt*, 432 U.S. at 344. Notably, none

of *Hunt*'s three indicia of membership are present here. Individuals with mental illness play no role in selecting the members of DRSC's governing board. Four are appointed by the governor, three are chairs of advisory councils, and the remainder are elected by the board. J.A. 126. Nor are board positions limited to individuals with mental illness. Anyone who "broadly represent[s]" them or is "knowledgeable about" their needs can serve on the board. 42 U.S.C. § 10805(c)(1)(B). DRSC also fails to allege that its constituents provide any funding for its operations. Rather, the complaint suggests the organization is primarily funded by the federal government. *See* J.A. 125. In the absence of these indicia of membership, we cannot conclude with any real confidence that DRSC "provides the means by which [its constituents] express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345.

We recognize that this is an issue on which courts have disagreed. *Compare Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (holding that an organization like DRSC did not have associational standing), *and Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 809–10 (8th Cir. 2007) (same), *with Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1110–11 (9th Cir. 2003) (holding that an organization like DRSC did have associational standing), *and Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (same). But even those that disagree with our conclusion acknowledge that the constituents of protection and advocacy systems "do not have all the indicia of membership that the *Hunt* apple growers and dealers possessed." *Mink*, 322 F.3d at 1111; *see also Stincer*, 175 F.3d at 886 (declining to say that statutory constituents possess "all of" the indicia of membership).

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 10 of 27

*Hunt* was an exceptional case. The constituents there were directly involved in financing and directing the Commission's activities, so the Commission could credibly claim to serve as their representative. The same cannot be said here, where DRSC's rank-and-file constituents lack comparable means to "participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dall.*, 19 F.3d at 244. Indeed, individuals with mental illness need not even be aware of DRSC's existence to be counted among its constituents. Genuine membership in an organization requires more than that.

In acknowledging the more paternalistic function DRSC performs, we do not intend to diminish its mission or the role of protection and advocacy systems more generally. Individuals with mental illness may face obstacles to vindicating their rights, and DRSC's advocacy on their behalf is commendable. But associational standing is not designed to empower independent organizations to act as legal guardians of the rights of vulnerable populations. Other procedural devices serve that purpose. *See, e.g.*, Fed. R. Civ. P. 17(c). Associational standing is designed to empower individuals by allowing them "to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). The fact that members are in control of the organization and direct its activities are what provide courts with "some guarantee" that it can act as a credible and effective representative of their interests. *Id.* Those assurances are absent where, as here, individuals have not chosen to join the organization and lack any meaningful say over its operations.

We appreciate the fact that, in passing the PAIMI Act, Congress likely intended to give protection and advocacy systems the authority to sue on behalf of their statutory

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 11 of 27

constituents. *See* 42 U.S.C. § 10805(a)(1)(B). But Congress cannot displace constitutional limitations on the jurisdiction of federal courts via statute. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021). And the associational standing requirement at issue here—that an organization must have a member with standing it can represent—is "constitutional and absolute." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551, 555 (1996).

Even courts that read *Hunt* more broadly than we do recognize that Congress's intent to confer standing on protection and advocacy systems "does not definitively answer the question." *Mink*, 322 F.3d at 1110. They simply disagree about whether statutory constituents "are the functional equivalent of members for purposes of standing." *Id.* That we answer the question in the negative does not mean protection and advocacy systems have no role to play in pursuing legal remedies for individuals with mental illness. It just means that the affected individuals need to be included as parties to the litigation. The say-so of advocacy groups will not do, no matter how well-intentioned.

B.

Alternatively, plaintiffs claim that they have standing to bring this suit in their own right. Like individuals, "organizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). However, an organization does not suffer a cognizable injury whenever it voluntarily "diverts its resources in response to a defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). The organization must show that the defendant's actions

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 12 of 27

"directly affected and interfered with" one of its "core business activities." *Id.* With these principles in mind, we consider each of the organization's alleged injuries.

1.

SC NAACP claims it has had to divert volunteer time and resources away from its core mission to investigate conditions at DJJ's facilities. The organization says it has written letters to the Department of Justice, reviewed and responded to audits of the facilities, and discussed conditions-related advocacy with members whose loved ones are detained. Reply Br. at 25; J.A. 132. But because SC NAACP's injuries are a consequence of its "'unilateral and uncompelled' choice to shift its resources" in response to DJJ's actions, they are not cognizable. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quoting *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 238 (4th Cir. 2020)).

The Supreme Court's decision in *Alliance for Hippocratic Medicine* is instructive. That case involved the FDA's decision to relax its regulatory requirements on mifepristone, an abortion drug. *All. for Hippocratic Med.*, 602 U.S. at 376–77. Among other plaintiffs, four pro-life medical associations claimed they had standing to sue because they had spent considerable resources opposing the FDA's actions "to the detriment of other spending priorities." *Id.* at 394. They claimed the FDA had "caused [them] to conduct their own studies on mifepristone so that [they could] better inform their members and the public about mifepristone's risks," and "forced [them] to expend considerable time, energy, and resources drafting citizen petitions to [the] FDA, as well as engaging in public advocacy and public education." *Id.* (internal quotation marks omitted).

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 13 of 27

The Supreme Court rejected the medical associations' theory of standing, explaining that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* So too here, where all of SC NAACP's asserted injuries are the result of a voluntary decision to divert its resources into investigating and opposing the conditions in DJJ's facilities. This was the organization's choice; it was not dictated or compelled. SC NAACP "cannot manufacture its own standing in that way." *Id.*; *see also Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012).

2.

For its part, Justice 360 claims the conditions in DJJ's facilities have caused it to "divert some of its time and attention . . . into trainings designed to improve conditions-related advocacy." J.A. 123; Reply Br. at 21. Specifically, Justice 360 says it has begun "training practitioners on how to address the conditions-related challenges to juvenile representation" and has "spent time drafting and circulating model family court pleadings to help practitioners seek relief from, or avoid placements in, DJJ['s] facilities." J.A. 124.

Justice 360 also claims that its own ability to provide direct representation to juveniles has been impaired by DJJ's conduct. Attorney visits now allegedly take twice as long as they should because clients show up to the meetings exhausted, anxious, and unwilling to discuss case-related matters until they have had an opportunity to process their conditions-related trauma. As a result, Justice 360 claims it cannot represent as many juveniles as it otherwise would. Reply Br. at 20–21; J.A. 119–23.

The time and attention that Justice 360 devotes to advocacy-related trainings may have been prompted by the conditions in DJJ's facilities, but that fact alone does not suffice to demonstrate standing. If it did, then "all the organizations in America would have standing to challenge almost every [government action] that they dislike, provided they spend a single dollar opposing [it]." *All. for Hippocratic Med.*, 602 U.S. at 395. The Supreme Court has rejected such an "expansive theory of standing," *id.*, and so have we, *Lane*, 703 F.3d at 675. In the absence of any allegations that DJJ somehow compelled Justice 360 to begin offering these advocacy-related trainings, Justice 360's decision to do so does not amount to a cognizable injury.

Justice 360 alleges more than that, however. It claims it is *forced* to spend the first half of attorney visits listening to and engaging with conditions-related complaints. If Justice 360 attempts to redirect the conversation to its client's case, the client often "shuts down" and "become[s] despondent." J.A. 119–21. To continue representing its clients, then, Justice 360 says it has no choice but to help them process their conditions-related trauma.

The time Justice 360 is forced to spend discussing topics that are not relevant to its clients' cases could conceivably impede its ability to provide legal services. To establish standing, however, Justice 360 must show that *the defendant* "directly affected and interfered with" its ability to provide juvenile representation. *All. for Hippocratic Med.*, 602 U.S. at 395. Here, the direct impediment to Justice 360's activities is its own clients' refusal to discuss case-related matters. "Because any harm to [Justice 360] results from the actions of third parties not before this court, [it is] unable to demonstrate traceability."

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 15 of 27

*Lane*, 703 F.3d at 674; *see also Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is . . . ordinarily substantially more difficult to establish." (internal quotation marks omitted)).

The Supreme Court rejected a similar theory of standing in *Alliance for Hippocratic Medicine*. There, several doctors claimed they had standing to sue the FDA for its decision to relax regulatory requirements on mifepristone because "more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *All. for Hippocratic Med.*, 602 U.S. at 391. The Court declined to take such a "loose approach to causation," which it warned would give doctors standing to challenge "almost any policy affecting public health." *Id.* at 391–92. Just as there is "no Article III doctrine of 'doctor standing'" that permits medical providers to sue in place of their injured patients, *id.* at 391, there is no doctrine of attorney standing that permits Justice 360 to sue in place of its injured clients. "The chain of causation is simply too attenuated." *Id.*

3.

DRSC says DJJ's failure to ensure physical safety in its facilities interferes with DRSC's monitoring access. Juveniles are often afraid to speak with DRSC's monitors for fear of retaliation, and facilities may be so violent that monitors feel the need to go together or not at all. (The monitors to which we refer are the old-fashioned kind, of course, akin to those that used to roam grade school hallways.) In one instance, for example, a juvenile was assaulted hours after meeting with a DRSC monitor by other juveniles. DRSC also says that DJJ's failure to properly identify individuals with mental illness means it must

expend additional time and resources identifying which juveniles fall within its statutory mandate. Reply Br. at 24–25; J.A. 126–27.

Like Justice 360, DRSC fails to show that DJJ's actions directly impede its activities. Juveniles—not DJJ—refuse to speak with DRSC, and they refrain from doing so because they fear retaliation from other juveniles—not DJJ. *See Lane*, 703 F.3d at 674. Moreover, DRSC cannot manufacture its own standing by taking measures to protect its monitors unless the risk of harm is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). There are no allegations in the complaint suggesting DRSC's monitors have been subjected to violence in the past or have been put in imminent danger during their visits to DJJ's facilities. Absent such a showing, the mere allegation that DJJ's facilities are "sometimes too dangerous for DRSC's monitors to visit, or for them to visit alone," J.A. 126–27, does not suffice to establish standing. The other injury DRSC asserts in passing concerns the time and resources it spends identifying juveniles in DJJ's custody with mental illness. As with SC NAACP, DRSC's decision to divert its resources in response to DJJ's actions is not a cognizable injury. *All. for Hippocratic Med.*, 602 U.S. at 394.

III.

Plaintiffs cannot manufacture organizational standing out of whatever injuries their clients might sustain in DJJ's custody. While the violence juveniles experience may affect how they interact with Justice 360 and DRSC, DJJ's role in failing to prevent that violence is too attenuated from plaintiffs' ensuing injuries to establish standing. Even if we were to conclude otherwise, however, plaintiffs would still need to show that they possess a cause

of action with which they can press their claim. Plaintiffs maintain that they fall "within the class of plaintiffs whom Congress has authorized to sue under" 42 U.S.C. § 1983. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Section 1983 provides:

> Every person who, under color of any statute, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, *shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

Because Hendrick "subjects" juveniles in DJJ's custody "to the deprivation of" their Fourteenth Amendment right to be free from violence and plaintiffs have been "injured" by that deprivation, plaintiffs argue they can bring suit under § 1983. *Id.* Put more simply, plaintiffs contend that any "party injured" by the deprivation of someone's federal rights can bring an action under § 1983. Opening Br. at 44–45.

We read the text differently. Section 1983 does not hold state officials liable to *any* party injured but rather "to *the* party injured" by the deprivation of a federal right. The party injured is the person deprived of a federal right. This construction of the statute accords with our long-held view that § 1983 actions must be based on injuries personal to the plaintiff. *See, e.g.*, *Inmates v. Owens*, 561 F.2d 560, 562–63 (4th Cir. 1977) ("In order to state a civil rights claim upon which relief can be granted under 42 U.S.C. § 1983, one must allege that he, himself, sustained a deprivation of a right, privilege or immunity secured to him by the Constitution and laws of the United States."); *Howerton v. Fletcher*, 213 F.3d 171, 173 (4th Cir. 2000) ("[A] section 1983 claim must be based upon the

violation of plaintiff's personal rights, not the rights of someone else." (quoting *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990))).

Plaintiffs argue that limiting § 1983 actions to those whose own rights have been violated "would close the courthouse doors to a legion of long-recognized plaintiffs." Opening Br. at 47–48 (citing *Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023) (collecting cases); *June Med. Servs. v. Russo*, 591 U.S. 299, 318 (2020); *Craig v. Boren*, 429 U.S. 190, 195 (1976); *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 171–72 (2023); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952–53 (7th Cir. 2019) (collecting cases)). These cases, however, do nothing to undermine our construction of the statute. They simply involve exceptions to the general rule against third-party standing.

The general rule is that a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. In certain circumstances, however, the law permits a plaintiff "standing to assert the rights of another," such as where "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).

None of these exceptions apply to the present case. Indeed, apart from DRSC's associational standing argument, plaintiffs have not attempted to explain how they fall within one of the exceptions. They have not, for example, asserted a close relationship with the youth detained by DJJ or a hindrance that prevents the juveniles from bringing this action themselves. Accordingly, plaintiffs cannot assert the legal rights of youth detained

by DJJ in bringing their § 1983 claims. And because plaintiffs' own federal rights have not been violated, their § 1983 claims would fail even if we agreed that they had Article III standing to bring them.

IV.

No matter how we approach the question, we reach the same conclusion: plaintiffs are not the proper parties to bring this action. Their cause may be a worthy one, and there may indeed be issues with the conditions in DJJ's facilities. But there is an appropriate way to seek judicial relief, and that is to get some actual people, name them, represent them, and indicate how they have been harmed in a concrete way. The federal judicial power "exists only to redress or otherwise to protect against injury to *the complaining party*." *Warth*, 422 U.S. at 499 (emphasis added). We cannot prevent injury to the juveniles in DJJ's custody if none of them are properly before us.

*AFFIRMED*

WYNN, Circuit Judge, dissenting:

Does an organization required by federal statute to "protect and advocate the rights of [individuals with mental illness in South Carolina] through activities to ensure the enforcement of the Constitution and Federal . . . statutes," 42 U.S.C. § 10801(b)(2)(A), have standing to bring claims against the South Carolina Department of Juvenile Justice ("the Department") for allegedly violating the federal constitutional and statutory rights of individuals with mental illness in South Carolina?

The majority says no. But in my view, the answer is yes. I therefore respectfully dissent.[1]

I.

Disability Rights South Carolina ("DRSC") serves as South Carolina's Protection and Advocacy System and Client Assistance Program, as defined by the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801–10851. *See* S.C. Code §§ 43-33-310–400. Congress enacted the federal statute in 1986 "to ensure that the rights of individuals with mental illness are protected[.]" 42 U.S.C. § 10801(b)(1). Congress noted that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." *Id.* § 10801(a)(4). Accordingly, Congress granted protection and advocacy systems like DRSC

[1] This dissent does not address whether *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), requires organizational plaintiffs to identify their injured members by name to establish associational standing or whether DRSC's associational standing is rendered moot by the release from custody of all the constituents it identified in its Amended Complaint.

"the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State[.]" *Id.* § 10805(a)(1).

Congress did not merely permit such organizations to engage in advocacy; it affirmatively conditioned federal funding on the State's designation of a protection-and-advocacy system empowered to pursue legal remedies for this population. *See* 42 U.S.C. §§ 10803, 10805(a)(1)(B). Where Congress creates substantive federal rights and specifies a particular entity to enforce them, courts should hesitate before imposing additional standing barriers absent a clear constitutional command.

Despite this statutory mandate, the majority concludes that DRSC lacks Article III standing to sue to protect the rights of mentally ill youth incarcerated in Department facilities because its constituents lack the requisite indicia of membership under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 344 (1977).[2] I disagree.

---

[2] In Part II.B., the majority opinion concludes that DRSC—and the other organizational plaintiffs—failed to adequately plead injury, traceability, or both as required to establish organizational standing. It is well settled that plaintiffs must have Article III standing for federal courts to have jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Curiously, in Part III, the opinion goes on to explain why, "[e]ven if [it] were to conclude otherwise," plaintiffs cannot raise a claim under § 1983. Maj. Op. at 16. That is dicta. The question of "whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action" is not jurisdictional. *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (citation omitted). And where jurisdiction is lacking—as the majority concludes to be the case here—the "court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868). Rather, "*the only function* remaining to the court is that of announcing the fact and dismissing the cause." *Id.* (emphasis added).

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 22 of 27

II.

It is axiomatic that Article III of the Constitution limits federal courts' jurisdiction to actual cases or controversies. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). "One element of the case-or-controversy requirement" obligates plaintiffs to "establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To establish standing, a plaintiff typically must demonstrate that he has suffered a "*personal injury*." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

However, the Supreme Court has recognized that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). In *Hunt*, the Supreme Court formulated *Warth*'s requirements for associational standing into a three-part test:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343.[3]

In *Hunt*, the Washington State Apple Advertising Commission ("the Commission") challenged the constitutionality of a North Carolina statute that created labeling requirements for closed containers of apples sold or shipped into the state. *Id.* at 336. The North Carolina officials defending the statute argued that the Commission lacked

[3] The Department only challenges, and the majority opinion only addresses, whether DRSC established the first prong of the test for associational standing. *See* Response Br. at 11–12; Majority Op. at 7–11. This dissent similarly only reaches that question.

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 23 of 27

associational standing because it was "not a traditional voluntary membership organization" and thus had "no members whose claims it might raise" to confer standing on itself. *Id.* at 342.

Rejecting this argument, the Supreme Court reasoned that "for all practical purposes, [the Commission] performs the functions of a traditional trade association representing the Washington apple industry" and its constituents "possess all of the indicia of membership in an organization." *Id.* at 344. Specifically, the Court noted that the Commission's

> purpose is the protection and promotion of the Washington apple industry; and, in the pursuit of that end, it has engaged in advertising, market research and analysis, public education campaigns, and scientific research. It thus serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.

*Id.*

Nothing in *Hunt* suggests that its discussion of governance structure, financing, or selection of leadership was intended to establish a rigid constitutional checklist. Rather the Court emphasized a functional inquiry—whether, "for all practical purposes," the organization operates as a representative of the affected group. *Id*.

And nothing in Article III requires that representational accountability arise through private elections or voluntary dues where Congress has instead imposed statutory accountability mechanisms as a condition of federal funding.

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 24 of 27

III.

A.

Under *Hunt*, DRSC's constituents have the requisite indicia of membership to establish associational standing. As the district court found, the relationship between DRSC—as a protection and advocacy system—and its constituents is materially identical to the relationship between the Commission in *Hunt* and its constituents. DRSC was created, by statute, to serve the interests of a "specialized segment" of the community: individuals who are mentally ill in South Carolina. *Hunt*, 432 U.S. at 344. Those individuals are "the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Id.*

DRSC's statutory mandate specifically includes advocating and taking legal action on behalf of its constituents—binding its mission and authority to that population by federal law, not by private choice. That statutory accountability is at least as robust as the financial dependency emphasized in *Hunt*.

DRSC's constituents also govern the organization to a meaningful degree. While the *Hunt* Commission's board was comprised exclusively of its constituents, DRSC's governing board is required by regulation to include "significant representation of individuals with mental illness who are, or have been eligible for services, or have received or are receiving mental health services[.]" 42 C.F.R. § 51.22(b)(2). Moreover, DRSC's activities must be guided by an advisory council chaired by and comprised primarily "of individuals who have received or are receiving mental health services or who are family members of such individuals[.]" 42 U.S.C. § 10805(a)(6)(B). And DRSC's constituents

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 25 of 27

further direct the organization through mandatory grievance procedures designed "to assure that individuals with mental illness have full access to [DRSC's services]" and "to assure that [DRSC] is operating in compliance with [the relevant statutes]." 42 U.S.C. § 10805(a)(9).

Collectively, these circumstances reveal sufficient indicia of membership and establish that "[i]n a very real sense . . . [DRSC] represents the State's [individuals with mental illness] and provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345.

B.

The arguments to the contrary in the majority opinion are unpersuasive.

The majority concludes that DRSC's constituents "lack any meaningful say over its operations." Maj. Op. at 10. But that conclusion cannot be reconciled with the statutory and regulatory requirements mandating constituent representation on DRSC's governing board and advisory council, nor with the existence of mandatory grievance procedures designed to ensure DRSC is accountable to its constituents. *See* 42 U.S.C. §§ 10805(a)(6)(B), 10805(a)(9); 42 C.F.R. § 51.22(b)(2). At the motion-to-dismiss stage, DRSC's allegations that it complies with these requirements must be accepted as true. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The majority also emphasize that mentally ill individuals "have not chosen to join" DRSC. Maj. Op. at 10. But voluntariness is not a constitutional prerequisite for associational standing. The apple growers in *Hunt* were subject to mandatory assessments

0:22-cv-01338-JDA-PJG Date Filed 01/29/26 Entry Number 187 Page 26 of 27

and automatic inclusion. Their participation was no more voluntary than that of DRSC's constituents—yet the Supreme Court found standing nonetheless.

Additionally, the majority expresses concern that organizations "roam the country in search of governmental wrongdoing" and are ultimately nothing more than "concerned bystanders" seeking to use the judiciary as "a vehicle for the vindication of the[ir] value interests." Maj. Op at 7 (first quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982); and then quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 687 (1973)). That concern has no application here.

DRSC is a federally authorized and highly regulated organization with a statutory obligation to protect the rights of its mentally ill constituents who play a meaningful role in guiding its policies and operations. Its authority to litigate is not self-assigned but conferred by Congress. In other words, its mission, like the *Hunt* Commission before it, is tightly circumscribed and narrowly focused on bringing justice to the specific constituents it is commanded to serve in a particular state.

Lastly, my colleagues' attempt to limit the consequences of today's holding cannot be squared with the statutory text. The statute says nothing about "membership." Instead, Congress authorized protection and advocacy systems to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness[.]" 42 U.S.C. § 10805(a)(1)(B). When Congress speaks in such terms, courts are not free to add conditions it did not impose. The majority's contrary approach elevates an unstated requirement over the text Congress chose.

As in *Hunt*, therefore, "[u]nder the circumstances presented here, it would exalt form over substance" to conclude that DRSC's constituents lack the requisite indicia of membership to satisfy *Hunt*'s standard. 432 U.S. at 345.

IV.

When Congress creates substantive federal rights and expressly authorizes a designated entity to pursue legal remedies to enforce them, courts should be hesitant to impose extra-textual standing barriers absent a clear constitutional command. Here, Congress did not merely permit advocacy—it conditioned federal funding on the State's designation of a protection-and-advocacy system empowered to litigate on behalf of mentally ill individuals. In doing so, Congress created an enforcement mechanism to protect a uniquely vulnerable population, one often unable as a practical matter to vindicate its own rights through individual litigation. Today, the majority disables that enforcement mechanism. Article III does not compel that result, and *Hunt* does not require it.

Because DRSC satisfies the functional "indicia of membership" standard articulated in *Hunt*—particularly in light of the statutory structure and governmental involvement that define protection-and-advocacy systems—I must, with great respect, dissent.